DOUGLAS A. WAIN
ELISA WAIN
P.O. Box 7473
Westlake Village, CA 91359
Telephone: (859) 494-3677
Email: douglaswain@gmail.com
Plaintiffs in Pro Per

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| **In re**<br><br>**Douglas Alan Wain, Elisa Wain,**<br><br>**Debtors,**<br>________________<br><br>**Douglas Alan Wain and Elisa Wain**<br><br>**Plaintiffs,**<br>**vs.**<br><br>**Central Bank & Trust Co.**<br><br>**Defendant.** | **Case No. 1:24-bk-11814-MB**<br><br>**Adv. Proc. No. 1:25-ap-01026-MB**<br><br>**Chapter 13**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO QUASH DEPOSITION OF AN APEX EXECUTIVE (DOC. 76); REQUEST FOR ORDER DIRECTING DEPOSITION ON A DATE CERTAIN**<br><br>**Hon. Martin R. Barash**<br><br><br>**Hearing on Doc. 76 (Doc. 77):**<br>**September 24, 2026, 2:30 p.m.**<br>**Courtroom 303**<br>**21041 Burbank Blvd.**<br>**Woodland Hills, CA 91367** |

**TABLE OF CONTENTS**

I. INTRODUCTION 3
II. FACTUAL AND PROCEDURAL BACKGROUND 3
A. The notice, and CBT's written refusals. 4

B. Plaintiffs' conduct in response. 4

III. THE MOTION IS PROCEDURALLY IMPROPER 5

A. Rule 45 does not apply: there is no subpoena. 5

B. Treated as a Rule 26(c) motion, it fails its threshold requirements. 5

C. The Motion's own papers reflect the haste of its filing. 6

IV. THE APEX SHOWING FAILS ON THE MERITS 7

A. CBT offers no evidence from Mr. Deaton — and the burden is CBT's. 7

B. The record shows unique, personal knowledge — and refutes the "not directly involved" characterization. 9

C. Every less intrusive avenue CBT identifies has been used — and each came up empty on the central question. 15

D. CBT's cited authorities support Plaintiffs. 18

E. The remaining pages of the Motion are makeweight. 19

V. CBT'S REQUEST FOR FEES SHOULD BE DENIED 19

VI. RELIEF REQUESTED 19

VII. CONCLUSION 20

## TABLE OF AUTHORITIES

**Cases**

Affinity Labs of Texas v. Apple, Inc., 2011 WL 1753982 (N.D. Cal. May 9, 2011) 18

Apple Inc. v. Samsung Elecs. Co., 282 F.R.D. 259 (N.D. Cal. 2012) 7

BAE Systems San Diego Ship Repair Inc. v. United States, 670 F. Supp. 3d 1064 (S.D. Cal. 2023) 8

Blankenship v. Hearst Corp., 519 F.2d 418 (9th Cir. 1975) 7

Estate of Levingston v. County of Kern, 320 F.R.D. 520 (E.D. Cal. 2017) 7

Hunt v. Cont'l Cas. Co., No. 13-cv-05966-HSG (N.D. Cal. Apr. 3, 2015) 18

In re Uber Techs., Inc., Passenger Sexual Assault Litig., No. 3:23-md-03084-CRB, 2025 WL 896412 (N.D. Cal. Mar. 24, 2025) 7

Liberty Mutual Ins. Co. v. Superior Court, 10 Cal. App. 4th 1282 (1992) 18

Stratford v. Umpqua Bank, 2 Wash. 3d 112, 534 P.3d 1195 (2023) 18

United States v. Flewitt, 874 F.2d 669 (9th Cir. 1989) 18

**Rules**

Fed. R. Civ. P. 26(c) 3, 5, 7, 19

Fed. R. Civ. P. 30(b)(1) 3, 5
Fed. R. Civ. P. 37(a)(5) 19
Fed. R. Civ. P. 45 3, 5

## I. INTRODUCTION

Defendant Central Bank & Trust Co. ("CBT") moves under Federal Rule of Civil Procedure 45(d)(3) to "quash" a subpoena that does not exist. Luther Deaton, Jr. is the Chairman, President, and Chief Executive Officer of the Defendant. He was noticed for deposition as an officer of a party under Rule 30(b)(1) on July 21, 2026 — thirty-seven days' notice — and no subpoena was ever required or issued. Rule 45 therefore has no application. Treated charitably as a motion for a protective order under Rule 26(c), the Motion fails on its own terms: it is supported by no declaration from Mr. Deaton himself; it rests on two declarations of a subordinate — one asserting in a single conclusory sentence that Mr. Deaton "was not directly involved," the other made "upon information and belief" and citing three exhibits, including the "calculations" of CBT's Proof of Claim, none of which is attached; it contains no certification of any attempt to meet and confer; and it asks this Court to apply the apex doctrine while the record establishes precisely the two things the doctrine requires the deposing party to show: Mr. Deaton's unique personal knowledge, and Plaintiffs' exhaustion of every less intrusive avenue CBT itself identifies — including the deposition of the witness CBT's own counsel called the "best source" on these accounts, who left the bank eight months before the Proof of Claim was filed.

