institution-wide lending practices unrelated to the Wain Account and appears calculated to explore matters outside the scope of this proceeding. Indeed, this Interrogatory concerns the reports of non-party.

**INTERROGATORY NO. 23:**

*Describe the corporate governance structure of Central Bancshares, Inc. and Central Bank & Trust Co. during the relevant period, including the concurrent service of Luther Deaton, Jr. as Chairman, President, and Chief Executive Officer of both entities, and identify any audit, risk, compliance, or litigation-oversight committee with responsibility over the matters at issue.*

**RESPONSE:**

Subject to and without waiving the General Objections, Central Bank objects to this Interrogatory on the grounds that it is not relevant to any claim or defense pleaded in this adversary proceeding absent an alter-ego, veil-piercing, or similar theory connecting Central Bank's corporate governance structure to Plaintiffs' claims, and is not proportional to the needs of the case. Subject to and without waiving this objection, CBT states that Luther Deaton, Jr. has served as Chairman, President, and Chief Executive Officer of both Central Bank & Trust Co. and Central Bancshares, Inc., a matter of public record. Central Bank otherwise withholds a substantive response pending clarification of the relevance of this Interrogatory to the pleaded causes of action.

Haight

**INTERROGATORY NO. 24:**

*State whether CBT issued any litigation hold, document-preservation directive, or similar instruction in connection with Plaintiffs, the Foreclosure Proceeding, the Plaintiffs' bankruptcy case, or this adversary proceeding, and if so, state the date of issuance, the persons to whom it was directed, and its scope.*

**RESPONSE:**

Subject to and without waiving the General Objections, Central Bank objects that the content and scope of any litigation hold reflect the mental impressions and legal analysis of counsel and are protected by the attorney work-product doctrine. Subject to and without waiving this objection, Central Bank states that it undertook reasonable steps to preserve relevant documents and information upon reasonably anticipating litigation, and no spoliation of evidence has occurred.

**INTERROGATORY NO. 25:**

*Identify all facts and documents on which CBT relies in support of each affirmative defense it has asserted or intends to assert in response to Plaintiffs' thirteen causes of action in this adversary proceeding, including without limitation any defense based on the doctrines of res judicata, collateral estoppel, or the Rooker-Feldman doctrine.*

**RESPONSE:**

Haight

Subject to and without waiving the General Objections, CBT objects that this is a contention interrogatory as to which Central Bank is not obligated to provide a final and complete response until discovery is substantially complete, pursuant to Rule 33(a)(2). Central Bank further objects that the *Rooker-Feldman doctrine* is jurisdictional in nature rather than an affirmative defense requiring identification of supporting "facts." Subject to and without waiving these objections, CBT refers Plaintiffs to its Answer and states that it will supplement this response in accordance with Rule 26(e) as discovery progresses and its contentions are finalized.

DATED: _________ HAIGHT BROWN & BONESTEEL LLP

By: */s/*

William E. Ireland
Attorneys for Defendant
CENTRAL BANK & TRUST CO.

Haight

**VERIFICATION**

The foregoing answers to Interrogatories are true and correct to the best of my present memory, knowledge and belief.

Becky Mullins
*Becky Mullins*
for and on behalf of Central Bank & Trust Co.

COMMONWEALTH OF KENTUCKY

COUNTY OF FAYETTE

Subscribed, sworn to, and acknowledged before me Becky Mullins, for and on behalf of Central Bank & Trust Co., on this the 24th day of August, 2026.

My commission expires: 4·21·2029

RYLEYANNE C. VAUGHN
MY COMMISSION EXPIRES
NOTARY PUBLIC
COMM. KYNP24952
APRIL 21, 2029
COMMONWEALTH OF KENTUCKY

*Ryleyanne Vaughn*
NOTARY PUBLIC

# PROOF OF SERVICE

4924-0648-2633.1

Haight

# EXHIBIT O

Letter from William E. Ireland, August 13, 2026

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

Haight

William Ireland
*direct:* 213.542.8035
wireland@hbblaw.com

Haight Brown & Bonesteel LLP
555 South Flower Street
Forty-Fifth Floor
Los Angeles, California 90071
213.542.8000
213.542.8100 fax
www.hbblaw.com

August 13, 2026

**VIA E-MAIL AND U.S. MAIL**

Douglas A. Wain and Elisa Wain
P.O. Box 7473
Westlake Village, California 91359
Email: douglaswain@gmail.com

Re: Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB (Bankr. C.D. Cal. Response to August 10, 2026 Meet and Confer Letter

Dear Mr. Wain:

We write in response to your August 10, 2026 letter concerning Central Bank & Trust Co.'s ("CBT") responses to Plaintiffs' First Set of Interrogatories, Requests for Production, and Requests for Admission. CBT disagrees with the characterization of its discovery responses and objects to the assertions that its responses are deficient. Nevertheless, in the interest of cooperation and narrowing disputes, CBT provides the following response.

**1. Verification of Interrogatory Responses**

CBT does not agree that Plaintiffs have suffered any prejudice from the timing of a verification. To the extent a verification is required under Rule 33(b), CBT will provide a verification executed by an appropriate corporate representative within a reasonable time.

**2. Interrogatories Referencing Previously Produced Documents**

CBT objects to Plaintiffs' contention that its responses invoking Rule 33(d) are improper. The interrogatories at issue seek information reflected in transactional records, loan documents, foreclosure records, payment histories, and related business records previously produced to Plaintiffs or filed in connection with CBT's Proof of Claim.

Rule 33(d) expressly permits reliance on business records where the information may be ascertained from those records. Plaintiffs have had access to the same records as CBT and are equally capable of reviewing them. Many of the interrogatories seek detailed financial calculations and account histories spanning years of activity and are precisely the type of requests for which Rule 33(d) is appropriate.

Haight



That said, CBT will evaluate whether supplemental Bates references can reasonably be provided for certain responses without undertaking a disproportionate burden. For now, CBT states:

- CB0001 to CB0064 are statements for the subject account from 2012 to 2014
- CB0065 to CB0261 are statements for the subject account from 2015 to 2019
- CB0262 to CB0283 are the account application and agreement documents
- CB0284 to CB0331 are documents from a previous foreclosure case against Plaintiffs
- CB0332 to CB0337 are documents evidencing compliance with Fair Credit Reporting Act
- CB0338 to CB0725 are documents evidencing communications with Plaintiffs
- CB0726 to CB0738 are documents summarizing account activity

**3. Contention Interrogatories**

CBT disagrees that its responses to Interrogatory Nos. 5, 6, and 25 are improper. Interrogatories Nos. 5, 6, and 25 seek precisely the type of legal contentions that continue to depend on the Court's resolution of disputed legal issues. CBT's responses accurately reflect the current status of its investigation and analysis. Rule 26(e) expressly contemplates supplementation as additional information becomes available.

