handling that.

MR. WAIN: Internal legal counsel?

THE WITNESS: No.

MR. WAIN: Oh. No, inside Central Bank, I mean, not legal -- outside legal counsel.

THE WITNESS: No.

MR. WAIN: Does Central Bank have that -- have an internal legal department?

THE WITNESS: No.

MR. WAIN: So then who at Central Bank -- let me say it exactly the way I heard it.

You assume that Becky Mullins is handling the legal affairs between Central Bank and us, the Wains?

THE WITNESS: I believe she is Central Bank's contact with Central Bank's representation.

MR. WAIN: Thank you.

Is Luther Deaton involved -- Junior -- involved in the litigation management?

THE WITNESS: I'm sorry. Can you rephrase that question, please? I didn't understand it.

MR. WAIN: Is it possible that Luther Deaton Jr. is involved regarding the litigation between Central Bank and the Wains?

THE WITNESS: I don't know the answer.

MR. WAIN: Okay. Thank you.
Go ahead.
BY MRS. WAIN:
Q The Kentucky judgment awarded $358,412.72, plus interest at $52.70 per day from March 6, 2019.
Does Central Bank have a running calculation of interest on this judgment?
A I don't know.
Q Who would know?
A I'm assuming Becky Mullins.
MR. WAIN: Yeah. Go ahead.
BY MRS. WAIN:
Q So the property, 2711 Barbados Lane, sold at the master commissioner's sale in February 2021.
What does Central Bank's ledger show happen to the Wain account balance after that sale?
A I don't know.
Q Who would know?
A I am assuming Becky Mullins.
Q The master -- sorry.
The master commissioner held approximately $605,035.42 in proceeds after fee.

What records does Central Bank have about those proceeds between 2021 and 2024?

A I don't know.

Q And would we -- who would know that, please?

A I'm assuming Becky Mullins.

Q On March 7, 2024, the Court entered a distribution order. What did Central Bank receive?

MR. WISEMAN: Objection. This, again, is her personal knowledge; she's not the bank.

MR. WAIN: If she doesn't know, she can say she doesn't know.

THE WITNESS: I don't know.

BY MRS. WAIN:

Q Where would that be recorded?

A Ask the -- ask the first question again, please.

Q Where would the information about a distribution that Central Bank received be -- a distribution order, where would that information be recorded?

A I don't know.

MR. WAIN: Who would know?

THE WITNESS: I'm sorry?

BY MRS. WAIN:
Q Who would know?
A I'm assuming Becky Mullins.
Q Central Bank has said the amount owed was reduced by $66,884.60 from that distribution.
Who calculated that application?
A I don't know.
Q Would you know how -- who would know?
A I'm assuming Becky Mullins.
Q Would you walk me through how that amount was applied: Principal, interest, fees, et cetera?
A I don't know.
Q And who would know?
A I'm assuming Becky Mullins.
Q Central Bank also received wage garnishment payments, about $4,185.
Where was that information recorded, those garnishments?
A I don't know.
Q And who would know?
A I'm assuming Becky Mullins.
Q So as of April 8, 2024, Central Bank said the Wains owed $357,944.91. Who calculated this figure?

A I don't know.
Q And who would know?
A I'm assuming Becky Mullins.
Q Would you know what documents she would use, or -- to calculate this?
A I do not.
Q Would there be a -- where would a calculation record exist?
A I don't know.
Q Who would know?
A I'm assuming Becky Mullins.
Q Do you know what is the balance Central Bank claims today?
A No.
Q Who would calculate such a balance?
A I'm assuming Becky Mullins.
Q How long would it take to produce that calculation?
A I don't know.
Q Who would know?
A I'm assuming Becky Mullins.
Q Have you seen Central Bank's proof of claim in the Wain bankruptcy?
A No.
Q You have not.

(Plaintiffs' Exhibit 1, Plaintiffs' Notice of Deposition of Donna Craven, was marked and presented for purposes of identification.)

MR. WISEMAN: Okay.

MR. WAIN: I just want to make sure that Ms. Craven has seen it. Is she familiar with it?

THE WITNESS: I haven't seen it. I -- this is the first time I have seen it.

BY MR. WAIN:

Q Okay. So this is the first time you've seen it?

A Yes.

Q Okay.

(Plaintiffs' Exhibit 2, September 27, 2023, letter to Douglas Wain, from Donna Craven, Senior Vice President and Compliance Officer, was marked and presented for purposes of identification.)

BY MR. WAIN:

Q This Exhibit 2, which is the letter you wrote on September 27, 2023, those are going to be my next questions.

Did you write this letter?

A No.

Q Is that your signature?

A Yes.
Q Who wrote the letter?
A Legal counsel.
Q Which legal counsel?
A Legal counsel that assists me with regulatory items.
Q And whom may they be?
A Frost Brown Todd.
Q Frost Brown Todd.
Who at Frost Brown Todd wrote this letter?
A Nancy Presnell.
Q Did -- some members of the board of Central Bank that are from Frost Brown Todd; is that correct?
A I'm sorry. Ask that question again, please.
Q The board members of Central Bank -- I think you named six -- did any of them used to work or currently work at Frost Brown Todd?
Don't look at --
A Yes.
Q Do you know which ones?
A Bart Rogers.
Q Did you discuss any of the Wain matters with him, Mr. Rogers?