Plaintiffs took the noticed August 27, 2026 session off calendar the day the Motion was filed, in deference to its pendency (Exs. A, B), and ask the Court to resolve the question on the merits at the September 24, 2026 hearing the Court has set (Doc. 77): to deny the Motion and order that Mr. Deaton's remote deposition proceed on a date certain.

## II. FACTUAL AND PROCEDURAL BACKGROUND

**A. The notice, and CBT's written refusals.**

Plaintiffs served the notice of Mr. Deaton's deposition on July 21, 2026, setting a remote deposition for August 27, 2026 at 9:00 a.m. Pacific — thirty-seven days' notice. (Ex. H, POS at p. 3.) CBT's counsel acknowledged Mr. Deaton's position in his declaration of August 18, 2026: "Luther Deaton, who the Plaintiff[s] seek to depose, is the chairman, president and CEO for Central Bank & Trust, and Central Bancshares, Inc." (Doc. 69, Ireland Decl. ¶ 10.) Between August 20 and August 21, 2026, CBT's counsel stated in writing, repeatedly, that Mr. Deaton "will not be appearing," while filing nothing. (Exs. D-E, F-G.) Plaintiffs responded in writing that the date was locked, citing the thirty-seven days' notice. Not until August 24, 2026 — three days before the deposition, and thirty-four days after the notice — did CBT file the present Motion. (Doc 76.)

**B. Plaintiffs' conduct in response.**

Upon receiving the Motion, Plaintiffs promptly notified CBT's counsel and the court reporter that the August 27 session would not convene in light of the pending Motion, expressly reserving all rights (Ex. B; Ex. A — the reporter's cancellation confirmation). Plaintiffs have likewise accommodated CBT's other witnesses: when counsel advised that Senior Vice President Becky Mullins had pressing family issues, Plaintiffs released her from the noticed dates and continued her deposition without prejudice to a later agreed date (Exs. C, F-G). Plaintiffs deposed the subordinate witnesses first — the account and compliance witnesses CBT identified, Ms. Craven on August 18 and Mr. Hall on August 21 — and convened the noticed Rule 30(b)(6) deposition of CBT's outside auditor, Crowe LLP, on August 24, at which no witness and no counsel for Crowe appeared (Ex. Z), Crowe having instead produced documents and declined to produce a witness (Ex. CC). That is the sequence the apex doctrine prescribes. On September 3, 2026, Plaintiffs filed their Motion to Compel Written Discovery (Doc. 80), which the Court has set for hearing with this Motion on September 24, 2026 (Doc. 83). Together with Plaintiffs' Motion for Orders Compelling

Depositions (Doc. 47), CBT's motion to quash the Wiseman deposition (Doc. 58), and Debtors' objection to CBT's Claim No. 1 (Case No. 1:24-bk-11814-MB, Doc. 38), all set for the same afternoon, the matters before the Court on September 24 concern one unanswered question — the calculation of CBT's claim — and are best heard together.

## III. THE MOTION IS PROCEDURALLY IMPROPER

### A. Rule 45 does not apply: there is no subpoena.

Rule 45(d)(3) authorizes a court to quash or modify a subpoena. No subpoena exists here. The Motion is even docketed as one to quash a "Subpena" (Doc 76, docket text), but a party's officer is deposed on notice alone under Rule 30(b)(1); no subpoena is required, and none was served. The Motion's companion invocation of Rule 45(f) — "consent" to this Court resolving a transfer from the "compliance district" — is likewise inapposite: transfer under Rule 45(f) concerns subpoena-related motions pending in the district where compliance is required, and there is no subpoena, no compliance district, and no motion pending anywhere else. The only procedural vehicle for the relief CBT seeks is a motion for protective order under Rule 26(c).

### B. Treated as a Rule 26(c) motion, it fails its threshold requirements.

Rule 26(c)(1) requires that a motion for protective order "include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." The Motion contains no certification. None could truthfully be made: at no time between the July 21 notice and the August 24 filing did CBT's counsel propose alternatives, request a conference, or seek relief — counsel simply announced, repeatedly in writing, that the witness "will not be appearing." The omission is of a piece with CBT's conduct of discovery generally: counsel met none of the deadlines set by rule or by Plaintiffs' letters — August 5, August 14, August 19, and August 28 — and, having advised Plaintiffs on August 21 that he would be out of the office from August 24 through September 1 and "not available," filed this

Motion and served CBT's verified supplemental responses on August 24, the first day of the stated absence. (See Plaintiffs' Motion to Compel Written Discovery, Doc. 80, §§ II.F–G & Ex. 12.) A party available to file a motion was available to confer about it. A protective order also requires "good cause" shown by the movant; as set out below, the Motion offers no evidence from the one person whose knowledge is at issue.