Plaintiffs' complaint regarding Interrogatory No. 5 is particularly unfounded. The effect, if any, of the March 7, 2024 Distribution Order remains the subject of disputed legal interpretations central to this litigation. To the extent Plaintiffs want a different answer to Interrogatory No. 5, the order's impact on CBT's claim, as stated in multiple filings in multiple courts, is to reduce the amount owed by the Plaintiffs on CBT's judgment. Specifically, amount owed was reduced by $66,884.60. To the extent Plaintiffs want a different answer to Interrogatory No. 6, there is amount still owed to CBT on the judgment by the Plaintiffs. That amount was $357,944.91 as of the filing of the Proof of Claim (and reflects the application of all garnishments and funds from the Master Commissioner). Due to a clerical error, the Proof of Claim filed in this case stated the amount as $357,9**90**.91. CBT will amend its claim to correct the difference.

Finally, Interrogatory 25 and RFP No. 22 improperly seeks to force CBT to marshal all evidence supporting its legal positions. The rules do not require a party, in response to a

document request, to identify every document that may support a future contention or defense. To the extent responsive, nonprivileged documents exist, CBT has produced or will produce documents consistent with its discovery obligations. Plaintiffs are not entitled to a premature trial roadmap or an advance evidentiary index.

**4. Interrogatory No. 6 and Requests for Admission Nos. 10 and 11**

CBT's responses fairly address the requests as phrased. Plaintiffs' requests are framed in a manner that assumes legal conclusions and characterizations with which CBT does not agree.

To the extent Plaintiffs seek admissions concerning the existence or nonexistence of a judicial deficiency judgment, CBT will review the responses and determine whether clarification is appropriate. CBT does not, however, concede Plaintiffs' legal theories regarding the effect of any foreclosure proceedings, sale proceeds, judgments, distributions, indebtedness, or claim amounts.

**5. Requests for Admission Characterized as "Denied as Phrased"**

CBT denies that its responses violate Rule 36. Several requests contain ambiguous wording, undefined terminology, contested assumptions, or compound propositions. Where necessary, CBT responded to the requests as framed.

CBT further rejects Plaintiffs' characterization that responses to Requests for Admission Nos. 4 and 5 are inconsistent. The requests employ distinct terminology and legal concepts. An admission concerning receipt of funds associated with a foreclosure sale does not necessarily constitute an admission of Plaintiffs' characterization of those funds as "surplus proceeds," nor does it concede Plaintiffs' legal interpretation of the transaction.

**6. Privilege Log**

CBT appropriately asserted privileges as applicable. Critically, however, CBT contends that the information and documents the Plaintiffs seek are non-responsive and irrelevant, so there is no need to create a privilege log at all. Plaintiffs simply are not entitled to conduct a fishing expedition into corporate activities because they wish to avoid the only claim filed in their Chapter 13 bankruptcy.

Without waiving any objections, CBT is evaluating whether a privilege log is warranted for any withheld materials and, if so, the appropriate scope of such a log.

**7. Financial Statements**

Haight



CBT disagrees with Plaintiffs' characterization of the responses concerning financial statements. The requests seek information involving entities beyond CBT itself and implicate relevance, proportionality, confidentiality, privacy, and third-party concerns.

Nothing in CBT's response should be construed as a waiver of those objections. CBT did not intend to suggest it would be producing anything that was not already available publicly. CBT will review the responses to determine whether clarification concerning the scope of any potential production is appropriate.

**8. Rule 34 Responses**

CBT's document responses comply with Rule 34. Plaintiffs have already received a substantial production of documents, including the documents supporting CBT's Proof of Claim and additional records responsive to multiple requests.

Rule 34 does not require a responding party to re-produce documents already in the requesting party's possession. Nor does it require CBT to organize its entire production according to Plaintiffs' preferred format. CBT objects to Plaintiffs' demand that it provide a request-by-request catalog of all previously produced documents to the extent such a demand exceeds the requirements of the Federal Rules.

CBT will continue to evaluate its responses and supplement as appropriate under Rule 26(e).

**9. Relevance Objections**

CBT stands by its relevance objections. Discovery must remain tied to the claims and defenses actually pleaded. Plaintiffs' requests regarding credit reporting, consumer reporting disputes, and other peripheral issues seek information that is outside the scope of the claims asserted or is disproportionate to the needs of this adversary proceeding. This Bankruptcy Court cannot adjudicate such claims, and so discovery cannot be compelled on them.

Likewise, CBT maintains its objections to requests concerning matters that extend beyond the issues framed by the pleadings and the Court's prior rulings.

**10. Service Issues**

CBT disagrees with Plaintiffs' assertions regarding service. Throughout this litigation the parties have regularly communicated and exchanged materials by email, and Plaintiffs have consistently received notice of filings and discovery responses by electronic means.

Haight



CBT further notes that Plaintiffs indisputably received the documents at issue and have demonstrated no prejudice. CBT reserves all rights regarding any contention that service was ineffective.

**Conclusion**

CBT believes its discovery responses are substantially compliant with the Federal Rules and that Plaintiffs' objections predominantly reflect disagreements with CBT's substantive positions rather than legitimate discovery deficiencies. CBT nevertheless remains willing to meet and confer in good faith regarding specific requests and potential supplementation where appropriate.

Nothing in this letter waives any objection, privilege, protection, or substantive position asserted by CBT in this action.

Sincerely,

William E. Ireland

William E. Ireland
Haight Brown & Bonesteel LLP
Counsel for Central Bank & Trust Co.

WI:JS

# EXHIBIT P

Memorandum of Understanding (Lexington Center Corporation/OVG – CBT), signed by Deaton June 2, 2023

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

## Memorandum of Understanding

This Memorandum of Understanding (the "Memorandum") is made and entered into as the 9th day of June, 2023 by and between OVG Facilities, LP. ("Licensor") as agent on behalf of Lexington Center Corporation ("the Owner") and Central Bank & Trust Co. ("Licensee").