A No.
Q Was Frost Brown Todd the other attorney who helped you prep for this deposition?
A I don't believe so. I don't remember the firm name. But, no, I don't believe so.
Q Was it William Ireland?
A I don't know.
MR. WISEMAN: We don't have to hide the ball on this, Mr. Wain. It was. We can -- we can represent that she spoke to Mr. Ireland and myself to prepare for this. We don't have to go round and round. I'm happy to make that clear.
MR. WAIN: Well, that's not what she said.
MR. WISEMAN: She said she couldn't remember his name. I'm just -- I'm representing that to you.
MR. WAIN: All right. So I'm going to have to ask her.
BY MR. WAIN:
Q Was William Ireland the other person that helped prepare you for this deposition?
A If Mr. Wiseman says so, yes.
Q What do you say?
A Yes.
Q Yes?

A (No response.)
Q If you did not write the letter, why did you sign it?
A I signed it in my capacity as compliance officer.
Q Who else knew that you were signing a document that was not your words?
MR. WISEMAN: Objection. Misstates her testimony. "Not her words" seems strong.
BY MR. WAIN:
Q The text was from Frost Brown & Todd, I believe you said, correct?
A Yes.
Q Did you change any of the words?
A No.
Q Who else was aware that Frost Brown Todd created these words for you to sign?
A Are you looking for individuals' --
Q Yes.
A -- names?
Q Correct. An individual name and their titles, if you know.
MR. WISEMAN: I'll object as to when did these people know.
This is a letter dated September 27, 2023.

Q Does Central Bank have credit-reporting records?
A I'm sorry. I -- it -- it cut out there for a minute.
Q Does Central Bank have credit-reporting records? Reports to credit agencies.
MR. WISEMAN: I think he's saying credit-reporting records. Bay maybe you would repeat that one more time, Mr. Wain. I think it's -- sorry. She's just having a hard time hearing you there.
BY MR. WAIN:
Q Does Central Bank & Trust keep records of any and all of their credit reporting?
A Oh, I understand now. Thank you.
Central Bank maintains the required reporting records.
BY MR. WAIN:
Q Who maintains those records?
A Loan services department.
Q And who is in charge of loan services department?
A Tim Austin.
Q To the best of your knowledge, does any outside -- I mean, does any entity outside of

Q Okay. Let me take it piece by piece.
Within the last five years, has Central Bank made any donation to anybody running in an election?
A I don't know.
Q Who would know?
A Who would --
MR. WISEMAN: Objection. She's here in her personal capacity.
BY MR. WAIN:
Q You may answer the question.
A Luther Deaton Jr.
Q Are you aware of any campaign donations to any person running for office or who has run for office or might run for office made by Luther Deaton on behalf of Central Bank?
MR. WISEMAN: Objection. Form.
THE WITNESS: I don't know who might run for office.
BY MR. WAIN:
Q Hmm?
A I don't know who might run for office. The question was too broad.
Q You said Luther Deaton would know if there was any campaign donations on behalf of Central

Bank or someone on behalf of Central Bank; is that correct?

A Any -- to clarify, the question is about any political campaign contributions? Is that the question?

Q Let's start --

A Or is it a different question?

Q Let's start with political campaigns. Yes. Political campaigns.

A Okay. Please ask the full question again.

Q I'm sorry, this is somewhat reminiscent of the word "audit." I can only explain it so many time -- so many ways.

Luther Deaton Jr. would know if there was any donations to any political campaign, individual or group, on behalf of Central Bank or someone on behalf of -- or on behalf of Central Bank?

A I would assume so.

Q Do you know of any specific ones he donated to?

A No.

Q Is it someone other than Luther Deaton Jr. that would make the donation to a political campaign?

A I don't know.

Q Okay. And the person who would know would be Luther Deaton Jr.; is that --

MR. WISEMAN: I also object that this is publicly available information more readily accessible by you, Mr. Wain, that we don't have to spend time on this.

MR. WAIN: Thank you.

BY MR. WAIN:

Q But Luther Deaton Jr. would know if there are any contributions on behalf of Central Bank to any political campaign?

A I would assume so.

MRS. WAIN: Okay.

MRS. WAIN: Okay. I'm going to give Douglas a break.

FURTHER RECROSS-EXAMINATION

BY MRS. WAIN:

Q In 20 -- in 2023, the account -- our -- the Wain account -- was reported to Experian as charged off.

What does charged off mean at Central Bank?

A I don't deal with that on a day-to-day basis.

Q Well, what would it mean in your -- your estimation? What does charged off mean in your department?
A I work on the consumer regulatory compliance side and not on a safety and soundness side.
Q Who would know that definition?
A Becky Mullins.
Q So who made the decision to report the account as charged off? Would that also be Becky Mullins?
A Ask the question again, please.
Q Who would make that decision as a -- as an account being charged off?
A I assume Becky Mullins.
Q And are decisions like those documented?
A Yes.
Q Where? What department?
A I'm assuming special assets.
Q Thank you.
If the account was charged off in 2023, how does Central Bank reconcile that with claiming $357,944.91 in the bankruptcy?
MR. WISEMAN: Objection. Calls for a legal conclusion.