**C. The Motion's own papers reflect the haste of its filing.**

The Motion is captioned in the "Los Angeles Division"; this case proceeds in the San Fernando Valley Division. (So are the supplemental interrogatory responses served the same day. (Ex. N at 1.)) Its first page carries the footer of a different document — "Central Bank's Request for Judicial Notice Re Motion to Dismiss." The Motion attaches two declarations of Becky Mullins. The first (Doc 76 at 9–10) addresses Mr. Deaton in three sentences and carries, on each page, the footer of the unrelated Request for Judicial Notice. The second (Doc 76 at 12–13) is made "upon information and belief," leaves its date line blank ("Dated this ______"), misstates the judgment figure ("$358,412.712"), and cites Exhibits A, B, and C — the foreclosure complaint, the judgment, and "calculations" of the amount claimed — none of which is attached to the filed document. Plaintiffs' evidentiary objections to both declarations are filed concurrently. Exhibit C warrants particular note: the "calculations" of CBT's claim are the document Plaintiffs have sought since their July 5–6, 2026 written discovery; the document Plaintiffs told this Court in February has never been produced (Doc 30 at 52); and the document CBT's supplemental interrogatory responses, served the same day as this Motion, again did not provide, referring Plaintiffs instead to a 738-page production made in the 2019 Kentucky foreclosure action — records that predate the Proof of Claim by five years and cannot contain its calculation (Ex. N). The Motion was filed without a self-calendared hearing date, contrary to this Court's self-calendaring procedure; the Court set the hearing on its own the following day (Doc. 77), and CBT filed a notice of hearing two days after

that (Doc. 79). The Motion is of a piece with CBT's August filings generally: in the four weeks before it was filed, the Clerk issued CBT five notices of deficient or erroneous filings — for a motion filed in the wrong case under the wrong event code (Case No. 1:24-bk-11814-MB, Doc. 78), a motion docketed under the wrong event (Doc. 44), an incorrect PDF (Doc. 53), a declaration filed as a motion, without a caption, naming CBT's own counsel as "Counsel for Plaintiff" (Doc. 60), and incorrect ZoomGov information (Doc. 75).

## IV. THE APEX SHOWING FAILS ON THE MERITS

### A. CBT offers no evidence from Mr. Deaton — and the burden is CBT's.

A party resisting an officer's deposition under Rule 26(c) bears the burden of showing good cause. Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975). There is no absolute bar to deposing a high-ranking executive; the question is whether the executive has unique personal knowledge and whether less intrusive discovery has been exhausted. Apple Inc. v. Samsung Elecs. Co., 282 F.R.D. 259, 263 (N.D. Cal. 2012). "[W]hen a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition"; conversely, "when a high-ranking official is removed from the daily subjects of the litigation, [and] has no unique personal knowledge of the facts at issue, a deposition of the official is improper." Estate of Levingston v. County of Kern, 320 F.R.D. 520 (E.D. Cal. 2017) (protective order granted for a sheriff with no first-hand knowledge, where plaintiffs had made no effort to obtain the evidence from other sources — the opposite of this record). And the most recent decision in the district declines to treat unique knowledge and exhaustion as rigid legal requirements at all, finding Apple v. Samsung's "sliding scale of relevance and burden" — in which those factors "form only part of a more nuanced equation" — "more persuasive and consistent with Rule 26." In re Uber Techs., Inc., Passenger Sexual Assault Litig., No. 3:23-md-03084-CRB, 2025 WL 896412 (N.D. Cal. Mar. 24, 2025). Under either formulation the result here is the same: the deposition's relevance is