Whereas, the Owner owns Rupp Arena and the convention center located in Lexington, KY ("Facilities") and has engaged Licensor to manage and operate the Facilities on the Owner's behalf; and

Whereas, Owner has entered into a Facility Right of Use Agreement with the University of Kentucky on February 18, 2018 that gives the University of Kentucky's Facility Naming Rights Partner the option of selling sponsorships to certain areas of the Facilities; and

Whereas, Licensee has executed a Sponsorship Agreement with University of Kentucky's Facility Naming Rights Partner in the Facilities that states Licensee has the exclusivity of providing Automatic Teller Machines ("ATMs") in Facilities;

Now, therefore, the parties agree to allow the use of non-branded temporary ATMs by contracted event Licensees ("Event Licensees") within the Event Licensees' contracted spaces. Licensor will offer fifty percent (50%) off Licensor's standard License Fee for Licensee's private events. This discount cannot be combined with any other discount offered to Licensee on space rental and cannot be transferred to another party.

The term of this Memorandum will run concurrently with the Facility Naming Rights sponsorship term.

OVG Facilities, L.P.
as Agent on behalf of Owner,

By: L. Alexander

Name: ~~Brian Sipe~~ Laura Alexander

Title: ~~General Manager~~ Asst. General Manager

Date: 6/9/23

Licensee:
Central Bank & Trust Co.

By: [signature]

Name: Luther Deaton

Title: Chairman, President, and CEO

Date: 6/2/2023

# EXHIBIT Q

ABA Banking Journal profile, “The Bluegrass Banker,” August 26, 2019

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

ABA BANKING JOURNAL
From the American Bankers Association
Search...
TOPICS NEWSBYTES PODCASTS MAGAZINE


# The Bluegrass Banker

August 26, 2019 Reading Time: 5 mins read

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking “Accept All Cookies”, you agree to the storing of cookies on your device. Privacy Policy and Cookies

Cookies Settings

Accept All Cookies



By Craig Colgan

That day in 2018 was a grim moment for a proud Kentucky community. Before a cluster of TV cameras, a determined and resolute group stood together, proponents of a tax to raise $13.5 million to fund several major school-safety measures. Their message was simple: We need to address this right now.

Two students at a nearby school district had been killed in a school shooting earlier in the year. Soon after, a police search of a student's bedroom after he threatened to shoot up his Lexington high school turned up 500 rounds of ammunition and a rifle. Several weeks later inside separate Lexington-area schools, one student was caught with a gun, and another student accidentally shot his own hand.

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. **Privacy Policy and Cookies**

approved the plan a few weeks later.

"There were some people who didn't like that I stood up," Deaton says. "When we have a problem, I dive into it. I try to convince people this is the right thing to do. That's just exactly the way I am made."

## Dream job

The banker with 41 years in the business—and just completing his first of two years as the American Bankers Association's treasurer—got his start a long way from the cameras and the corner office.

"My dream job was a lender," Deaton reflects. "I wanted to be the contact person to loan people money to watch them grow. And when they grew, our bank grew and I figured everything else will take care of itself."

Did it ever.

Deaton graduated from Louisiana State University's Graduate School of Banking and moved from that teller position in 1978 quickly to several managerial positions to a position there that no longer exists: VP for equine lending. In Kentucky, the horse business was so prominent that banks gave it its own department. "Today, it's just called commercial lending," Deaton says. The title changed, but the love of horse racing stuck for him.

Deaton grew up in a four-room house, with three sisters and no running water in Breathitt County. His parents were major influences on the man and businessman he would become.

"We had a little church in our community, and my dad and mom had nothing," he said. "I remember one time the church needed windows, and it couldn't get any. And, to this day, I do not know how it happened. But my dad furnished that church with windows. So from the beginning, I was always taught to give back."

By 1991, Deaton was promoted to EVP for the commercial and retail banking group, before the board made him president and COO in 1994, president and CEO in 1995, and finally adding the chairman

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. **Privacy Policy and Cookies**

near and dear to his heart, which have included University of Kentucky athletics, UK's Gatton School of Business, UK Hospital, a local community and technical college, a food pantry and an organization that works with children in crisis.

## 'He was built for this'

The success for Central Bank has been direct under Deaton's stewardship. In 1994, the bank's assets totaled $512 million. In 2018, that total was $2.6 billion. As the bank has grown to about 540 employees, so has its place not only as a commercial instigator of growth across the region but as a pretty good employer too. Central Bank was recently named a Best Place to Work in Kentucky.

Deaton is regularly listed among the *Lexington Herald-Leader*'s list of the most influential leaders in the Lexington area. Holding down the top spot often is John Calipari—coach of the powerhouse UK men's basketball team—who annually tweets happy birthday wishes to Deaton.

"He was built for this," says Ballard Cassady, president and CEO of the Kentucky Bankers Association. "There is no daylight between him as an individual and as a banker. He wants to truly help people. He cares about his community, and about his industry. Luther has a very strong moral compass. Banking is really the winner because we have somebody like him."

Deaton was talked about as a potential Democratic gubernatorial candidate several years ago. He has friends on both sides of the aisle, though, including the current U.S. Senate majority leader.

"My friend Luther Deaton is a one-man force for the Commonwealth of Kentucky," Sen. Mitch McConnell tells the *ABA Banking Journal*. "A man of integrity and respect, he's a banking leader both in our state and throughout the nation. With his great success, Luther has generously contributed back into our communities and his beloved University of Kentucky. His leadership at the Kentucky Chamber of Commerce has bolstered economic growth throughout our state, and his philanthropic support of hospitals and research institutions helps build a brighter future. Simply put, Luther makes Kentucky a better place to live and work."

Deaton says his friends in both parties are very important to him but that he regularly tells them all of

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. Privacy Policy and Cookies

about economic cycles.

"I don't know of another business around that does what banking does," Deaton said. "You are so in the heart of the community. You see people every day. You see them at church, you see them on the baseball field, the basketball court. You see them everywhere. In banking, you have got to know your clientele. I have never in my lifetime seen collateral repay a loan. But I've seen character repay many of them. It's all about character. I love what I do."