MR. WAIN: Objection noted.
Please answer.
THE WITNESS: I don't work on the safety and soundness or the bankruptcy. I do not know.
BY MRS. WAIN:
Q What records does Central Bank keep of what it reports to credit bureaus each month?
A Central Bank maintains the required reporting documents.
Q And what are those?
A I do not deal with that on a daily basis and cannot answer.
Q Where are they kept?
A At Central Bank.
Q Which departments?
A Loan services.
Q Were they collected for this case?
MR. WISEMAN: Objection. Privileged information and calls for a legal conclusion. She's -- it's beyond her scope.
MRS. WAIN: Okay.
BY MRS. WAIN:
Q Does Central Bank have records showing how the proof of claim amount was calculated?
A I don't have personal knowledge of that

information.

Q Who would keep those? Who would have that knowledge?

A I'm assuming Becky Mullins.

Q Does Central Bank have records of the application of the sale proceeds?

A I --

MR. WISEMAN: Again, objection. Form.

We're not sure what sale proceeds we're talking about. But she can answer if she --

BY MRS. WAIN:

Q Proceeds of 2711 Barbados Lane.

MR. WISEMAN: Okay.

A I'm sorry. Ask the question again, please.

Q Yeah. Does Central Bank have records of the application of the sale proceeds of the auction?

A I would assume so. I do not have personal knowledge.

Q Who would have that knowledge?

A I'm assuming Becky Mullins.

Q And of each garnishment?

A I don't have personal knowledge.

Q Who would, please?

A I thought I answered that earlier: I'm assuming Becky Mullins.
Q Does Central Bank have its credit-reporting records for the -- for this account, the Wain account?
A Central Bank maintains the required regulatory records.
Q And in what department, please, would that be?
A Loan services.
Q Does Central Bank have the records concerning the master commissioner proceeds from 2021 through 2024?
MR. WISEMAN: Yeah, objection. Asked and answered.
We covered this earlier today and, again, we -- she's not here as a designated --
(Overlapping speakers.)
MR. WAIN: There hasn't been a question about the master commissioner.
MR. WISEMAN: We talked about the master commissioner and the application of proceeds earlier, but we can ask these questions again.
MR. WAIN: But she has not been questioned about the master commissioner.

MR. WISEMAN: I have a different recollection. But we -- you can ask these questions about records again. But Ms. Craven is not here as a record custodian to testify about records. She's here about her personal knowledge. So if you want to spend your time this way, you can --

MR. WAIN: Thank you.

MR. WISEMAN: -- but --

MR. WAIN: Go ahead, Elisa.

MRS. WAIN: Okay.

MR. WAIN: Same question.

MRS. WAIN: Yeah.

BY MRS. WAIN:

Q So, again, does Central Bank have records concerning the master commissioner's proceeds from 2021 through 2024?

A I do not deal directly with that. I do not know.

Q And who would know that?

A I'm assuming Becky Mullins.

Q Have you ever been asked to gather any of these records for this lawsuit?

A No.

Q Is there any category of records about the

Wain accounts that has been, to your knowledge, destroyed, deleted, or lost?

A No.

MRS. WAIN: Mm-hmm.

FURTHER RECROSS-EXAMINATION

BY MR. WAIN:

Q To the best of your knowledge, has anyone at Central Bank discussed plaintiffs' subpoena to Crowe attorneys -- I mean, accounts?

A I'm sorry. Ask that question again, please.

Q To the best of your knowledge, has anybody at Central Bank discussed the plaintiffs' subpoena to Crowe, accountants, with Crowe?

Has anyone discussed the subpoena we gave to Crowe with Crowe?

Has anybody discussed it with Crowe?

A I don't know.

Q Who would know?

A I don't know.

Q Do you review financial statements that Crowe provides to Central Bank?

A No.

Q Who reviews financial statements that are created by pro -- or Crowe?

A Financial -- financial planning personnel.
Q Who is the financial planning personnel?
A Edward Barnes and Mark Hampton.
Q Thank you.
And just to be clear, the only person who signed a sworn statement about this claim is -- the proof of claim in this case in California was Tim Wiseman, who says he didn't calculate it.
Is there anybody at Central Bank who has sworn to these figures?
MR. WISEMAN: Objection. Assumes facts not before her.
But go on.
THE WITNESS: So ask the question again, please.
BY MR. WAIN:
Q Has anybody at Central Bank sworn to the figures in the proof of claim that Central Bank has filed in this case that we're in in California?
A I don't know.
Q Who would know?
A I'm assuming Becky Mullins.
MR. WAIN: First, this is important, I reserve the right to reopen this deposition if

Central Bank?
A That question is too broad. I don't -- I know my position, and I don't know Mr. Deaton's positions.
Q Well, you've seen activities by Luther Deaton Jr. with Central Bank, correct?
A I have seen my interactions with Mr. Deaton, yes.
Q Would you say he is very active in the operations of Central Bank & Trust on a daily basis?
MR. WISEMAN: Objection. Form.
THE WITNESS: Operations is overly broad, and I can only comment on my interactions with Mr. Deaton.
BY MR. WAIN:
Q Okay. Let's start there.
How much interaction do you have with Luther Deaton Jr. over the last five years?
A As-needed basis.
Q How often is that? Can you quantify it, please?
A I cannot quantify it, because it is an as-needed basis.
Q Okay. Let me try to narrow it down.

What -- is once-a-year a fair assessment with your interaction with Luther Deaton Jr.?

A That is a minimum.