established by a decade of documented personal involvement, its burden is a single remote session — and Plaintiffs are prepared to conduct the examination within reasonable time limits set by the Court — while CBT's Motion offers no specific showing of burden beyond the generality that its executive is busy. Even the decisions that grant apex protection confirm where the line falls: in BAE Systems San Diego Ship Repair Inc. v. United States, 670 F. Supp. 3d 1064 (S.D. Cal. 2023), the court shielded a retired rear admiral because the individuals who had briefed him were the better source and were available to be deposed. Here the individual who briefed Mr. Deaton — the director of lending, Mr. Thornsberry — has never been offered, and the officer who prepared the claim "will not be appearing." Courts applying the apex framework expect the good-cause showing to come from the executive himself — a declaration that he lacks unique personal knowledge of the relevant facts. Mr. Deaton has signed nothing. The only support is the first declaration of a subordinate, Senior Vice President Becky Mullins, which asserts in a single conclusory sentence that Mr. Deaton "was not directly involved in the day-to-day events giving rise to Plaintiffs' claims," and in another that he "oversees broad strategic and organizational matters." (Doc 76 at 9–10, ¶¶ 4–5.) The declaration does not say how Ms. Mullins — who did not head Special Assets until May 2024 (Hall Tr. 22:23–23:3) — would know what the chief executive did or did not do from 2019 forward; it does not mention the Proof of Claim at all; and its one specific factual assertion, that Donna Craven was among the employees "responsible for the matters at issue" (id. ¶ 6), was contradicted three days earlier by Ms. Craven herself, who agreed under CBT's counsel's own questioning that she is "not involved with the collection of special assets or foreclosures at all." (Craven Tr. 141:8–10 (Ex. W).) Ms. Mullins's second declaration is made "upon information and belief," and her verification of CBT's supplemental interrogatory responses, executed the same day, is qualified the same way — "to the best of my present memory, knowledge and belief" (Ex. N) — so that of the three sworn statements CBT filed or served on August 24, the only one made on claimed personal knowledge is

the one that says nothing about the claim. A subordinate's belief about what the CEO does not know is not evidence of what the CEO knows — and, as shown below, neither is a leading question put by CBT's counsel to a retired employee who never reported to him.

**B. The record shows unique, personal knowledge — and refutes the "not directly involved" characterization.**

The Kentucky Department of Financial Institutions — the state regulator — transmits consumer complaints concerning Central Bank to Mr. Deaton personally, by name, and has for at least eight years: its transmittal letters of December 6, 2017, December 12, 2022, and September 2, 2025 are each addressed to Mr. Deaton by name — the 2022 letter to "Mr. Luther Deaton, President/CEO," the others to him at the bank and, in 2025, at his own email address. (Exs. T at 1, K, L.) The bank's entity-defining instruments are executed by Mr. Deaton's own hand: the Articles of Merger filed with the Kentucky Secretary of State bear his signature, "Luther Deaton, Jr., President & CEO." (Ex. M.) CBT's counsel has sworn that Mr. Deaton "is the chairman, president and CEO for Central Bank & Trust, and Central Bancshares, Inc." (Doc. 69, Ireland Decl. ¶ 10), and CBT's supplemental interrogatory responses, verified August 24, 2026, admit the same dual role as "a matter of public record" (Ex. N, Response No. 23) — while, in the same response, CBT "withholds a substantive response" to the request that it identify "any audit, risk, compliance, or litigation-oversight committee with responsibility over the matters at issue," pending "clarification of the relevance" of the bank's governance to a dispute over the bank's claim. (Id.) Mr. Hall has since identified one such committee under oath. (Hall Tr. 45:1–7, 46:5–8.) The bank's 2025 Annual Report shows Mr. Deaton chairing a governing board of six — a board he has described in his own words as one he "can call … any time day or night with any concern." (Ex. S.). The same declaration swore, six days before the Motion was filed, that "Plaintiff has not identified any documents relating to this action that were signed by Deaton or 'touched' by Deaton in any way," and that Plaintiffs

claim only that "his name apparently appears in public records as the apex executive." (Doc. 69, Ireland Decl. ¶ 10.) The exhibits to this Opposition — the regulator's transmittals addressed to him, the complaint email he personally routed, the response and the corporate instruments over his signature, and the annual reports he signs each year — are those documents. (Exs. K, L, M, P, R, T, AA.)

Mr. Deaton does not merely receive the regulator's complaint correspondence — he personally acts on it. On January 11, 2023 at 2:12 p.m., a KDFI examiner emailed Mr. Deaton directly at his own address concerning a pending consumer complaint; at 2:15 p.m., Mr. Deaton forwarded it from his iPhone to a bank employee; and at 2:18 p.m. — six minutes after the regulator's email arrived — he forwarded it from his iPhone to Donna Craven, the same employee CBT's Motion identifies as one of those "responsible for the matters at issue." (Ex. R; Doc 76 at 3.) And he personally answers the regulator: on December 12, 2017, six days after KDFI transmitted a customer complaint disputing liability on a home equity line of credit, Central Bank's response issued over Mr. Deaton's own signature as "Chairman/President/CEO" — a letter in which Mr. Deaton cites the Fayette Circuit Court case number, quotes the court's summary-judgment findings, distinguishes the judgment's procedural posture, itemizes the attached loan documents and pleadings, and notes the customer's Chapter 13 bankruptcy filing, by case number, as "temporarily staying enforcement of Central Bank's judgment." (Ex. T.) A home-equity dispute, Fayette Circuit litigation, a judgment, a Chapter 13 petition, and the automatic stay: that is the precise anatomy of this case, and the record shows CBT's chief executive personally commanding every element of it, at docket-number depth, over his own signature. The pattern reaches back a full decade: in January 2015, Central Bank's own response to a KDFI complaint reported that "Central Bank & Trust Co. President/CEO Luther Deaton, Jr. telephoned" the complaining customer personally to address his loss. (Ex. U.) And the pattern runs to the present: Central Bank's response to the regulator dated