**Tags:** ABA leadership Community engagement Leadership

Share Tweet Pin

## Author



### Craig Colgan

Craig Colgan is digital editor of the ABA Banking Journal.

## Related Posts

### ABA backs Senate bill to bolster CDFI Fund

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. Privacy Policy and Cookies

The ABA Foundation launched the Rebuild Right: Safe Credit Recovery and Responsible Debt Solutions campaign, a new national initiative designed to empower consumers to rebuild credit responsibly and avoid harmful financial pitfalls.

## Bankers urge House lawmakers to take steps to combat fraud, scams

**COMMUNITY BANKING** MARCH 5, 2026

Warning that banks cannot fight scams alone, bankers told House lawmakers that federal agencies need to better coordinate their efforts to mitigate the problem and that social media providers and other technology providers also need to do their...

## House committee advances ABA-backed bill to overhaul bank regulation

**COMMUNITY BANKING** MARCH 4, 2026

The House Financial Services Committee advanced legislation to boost community banking by raising regulatory thresholds, revising agency supervisory practices, tailoring regulations further, encouraging de novo banks and strengthening community development financial institutions.

## OCC finalizes revised licensing requirements, eliminates fair housing data system

**COMMUNITY BANKING** MARCH 3, 2026

The OCC finalized a rule to revise licensing requirements for community banks and eliminated a system used to monitor national

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. Privacy Policy and Cookies

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. Privacy Policy and Cookies

ABA BANKING JOURNAL
From the American Bankers Association



This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking “Accept All Cookies”, you agree to the storing of cookies on your device. Privacy Policy and Cookies

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking “Accept All Cookies”, you agree to the storing of cookies on your device. Privacy Policy and Cookies

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking "Accept All Cookies", you agree to the storing of cookies on your device. **Privacy Policy and Cookies**

Contact ABA

**ABA Banking Journal**

About ABA Banking Journal

Media Kit

Advertising

Subscribe

American Bankers Association

© 2026 American Bankers Association. All rights reserved.

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. By clicking “Accept All Cookies”, you agree to the storing of cookies on your device. Privacy Policy and Cookies

# EXHIBIT R

KDFI–Deaton–Craven emails, January 11, 2023 (redacted)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

**Central Bank & Trust Co.**
300 West Vine Street, Lexington, KY 40507

**From:** Luther Deaton <LDEATON@centralbank.com>
**Sent:** Wednesday, January 11, 2023 2:18 PM
**To:** Donna Craven <DCRAVEN@centralbank.com>
**Subject:** Fwd: [EXTERNAL] FW: Complaint - [redacted] against Central Bank, Lexington

Sent from my iPhone

Begin forwarded message:

> **From:** Luther Deaton <LDEATON@centralbank.com>
> **Date:** January 11, 2023 at 2:15:52 PM EST
> **To:** Susan Simmons <SSimmons@centralbank.com>
> **Subject: Fwd: [EXTERNAL] FW: Complaint - [redacted] against Central Bank, Lexington**
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** "Meador, Tim (PPC)" <Tim.Meador@ky.gov>
>> **Date:** January 11, 2023 at 2:12:33 PM EST
>> **To:** Luther Deaton <LDEATON@centralbank.com>
>> **Subject: [EXTERNAL] FW: Complaint - [redacted] against Central Bank, Lexington**
>>
>> Mr. Deaton,
>> This is a follow-up on the complaint filed by [redacted] against Central Bank and forwarded to you on December 12, 2022 with a response date of December 21, 2022. We request a reply by January 17, 2023.
>> Thank you,
>> Tim Meador
>>
>> **Tim Meador** (he/him)
>> CERTIFIED FINANCIAL INSTITUTIONS EXAMINER
>> Public Protection Cabinet
>> 500 Mero Street, 2SW19
>> Frankfort, Kentucky 40601
>> (502) 573-3390 OFFICE

(502) 782-9009 DIRECT
(502) 224-6357 CELL

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, is private and confidential and contains information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments, and notify me by return e-mail. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

---

**From:** Meador, Tim (PPC)
**Sent:** Monday, December 12, 2022 9:29 AM
**To:** 'ldeaton@centralbank.com' <ldeaton@centralbank.com>
**Subject:** Complaint - [redacted] against Central Bank, Lexington

**Central Bank & Trust Company**
Mr. Luther Deaton, President/CEO
300 West Vine Street
Lexington, KY 40507
ldeaton@centralbank.com

**RE: [redacted] / Complaint 392384**

Dear Mr. Deaton,

The Kentucky Department of Financial Institutions ("KDFI") is in receipt of a complaint filed by [redacted] regarding Central Bank & Trust Company (attached). Please send a response and any supporting documentation to KDFI by December 21, 2022, addressing the issues raised by the complainant. Please note that any documents may be subject to disclosure to the public, pursuant to the Kentucky Open Records Act. Thank you in advance for your assistance.

You may reach our department at 502-573-3390 or KFI.Complaints@ky.gov for questions regarding this letter.

Sincerely,
Tim Meador
Certified Financial Institutions Examiner
KDFI Depository Division

Tim Meador

**Tim Meador** (he/him)
CERTIFIED FINANCIAL INSTITUTIONS EXAMINER
Public Protection Cabinet
500 Mero Street, 2SW19
Frankfort, Kentucky 40601
(502) 573-3390 OFFICE
(502) 782-9009 DIRECT
(502) 224-6357 CELL

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, is private and confidential and contains information intended to be conveyed only to the designated recipient(s). If you are not an intended recipient, please delete this e-mail, including attachments, and notify me by return e-mail. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

# EXHIBIT S

ABA Banking Journal Directors Briefing, October 2023

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

ABA BANKING JOURNAL
From the American Bankers Association

Search...

TOPICS NEWSBYTES PODCASTS MAGAZINE SUBSCRIBE

Home > Directors Briefing

# Spotlight: At Kentucky's Central Bank and Trust, advisory boards help to fill the director pipeline

October 4, 2023 Reading Time: 3 mins read




This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. Cookie Policy

Do Not Sell or Share My Personal Information

Accept All Cookies

×

**‘We recruit some of our best customers to serve on our advisory boards. It’s a business feeder.’**

Veteran Kentucky banker Luther Deaton Jr. says even the best boards need to be open to changing as the banking industry evolves. That’s why he is looking to add one or two directors to the board of Central Bancshares Inc., from seven at present.