Q Would a maximum be ten times a year with Luther Deaton Jr., your interaction with him?

MR. WISEMAN: Objection. Define "interaction."

MR. WAIN: On a professional basis.

MR. WISEMAN: I mean, vague. This is an e-mail? Like, an hour conversation?

MR. WAIN: Well, she said she --

MR. WISEMAN: Is this a walk-by in the hall? It's one big building where everybody works.

MR. WAIN: She said that she has interactions with Luther Deaton Jr.

MR. WISEMAN: We're having an interaction right now. What -- what are -- how are you defining "interaction"?

MR. WAIN: Well, let me ask her to define it.

BY MR. WAIN:

Q What is your interactions with Luther Deaton Jr.? How would you describe them?

A Professional.

Q Professional.
Would you have a professional interaction with him more than ten times a year?
A Possibly.
Q Is it possible you would have professional interactions more than 20 times a year?
A Possible.
Q Is it possible that you would have interactions on a professional basis with Luther Deaton Jr. more than 30 times in a year?
A Sir, it is possible based on the needed circumstances. I cannot quantify the number.
Q Well, you said it was more than 20. Is it more than 30?
A Sir, it depends on the required interactions.
Q In the last 12 months.
A It has not been more than 30 times in the past six months.
Q Twelve months?
A I do not count individually. I do not know.
Q Is it possible that you've had professional interactions with Luther Deaton Jr. 30 times within the last 12 months?

A It's possible.
Q Is it possible that the number might be 40?
A Sir, I do not know.
Q I'm just asking if it's possible.
A And, sir, I'm saying I do not know.
Q You don't know if it's possible?
A It's possible. I don't know if it happened.
Q Do you know if it's possible you've met -- interacted with him professionally, Luther Deaton Jr., 50 times within the last 12 months?
A It is not possible.
Q It is not possible. Okay.
So 40 is possible, 50 is not possible. I understand.
In these 40 interactions, which, I guess, would be in any of his positions, not just as a board member, was the subject of the Wains ever discussed with him?
A No, sir.
Q Thank you.
MR. WAIN: Excuse me while I review my notes, please.
BY MR. WAIN:

Q So who would you say at Central Bank knows more than you about the Wains' accounts with Central Bank, litigation there?
Who knows more than you do?
A I'm assuming Becky Mullins.
Q Okay. Anybody else who knows more than you do?
A I don't know.
Q But it's possible?
A Yes.
Q Okay. Certainly, the people -- the person you discussed the letter with, they know about the Wain accounts, the September 23, 2023, letter, they know about the Wain accounts.
So, again -- so Becky Mullins knows more about the Wains' interaction with CBT more than you would?
You don't know if anybody else knows more than you. So you would be the second source of information on CBT's relationship with the Wains? You would be number two?
A No, sir, I did not say that.
Q I didn't say you did. I'm asking you a question.
Would you be number two in the --

Again, this is Tim Wiseman of Stoll Keenon Ogden.

DIRECT EXAMINATION

BY MR. WISEMAN:

Q Ms. Craven, your role is in the compliance department, correct?

A Yes.

Q You're not involved with the collection of special assets or foreclosures at all, correct?

A Correct.

Q So it's not surprising that you know almost nothing about Mr. and Mrs. Wain and their distressed loan, correct?

A Correct.

Q And you wouldn't talk about them at all for the last four years since you've been in this role, correct?

A Correct.

Q And you don't handle proofs of claims or anything involving bankruptcy matters at the bank, correct?

A Correct.

Q So when you're asked about calculations of proofs of claims, you don't have information about that, correct?

A Correct.

MR. WISEMAN: That's all the questions I have at this time.

MR. WAIN: I do have one follow-up.

FURTHER RECROSS-EXAMINATION

BY MR. WAIN:

Q You just said you have no information or no contact or interaction regarding the Wains in the last four years?

MR. WISEMAN: Me? Oh, she can clarify that.

I think -- I think I might have been talking about litigation matters.

MR. WAIN: Anything. It wasn't clear. That's why I'm asking her.

BY MR. WAIN:

Q Have you had any -- well, obviously, it's '23 -- that obviously can't be right.

So I just want to clarify. You've had some interaction regarding the matters with the Wains and Central Bank within the last four years?

A Correct.

Q Okay.

MR. WAIN: I am done. If you --

MR. WISEMAN: Yeah, I'll just -- I'll just

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY )
) SS:
COUNTY OF KENTON )

I, April L. Crites, RPR, RMR, CRR, CSR, CCR, and a Notary Public within and for the Commonwealth of Kentucky, duly commissioned and qualified, DO HEREBY CERTIFY:

That the above-named DONNA JEAN CRAVEN was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said testimony was reduced to writing by me stenographically in the presence of the witness and thereafter reduced to typewriting, and;

I FURTHER CERTIFY that I am not a relative or attorney of either party, in any manner interested in the event of this action, nor am I, or the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Covington, Kentucky, this 26th day of August, 2026.

I, April L. Crites, a Kentucky Notary Public - State at Large - No. KYNP13794, for acts performed in or outside Kentucky for recordation in Kentucky; my commission expires: August 25, 2028.