September 10, 2025 reports that the complaining customer "discussed Central Bank's honor of check #2651 for $350 with Central Bank's President, Chairman and CEO Luther Deaton on August 27, 2025" — one year to the day before the deposition CBT now resists. (Ex. V.) An executive who personally fields a customer's dispute over a $350 check can answer questions about a $357,990.91 claim. Nor is this simply an executive who signs whatever crosses his desk: the bank's routine regulatory correspondence in the same KDFI institutional file — branch-opening and consolidation notices — issues under the signature of its Chief Financial Officer, Edward Barnes. (Ex. X.) By Central Bank's own practice, the routine goes to the CFO; the customer complaint goes to the chief executive, personally.

The Mullins declaration's assertion that Mr. Deaton "was not directly involved in the day-to-day events" cannot be reconciled with the record of how Mr. Deaton actually operates. He personally executes even one-page operational instruments: a one-page memorandum of understanding governing temporary ATM placement, which he signed on June 2, 2023, bears his signature as "Chairman, President, and CEO." (Ex. P.) His own public self-description, in the American Bankers Association's journal, is: "When we have a problem, I dive into it. I try to convince people this is the right thing to do. That's just exactly the way I am made" — and, of banking: "you have got to know your clientele." (Ex. Q.) And as the ABA's Directors Briefing profiled in 2023: in a bank of more than 500 employees, Mr. Deaton "still has lunch with every new hire," and on a two-year cycle personally meets "with every bank employee face-to-face in small groups or individually." (Ex. S.) An executive to whom the state regulator personally routes the bank's consumer-complaint traffic, whose hand executes its corporate instruments large and small, and who systematically meets every employee of the institution, is a percipient witness with personal knowledge — not a figurehead the doctrine shields.

The record also shows Mr. Deaton's knowledge of this dispute in particular. Central Bancshares' annual reports for every fiscal year from 2020 through 2025 — the life of this dispute from the foreclosure judgment through this bankruptcy — contain, in the notes to the audited consolidated financial statements, the identical representation: "Management does not believe that there now are such matters" — claims and legal actions — "that will have a material effect on the consolidated financial statements." Each report issues over a letter to shareholders signed by Mr. Deaton as Chairman, President & CEO, dated each year the same day as Crowe LLP's audit opinion. (Ex. AA.) A chief executive who has put his name to the report carrying that representation six years running, on the day the auditor signed off on it, has necessarily formed a view of what this dispute is worth and how it is accounted for. That is personal knowledge of the very claim at issue, and it is not obtainable from Ms. Craven, Mr. Hall, or Ms. Mullins, none of whom signs the bank's annual report. The point is sharpened by what CBT's outside auditor has now produced. In response to Plaintiffs' subpoena, Crowe LLP produced seventy-seven pages (Crowe 000001–000077): the audit-inquiry responses of CBT's outside counsel for every fiscal year from 2019 through 2025, and Crowe's own "Attorney Letter Evaluation" workpapers for each year-end audit. (Ex. CC; Wain Decl. ¶ 9A.) In every one of those years, the litigation reported to the auditor is this one. Beginning with the 2021 audit, Stoll Keenon Ogden's letters to Crowe state: "In none of these cases, except the Wain case, has a claim been asserted for money damages against the Client." (Ex. CC, Crowe 000014, 000038.) Crowe's 2019 workpaper tracks "Central Bank vs Douglas/Elise Wain" and records the auditor's follow-up with Ellen Sharp, then head of Special Assets (Crowe 000041); its February 2026 workpaper for the 2025 audit records "Wain vs Central: Unfavorable outcome does not seem likely" and "No cases except the Wain case has a claim been asserted for money damages against Central." (Crowe 000073.) The "no material effect" representation in each annual report was thus made, every year, with this litigation as the only money-damages claim on the auditor's list —