“We’ve got a great board. I can call them any time day or night with any concern,” says Deaton, who is chairman, president, and CEO of both the holding company and Central Bank and Trust Co., a $3.5 billion-asset bank in Lexington, Kentucky. But his board isn’t getting any younger, and he wants to round it out with some directors who are working and running companies and who can add new, diverse perspectives. Luckily, the bank operates advisory boards in its key markets, and his last three directors came up through his feeder system. The advisory board provides a great way for the bank and potential future directors to get to know each other better, Deaton says.

ABA BANKING JOURNAL DIRECTORS BRIEFING
September/October 2023 | Volume 8, Number 5
American Bankers Association.

**This article originally appeared in the September-October 2023 issue of *ABA Banking Journal Directors Briefing*. Subscribe now.**

“We recruit some of our best customers to serve on our advisory boards. It’s a business feeder. They get insights from us, and they help us by recommending us to their friends in the community. It has worked great,” Deaton explains. There’s no formal expectation that an advisory role will translate into a board seat, but the board has added directors with technology know-how by tapping into this resource.

He hasn’t set a deadline to expand the board, stressing that “it has to be the right person.” Conversations with prospective directors take time, too, he noted.

**Veteran Kentucky banker Luther Deaton Jr. says even the best boards need to be open to changing as the banking industry evolves. That’s why he is looking to add one or two directors to the board of Central**

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**

responsibilities and recognize that this is not a showplace," Deaton says. "It's a serious business, and board members take on liability risk. Once you tell people what the responsibilities are, they back up a little bit."



Deaton, who grew up in modest circumstances in Kentucky's Breathitt County, exemplifies a breed of banker that is harder and harder to find. He started at Central Bank and Trust as a teller in 1978. He previously worked for a finance company, but was traveling a lot and missed his growing family. So he applied at Central Bank and Trust Co. and grabbed the only job they had open.

In subsequent years, he says, "I leaped from teller to cash vault teller to assistant manager to manager of the retail banking center, and then came down over commercial lending. Back then, they would take you through all departments of the bank so you could understand it."

The bank has thrived under his stewardship, with assets growing tenfold since he became president in 1995. He's seen a lot of ups and downs in that time.

Today, he sees deposit competition as one of the big issues that all banks and directors must grapple with, as rising interest rates have provided a graphic lesson for boards in the value of good asset/liability management.

"When the pandemic hit and every bank was flush with cash, a lot of them put money in long-term bonds. We didn't do that; instead, we took a much more conservative approach by positioning the excess funds much shorter in our investment portfolio." The strategy paid off with lower unrealized losses and more cash flow to meet liquidity needs when rising interest rates sapped the bond market. The initial below-peer investment yields took some explaining to his board to help them understand

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**

bank employee face-to-face in small groups or individually. In the other year, he convenes the President's Roundtable to hear from employees in detail.

He's seen how vibrant communities are when they have a good community bank in their midst—and he's seen the opposite, too. "A community bank is the heart of the community," Deaton says. "Our job is to strengthen every community we serve."

**Tags:** Advisory board Community banking Community engagement Directors Leadership

Share Tweet Pin

## Related Posts




### From the Vault: Traveler's checks and creative destruction

**RETAIL AND MARKETING** AUGUST 19, 2026

The first recognizable traveler's check was issued in 1772. Why did they disappear?



### Survey finds most consumers want to maintain bank branch access

**COMMUNITY BANKING** AUGUST 14, 2026

U.S. consumers want digital banking convenience but also want to maintain access to bank branches and people for complex issues and personalized financial guidance, according to a new survey by Santander.



### The new playbook for banking athletes

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**



## How banks can garner their share of the wealth transfer windfall

**WEALTH MANAGEMENT** AUGUST 3, 2026

Many financial institutions are very good at building multi-generational family relationships and there is much to learn from them.

## Nothing 'nil' about NIL

**RETAIL AND MARKETING** JULY 28, 2026

Five years after court rulings and NCAA changes freed up student-athletes to be compensated, banks of all sizes are finding new opportunities to connect with audiences.

## Directors Briefing: For stablecoins and tokenized deposits, the value of focusing on strategy

**DIRECTORS BRIEFING** JULY 22, 2026

The takeaway is not that every bank needs a stablecoin strategy tomorrow. It is that stablecoins are no longer purely a fintech or cryptocurrency story.

## NEWSBYTES

- **Consumer confidence slips in August**
  AUGUST 25, 2026
- **Growth in home prices increased in June**
  AUGUST 25, 2026

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**

NEXCESS
CLOUD WITHOUT COMPROMISE

**The exam question a backup can't answer**

AUGUST 18, 2026



**Beyond Surveillance: Rethinking Security for Modern Financial Institutions**

AUGUST 12, 2026



**Relationship Banking at Scale: Why Banks Need The Digital Sales & Service Platform**

AUGUST 1, 2026

## PODCASTS

- **Could Your Bank Absorb the Hidden Cost of Running Legacy Systems?**
  AUGUST 20, 2026
- **Podcast: Banking the brave new world of college athletics**
  AUGUST 4, 2026
- **Podcast: Tactics for meaningful strategic planning**
  JULY 28, 2026

**American Bankers Association**
1333 New Hampshire Ave NW
Washington, DC 20036

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**

Media Kit
Advertising
Subscribe

© 2026 American Bankers Association. All rights reserved.

This site uses cookies to improve your browsing experience, gather site analytics and activity, track shopping cart contents and deliver relevant marketing information. If we have detected an opt-out preference signal then it will be honored. **Cookie Policy**

# EXHIBIT T

KDFI transmittal, December 6, 2017, with CBT response signed by Deaton, December 12, 2017 (redacted)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

**PUBLIC PROTECTION CABINET**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**

**Matthew G. Bevin**
Governor

1025 Capital Center Drive, Suite 200
Frankfort, KY 40601
Phone: (502) 573-3390
Fax: (502) 573-8787
http://kfi.ky.gov

**David A. Dickerson**
Secretary

**Charles A. Vice**
Commissioner

December 6, 2017

Mr. Luther Deaton
Central Bank & Trust Company
P.O. Box 1360
Lexington, Kentucky 40588-1360

RE: [redacted] / Case No: 391215

Dear Mr. Deaton:

The Kentucky Department of Financial Institutions is in receipt of a complaint by [redacted] regarding Central Bank & Trust Company ("Central Bank"). Ms. [redacted] asserts that she is not responsible for the balance of a home equity line of credit account at Central Bank, stating that the funds from the account went to Mr. [redacted] Please send a response, loan documents, payment history, and any other supporting documentation to this Department by December 20, 2017, addressing the issues raised by the complainant. Please note that any documents may be subject to disclosure to the public, pursuant to the Kentucky Open Records Act. Thank you in advance for your assistance.