__________________________________________
April L. Crites, RPR, RMR, CRR, CSR, CCR

* * *

# EXHIBIT X

CBT branch notice, March 4, 2019, signed by Edward Barnes, CFO

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB

Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

Central Bank

RECEIVED

DDI
KDFI

March 4, 2019

Department of Financial Institutions
Depository Division
Marni Gibson, Director
1025 Capital Center Drive, Suite 200
Frankfort, KY 40601

Please consider this letter to be our notice as required by 808 KAR 1:150 to your office that our branch at 3541 Outer Loop, Louisville, Kentucky 40219, was established on March 1, 2019.

If you require any additional information, please do not hesitate to contact the undersigned.

Sincerely,

Edward Barnes
Chief Financial Officer

# EXHIBIT Y

Certified Excerpts — Deposition of Steven D. Hall — August 21, 2026

Transcript pages 1–3, 15–17, 21–24, 30–35, 38–50, 91–95,
and the Reporter's Certificate, pages 96–97 (April L. Crites, RMR, CRR, CSR, CCR)

Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB
Declaration of Douglas A. Wain ISO Opposition to Motion to Quash (Doc. 76)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

- - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Civil Action No. 1:24-bk-11814-MB |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : | Chapter 13 |
| | : | |
| Debtors. | : | |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : | Adversary Proceeding No. |
| | : | 1:25-ap-01026-MB |
| Plaintiffs, | : | |
| v. | : | |
| CENTRAL BANK & TRUST CO., et al., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - x

VIDEOCONFERENCED (BY ZOOM) DEPOSITION OF

STEVEN DENNIS HALL

Lexington, Kentucky

Friday, August 21, 2026

11:38 a.m. EDT

Pages: 1 - 97

Reported By: April L. Crites, RMR, CRR, CSR, CCR

Notary Public, Commonwealth of Kentucky

Deposition of STEVEN DENNIS HALL
held at the offices of:

STOLL KEENON OGDEN PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507
(859) 231-3000

* * *

Pursuant to notice, and pursuant to the
Federal Rules of Civil Procedure,
before April L. Crites, RMR, CRR, CSR, CCR,
and Notary Public in and for the
Commonwealth of Kentucky.

* * *

# I N D E X

EXAMINATIONS CONDUCTED PAGE

STEVEN DENNIS HALL

Cross-Examination by Mr. Wain................ 7
Direct Examination by Mr. Wiseman........... 94

* * *

## EXHIBITS



| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding), to: Steve Hall | 10 |
| Exhibit 2 | August 11, 2026, letter to Mr. Steve Hall, Re: Your Deposition - Friday, August 21, 2026, 12:00 noon Eastern Time - By Zoom | 10 |
| Exhibit 3 | August 14, 2026, letter to Mr. Steve Hall, Re: Deposition of Steve Hall - Friday, August 21, 2026, 9:00 a.m. Pacific/12:00 noon Eastern | 11 |
| Exhibit 4 | Motion For Distribution of Proceeds: Notice, CA No. 19-CI-00812, May 22, 2023 | 37 |

collections, make sure the bank stayed in compliance with the duties of that department.

In probably 2019 or 2020, my supervisor, who was the manager of the special assets department, left to take another job outside of the bank, and I was promoted to the manager of the special assets department. And that --

Q What year was that?

A It was -- I don't -- I don't remember, specifically. Probably 2019 or 2020, maybe even '21.

Q So you became the head of the special assets division in 2019 --

A I don't -- I --

Q -- approximately?

A -- do not recall the year.

Q Approximate?

A Yes.

Q Okay. And your position before that was?

A The consumer collections manager.

Q Understood.

A During that time, I think I was promoted to assistant vice president. I don't recall the year. Probably 2012. Within a year or two of that, I was promoted to a vice president.

Q Was that your title when you retired?
A Yes.
Q Could you say it again, please?
A Say what, the role -- the title?
Q Yes.
A Vice president/manager of special assets.
Q Thank you.
When exactly did you retire?
A My last day of employment was April 30, 2024.
Q April 30, 2024?
A Yes, sir.
Q Okay. Why did you retire?
A I wanted to retire. I was close to 65. My birthday is in late fall. I did not want to retire at 65 when winter was ready to set in; I wanted to spend my first several months of retirement during the spring and summer when I could get outside and enjoy myself.
Q Did your retirement have anything to do with the Wain matters or litigation?
A No.
Q Do you have a continuing relationship with Central Bank?
A Other than being a customer, no.

Q Do you receive any benefits from Central Bank?
A As -- what type of benefits are you referring to?
Q Any benefits.
A No.
Q No 401(k), no retirement --
A Well, yes, I have -- I have a 401(k), which was established at the bank, and the bank also had a stock/ESOP plan, in which I cashed out that stock I believe the begin -- near the beginning of this year.
Q So the ESOP and the 401(k), you receive benefits, and those are controlled by Central -- from Central Bank?
A No, they're controlled by me.
Q You were able to get these benefits through Central Bank; is that saying it better?
A Yes.
Q Okay. Is there a third benefit?
A No.
Q Just those two?
A Yes.
Q And one you cashed out, and one which is continued? The 401(k) --

Q Go ahead, Mr. Hall.
A It was -- to my knowledge, it was kept in the bank's computer system. The equity line was on our credit card system. And I don't remember who our servicing provider was at the time, but it was an automated system where all payments were processed and showed up in the -- in the recordkeeping system.
Q Do you know the name of that system?
A I don't recall which system we were on at that time for credit cards.
Q Who do you think would know now?
A I'm sorry?
Q Who do you think -- what position at Central Bank would know that information, what the computer system was for recordkeeping?
A The man -- the manager of the card services department.
Q Manager of card services.
Do you know who that was while you were at Central Bank?
A It was originally -- oh, I can't -- I can't recall the names. When I retired from Central Bank, it was -- it was Ken -- I can't remember Ken's last name. Ken Kirk.