and the report went out over Mr. Deaton's signature the day the auditor signed. Equally telling is what the bank did not tell its auditor. Counsel's February 11, 2026 response lists three Wain matters — the Fair Credit Reporting Act action, the Jessamine Circuit action, and the Fayette foreclosure — and mentions Plaintiffs' Chapter 13 case only as a possible bar to Plaintiffs' standing; it says nothing of this adversary proceeding, of the Proof of Claim, or of the $66,884.60 the bank had by then received and not credited. (Ex. CC, Crowe 000035–000038.) The audit-inquiry process begins with the bank's own letter to its counsel identifying the matters to be reported (id., Crowe 000011, 000035); which matters were reported, and which were left out, was a decision of the bank's management — the same management whose representation letter to the auditor CBT will not produce. What Crowe did not produce are the management-representation letters CBT furnished for each audit, which Crowe's objections describe as "CBT-created or CBT-signed documents available from CBT" (Ex. Z, Crowe Ex. 2 at 4) and which CBT has refused to produce, asserting that its audited financial statements are "business records not relevant to this proceeding" (Ex. N, Response No. 18) and that its "management representation letters" are privileged "notwithstanding their provision to the auditor" (id., Response No. 20) — though a representation letter from a bank's management to its independent auditor is, on its face, neither a communication with counsel nor a document counsel prepared. (See Motion to Compel, Doc. 80, § II.E.3.) The auditor says the bank signed them; the bank will not produce them; and the officer who signs the bank's statements is the one CBT says may not be asked. Plaintiffs are entitled to ask the bank's chief executive, under oath, what the bank represented about this claim to the auditor who certified its financial statements.

The deposition record now corroborates the documents. Ms. Craven — the compliance officer to whom Mr. Deaton personally routed the regulator's complaint email within six minutes (Ex. R) — testified that she reports "to the board of directors," whose members she named beginning with Mr. Deaton (Craven Tr. 21:1–11 (Ex. W)); asked whether Mr. Deaton is involved in the

litigation between Central Bank and the Wains, she answered, "I don't know the answer" (id. 70:18–25) — which is the answer of a subordinate, and the reason the question must be put to him. She further testified that her professional interactions with Mr. Deaton occur on an "as-needed basis" she could not cap below forty in the past twelve months: more than ten per year, more than twenty and thirty "possible," forty "possible," and only fifty "not possible." (Craven Tr. 128:17–131:16 (Ex. W).) And asked whether anyone at Central Bank has sworn to the figures in the Proof of Claim, she answered "I don't know" — pointing, as she did throughout her examination on records questions, to Becky Mullins, the officer CBT likewise refuses to produce. (Id. 125:5–23; e.g., 71:4–74:21, 132:1–5.)

Mr. Hall's testimony supplies the rest. He identified the chain of command: he reported to Paul Thornsberry, the director of lending, who reported to no one "other than the president of the bank" — Luther Deaton, Jr. (Hall Tr. 39:25–40:10 (Ex. Y).) Mr. Hall himself never attended a board meeting and never spoke with a director about the Wain accounts; "the responsibility of reporting on delinquent loans would have fallen to Paul Thornsberry." (Id. 41:3–42:14.) The Wain accounts were discussed "every month" at the bank's monthly Watch Loan Committee — a body of twelve to fifteen bank executives and compliance, accounting, and loan-review personnel, established by written bank policy, whose minutes were kept by Ms. Mullins, Ms. Craven, and Ms. Sharp — and "senior members of the bank leadership" were kept informed of each collection action Mr. Hall took, from the motion for distribution to the debtor's examination. (Id. 43:18–48:8, 92:2–11.) Those minutes have never been produced; they are the subject of Plaintiffs' pending Motion to Compel. Two subordinate witnesses have now testified. Each described a reporting structure that runs upward — from special assets, to the director of lending, to the president — and neither sits at the top of it. The person who does is Mr. Deaton.

CBT will doubtless point to the final exchange of Mr. Hall's deposition, in which CBT's counsel asked, on a two-question direct examination, whether Mr. Deaton "would have no information firsthand about the Wains," and Mr. Hall answered "Correct." (Id. 94:20–95:9.) The answer proves less than the question assumes. Mr. Hall had testified minutes earlier that he never reported to Mr. Deaton, never attended a board meeting, and never spoke to a director about the Wain accounts (id. 41:3–42:14); his belief about what the chief executive knows is, like Ms. Mullins's, a subordinate's assumption about a superior — and counsel's leading question is not a declaration from Mr. Deaton. The Court can gauge the weight of such answers from what the same technique produced three days earlier: CBT's counsel led Ms. Craven to agree that she "wouldn't talk about [the Wains] at all for the last four years" (Craven Tr. 141:15–18 (Ex. W)) — and Mr. Hall then testified that Ms. Craven "was always there" at the monthly Watch Loan Committee at which the Wain accounts "were discussed every month." (Hall Tr. 44:17–18, 47:1–8.) More fundamentally, Mr. Hall's last day at Central Bank was April 30, 2024. (Id. 16:8–10.) The Proof of Claim was filed December 20, 2024; Mr. Hall was not at the bank, was not consulted on it, and cannot speak to it (id. 22:2–10); and he could only "assume" that Ms. Mullins took over the Wain account after him (id. 23:21–25). The document at the center of this proceeding was prepared and filed by a bank Mr. Hall had already left, under a chief executive who was there before, during, and after. The apex doctrine asks whether the executive holds knowledge that cannot be obtained from lower-ranking witnesses. CBT's own "best source" (id. 94:22–25) left before the Proof of Claim existed; the successor who prepared it "will not be appearing"; and the director of lending to whom both reported has never been offered. What remains is the president to whom the director of lending reports.