If you have any questions, please contact me at christinam.hayden@ky.gov or 502-782-9029.

Sincerely,

Christina M. Hayden
Program Coordinator, Bank Branch

CC: Holly Ross, DFI Bank Branch Manager

Central Bank

**Luther Deaton, Jr.**
Chairman/President/CEO
(859) 253-6184

*Via Regular U.S. Mail*

December 12, 2017

RECEIVED
DEC 15 2017
PPC/DFI/DDI

Commonwealth of Kentucky
Public Protection Cabinet
Department of Financial Institutions
Attn: Christina M. Hayden
Program Coordinator, Bank Branch
1025 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601

*Re: Case no. 391215,* [redacted]

Ms. Hayden:

We are in receipt of your letter dated December 6, 2017 regarding a complaint filed against Central Bank & Trust Co. ("Central Bank") by [redacted] ("Ms. [redacted] case no. 391215 (the "Complaint"). Please find below our response to the Complaint.

Per your letter, Ms. [redacted] Complaint states that she should not be liable for repayment of a home equity line of credit (the "HELOC") because the proceeds of the HELOC went to a Mr. [redacted] Please be advised that Ms. [redacted] obligations to Central Bank under said HELOC have been fully and finally adjudicated by the Fayette Circuit Court in Civil Action 17-CI-308 (the "Action"). In a final and now non-appealable order entered in the Action on August 7, 2017, the Court granted Central Bank's motion for summary judgment on its claims against Ms. [redacted] specifically finding that "the uncontroverted facts show that [redacted] indeed executed the loan documents at issue, received the funds from Central Bank, and then defaulted on the payments thereunder." A copy of the Court's August 7, 2017 Order is attached hereto as Exhibit A for your reference.

For your further information, Ms. [redacted] is represented by counsel in the aforementioned Action, and the relief granted to Central Bank by the Court was not in the form of a default judgment, but a summary judgment order entered after substantial briefing and oral arguments by counsel for both sides. Copies of the docket, Central Bank's initial complaint, including the HELOC documents, as well as Ms. [redacted] Answer and Counterclaim, and other relevant pleadings and evidence submitted to the Court in the Action area all attached hereto collectively as Exhibit B.

Finally, it should be noted that Ms. [redacted] filed a petition for relief under Chapter 13 of Title 11 of the United States Code on or about October 13, 2017 in the United States Bankruptcy Court for the Eastern District of Kentucky, Case no. 17-52027, temporarily staying enforcement of Central Bank's judgment.

Because the substance of Ms. [redacted] Complaint has already been litigated and fully adjudicated by the Fayette Circuit Court, we do not believe any further response should be necessary; however, should you have any questions or require any additional information or documentation, please do not hesitate to contact us.

Sincerely,

Luther Deaton, Jr.
President/Chairman/CEO

# EXHIBIT U

CBT response to KDFI Complaint No. 311721, January 26, 2015 (redacted)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

**Central Bank**

Central Bank & Trust Co.
P.O. Box 1360
Lexington, KY 40588-1360
(859) 253-6222

January 26, 2015

Ms. Allison Harrod
Public Protection Cabinet
Department of Financial Institutions
1025 Capital Center Drive, Suite 200
Frankfort, KY 40601

RE: Case #311721

Dear Ms. Harrod,

Thank you for the opportunity to respond to the complaint filed by Mr. [redacted] Mr. [redacted] suffered a loss when the individual who was performing repairs in his home stole two checks, forged the drawer's signature and deposited them at another institution.

Central Bank & Trust Co. President/CEO Luther Deaton, Jr. telephoned Mr. [redacted] to inform him that, although not obligated by law to do so, the Bank would reimburse him for his loss. Mr. [redacted] informed Mr. Deaton that he couldn't accept the money because the individual who stole the checks returned the money taken from the account.

I spoke with you sometime last week regarding the KDFI letter that accompanied the complaint and was curious about the reference to a violation of Kentucky Revised Statutes (KRS). From the letter, I got the impression that the Bank may have committed a violation. In reporting the incident to the Bank, Mr. [redacted] filed a police report and submitted an affidavit. Mr. [redacted] made a statement in the affidavit that the individual had been hired to do work in his home. If Mr. [redacted] did not exercise "ordinary care" (KRS 355.3-406) while the individual was performing work in his home, was the Bank legally required to reimburse him for his loss?

Fortunately, Mr. [redacted] money was returned to him. However, any information you can provide regarding the potential KRS violation that may have resulted in this situation would be greatly appreciated. I am enclosing Mr. [redacted] affidavit and the Central Bank Deposit Account Rules and Regulations section that pertains to forgeries.

Sincerely,

Lisa S. Grant

Lisa S. Grant
Vice President/Compliance Officer
Central Bank & Trust Co.
lgrant@centralbank.com
859-253-6150

Enclosures

# EXHIBIT V

CBT response to KDFI Complaint No. 393679, September 10, 2025 (redacted)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

Central Bank

September 10, 2025

VIA ELECTRONIC MAIL

Jessica Pogrotsky Walker
Program Coordinator
Kentucky Department of Financial Institutions
500 Mero Street 2SW19
Frankfort, KY 40601

Re: Central Bank & Trust's response to [redacted] complaint #393679

Dear Ms. Pogrotsky Walker,

Central Bank & Trust Co. ("Central Bank") has received your correspondence regarding a consumer complaint filed with the Kentucky Department of Financial Institutions by Dr. [redacted] Dr. [redacted] expressed concerns about Central Bank honoring a personal check that was dated March 23, 2018. We appreciate Dr. [redacted] concerns being brought to our attention and we welcome the opportunity to respond to our customer's concerns in this letter.