Q Ken Kirk. Great.
Central Bank filed the proof of claim on December '24 or $357,990.91. That was signed by Mr. Wiseman in the chapter 13 case.
Were you still at the bank at that time?
A And what was the date?
Q December 20, 2024.
A No, my last day was April 30, 2024.
Q Were you consulted on the proof of claim?
A No.
Q Who at Central Bank would gather these figures for the proof of claim?
A The card services department would gather that information and send it to special assets.
Q And then special assets would populate the proof of claim numbers; is that right?
A They would -- they would send the -- the numbers to the -- to the bank's attorney that was handling the bankruptcy case.
Q Who would? The special assets manager or the card services manager?
A The special assets manager.
Q Who succeeded you as the special assets manager?
A Rebecca Mullins.

Q So she took over, I would imagine, May 1, 2024, approximately?
A I believe so.
Q Okay. She was already working in the special assets division?
A Yes.
Q How long had she been in the special assets division?
A When I was hired into the special assets department in 2020, she was the first employee I hired to work with me. So she was there in 2020, also.
Q You hired Becky Mullins, not Central -- you hired her into the special assets division; is that correct?
A Yes.
Q She was already an employee at Central Bank?
A She was already -- she was in our customer service's department at the time.
Q So when you retired April 30, 2024, Rebecca Mullins took over the Wain account; is that correct?
A I don't have knowledge of that, but I would assume so.

Q Okay. So you did not hand it to her directly?
A No, she took over, as far as I know. I don't know if the bank did something different with it after I left. But normal procedures were prior procedures, so I don't --
Q So you don't -- I'm sorry. Go ahead.
A -- when the head of -- when the head of special assets left the department for whatever reason, the person who took over took on all their responsibilities.
Q So you had no role in the handoff --
A No.
Q -- to Rebecca?
A No, other than to train her as to what I was working on --
Q Did that include --
(Overlapping speakers.)
A -- or to --
Q -- the Wain accounts?
A -- or to bring her up to speed.
Q Okay.
A I don't recall any discussions with the Wain accounts, because, to us, that was pretty much over.

A No, not that I remember.
Q Were they involved in the decision that after the March 14th distribution of 66,000, that the Wains still owed money to Central Bank?
A Yes.
Q Is there documentation?
MR. WISEMAN: Objection. Privileged information between attorney -- work product.
MR. WAIN: Okay.
BY MR. WAIN:
Q Is there documentation within Central Bank by non-attorneys of this procedure or this action of continuing to collect?
A I'm sorry. Could you repeat that, please?
Q Is it documented anywhere in Central Bank -- that is not attorney-privileged -- that documents the continued collection actions against the Wains after March 14, 2024?
MR. WISEMAN: Objection. Form, and vague. How would he know?
THE WITNESS: (No audible response.)
BY MR. WAIN:
Q Have you ever heard of the words "deficiency judgment"?
A Oh, yes.

Q Was that discussed while --
A No, sir. We already had a judgment for the full amount owed on the account.
Q Okay. I mean, you say you heard of the term. It's a legal -- well, it's called a deficiency judgment, correct?
MR. WISEMAN: Objection. Calling for a legal conclusion, or stating one.
MR. WAIN: I'm asking if he ever heard of it. I'm not asking him to define it.
THE WITNESS: Yes, I've heard -- yes, I've heard of it.
BY MR. WAIN:
Q Did you hear of it in the context of the Wain discussions?
A No.
Q When did you hear of it?
A Through the course of my career.
If we did not have a judgment on a debtor prior to the collateral being sold, then we would seek a deficiency judgment.
Q I'm sorry; say that again. I didn't understand.
A Well --
MR. WISEMAN: Objection. Asked and

answered.

But you can answer.

MR. WAIN: I didn't understand it. I didn't understand it.

MR. WISEMAN: Well, you can ask another question.

BY MR. WAIN:

Q Could you repeat that answer? I didn't understand.

A Yes, sir. I'm trying to clarify it in my mind to where you --

Q Take your time. Take your time. Take your time.

A There were instances, mainly -- and possibly exclusively -- with automobile loans or unsecured consumer loans for -- well, the unsecured doesn't fall into play. But mainly, with automobile loans, where we would not file suit for judgment until after the collateral had been sold by the bank through repossession. At that point, we could file for a deficiency judgment. Is that --

Q Well, that wasn't a foreclosure, though, was it?

A No.