**C. Every less intrusive avenue CBT identifies has been used — and each came up empty on the central question.**

The Motion argues Plaintiffs should first use "document production; interrogatories; depositions of employees with direct involvement, including Steve Hall and Donna Craven; and other less burdensome discovery methods." (Doc 76 at 3.) Plaintiffs have used every one. Plaintiffs deposed Ms. Craven on August 18, 2026 and Mr. Hall on August 21, 2026, and appeared on August 24, 2026 for the noticed Rule 30(b)(6) deposition of CBT's outside auditor, Crowe LLP — which, having stated in writing that "We will not be producing the witness," sent neither a witness nor counsel, and filed no motion to quash or modify (Ex. Z); Crowe produced seventy-seven pages of documents in lieu of a witness (Ex. CC). The Hall deposition proved the exhaustion point a second time: the witness CBT's counsel called "the best source of information about accounts like the Wains'" (Hall Tr. 94:22–25 (Ex. Y)) retired on April 30, 2024, eight months before the Proof of Claim was filed; was not consulted on it; and testified that a deficiency judgment was never sought or discussed because the bank "already had a judgment for the full amount owed on the account." (Id. 16:8–10, 22:2–10, 31:1–3, 33:14–24, 34:5–8.) The Craven deposition proved the exhaustion point in CBT's own voice: Mr. Wiseman closed the examination by establishing that the witness CBT offered is "not involved with the collection of special assets or foreclosures at all" and knows "almost nothing about Mr. and Mrs. Wain and their distressed loan" (Craven Tr. 141:5–142:1 (Ex. W)) — while her answer to virtually every records question, given more than twenty times, was that the person who would know is Becky Mullins, whom CBT has announced "will not be appearing for deposition in this matter." (E.g., id. 71:4–74:21, 125:5–23, 132:1–5.) Plaintiffs served interrogatories and document demands on July 5–6, 2026 directed to the mathematical basis of the Proof of Claim; CBT's responses objected and gestured at the 2019 Kentucky production; and CBT's own correspondence confirms the character of that production — counsel wrote on August 14, 2026 that the documents "were provided to you in your Kentucky litigation," calling them the "complete responsive documents."

The written-discovery record on the central question now reads as follows. On August 13, 2026, CBT's counsel wrote that the Distribution Order's impact on CBT's claim "is to reduce the amount owed by the Plaintiffs on CBT's judgment … by $66,884.60," and admitted: "Due to a clerical error, the Proof of Claim filed in this case stated the amount as $357,990.91. CBT will amend its claim to correct the difference." (Ex. O at 2–3.) No amended claim has been filed: the Chapter 13 Trustee's accounting report as of August 31, 2026 — eighteen days after counsel's letter — still carries CBT's Claim No. 1 at $357,990.91. (Case No. 1:24-bk-11814-MB, Doc. 81 (Ex. BB).) Eleven days later, on August 24, 2026 — the same day as this Motion — CBT served supplemental interrogatory responses, verified under oath, stating that CBT "is reviewing any impact of the Distribution Order on the Proof of Claim and will supplement if necessary." (Ex. N, Response No. 5.) Twenty months after filing its claim, the corporation's sworn position is less definite than its counsel's letter of the week before. Two further responses served that day show how little the "less intrusive" avenues were ever going to yield. Interrogatory No. 16 asked CBT to identify each present or former officer, employee, or director with knowledge of the Proof of Claim; the verified answer is that CBT "will identify those persons with knowledge of the specific disputed facts at issue in this adversary proceeding, namely the calculation of the Proof of Claim" — a promise, not an identification, made twenty months after the claim was filed and seven weeks after the interrogatory was served. (Ex. N, Response No. 16.) Interrogatory No. 14 asked CBT to identify the officer responsible for "retaining, supervising, or directing outside counsel" in the collection and litigation activities against Plaintiffs; CBT objected "in its entirety" and answered nothing. (Id., Response No. 14.) A party that will not say who at the bank has knowledge of the claim, and will not say who at the bank directs the litigation over it, cannot be heard to say that its chief executive is not that person. The identified subordinates did not resolve the question; the written discovery did not resolve the question; the records custodian who by CBT's own supplemental response "worked

on the Proof of Claim" (Ex. N, Response No. 3) submitted a declaration citing a calculation exhibit that is not attached. Exhaustion is not a hypothetical future step. It is complete, and it points in one direction: up. (See Plaintiffs' Motion to Compel Written Discovery, Doc. 80, §§ II.B–E, III.B–C.)