Dr. [redacted] discussed Central Bank's honor of check #2651 for $350 with Central Bank's President, Chairman and CEO Luther Deaton on August 27, 2025. Check #2651 was dated March 23, 2018 and cleared Dr. [redacted] checking account on June 23, 2025. The check was written payable to [redacted] Dr. [redacted] former wife, and that she on some unknown date endorsed this check over to [redacted] [redacted] Dr. [redacted] son from his marriage to [redacted] The check was negotiated by [redacted] [redacted] in accordance with the Disclosure of Personal Deposit Rules and Regulations ("Disclosure") governing Dr. [redacted] account as outlined on Page 5, Paragraph 10, stating "the Bank has the right to pay or refuse a stale dated check". This Paragraph 10 also states, "Because of the high volume of Items we must process and the largely automated nature of such processing, you agree that we will not be considered to have failed to exercise ordinary care if we do not manually examine all Items." Enclosed is a copy of this Disclosure that Central Bank mailed to Dr. [redacted] in the fall of 2024. Central Bank's Disclosure's terms are in accord with Kentucky law in this matter. Kentucky's Uniform Commercial Code, particularly KRS 355.4-404, states that banks may charge a customer's account for checks older than six months of the maker's date of creation, a/k/a stale checks, but that the banks are under no obligation to pay such stale checks.

Thank you for the opportunity to respond to Dr. [redacted] concerns. If there are any questions, please contact me at (859) 253-6377 or gshewmaker@centralbank.com.

Sincerely,

Greg Shewmaker
EVP/Director of Private Banking and Retail

Enclosure: Central Bank & Trust Co. Disclosure of Personal Deposit Rules & Regulations
cc: Luther Deaton, President, Chairman and CEO

0002006.0013239 4931-0397-1687v1

# EXHIBIT W

Certified Excerpts — Deposition of Donna Jean Craven — August 18, 2026

Transcript pages 1–6, 9, 12–15, 21, 67, 69–74, 79–82, 109, 116–125, 128–132, 141–142, and the Reporter's Certificate (April L. Crites, RMR, CRR, CSR, CCR)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

**In The Matter Of:**

*WAIN v.*

*CENTRAL BANK & TRUST CO., et al.*

---

*DONNA JEAN CRAVEN*

*August 18, 2026*

---

April L. Crites, RMR, CRR, CSR, CCR
National and International Realtime Court Reporter
aprilcrites@outlook.com
(434) 774-5993

*Min-U-Script® with Word Index*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

- - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Civil Action No. 1:24-bk-11814-MB |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : | Chapter 13 |
| | : | |
| Debtors. | : | |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : | Adversary Proceeding No. |
| | : | 1:25-ap-01026-MB |
| Plaintiffs, | : | |
| v. | : | |
| CENTRAL BANK & TRUST CO., et al., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - x

VIDEOCONFERENCED (BY ZOOM) DEPOSITION OF

DONNA JEAN CRAVEN

Lexington, Kentucky

Tuesday, August 18, 2026

12:05 p.m. EDT

Pages: 1 - 147

Reported By: April L. Crites, RMR, CRR, CSR, CCR
Notary Public, Commonwealth of Kentucky

Deposition of DONNA JEAN CRAVEN
held at the offices of:

STOLL KEENON OGDEN PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507
(859) 231-3000

* * *

Pursuant to notice, and pursuant to the
Federal Rules of Civil Procedure,
before April L. Crites, RMR, CRR, CSR, CCR,
and Notary Public in and for the
Commonwealth of Kentucky.

* * *

# I N D E X


| EXAMINATIONS CONDUCTED | PAGE |
|---|---|
| DONNA JEAN CRAVEN | |
| Cross-Examination by Mr. Wain................ | 6 |
| Cross-Examination by Mrs. Wain............... | 19 |
| Recross-Examination by Mr. Wain.............. | 23 |
| Recross-Examination by Mrs. Wain............. | 64 |
| Further Recross-Examination by Mr. Wain...... | 78 |
| Further Recross-Examination by Mrs. Wain..... | 118 |
| Further Recross-Examination by Mr. Wain...... | 124 |
| Direct Examination by Mr. Wiseman............ | 141 |
| Further Recross-Examination by Mr. Wain...... | 142 |
| Redirect Examination by Mr. Wiseman.......... | 143 |
| Further Recross-Examination by Mr. Wain...... | 144 |


* * *

EXHIBITS


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiffs' Notice of Deposition of Donna Craven | 79 |
| Exhibit 2 | September 27, 2023, letter to Douglas Wain, from Donna Craven, Senior Vice President and Compliance Officer | 79 |


* * *

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, DOUGLAS A. WAIN and ELISA WAIN (pro per):

Douglas Alan Wain
Elisa Wain
Post Office Box 7473
Westlake Village, California 91359
859-494-3677
douglaswain@gmail.com

ON BEHALF OF DONNA JEAN CRAVEN:

Timothy R. Wiseman, Esq.
STOLL KEENON OGDEN PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507
859-231-3073
tim.wiseman@skofirm.com

* * *

THE COURT REPORTER: Good morning. Today is Tuesday, August 18, 2026. The time is approximately 12:05 p.m. Eastern.

The location of the witness is Lexington, Kentucky.

We are here in the case of Douglas Alan Wain and Elisa Wain v. Central Bank & Trust Co., et al., case number 1:25-ap-01026.

My name is April Crites. I am a certified court reporter and a notary public for the Commonwealth of Kentucky.

Will counsel please state their appearance and identify any additional attendees present with them for the record? If there are any objections to proceeding, please state them at the time of your appearance, beginning with Mr. Wain.

MR. WAIN: No objections.

THE COURT REPORTER: Do you want to state your appearance for the record?

MR. WAIN: Oh, state my appearance. I'm sorry. Douglas Alan Wain.

THE COURT REPORTER: No objections?

MR. WAIN: No objections.

THE COURT REPORTER: Thank you.

Mr. Wiseman?

MR. WISEMAN: Yeah, my name is Tim Wiseman of Stoll Keenon Ogden appearing here for Ms. Craven.

I think my colleague, Mr. Ireland, has waived -- has given some objections, generally, to these depositions. So I would note those for the record, our objections to much of this discovery being irrelevant and unduly burdensome and bordering on harassment.

DONNA JEAN CRAVEN

of lawful age, Witness herein, having been first duly cautioned and sworn, as hereinafter certified, was examined and said as follows:

THE COURT REPORTER: Okay. Thank you. And we may proceed.

MR. WAIN: Thank you.