Q Okay.
A No. In the foreclosure action, we were required, by law, to seek judgment, be granted a judgment against the debtor before the property could be sold.
Q All right.
A So the bank obtained the judgment, sent the property to the master commissioner for sale, the property was sold. The first mortgage-holder was paid the majority of the sale proceeds. The bank received approximately $66,000 from that sale and applied those funds to what was owed on the Wain debt.
So we did not have any need to seek a deficiency judgment; we had already obtained judgment for the entire amount owed on the debt.
Q Just to repeat what you said -- I don't want to put words in your mouth. You said the topic of deficiency -- getting a deficiency judgment was not discussed when continuing collection on the Wains?
A No, it was not discussed. We were already granted our judgment for the entire amount of the debt.
Q The original judgment on January 19, 2021,

approximately?
A If --
Q Yeah.
A Yeah. Yes.
Q So nobody advised you that -- or even discussed with you that you might need a deficiency judgment to continue collection?
A No.
Q Okay. It was -- March 7, 2024, was the settlement -- I mean, was the final distribution agreement where you received $66,000, approximately? Did you appeal that order?
MR. WISEMAN: If you have a document that could refresh his memory, if you have something to -- he can answer if he knows.
MR. WAIN: If he knows, he knows.
THE WITNESS: As far as I remember, I don't -- I do not remember an appeal of the distribution of funds. Prior to the distribution of funds, I do recall that we were taking actions to -- to implore the first mortgage-holder to file a motion for the distribution of funds. As I remember, they took -- I don't remember how long, but we waited and waited and waited for the first mortgage-holder to file that motion so the funds

could be disbursed. That -- that's about all I remember.

BY MR. WAIN:

Q Why did it take two and a half years for Central Bank to file for a motion of distribution on the -- on the proceeds?

MR. WISEMAN: Objection to form.

THE WITNESS: The responsibility to file the motion for distribution of the sale proceeds is a responsibility of the first mortgage-holder. Central Bank, being in a junior lien position to the first mortgage-holder, was not allowed to do that. So you would have to ask the first mortgage-holder that question.

BY MR. WAIN:

Q Do you believe that you could not file a motion for distribution until May 23, 2023, because you were not allowed to?

A Yes.

Q Not allowed --

A That was -- that was the duty of the first lienholder's.

Q Okay. Was this -- this -- this was your opinion at the time when you were in this position?

MR. WISEMAN: He's still reviewing it.
MR. WAIN: Oh, okay. That's fine.
BY MR. WAIN:
Q Do you remember that document now?
A Yes, I am starting to remember what took place at the time. Give me one more minute.
Q Sure.
A I'm sorry.
Yes, and this is what I alluded to previously. I'm not quite done with the entire document yet, but the issue at hand, and what this says, is that due to the inaction of Newrez, who your first mortgage was transferred to during the process of the foreclosure, due to their inaction, the funds from the sale proceeds were to be escheated to the State. At that point, the master commissioner, or someone, implemented a new rule, and basically told us to go ahead and file for the order of distribution.
Q So you filed for this -- I think it was the 22nd -- I had the wrong date -- February 22, 2023, the motion for distribution, because of the new information received from the master commissioner about the escheat loss; is that correct?

A We were basically told to go ahead and file the order of distribution.
Q Told by who?
A The master commissioner. And it plain clearly states in this that due to the in -- inaction of Newrez, a new rule had been implemented that the proceeds would be escheated, and the master commissioner apparently did not want to do that and allowed us to go ahead and file the order of distribution.
It also states in here that the bank had diligently pursued the distribution of funds since the master -- since the sale of the property, but due to Newrez' inaction, they had never been distributed.
Q Did you speak directly with the master commissioner?
A No.
Q You never spoke directly with him, Mr. Frazier, regarding this case?
A No, any -- any of those communications would have been done through the bank's attorney.
Q And that is Stoll Keenon Ogden?
A Yes.
Q Who did you report to in your position the

last -- when you took over in 2019, 2020?
A The -- the director of lending, Paul Thornsberry.
Q You reported to Paul Thornsberry?
A Yes.
Q And who did he report to?
A I don't believe he reported to anyone other than the president of the bank.
Q Which is Luther Deaton Jr.?
A Yes.
Q Okay. Was Paul Thornsberry involved in these decisions as well with -- regarding the Wain account?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q Did you discuss the Wayne accounts with Paul Thornsberry?
A There were discussions, yes.
Q About the Wain situation, the Wain accounts?
A Yes.
Q Was there many discussions with Paul Thornsberry?
A It was mainly just -- from what I remember, mainly just providing him updates on the

status of the account; the foreclosure and the distribution of proceeds.
Q And so you report -- did you report at all to Luther Deaton Jr. or any of the board members of Central Bank or Central Bancshares?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q You can go ahead and answer.
MR. WISEMAN: The objection is noted.
THE WITNESS: Could you repeat it, please?
BY MR. WAIN:
Q Did you speak to the board members of Central Bank or Central Bancshares or board directors?
A No.
Q You never spoke to Central Bank's board members or Bancshares' board members about the Wain account?
A During this action, that would have been the responsibility of Ellen Sharp.
Q But Ellen Sharp, you said, left in '21, I believe you said, and you were there until 2024.
A I believe when she left, there were -- I never attended the board meetings. The responsibility of reporting on delinquent loans

would have fallen to Paul Thornsberry.
Q So have you had any discussions with any board member regarding the Wain accounts?
A Not personally, no.
Q Professionally?
A I personally never had any discussions with any board members concerning the Wain accounts --
Q Of Central Bank?
A -- in my -- in my position at Central Bank.
Q So Paul Thornsberry was your main -- was your superior that you had to report to on those?
A Yes.
Q Okay. So did Paul Thornsberry tell you to file this first distribution for -- motion for distribution on February 22, 2023?
MR. WISEMAN: Objection. Misstates the document.
MR. WAIN: I'm sorry?
MR. WISEMAN: The document says May 22, 2023.
MR. WAIN: What did I say?
MR. WISEMAN: I think you said February. Just to --