**D. CBT's cited authorities support Plaintiffs.**

CBT relies principally on Affinity Labs of Texas v. Apple, Inc., 2011 WL 1753982, at *16 (N.D. Cal. May 9, 2011), where the deposing party failed to show that the executive had "unique and personal knowledge of facts relevant to this litigation, which cannot be obtained through less intrusive discovery, for example, interrogatories, requests for admissions, or other depositions." The contrast decides this Motion: in Affinity Labs the "sole asserted basis" for the deposition was the executive's public statements; here the regulator's letters, his own signed correspondence, the corporate instruments, counsel's sworn description of the dual role, and the exhausted discovery described above supply exactly the showing Affinity Labs found missing. Courts in the same district have distinguished Affinity Labs on facts like these, holding that a subordinate's "declaration is not a substitute for Plaintiff's entitlement under the Federal Rules to ask questions in person and obtain answers under oath." Hunt v. Cont'l Cas. Co., No. 13-cv-05966-HSG (N.D. Cal. Apr. 3, 2015) (distinguishing Affinity Labs). Liberty Mutual Ins. Co. v. Superior Court, 10 Cal. App. 4th 1282 (1992), applies California state discovery procedure and does not govern this federal proceeding; its formulation has since been rejected outright by at least one state supreme court, see Stratford v. Umpqua Bank, 2 Wash. 3d 112, 534 P.3d 1195 (2023) (en banc) (disagreeing with Liberty Mutual and declining to adopt the apex doctrine); and in any event Plaintiffs satisfy its two-part test for the same reasons. And United States v. Flewitt, 874 F.2d 669 (9th Cir. 1989) — CBT's only appellate authority, a criminal case in which the Ninth Circuit reversed a trial court for refusing to let defendants represent themselves — imposes good-faith obligations that Plaintiffs have exhibited: they released Ms. Mullins from her noticed dates on a family accommodation, continued her

deposition without prejudice, deposed the subordinate witnesses first, and stood down the August 27 session the day CBT's Motion was filed.

**E. The remaining pages of the Motion are makeweight.**

The Motion closes by quoting a decade-old, unpublished Kentucky Court of Appeals order from unrelated litigation concerning a stricken appellate brief. That order has no connection to this proceeding, to CBT, to the Proof of Claim, or to any Rule 26 factor. Its inclusion serves no purpose but atmosphere, and the Court should disregard it. What the Motion nowhere contains is any authority or evidence addressed to the subject Mr. Deaton would actually be examined on: the calculation of a claim whose stated amount CBT's own counsel has admitted in writing is erroneous (Ex. O), which CBT promised to amend and has not, and which no CBT witness, declaration, or document has ever computed on any record.

## V. CBT'S REQUEST FOR FEES SHOULD BE DENIED

CBT asks for "an award of the fees incurred in opposing this discovery." A movant that files under an inapplicable rule, without the required conference or certification, without evidence from the affected witness, and with its central exhibit missing, is not the party to whom expenses run. If expenses are addressed at all, Rule 26(c)(3) and Rule 37(a)(5) point the other way; Plaintiffs reserve their request.

## VI. RELIEF REQUESTED

Plaintiffs respectfully request that the Court: (1) deny the Motion in its entirety; (2) to the extent the Motion is treated as one for a protective order under Rule 26(c), deny it for failure of the required certification, showing, and evidence; (3) order that the deposition of Luther Deaton, Jr. proceed by remote videoconference on a date certain within fourteen (14) days of the Court's order,

or on such other date as the Court sets; (4) deny CBT's request for fees; and (5) grant such other relief as the Court deems just.

**VII. CONCLUSION**

CBT noticed this fight for thirty-four days, filed on the thirty-fifth under the wrong rule, and supported it with a declaration that cites a calculation no one has ever seen. The man it seeks to shield personally receives the regulator's complaint letters, personally routes them from his own phone to the employees CBT calls "responsible," personally answers the regulator over his own signature about a home-equity dispute and a customer's Chapter 13 stay, personally telephones complaining customers, personally signs the bank's instruments, personally lunches with every new hire, and describes himself as one who "dive[s] into" problems. CBT's own "best source" retired before the Proof of Claim existed; the officer who succeeded him "will not be appearing"; the director of lending has never been offered. The apex doctrine protects executives from harassment; it does not protect the last witness standing between a creditor and its own arithmetic. The Motion should be denied, and Mr. Deaton's deposition should be ordered on a date certain.

DATED: September 9, 2026

Douglas A. Wain

Elisa Wain
Plaintiffs, Pro Per