CROSS-EXAMINATION

BY MR. WAIN:

Q Good morning, Ms. Craven.

A Good morning.

Q Please state your name -- your full name and business address for the record.

A My full name is Donna Jean Craven. And I'm sorry, the second -- my business address?

Q Yes.

A -- or when did he represent me for my appearance today?

Q When did he start representing you for your appearance today?

A That was Friday.

Q Okay. Now, has Stoll Keenon Ogden and/or Tim Wiseman ever represented you personally before Friday?

A No.

Q Okay. Thank you very much.

Does William Ireland or his firm, Haight Brown & Bonesteel, do they represent you, personally.

A I'm sorry. Could you ask that question again, please?

Q William Ireland of Haight Brown & Bonesteel, Los Angeles, do they represent you personally?

A I'm unclear on that question, please.

Q Does Tim Wiseman or Stoll Keenon Ogden represent you personally?

MR. WISEMAN: Asked and answered. Objection. We've done this.

MR. WAIN: I -- it has not been answered.

MR. WISEMAN: She already did a second

but I don't want her getting into any privileged matters.

MR. WAIN: Could you note that for the record, Madam Court Reporter?

BY MR. WAIN:

Q Okay. Who did you speak with to prepare for today?

A Mr. Wiseman and another attorney.

Q Who was the other attorney?

A I don't remember his name.

Q Which --

A My apologies.

Q Which firm did this attorney work for?

A I apologize; I don't remember the firm name.

Q It was a different firm than SKO?

A I don't know.

Q Ms. Craven, this is an important matter to us to know how you are represented, and we work -- you don't know the name of the other firm that helped you prepare for today, that might be involved in this case?

A I don't remember the name.

Q Who would know?

A Mr. Wiseman.

Q Who chose Mr. Wiseman and SKO to represent you today? Was it you, or was it Central Bank?
A Central Bank.
Q Who at Central Bank directed this representation?
A I don't know.
Q You don't know who directed you to work with SKO on this deposition? Is that what you're saying?
A Could you rephrase the question, please?
Q Sure.
Somebody at Central Bank chose SKO, or Tim Wiseman, to represent you at this deposition. Who was it that let you know?
A An internal colleague.
Q And that name is?
A Becky Mullins.
Q Becky Mullins.
And her position?
A I don't know her exact title.
Q Okay. So you prepared for this deposition with Mr. Wiseman and another attorney, who you don't know the firm and you don't know the name; is that correct?
A Yes.

Q And Tim Wiseman knows the name of this other firm or attorney?
A I can't ask -- answer for Mr. Wiseman.
Q Well, I said, Who would know -- the question before, I said, Who would know who was with you at the other attorney's, and you said Mr. Wiseman?
A Correct.
Q So Mr. Wiseman knows who the other attorney and the other -- or the other firm was who helped you prepare for today's deposition?
A Yes.
Q Okay. Mr. Wiseman would know. Gotcha.
Is it written down anywhere?
A Is what written down?
Q The name of the other attorney or firm.
A Written down by whom or by where?
Q In your notes. By your hand.
A I did not take notes.
Q Okay. Did you write down the name of the other attorney or other firm?
Do you have it written down somewhere?
Did you write it down somewhere, where you can go and look at it?
A No, I did not.

Q Okay. Okay. So when did you prepare, and for how long?
A I prepared on Friday for approximately 30 minutes.
Q Okay. What documents did you review for this deposition?
A I did not review any documents.
Q I just want to understand. There was only two people who helped you prepare for this deposition; is that correct?
A Yes.
Q And that was Mr. Wiseman and an unknown attorney?
A Yes.
Q Did anyone tell you what to say or what not to say?
MR. WISEMAN: Objection. Privilege.
MR. WAIN: On what grounds?
MR. WISEMAN: You've already -- you've already -- you've already established she's represented by counsel, and we've discussed these things with her. She can't -- she cannot -- she can't talk about things that were discussed with her attorneys. It's protected by privilege.
BY MR. WAIN:

Q Who do you report to?
A Please ask the question again.
Q Who do you report to?
A Operationally or functionally?
Q Both.
A Operationally, Executive Vice President Jennifer Stivers and to the board of directors.
Q Who are on the board of directors?
A Board of directors include Ms. Kincaid, Mr. Deaton, Mrs. Pope, Mr. Foley, Mr. Ritchie, Mr. Rogers.
I believe I have listed all of them, but I would have to confirm.
Q Whom reports to you?
A The compliance team.
Q Who are?
A Are you asking for individual names, or --
Q Yes.
A -- positions?
Q Both.
A What is the relevance of that question?
MR. WAIN: Just please answer the question, Ms. Craven.
THE WITNESS: Jamie Cooper, Adam Spiller, Amber Watson, Nate Holt.

A A bank representative.
Q Such as? Any bank representative, or what?
A It would go to the special assets department.
MR. WAIN: And who is -- runs the special assets department?
THE WITNESS: Becky Mullins.
BY MRS. WAIN:
Q Does Central Bank keep records of how the payments and credits are applied to an account, like a transaction ledger?
A Yes.
Q Are those systems still in use today?
MR. WISEMAN: Objection. Vague. As compared to when?
BY MRS. WAIN:
Q Do they go back to 2019?
MR. WISEMAN: Again, I object. She's testifying in her personal capacity. She can answer to the extent she knows.
THE WITNESS: I would defer to one of my colleagues: Becky Mullins.
BY MRS. WAIN:
Q How long would it take to pull that

this lawsuit?

MR. WISEMAN: Again, I object. She's testifying in her personal capacity. Those questions are better directed elsewhere.

MR. WAIN: Yeah, go ahead.

BY MRS. WAIN:

Q What was the balance on the Wain accounts when the foreclosure case was filed in 2019?

A I don't know.

Q Who would know?

A Becky Mullins.

MR. WAIN: Would you say Becky Mullins is the primary person at Central Bank who is handling the litigation between the Wains and Central Bank?

THE WITNESS: I don't know.

MR. WAIN: To the best of your knowledge.

THE WITNESS: I would assume so.

MR. WAIN: Would there be anybody else who might have that role at Central Bank.

THE WITNESS: I don't know who assists in legal action.

MR. WAIN: But you assume that Becky Mullins is handling the legal aspects between us, the Wains, and Central Bank?

THE WITNESS: I believe legal counsel is