MR. WAIN: Oh, I'm so sorry. So sorry.
BY MR. WAIN:
Q Did Paul Thornsberry, or anybody else for that matter at Central Bank, tell you to file this May 22, 2023, motion for distribution?
A No. That decision would have been made between myself and counsel.
Q So it was your decision alone to file this May 22, 2023, motion for distribution?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q You can go ahead and answer.
A Yes.
Q Nobody else at Central Bank knew that you were filing this motion for distribution on May 22, 2023; is that correct?
A No, that is not correct.
Q Who else knew?
A Paul Thornsberry. Senior members of the bank leadership. You know, these things were discussed.
Q So you did not make the decision all by yourself?
A Yes, I just informed them of the fact.
Q Ah. Who did you inform? The names

please.
A Paul Thornsberry, Greg Shewmaker. And these were -- these were not necessarily individual discussions. These were during the course of regular meetings where delinquent loans and foreclosure actions and things of that nature were discussed.
Q So there were regular meetings of these topics where the Wain accounts were discussed?
A Yes.
Q Who was at these meetings?
A There were several people. The group usually consisted from 12 to 15 individuals. They were executives of the bank. They were people from the compliance department. The financial accounting department. Certainly Paul Thornsberry, Greg Shewmaker. Compliance people were -- Donna Craven was always there. David Ross, who was the director of commercial mortgage lending. Becky Mullins was always in the meeting. Representatives of the loan review department were in the meetings.
It was a representation of the bank employees who were in charge of oversight of loans and compliance.

Q This group have a name?
A It was the watch loan committee.
Q The watch loan committee?
A Yes.
Q Is that documented somewhere in Central Bank's policies and records?
A Yes, it is.
Q Were decisions made about accounts in the watch loan committee?
A They were discussed, yes.
Q Were decisions made in the committee?
A Yes.
Q How were decisions made?
A Through discussions concerning the individual loans, the group would normally come to a consistence as to -- a consensus as to what action needed to be taken.
Q Was there a vote?
A Occasionally.
Q Were there any votes on the Wain accounts?
A No.
Q Who was the chairperson of this committee?
A Ellen Sharp until she left the bank, and then I became the chairperson when I assumed her position.

Q Were there any board members of Central Bancshares or Central Bank at -- in this watch loan committee?
A Not that I remember, no.
Q But there is a policy of detailing the duties and responsibilities of the watch loan committee in Central Bank's records?
A Yes.
Q So were decisions made about the Wain account at this committee?
MR. WISEMAN: Objection. Form. What?
BY MR. WAIN:
Q If the watch committee made a decision on the Wain accounts, you would abide by that decision and you would carry it out, correct?
A If there were decisions made. But due to the delinquency of the loan, there was really no decision -- there was only one decision that needed to be made. It had -- there was no -- I would inform the committee about what actions I had decided to take, and there were never any objections to those decisions.
Q That includes the Wain account, too, right?
A Yes.

Q How often does the watch loan committee meet?
A Once a month.
Q How often were the Wain accounts discussed at this once-a-month meeting?
A They were discussed every month.
Q The Wain accounts was discussed every month?
A Yes, I don't -- I don't remember the exact requirements for which loans were discussed, but it was based on the number of days past due on the loan, with a minimum-dollar threshold. And the Wain -- and the Wains' loan, once it became delinquent, was included in those discussions, where every loan that met those requirements were discussed.
Q Approximately, how many loans were discussed at one meeting?
A It varied tremendously from time to time, through the years. There could be 40, 50, maybe as few as 30 at times. It -- it was dependent a lot on -- well, it was solely dependent on how many loans met the requirement. But it -- it was several at every meeting.
Q Were minutes kept at this meeting, a

secretary?
A Yes.
Q Do you recall who the secretary was?
A Once I became the chair of the committee, Becky Mullins kept the minutes. And I believe before that, I know Donna Craven's kept minutes, and Ellen Sharp kept minutes, and that's about all I recall.
Q When decisions were made -- when you were the chair, or somebody else, would they make the final decision?
A It was -- the final decision would be -- if the room was in agreement, the final decision would be made by the bank employee that was assigned that -- that loan account.
Q So final decisions in this watch loan committee could be made by different people at different times?
A Yes.
Q Okay. Could someone be overruled?
A I would not use the term "overruled."
Q What would you use?
A There would be discussions at times about taking different forms of action, where discussing what other possibilities might be available --

available to the bank to collect the money that was owed.

Q Were attorneys present at this watch loan committee?

A Were -- I'm sorry, who?

Q Were there any attorneys?

A No.

Q What I'm trying to understand is the decision-making process regarding the Wain accounts, if you were the final decision, or Thornsberry was the final decision, or the watch loan committee was the final decisions. Which of --

A I was the final decision, but I never had any objections to any actions taken.

Q By Paul Thornsberry or by the watch --

A By anyone --

Q -- loan committee?

A By anyone employed at the bank.

Q So you advised them of your legal actions, and there was no objection?

A Correct.

Q Okay. Okay. So there was no objection for you filing this May 22, 2023, motion for distribution?