DOUGLAS A. WAIN
ELISA WAIN
P.O. Box 7473
Westlake Village, CA 91359
Telephone: (859) 494-3677
Email: douglaswain@gmail.com
Plaintiffs in Pro Per

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| **In re**<br><br>**Douglas Alan Wain, Elisa Wain,**<br><br>**Debtors,**<br>____________________<br><br>**Douglas Alan Wain and Elisa Wain**<br><br>**Plaintiffs,**<br>**vs.**<br><br>**Central Bank & Trust Co.**<br><br>**Defendant.** | **Case No. 1:24-bk-11814-MB**<br><br>**Adv. Proc. No. 1:25-ap-01026-MB**<br><br>**Chapter 13**<br><br>**SECOND SUPPLEMENTAL DECLARATION OF DOUGLAS A. WAIN IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL WRITTEN DISCOVERY (DOC. 80)**<br><br>**Hon. Martin R. Barash**<br><br><br>**Hearing on Doc. 80 (Doc. 83):**<br>**September 24, 2026, 2:30 p.m.**<br>**Courtroom 303**<br>**21041 Burbank Blvd.**<br>**Woodland Hills, CA 91367** |

**SECOND SUPPLEMENTAL DECLARATION OF DOUGLAS A. WAIN**

I, Douglas A. Wain, declare as follows:

1. I am a Plaintiff in this adversary proceeding, appearing pro per together with my wife, Elisa Wain. I have personal knowledge of the facts stated below and, if called as a witness, could and would testify competently to them. I make this Second Supplemental Declaration in support of Plaintiffs' Reply in Support of their Motion for Orders Compelling Further Responses to Written Discovery (Doc. 80), set for hearing on September 24, 2026 at 2:30 p.m. I incorporate by reference my Declaration filed with the Motion (Doc. 80), my Declaration filed September 9, 2026 (Doc. 85), and my Supplemental Declaration filed September 10, 2026 (Doc. 90), together with their exhibits.

2. As stated in paragraph 10 of my Declaration filed with the Motion, Defendant served no insertions and no response of any kind to the Joint Stipulation Regarding Written Discovery Disputes by the August 28, 2026 deadline. As stated in paragraph 5 of my Supplemental Declaration (Doc. 90), the only insertions I have received from Defendant's counsel were sent by email on September 4, 2026, and were unsigned.

3. Defendant's Opposition (Doc. 91) states that "Central Bank provided its responses on September 10, 2026." I received nothing from Defendant or its counsel on September 10, 2026 other than the Opposition itself, which was served by email that evening. No signed Joint Stipulation, no further insertions, no amended discovery responses, no privilege log, and no documents were received on that date or at any time since September 4, 2026.

4. I reviewed the dockets of the main case (No. 1:24-bk-11814-MB) and this adversary proceeding on the morning of September 17, 2026. As of that review, no amended Proof of Claim has been filed, and no order memorializing the Court's rulings at the March 5, 2026 hearing has been lodged by Defendant's counsel.

5. Exhibit 16 to the Motion consists of excerpts from the deposition of Steven Dennis Hall, taken in this adversary proceeding by videoconference on August 21, 2026, before April L. Crites, RMR, CRR, CSR, CCR, Notary Public, Commonwealth of Kentucky, at the offices of Stoll Keenon

Ogden PLLC in Lexington, Kentucky. Attached as Exhibit EE is a true and correct copy of the complete certified transcript of that deposition (pages 1 through 97, including the reporter's certificate), together with the word index and the seven exhibits marked at the deposition (Hall Exhibits 1 through 7), as I received them from the court reporter. Defendant's counsel, Timothy R. Wiseman of Stoll Keenon Ogden PLLC, attended and defended the deposition. I submit the complete transcript so that the Court has the full context of the passages cited in the Motion and in Plaintiffs' Reply.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 17, 2026, at Bradenton, Florida.

Douglas A. Wain

Plaintiff, Pro Per

**INDEX OF EXHIBITS**

**TO SECOND SUPPLEMENTAL DECLARATION OF DOUGLAS A. WAIN (DOC. 80)**

| **Exhibit** | **Description** | **Pages** |
|---|---|---|
| EE | Complete certified transcript of the deposition of Steven Dennis Hall, taken August 21, 2026 (pp. 1–97, with reporter's certificate), with word index and Hall Exhibits 1–7 marked at the deposition | 142 |

# EXHIBIT EE

Complete Certified Transcript of the Deposition of Steven Dennis Hall

August 21, 2026 (with Word Index and Hall Exhibits 1–7)

**In The Matter Of:**

*WAIN v.*

*CENTRAL BANK & TRUST CO., et al.*

---

*STEVEN DENNIS HALL*

*August 21, 2026*

---

ALC

April L. Crites, RMR, CRR, CSR, CCR
National and International Realtime Court Reporter
aprilcrites@outlook.com
(434) 774-5993

*Min-U-Script® with Word Index*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

- - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Civil Action No. 1:24-bk-11814-MB |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : Chapter 13 |
| | : |
| Debtors. | : |
| DOUGLAS ALAN WAIN and ELISA WAIN, | : Adversary Proceeding No. |
| | : 1:25-ap-01026-MB |
| Plaintiffs, | : |
| v. | : |
| CENTRAL BANK & TRUST CO., et al., | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - x

VIDEOCONFERENCED (BY ZOOM) DEPOSITION OF

STEVEN DENNIS HALL

Lexington, Kentucky

Friday, August 21, 2026

11:38 a.m. EDT

Pages: 1 - 97

Reported By: April L. Crites, RMR, CRR, CSR, CCR

Notary Public, Commonwealth of Kentucky

Deposition of STEVEN DENNIS HALL
held at the offices of:

STOLL KEENON OGDEN PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507
(859) 231-3000

* * *

Pursuant to notice, and pursuant to the Federal Rules of Civil Procedure, before April L. Crites, RMR, CRR, CSR, CCR, and Notary Public in and for the Commonwealth of Kentucky.

* * *

# I N D E X


| EXAMINATIONS CONDUCTED | PAGE |
| --- | --- |
| STEVEN DENNIS HALL | |
| Cross-Examination by Mr. Wain................ | 7 |
| Direct Examination by Mr. Wiseman........... | 94 |


* * *

## EXHIBITS


| MARKED | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding), to: Steve Hall | 10 |
| Exhibit 2 | August 11, 2026, letter to Mr. Steve Hall, Re: Your Deposition - Friday, August 21, 2026, 12:00 noon Eastern Time - By Zoom | 10 |
| Exhibit 3 | August 14, 2026, letter to Mr. Steve Hall, Re: Deposition of Steve Hall - Friday, August 21, 2026, 9:00 a.m. Pacific/12:00 noon Eastern | 11 |
| Exhibit 4 | Motion For Distribution of Proceeds: Notice, CA No. 19-CI-00812, May 22, 2023 | 37 |

| | | |
|---|---|---|
| Exhibit 5 | Entry Granting Summary Judgment and Order of Distribution of Sale Proceeds, 03/07/2024, Case No. 19-CI-00812 | 60 |
| Exhibit 6 | May 15, 2023, Complaint, Re: Case No. 5:23-cv-00139-DCR | 51 |
| Exhibit 7 | Agreed Judgment, Case No. 19-CI-00812 | 70 |


* * *

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, DOUGLAS A. WAIN and ELISA WAIN (pro per):

Douglas Alan Wain
Elisa Wain
Post Office Box 7473
Westlake Village, California 91359
859-494-3677
douglaswain@gmail.com

ON BEHALF OF CENTRAL BANK & TRUST COMPANY AND THE DEPONENT, STEVEN DENNIS HALL:

Timothy R. Wiseman, Esq.
STOLL KEENON OGDEN PLLC
300 West Vine Street
Suite 2100
Lexington, Kentucky 40507
859-231-3073
tim.wiseman@skofirm.com

* * *

THE COURT REPORTER: Good morning.
Today is Friday, August 21, 2026, at approximately 11:39 Eastern Daylight Time.
The location of the witness is Lexington, Kentucky.
We are here in the case of Douglas A. Wain and Elisa Wain v. Central Bank & Trust Co., et al., case number 1:25-ap-01026-MB, and we are here to take the deposition of Steven Hall.
My name is April Crites. I am a certified court reporter for the State of California and a Notary Public for the Commonwealth of Kentucky.
Will counsel please voice-identify yourselves and state whom you represent, and if there are any objections to proceeding, please state them at the time of your appearance, beginning with Mr. Wain.
MR. WAIN: Yes, hi. Douglas Wain, plaintiff, making an appearance.
MR. WISEMAN: Tim Wiseman, Stoll Keenon Ogden, for Steven Hall.
I just reiterate our objections, generally, to the Court's jurisdiction over most of Mr. Wain's claims and, therefore, the discovery he's seeking as to those claims. We object,

generally, on those bases to the discovery, and so we'll just continue to reiterate those objections for the record.

THE COURT REPORTER: Mr. Hall, could you please raise your right hand?

STEVEN DENNIS HALL

of lawful age, Witness herein, having been first duly cautioned and sworn, as hereinafter certified, was examined and said as follows:

CROSS-EXAMINATION

BY MR. WAIN:

Q Great. Well, welcome.

MR. WAIN: Mr. Wiseman, can I ask you a question? You're representing Mr. Hall here today. Are you representing anybody else today?

MR. WISEMAN: What do you mean by represent? We represent Central Bank, and Mr. Hall is a former employee of Central Bank.

MR. WAIN: Oh, okay. So you're representing Central Bank here, too, in Kentucky?

I'm sorry.

MR. WISEMAN: What's the question?

MR. WAIN: I know -- okay.

I know you're representing Mr. Hall today, right?

MR. WISEMAN: Yes.

MR. WAIN: And you're presenting here today, participating. Are you representing, also, Central Bank in Kentucky?

MR. WISEMAN: We are in Kentucky. We're appearing for a deposition you noticed in Kentucky. Yes.

MR. WAIN: Are you representing -- I want to know if you're also representing Central Bank today, or just Mr. Hall.

MR. WISEMAN: I represent Central Bank and its interests and Steve Hall as a former employee of Central Bank.

MR. WAIN: Okay.

MR. WISEMAN: I have not yet entered an appearance in the adversary proceeding if that's where you're heading with this. I am not --

MR. WAIN: No, no, no. You answered my question. That's fine.

BY MR. WAIN:

Q Okay. Mr. Hall, could you state your full name for the record? City and residence?

A Steven Dennis Hall. Lexington, Kentucky.

Q And your residence?

A 1183 Rockbridge Drive [sic], Lexington,

40515.
Q Okay. Mr. Hall, you understand you're under oath today and it's the same as if you were in a court?
A Yes.
Q Mr. Hall, is there any reason you cannot give complete and truthful testimony today?
A No.
Q Are you represented by a lawyer today?
A Tim Wiseman.
Q When did that start?
A I would say today.
Q Today? So today is the first day he is representing you?
A Yes.
Q Okay. When I repeat things, it's just to make sure I understand correctly.
Who is paying for Mr. Wiseman's appearance today?
A I would assume Central Bank.
MR. WAIN: Okay. I just want to get to some preliminary documents. I'm going to try to do this in the chat, and make sure -- I'm sorry.
Okay. I'll come back to this.
Oh, here it is.

BY MR. WAIN:
Q Did you get that?
A We need to open the document.
Q Were you able to open it?
A Yes, sir. And, yes, I received that.
Q Okay. That's the subpoena --
A Which is why I'm here today.
Q Okay.
MR. WAIN: I have another document.
MR. WISEMAN: Are you introducing it?
THE COURT REPORTER: Mr. Wain --
MR. WISEMAN: Are you introducing it as an exhibit, Mr. Wain?
MR. WAIN: Yes. That's Exhibit 1.
(Plaintiffs' Exhibit 1, Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding), to: Steve Hall, was marked and presented for purposes of identification.)
MR. WAIN: Here comes the other one.
This is Exhibit 2.
It's loaded.
(Plaintiffs' Exhibit 2, August 11, 2026, letter to Mr. Steve Hall, Re: Your Deposition - Friday, August 21, 2026, 12:00 noon Eastern Time - By Zoom, was marked and presented for purposes of

identification.)

MR. WISEMAN: Do you want me to print this out for you, Steve?

THE WITNESS: No.

BY MR. WAIN:

Q Okay. Have you -- have you received this letter?

A Let me review the letter, please.

Q Sure.

A Yes, I do -- I do believe I received that letter, yes.

Q All right.

MR. WAIN: One more here.

This is Exhibit 3.

(Plaintiffs' Exhibit 3, August 14, 2026, letter to Mr. Steve Hall, Re: Deposition of Steve Hall - Friday, August 21, 2026, 9:00 a.m. Pacific/12:00 noon Eastern, was marked and presented for purposes of identification.)

THE WITNESS: Yes, I received that letter.

BY MR. WAIN:

Q Okay. Thank you.

Did you meet with anybody to prepare for this deposition?

A No. I spoke on the phone briefly with Tim

Wiseman concerning the deposition, and I spoke with William Ireland for five minutes.

Q All right. Did you review any documents for this deposition?

A No. Other than this (indicating), what was written on the subpoena.

Q Is there anyone -- who is in the room with you?

A Anyone other than Tim Wiseman?

Q Yes.

A No.

Q What devices are within your reach?

A I'm sorry? What --

Q Devices --

A Advices?

Q No, I'm sorry. Devices, D-E-V-I-C-E-S?

A Okay. The laptop that we're using presently and a piece of paper and a pen.

Q Do you agree not to communicate with anybody about your testimony while you are on the record?

A I will communicate with Tim Wiseman.

MR. WISEMAN: I think he's clarified it.

BY MR. WAIN:

Q While you're on the record, we request you

don't confer with Mr. Wiseman during a question or in between questions.
You agree?
A Sure.
Q Okay. Just to be clear, you are not going to confer with Mr. Wiseman while you're on the record during a question or in between questions; is that correct?
A Yes.
Q Thank you.
Could you walk me through your career at Central Bank: The titles, departments, dates, from start to retirement?
A I was employed by Central Bank beginning January of 1998. I was in the position of a personal banker -- that is a person who works in a branch -- at a desk in the lobby, opening new accounts, handling customer concerns, documenting loan files. Pretty much anything that the officer of that branch requested.
In the year 2000, a new position was created in the special assets department that I was applied for and was hired for that position. It was to oversee the implementation and then the daily workings of a new product at the bank

referred to as "courtesy coverage." It was an overdraft program to benefit our customers where we paid everyone's overdrafts on their checking accounts unless they opt out of the program. And I was placed in charge of collecting on those overdrawn accounts. I held that position until approximately 2008.

When I was first hired into the position, it came without a title. Within four to six months, I was given the title of supervisor. I hired two additional employees to help work that program. Within the next -- probably within the next year to two years, I was promoted to an officer of the bank.

Beginning about 2009, they removed me from that role, promoted one of my employees into that position. I did various jobs at that point: Assisting the consumer collection manager and the manager of the special assets department.

When the consumer collection manager retired -- and I don't remember the year. It was probably 2014 or '15 -- I was placed into the role of the consumer collections manager, overseeing the six employees who collected on delinquent consumer loans. My role was to oversee those

collections, make sure the bank stayed in compliance with the duties of that department.

In probably 2019 or 2020, my supervisor, who was the manager of the special assets department, left to take another job outside of the bank, and I was promoted to the manager of the special assets department. And that --

Q What year was that?

A It was -- I don't -- I don't remember, specifically. Probably 2019 or 2020, maybe even '21.

Q So you became the head of the special assets division in 2019 --

A I don't -- I --

Q -- approximately?

A -- do not recall the year.

Q Approximate?

A Yes.

Q Okay. And your position before that was?

A The consumer collections manager.

Q Understood.

A During that time, I think I was promoted to assistant vice president. I don't recall the year. Probably 2012. Within a year or two of that, I was promoted to a vice president.

Q Was that your title when you retired?
A Yes.
Q Could you say it again, please?
A Say what, the role -- the title?
Q Yes.
A Vice president/manager of special assets.
Q Thank you.
When exactly did you retire?
A My last day of employment was April 30, 2024.
Q April 30, 2024?
A Yes, sir.
Q Okay. Why did you retire?
A I wanted to retire. I was close to 65. My birthday is in late fall. I did not want to retire at 65 when winter was ready to set in; I wanted to spend my first several months of retirement during the spring and summer when I could get outside and enjoy myself.
Q Did your retirement have anything to do with the Wain matters or litigation?
A No.
Q Do you have a continuing relationship with Central Bank?
A Other than being a customer, no.

Q Do you receive any benefits from Central Bank?
A As -- what type of benefits are you referring to?
Q Any benefits.
A No.
Q No 401(k), no retirement --
A Well, yes, I have -- I have a 401(k), which was established at the bank, and the bank also had a stock/ESOP plan, in which I cashed out that stock I believe the begin -- near the beginning of this year.
Q So the ESOP and the 401(k), you receive benefits, and those are controlled by Central -- from Central Bank?
A No, they're controlled by me.
Q You were able to get these benefits through Central Bank; is that saying it better?
A Yes.
Q Okay. Is there a third benefit?
A No.
Q Just those two?
A Yes.
Q And one you cashed out, and one which is continued? The 401(k) --

A Yes.
Q -- is continued?
A Yes.
Q Okay. So you don't have any consulting retainer or any -- any -- like, do you have any agreements with Central Bank?
A No.
Q Do you --
(Overlapping speakers.)
A Other -- other than as a customer.
Q Okay. So there was no separation agreement?
A No.
Q What does "special assets" mean?
A They are -- it's hard to describe, but special assets are assets of the bank that are not performing. Assets to the bank include all loans, and not performing means that the customers are not making their payments.
Q How many people, while you were there in your last position, worked in the special assets department?
A It varied from time to time, but I believe when I retired, there were 11 or 12.
Q Who is Ellen Sharp?

A Ellen Sharp was the special assets manager for, I believe, approximately seven years. She was hired in from an outside law firm when our -- the special assets manager at the time retired. So she was the head of the department for seven years.
Q Was she your superior?
A Yes.
Q During the mediation we had, was that Ellen Sharp, who was also in attendance --
MR. WISEMAN: Objection. The mediation would have been confidential. Don't get into any of that.
MR. WAIN: Okay.
BY MR. WAIN:
Q To the best of your knowledge, is Ellen Sharp still at Central Bank?
A No, she's not, to the best of my knowledge.
Q Okay. Do you know when she left or when she no longer was employed by Central Bank?
A I don't remember specifically what year that was. But it was -- when she left, I was promoted into that position.
Q Do you have an approximate date?

A Well, you already have that date.
Q 2019, 2020?
A Yes.
Q So that means she left around 2019 and 2020, something like that?
A Something like that, yes, sir. I don't -- I don't recall specifically what year.
Q Okay. Do you know why she left? She --
A She --
Q Sorry.
A She took another -- she took a position at another bank as an in-house counsel.
Q When did the Wain account come into special assets?
A I don't remember the particular year, but it came into special assets when the loan payments became delinquent.
Q Was there somebody who delegated it to you, someone at Central Bank?
A No. It was just per bank procedure.
Q While you were handling the account, where was the payment history kept?
MR. WISEMAN: Objection. Form.
MR. WAIN: Noted for the record.
BY MR. WAIN:

Q Go ahead, Mr. Hall.
A It was -- to my knowledge, it was kept in the bank's computer system. The equity line was on our credit card system. And I don't remember who our servicing provider was at the time, but it was an automated system where all payments were processed and showed up in the -- in the recordkeeping system.
Q Do you know the name of that system?
A I don't recall which system we were on at that time for credit cards.
Q Who do you think would know now?
A I'm sorry?
Q Who do you think -- what position at Central Bank would know that information, what the computer system was for recordkeeping?
A The man -- the manager of the card services department.
Q Manager of card services.
Do you know who that was while you were at Central Bank?
A It was originally -- oh, I can't -- I can't recall the names. When I retired from Central Bank, it was -- it was Ken -- I can't remember Ken's last name. Ken Kirk.

Q Ken Kirk. Great.
Central Bank filed the proof of claim on December '24 or $357,990.91. That was signed by Mr. Wiseman in the chapter 13 case.
Were you still at the bank at that time?
A And what was the date?
Q December 20, 2024.
A No, my last day was April 30, 2024.
Q Were you consulted on the proof of claim?
A No.
Q Who at Central Bank would gather these figures for the proof of claim?
A The card services department would gather that information and send it to special assets.
Q And then special assets would populate the proof of claim numbers; is that right?
A They would -- they would send the -- the numbers to the -- to the bank's attorney that was handling the bankruptcy case.
Q Who would? The special assets manager or the card services manager?
A The special assets manager.
Q Who succeeded you as the special assets manager?
A Rebecca Mullins.

Q So she took over, I would imagine, May 1, 2024, approximately?
A I believe so.
Q Okay. She was already working in the special assets division?
A Yes.
Q How long had she been in the special assets division?
A When I was hired into the special assets department in 2020, she was the first employee I hired to work with me. So she was there in 2020, also.
Q You hired Becky Mullins, not Central -- you hired her into the special assets division; is that correct?
A Yes.
Q She was already an employee at Central Bank?
A She was already -- she was in our customer service's department at the time.
Q So when you retired April 30, 2024, Rebecca Mullins took over the Wain account; is that correct?
A I don't have knowledge of that, but I would assume so.

Q Okay. So you did not hand it to her directly?
A No, she took over, as far as I know. I don't know if the bank did something different with it after I left. But normal procedures were prior procedures, so I don't --
Q So you don't -- I'm sorry. Go ahead.
A -- when the head of -- when the head of special assets left the department for whatever reason, the person who took over took on all their responsibilities.
Q So you had no role in the handoff --
A No.
Q -- to Rebecca?
A No, other than to train her as to what I was working on --
Q Did that include --
(Overlapping speakers.)
A -- or to --
Q -- the Wain accounts?
A -- or to bring her up to speed.
Q Okay.
A I don't recall any discussions with the Wain accounts, because, to us, that was pretty much over.

Q What do you mean, "over"?

A Well, we had gone through -- we had obtained judgment, gone through the foreclosure proceedings, the property was sold. The only thing left to do was to attempt to collect on the deficiency balance that remained on the account.

Q So you -- while you were at Central Bank, you believed there was a deficiency balance?

A Yes.

Q Why?

A I don't remember the exact figures. Some of them are in the subpoena. But the bank was owed, I think it said, $357,000 of principal and interest. The property sold, I think I remember, for 800-some-thousand. The first mortgage-holder was owed the majority of that. The bank received only 66, $67,000 of -- of the proceeds from the sale of the property.

So the remaining balance -- after that was applied to the account, the remaining balance remained being owed to the bank.

Q Who made that decision?

MR. WISEMAN: Objection. Form.

BY MR. WAIN:

Q Did you make the decision --

A No. There was no decision --
Q -- what was still owed?
A There was no decision to be made.
Q The decision was if there was money still owed or not.
So who made the decision -- this is a very important question -- that the money was still owed by the Wains after you received the 66,000?
A There's -- there -- Mr. Wain, there was no decision to be made. There was still a balance on the account agreement. There was still a balance owed --
Q According to who?
A -- on the loan.
Q According to which officer?
A I'm sorry. According to law.
Q It was your opinion when you were still special assets -- this was in May of 2024. You were no longer there.
A May of 20-what?
Q 2024 was when -- I'm sorry, March -- I'm sorry. Let me rephrase that.
I believe it was March 14, 2024, that Central Bank received approximately $66,000 from the auction sale; is that correct?

A I don't recall what date it was. It was --
Q It was March 14th.
But was it around that date?
A I -- I do not remember what date we received the funds.
Q Okay. Well, when was it determined -- all right. Let me put it this way.
Was it determined by you, before you left, that after the distribution, the Wains still owed Central Bank money?
MR. WISEMAN: Objection to the extent it calls for a legal conclusion. But he can answer --
MR. WAIN: I asked his position -- as in his position.
MR. WISEMAN: You can answer.
THE WITNESS: It was determined by everyone, not just me. Yes, I -- I agreed. There was a deficiency balance on the loan that was still owed to Central Bank.
Once the property sold, it became an -- an unsecured debt to the bank.
BY MR. WAIN:
Q Who is "everyone"?

A The head of lending, the CFO. It -- everyone who had any knowledge of the loan.

Q Could you give me the names of everybody who had knowledge of the loan?

MR. WISEMAN: Objection. Form.

BY MR. WAIN:

Q Titles?

A There were executive vice presidents, senior vice presidents. As I said, the head of lending, our accounting department, the CFO, the chief financial officer, anyone who was in auditing. And there -- there were too many people to name.

Q But basically, together, the consensus was there was still an amount owed on the loan after the March 14th distribution, 2024, by the Wains?

A It was a fact that there was still amounts owed on the loan.

Q But there was a consensus among the people?

A Oh, yes.

Q A hundred percent?

A One hundred percent.

Q So approximately ten people?

MR. WISEMAN: Objection. Form.

BY MR. WAIN:
Q Approximately how many people?
A I could not even begin to approximate.
Q This was a bankruptcy foreclosure; am I correct?
A A bankruptcy foreclosure?
Q I'm sorry. This was a foreclosure action by Central Bank, correct?
A Correct.
Q Okay. Which counsel were you using at the time of the March 14th distribution of the $66,000?
MR. WISEMAN: Objection. Relevance, and to the extent he knows.
BY MR. WAIN:
Q Were you working directly with attorneys during Wain accounts?
A Yes. Through the foreclosure, yes.
Q Which attorneys?
A Stoll Keenon Ogden.
Q Did you work with Greg Pavey?
A Yes.
Q And you worked with Tim Wiseman?
A Yes.
Q Is there anybody else?

A No, not that I remember.
Q Were they involved in the decision that after the March 14th distribution of 66,000, that the Wains still owed money to Central Bank?
A Yes.
Q Is there documentation?
MR. WISEMAN: Objection. Privileged information between attorney -- work product.
MR. WAIN: Okay.
BY MR. WAIN:
Q Is there documentation within Central Bank by non-attorneys of this procedure or this action of continuing to collect?
A I'm sorry. Could you repeat that, please?
Q Is it documented anywhere in Central Bank -- that is not attorney-privileged -- that documents the continued collection actions against the Wains after March 14, 2024?
MR. WISEMAN: Objection. Form, and vague. How would he know?
THE WITNESS: (No audible response.)
BY MR. WAIN:
Q Have you ever heard of the words "deficiency judgment"?
A Oh, yes.

Q Was that discussed while --
A No, sir. We already had a judgment for the full amount owed on the account.
Q Okay. I mean, you say you heard of the term. It's a legal -- well, it's called a deficiency judgment, correct?
MR. WISEMAN: Objection. Calling for a legal conclusion, or stating one.
MR. WAIN: I'm asking if he ever heard of it. I'm not asking him to define it.
THE WITNESS: Yes, I've heard -- yes, I've heard of it.
BY MR. WAIN:
Q Did you hear of it in the context of the Wain discussions?
A No.
Q When did you hear of it?
A Through the course of my career.
If we did not have a judgment on a debtor prior to the collateral being sold, then we would seek a deficiency judgment.
Q I'm sorry; say that again. I didn't understand.
A Well --
MR. WISEMAN: Objection. Asked and

answered.

But you can answer.

MR. WAIN: I didn't understand it. I didn't understand it.

MR. WISEMAN: Well, you can ask another question.

BY MR. WAIN:

Q Could you repeat that answer? I didn't understand.

A Yes, sir. I'm trying to clarify it in my mind to where you --

Q Take your time. Take your time. Take your time.

A There were instances, mainly -- and possibly exclusively -- with automobile loans or unsecured consumer loans for -- well, the unsecured doesn't fall into play. But mainly, with automobile loans, where we would not file suit for judgment until after the collateral had been sold by the bank through repossession. At that point, we could file for a deficiency judgment. Is that --

Q Well, that wasn't a foreclosure, though, was it?

A No.

Q Okay.
A No. In the foreclosure action, we were required, by law, to seek judgment, be granted a judgment against the debtor before the property could be sold.
Q All right.
A So the bank obtained the judgment, sent the property to the master commissioner for sale, the property was sold. The first mortgage-holder was paid the majority of the sale proceeds. The bank received approximately $66,000 from that sale and applied those funds to what was owed on the Wain debt.
So we did not have any need to seek a deficiency judgment; we had already obtained judgment for the entire amount owed on the debt.
Q Just to repeat what you said -- I don't want to put words in your mouth. You said the topic of deficiency -- getting a deficiency judgment was not discussed when continuing collection on the Wains?
A No, it was not discussed. We were already granted our judgment for the entire amount of the debt.
Q The original judgment on January 19, 2021,

approximately?
A If --
Q Yeah.
A Yeah. Yes.
Q So nobody advised you that -- or even discussed with you that you might need a deficiency judgment to continue collection?
A No.
Q Okay. It was -- March 7, 2024, was the settlement -- I mean, was the final distribution agreement where you received $66,000, approximately? Did you appeal that order?
MR. WISEMAN: If you have a document that could refresh his memory, if you have something to -- he can answer if he knows.
MR. WAIN: If he knows, he knows.
THE WITNESS: As far as I remember, I don't -- I do not remember an appeal of the distribution of funds. Prior to the distribution of funds, I do recall that we were taking actions to -- to implore the first mortgage-holder to file a motion for the distribution of funds. As I remember, they took -- I don't remember how long, but we waited and waited and waited for the first mortgage-holder to file that motion so the funds

could be disbursed. That -- that's about all I remember.

BY MR. WAIN:

Q Why did it take two and a half years for Central Bank to file for a motion of distribution on the -- on the proceeds?

MR. WISEMAN: Objection to form.

THE WITNESS: The responsibility to file the motion for distribution of the sale proceeds is a responsibility of the first mortgage-holder. Central Bank, being in a junior lien position to the first mortgage-holder, was not allowed to do that. So you would have to ask the first mortgage-holder that question.

BY MR. WAIN:

Q Do you believe that you could not file a motion for distribution until May 23, 2023, because you were not allowed to?

A Yes.

Q Not allowed --

A That was -- that was the duty of the first lienholder's.

Q Okay. Was this -- this -- this was your opinion at the time when you were in this position?

A Yes.
Q Okay. Why did you end up filing it on May 23, 2023, then?
There was no motion for distribution by the mortgage-holder.
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q If you say you were not allowed to, how come you were allowed to on May 23, 2023?
A I don't recall us filing an order of distribution.
Q A motion for distribution.
You did on October -- I'm sorry. May 23, 2023, Central Bank filed the first motion for distribution of the sale proceeds.
Why did it --
A I do not -- I do not recall that.
Q My question is -- I guess I could upload it -- if you were not allowed to do it before, why were you allowed to do it then?
A As -- as, again, I'll repeat: I do not remember us order -- filing a motion for distribution.
Q Okay. I'll have -- during a break, I'll have to pull it up.

To the best of your knowledge --

MR. WAIN: I'm going to take a ten-minute break and try to find that document.

We're going to go off the record. Is that okay?

We're going to go off the record for ten minutes while I dig that up.

Thank you.

(A brief recess was taken.)

MR. WAIN: Let's go back on the record. I have two uploads.

This is Exhibit Number 4.

(Plaintiffs' Exhibit 4, Motion For Distribution of Proceeds: Notice, CA No. 19-CI-00812, May 22, 2023, was marked and presented for purposes of identification.)

BY MR. WAIN:

Q Did you receive it?

A Yes.

MR. WISEMAN: We're opening it now.

MR. WAIN: Okay.

MR. WISEMAN: We're reading it.

Do you want me to scroll along?

BY MR. WAIN:

Q Are you ready?

MR. WISEMAN: He's still reviewing it.
MR. WAIN: Oh, okay. That's fine.
BY MR. WAIN:
Q Do you remember that document now?
A Yes, I am starting to remember what took place at the time. Give me one more minute.
Q Sure.
A I'm sorry.
Yes, and this is what I alluded to previously. I'm not quite done with the entire document yet, but the issue at hand, and what this says, is that due to the inaction of Newrez, who your first mortgage was transferred to during the process of the foreclosure, due to their inaction, the funds from the sale proceeds were to be escheated to the State. At that point, the master commissioner, or someone, implemented a new rule, and basically told us to go ahead and file for the order of distribution.
Q So you filed for this -- I think it was the 22nd -- I had the wrong date -- February 22, 2023, the motion for distribution, because of the new information received from the master commissioner about the escheat loss; is that correct?

A We were basically told to go ahead and file the order of distribution.

Q Told by who?

A The master commissioner. And it plain clearly states in this that due to the in -- inaction of Newrez, a new rule had been implemented that the proceeds would be escheated, and the master commissioner apparently did not want to do that and allowed us to go ahead and file the order of distribution.

It also states in here that the bank had diligently pursued the distribution of funds since the master -- since the sale of the property, but due to Newrez' inaction, they had never been distributed.

Q Did you speak directly with the master commissioner?

A No.

Q You never spoke directly with him, Mr. Frazier, regarding this case?

A No, any -- any of those communications would have been done through the bank's attorney.

Q And that is Stoll Keenon Ogden?

A Yes.

Q Who did you report to in your position the

last -- when you took over in 2019, 2020?
A The -- the director of lending, Paul Thornsberry.
Q You reported to Paul Thornsberry?
A Yes.
Q And who did he report to?
A I don't believe he reported to anyone other than the president of the bank.
Q Which is Luther Deaton Jr.?
A Yes.
Q Okay. Was Paul Thornsberry involved in these decisions as well with -- regarding the Wain account?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q Did you discuss the Wayne accounts with Paul Thornsberry?
A There were discussions, yes.
Q About the Wain situation, the Wain accounts?
A Yes.
Q Was there many discussions with Paul Thornsberry?
A It was mainly just -- from what I remember, mainly just providing him updates on the

status of the account; the foreclosure and the distribution of proceeds.
Q And so you report -- did you report at all to Luther Deaton Jr. or any of the board members of Central Bank or Central Bancshares?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q You can go ahead and answer.
MR. WISEMAN: The objection is noted.
THE WITNESS: Could you repeat it, please?
BY MR. WAIN:
Q Did you speak to the board members of Central Bank or Central Bancshares or board directors?
A No.
Q You never spoke to Central Bank's board members or Bancshares' board members about the Wain account?
A During this action, that would have been the responsibility of Ellen Sharp.
Q But Ellen Sharp, you said, left in '21, I believe you said, and you were there until 2024.
A I believe when she left, there were -- I never attended the board meetings. The responsibility of reporting on delinquent loans

would have fallen to Paul Thornsberry.
Q So have you had any discussions with any board member regarding the Wain accounts?
A Not personally, no.
Q Professionally?
A I personally never had any discussions with any board members concerning the Wain accounts --
Q Of Central Bank?
A -- in my -- in my position at Central Bank.
Q So Paul Thornsberry was your main -- was your superior that you had to report to on those?
A Yes.
Q Okay. So did Paul Thornsberry tell you to file this first distribution for -- motion for distribution on February 22, 2023?
MR. WISEMAN: Objection. Misstates the document.
MR. WAIN: I'm sorry?
MR. WISEMAN: The document says May 22, 2023.
MR. WAIN: What did I say?
MR. WISEMAN: I think you said February. Just to --

MR. WAIN: Oh, I'm so sorry. So sorry.
BY MR. WAIN:
Q Did Paul Thornsberry, or anybody else for that matter at Central Bank, tell you to file this May 22, 2023, motion for distribution?
A No. That decision would have been made between myself and counsel.
Q So it was your decision alone to file this May 22, 2023, motion for distribution?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q You can go ahead and answer.
A Yes.
Q Nobody else at Central Bank knew that you were filing this motion for distribution on May 22, 2023; is that correct?
A No, that is not correct.
Q Who else knew?
A Paul Thornsberry. Senior members of the bank leadership. You know, these things were discussed.
Q So you did not make the decision all by yourself?
A Yes, I just informed them of the fact.
Q Ah. Who did you inform? The names

please.
A Paul Thornsberry, Greg Shewmaker. And these were -- these were not necessarily individual discussions. These were during the course of regular meetings where delinquent loans and foreclosure actions and things of that nature were discussed.
Q So there were regular meetings of these topics where the Wain accounts were discussed?
A Yes.
Q Who was at these meetings?
A There were several people. The group usually consisted from 12 to 15 individuals. They were executives of the bank. They were people from the compliance department. The financial accounting department. Certainly Paul Thornsberry, Greg Shewmaker. Compliance people were -- Donna Craven was always there. David Ross, who was the director of commercial mortgage lending. Becky Mullins was always in the meeting. Representatives of the loan review department were in the meetings.
It was a representation of the bank employees who were in charge of oversight of loans and compliance.

Q This group have a name?
A It was the watch loan committee.
Q The watch loan committee?
A Yes.
Q Is that documented somewhere in Central Bank's policies and records?
A Yes, it is.
Q Were decisions made about accounts in the watch loan committee?
A They were discussed, yes.
Q Were decisions made in the committee?
A Yes.
Q How were decisions made?
A Through discussions concerning the individual loans, the group would normally come to a consistence as to -- a consensus as to what action needed to be taken.
Q Was there a vote?
A Occasionally.
Q Were there any votes on the Wain accounts?
A No.
Q Who was the chairperson of this committee?
A Ellen Sharp until she left the bank, and then I became the chairperson when I assumed her position.

Q Were there any board members of Central Bancshares or Central Bank at -- in this watch loan committee?

A Not that I remember, no.

Q But there is a policy of detailing the duties and responsibilities of the watch loan committee in Central Bank's records?

A Yes.

Q So were decisions made about the Wain account at this committee?

MR. WISEMAN: Objection. Form. What?

BY MR. WAIN:

Q If the watch committee made a decision on the Wain accounts, you would abide by that decision and you would carry it out, correct?

A If there were decisions made. But due to the delinquency of the loan, there was really no decision -- there was only one decision that needed to be made. It had -- there was no -- I would inform the committee about what actions I had decided to take, and there were never any objections to those decisions.

Q That includes the Wain account, too, right?

A Yes.

Q How often does the watch loan committee meet?
A Once a month.
Q How often were the Wain accounts discussed at this once-a-month meeting?
A They were discussed every month.
Q The Wain accounts was discussed every month?
A Yes, I don't -- I don't remember the exact requirements for which loans were discussed, but it was based on the number of days past due on the loan, with a minimum-dollar threshold. And the Wain -- and the Wains' loan, once it became delinquent, was included in those discussions, where every loan that met those requirements were discussed.
Q Approximately, how many loans were discussed at one meeting?
A It varied tremendously from time to time, through the years. There could be 40, 50, maybe as few as 30 at times. It -- it was dependent a lot on -- well, it was solely dependent on how many loans met the requirement. But it -- it was several at every meeting.
Q Were minutes kept at this meeting, a

secretary?
A Yes.
Q Do you recall who the secretary was?
A Once I became the chair of the committee, Becky Mullins kept the minutes. And I believe before that, I know Donna Craven's kept minutes, and Ellen Sharp kept minutes, and that's about all I recall.
Q When decisions were made -- when you were the chair, or somebody else, would they make the final decision?
A It was -- the final decision would be -- if the room was in agreement, the final decision would be made by the bank employee that was assigned that -- that loan account.
Q So final decisions in this watch loan committee could be made by different people at different times?
A Yes.
Q Okay. Could someone be overruled?
A I would not use the term "overruled."
Q What would you use?
A There would be discussions at times about taking different forms of action, where discussing what other possibilities might be available --

available to the bank to collect the money that was owed.

Q Were attorneys present at this watch loan committee?

A Were -- I'm sorry, who?

Q Were there any attorneys?

A No.

Q What I'm trying to understand is the decision-making process regarding the Wain accounts, if you were the final decision, or Thornsberry was the final decision, or the watch loan committee was the final decisions. Which of --

A I was the final decision, but I never had any objections to any actions taken.

Q By Paul Thornsberry or by the watch --

A By anyone --

Q -- loan committee?

A By anyone employed at the bank.

Q So you advised them of your legal actions, and there was no objection?

A Correct.

Q Okay. Okay. So there was no objection for you filing this May 22, 2023, motion for distribution?

A No.
Q Okay. Again, my question is: Why did you wait until after the -- the foreclosure auction was February 6, 2021. Why did you wait two and a half years -- or two years?
A Again, because it was the responsibility of the senior lienholder to file that order of distribution. When Newrez took no action, the master commissioner informed the bank that he would allow us to file the order of distribution so he did not have to escheat the money to the State. And it -- it explains it in that document that you last showed me.
Q So do you think you needed the master commissioner's permission to file that motion for distribution?
A Oh, yes.
Q Did not need his permission?
A No, we did need his permission. We implored him -- our attorneys implored him several times to allow us to do that, and due to rules of order, we were not allowed to do that.
Q So you couldn't file the motion for distribution without the master commissioner's permission?

A Correct.
Q And how did you know he gave this permission?
A He contact -- I believe he contacted our attorneys.
Q And his attorneys contacted you?
A Yes.
Q In Central Bank's records, do you have records of this?
A I wouldn't know that.
Q I think I already did upload another document. This is -- I lost track. This is our filing for the Fair Credit Reporting Act, which was one week prior to your filing the motion for distribution.
Do you see that there?
A Not yet.
Q I already uploaded it.
A We're opening it.
MR. WISEMAN: We're opening a file with the United States District Court?
MR. WAIN: Yes. This is our filing on May 15, 2023.
(Plaintiffs' Exhibit 6, May 15, 2023, Complaint, Re: Case No. 5:23-cv-00139-DCR, was

marked and presented for purposes of identification.)

MR. WISEMAN: Okay. This is Exhibit 5?

MR. WAIN: Is this 5? I'm so sorry. Let me see --

MR. WISEMAN: Is this Exhibit 5, Mr. Wain?

MR. WAIN: One, two, three, four -- I think it's 6.

MR. WISEMAN: Okay.

BY MR. WAIN:

Q Does this document look familiar to you?

A I'm sure I've seen it, but I don't recall.

Q This is the Wains' Fair Credit Reporting Act complaint in U.S. District Court. It's still pending, by the way, against Central Bank.

Do you remember discussing this with anybody at Central Bank, or with the watch loan committee?

A Yes.

Q Okay. Am I saying that right. Is it watch loan commit?

A W-A-T-C-H.

Q Wait. W-A --

A Yes. Like you would watch --

Q Oh, W-A-C-H [sic]?

MR. WISEMAN: Like a wristwatch.
BY MR. WAIN:
Q Oh, W-A-T-C-H?
A Yes.
Q Gotcha. Watch loan committee.
What was the decision made about this Fair Credit Reporting Act document?
A There was no decision to be made. The committee was informed of your action, our records were reviewed, compared to what was being reported to the credit bureaus, and what we -- what we were reporting was completely accurate.
Q Who did the actual reporting to the credit agencies?
A That was done through our deposit services department.
Q They did the reporting to the credit agencies?
A Yes. And it was an automatic file sent to the bureaus that reported every delinquent loan appropriately.
Q Was there any outside entity, besides Central Bank, that did reporting for you to credit agencies?
A No.

Q The legal advice you got regarding the Wain account that we discussed today, that was from Stoll Keenon Ogden?
A Yes.
Q Did you deal mostly with -- what, would you say you deal mostly with Greg Pavey or with Tim Wiseman?
A Greg Pavey.
Q Are you still in contact with Greg Pavey?
A Yes.
Q In what way?
A We play golf about once a week together. Greg is retired, also.
Q So Greg Pavey is no longer employed at Stoll Keenon Ogden?
A No.
Q Do you know why he's no longer employed?
A Yes. He's retired.
Q He retired like you did?
A Yes.
Q And you play golf once a week?
A Almost every week.
Q I understand.
Have you discussed this case with Greg Pavey since he retired?

A The only discussion I've had with him was I did inform him that I received this subpoena to give a deposition.
Q So you've had no discussion with Greg Pavey after he retired regarding the Wains?
A No.
Q Did any of the issues we discuss today have anything to do with the retirement of Greg Pavey, to the best of your knowledge?
A No.
Q You seemed a little hesitant. Are you sure?
A Yeah, yeah, I think that's -- I don't know why you think I should see into the mind of Greg Pavey as to why he retired.
Q Okay.
MR. WISEMAN: I'll object on behalf of Greg. He'd take offense.
You have an outsized sense of yourself, Mr. Wain.
BY MR. WAIN:
Q There was a garnishment made on the -- Elisa Wain as -- under her employment at Fayette County public schools. You're aware of that?
A Yes. And I would not have remembered

unless I -- unless it was stated in the subpoena.
Q So you authorized Stoll Keenon Ogden for that garnishment?
A Yes.
Q Was that discussed with the watch committee?
A I don't think so. If it was, it would have been just to tell them that it had been done.
Q Did you inform Paul Thornsberry?
A Not to my recollection.
Q The garnishment was instituted before the confirmation of sale on March 12th. Can you tell me why?
A Because we had obtained judgment for the debt.
Q So you didn't have to wait for the confirmation of sale?
A No. We had a judgment.
Q And this is legal advice you received from Stoll Keenon Ogden; is that right?
MR. WISEMAN: Objection again to the extent where you're calling for privileged information.
MR. WAIN: I think he answered it already.
MR. WISEMAN: The objection was made.

BY MR. WAIN:
Q Who is Fowler Bell?
A Fowler Bell was a law firm.
Q That was hired by Central Bank in this -- for the Wain accounts. Why was it hired -- if you're working with Stoll Keenon Ogden, why did you hire Fowler Bell?
MR. WISEMAN: Again, I'll object to the extent this calls for privileged information between the bank -- his role at the bank and their attorneys.
MR. WAIN: I do not want to know any information.
BY MR. WAIN:
Q I just want to know why you hired --
MR. WISEMAN: The decision to obtain legal counsel is privileged information.
So I will instruct him not to answer.
You can move on.
BY MR. WAIN:
Q Did you deal directly with Fowler Bell?
A On occasion, yes.
Q Did Fowler Bell contact you, or did you contact them?
A I do not recall.

Q Did Fowler Bell replace Stoll Keenon Ogden in the Wain matter?
A I do not recall.
Q Is it possible?
MR. WISEMAN: Calls for speculation. Objection.
BY MR. WAIN:
Q You can answer.
A Could you repeat the question, please?
Q Why did you hire Fowler Bell?
MR. WISEMAN: Objection. Asked and answered. And objection, calls for privileged information. We've moved on from this. He's not -- we already just did this, Mr. Wain.
BY MR. WAIN:
Q Fowler Bell was hired for the Wain accounts; is that correct?
MR. WISEMAN: Objection. This is -- it's a matter of public record. If you have it, we don't need to talk to him about it.
MR. WAIN: Objection is noted for the record.
BY MR. WAIN:
Q Please go ahead and answer the question.
MR. WISEMAN: What was the question? You

just stated a fact. What was the question?
BY MR. WAIN:
Q Fowler Bell was hired by Central Bank for the Wain account; is that correct?
A Honestly, I do not remember hiring Fowler Bell. I -- it -- more information may refresh my memory, but I do not remember hiring Fowler Bell for the Wain account.
Q Okay. I'll have to supply another document for that.
You do know who Fowler Bell is?
A Yes.
Q But you -- have you used them on other accounts besides the Wains'?
A Yes.
Q Okay. But you don't know why you hired them for the Wain accounts --
A Right.
Q -- or if you did?
Do you know why Fowler Bell left -- withdrew from the Wain accounts?
A No.
Q Was there someone else at Central Bank who dealt with Fowler Bell for the Wain accounts?
A Not that I remember.

Q So you were the person who worked for Fowler Bell?
A Again --
Q The contact?
A Again, I -- I just do not remember working with Fowler Bell on the Wain accounts. It -- it could have -- I'm not denying it, but I just don't remember.
Q So you do not know if you relied on Fowler Bell's legal advice?
A I do not remember.
Q Okay. I'll have to dig out that document again, too.
MR. WAIN: I'm going to upload a different one. Oops. I think this is Exhibit 5. I already uploaded it.
(Off-the-record discussion.)
(Plaintiffs' Exhibit 5, Entry Granting Summary Judgment and Order of Distribution of Sale Proceeds, 03/07/2024, Case No. 19-CI-00812, was marked and presented for purposes of identification.)
MR. WISEMAN: Is this document that -- the file that says, "4 Judge Bunnell FCC," that's what you want us to open as Exhibit 5?

MR. WAIN: Yes. I believe it's the March 7th order, I believe.
MR. WISEMAN: All right.
BY MR. WAIN:
Q If you could go to page -- sorry, page 4. This is five pages. Page 4.
MR. WISEMAN: Sorry, the pages aren't numbered. Okay. This is where the -- the signature page, is that --
MR. WAIN: Exactly.
MR. WISEMAN: Okay. Yeah.
BY MR. WAIN:
Q Mr. Hall, you see there's a signature there by Fowler Bell?
A Yes. And this does refresh my memory. I believe U.S. Bank --
THE WITNESS: Scroll.
There was a conflict of interest between U.S. Bank and Stoll Keenon Ogden. And Stoll -- because of that conflict of interest with SKO and U.S. Bank, Stoll Keenon Ogden could not represent the bank in this portion of the proceedings.
Q Which --
A And --
Q Go ahead. Sorry.

A I don't know. I'm assuming that U.S. Bank had the first mortgage transferred to them from Newrez. But I do not remember exactly when U.S. Bank came into play. But after seeing this document, the U.S. Bank brought back the memory that they had -- that Stoll Keenon Ogden had a conflict of interest with U.S. Bank and could not represent the bank against U.S. Bank -- could not represent Central Bank against U.S. Bank.

Q But eventually, shortly after, Fowler Bell withdrew and it went back to Stoll Keenon Ogden while it was at Central Bank?

A Yes. That is because Stoll Keenon Ogden could not represent us through -- against U.S. Bank. Once that portion of the proceedings had finished, we no longer needed Fowler Bell's assistance.

Q Who made these decisions? Was it you? Was it Paul Thornsberry? Was it the board? Was it the watch committee?

A It would have been me to seek the assistance of Fowler Bell once I found out that Stoll Keenon could not answer this part of the proceedings for Central Bank.

Q And, of course, you advised the watch loan

committee of all of this?
A Yes.
Q Okay. In that document, you see the amount Central Bank had received, exactly $66,884.60.
A Yes.
Q Central Bank received this money on, approximately, March 14, 2024, correct?
A I don't remember the date we received the funds.
Q Is it -- would you -- Central Bank was the second lienholder on this property; is that correct?
A Yes.
Q Was the subject of second-lien shortfall ever discussed?
A You mean deficiency?
Q No.
A What do you -- what do you mean by "shortfall"?
Q First mortgage company gets -- first lien company gets this amount, and the rest of the creditors get, sometimes, a second-lien shortfall, a lien shortfall, based on the lien on file.
A Yes, that's what I call a deficiency.

Q I --
A A deficiency balance. I don't know what a shortfall is.
Q Okay. Well, that's what I'm here to ask you.
The difference between what you received and what the property sold for, can that be considered a liened [sic] shortfall; a second-lien shortfall?
MR. WISEMAN: Objection to the extent you're seeking some sort of legal conclusion.
BY MR. WAIN:
Q Is the reason why you received less because you were the second lienholder?
A Yes.
Q So there's no dispute that you were the second lienholder?
A Correct.
Q If you were the second lienholder, why did you institute a foreclosure knowing you were the second lienholder?
A Because of bank policies and banking regulations.
Q What are bank --
A The bank policy was that any mortgage loan

that was delinquent 120 days or more on the payments, would be either charged off or foreclosure-initiated.

In the case of the Wains' account, I was trying to implore you to make the payments and reduce the deficiency balance, so I let it go more than 120 days past due. I don't remember exactly how far past due it was when foreclosure was -- was initiated. But it was well more than 120 days past due.

Banking regulations tell us that loans that are more than 120 days past due can no longer be kept on the bank's books as an asset. At that point, when it becomes so far past due, it became obvious that the bank was not going to receive their payments, the only way we were going to get any of the money that was due us was to file for foreclosure.

Q Okay. I'm speaking of the -- your auction order with the master commissioner.

It was Central Bank who initiated the auction order?

A Yes. We needed -- we needed to recover as much of the debt as we could at the time. It -- it was apparent that the Wains were not going to

make their payments to Central Bank. And so to let it go any farther would have been imprudent. We would not have received the $66,000 if we had not filed the foreclosure.

Q Well, again, I'm talking about the auction order, the order of sale.

A Okay. Same thing. If we had not ordered the sale of the property, we did not feel like we were ever going to get paid anything.

Q So you knowingly, based on these reasons, requested an order of sale knowing you were the second lienholder?

A Yes.

Q The judgment amount -- I think it's in there -- was 300 -- where is it on this document? Hold on a second.

The judgment amount was approximately $358,000; is that correct, from January -- January 19, 2024 -- I mean, '21? Im sorry, my document's --

A That is, to my memory, the approximate amount. I think it was in the subpoena.

Q Mm-hmm. The property was sold for $600 and -- $630,000.01. That was 70 percent more than the judgment amount; is that correct -- or

approximately?
A I'm not doing the math, but if you say so.
Q Okay. What would you call the excess amount from the 630,000, the property sold for, and the 358,000 that was owed on judgment?
MR. WISEMAN: Objection. That misstates the facts. It doesn't -- it doesn't recognize the senior lien and the amount owed to it.
MR. WAIN: That's not the question I'm asking.
MR. WISEMAN: But it's misleading.
MR. WAIN: I'm trying -- that's -- that's your -- you are false. That's a completely false statement.
Let me ask the question again.
BY MR. WAIN:
Q It was Central Bank & Loan [sic] that initiated this -- this order of sale, correct?
A Yes.
Q Okay. The document -- the property sold for $630,000 and one cent. The judgment was approximately $358,000.
So you agree that $630,000 is more than 358,000; am I correct?
A That's obvious.

Q What do you call the difference between 630 and the 358? What would Central Bank call that?
A I don't -- I don't understand the question. There is -- I'm not -- I'm not understanding your question.
Q There was a -- was there a surplus over the judgment of Central Bank from the auction sale price?
MR. WISEMAN: Objection. Form.
BY MR. WAIN:
Q Go ahead and answer. You can use whatever word you'd like to describe it. I'm using the word "surplus."
A The sale proceeds were more than Central Bank was owed. Central Bank only received approximately $66,000 of the sale of proceeds, because the sale of proceeds went to pay the first lienholder what they were owed, and then Central Bank received the remainder.
Q So there was considerable surplus at the time of the auction, February 6, 2021?
A Not --
MR. WISEMAN: Objection to form.
THE WITNESS: Not for the bank. Not if --

BY MR. WAIN:
Q I wasn't -- don't -- there was additional funds held by the master commissioner. How about that?
A I'm sorry. Say that again.
Q I'm just repeating what you said.
It was $630,000 received by the master commissioner on February 6th. The judgment was approximately 358,000 on 1/19/2021. There was several hundred thousand dollars in addition that the master commissioner was holding, February 6, 2021, over the judgment of Central Bank; is that correct?
A That sounds correct, I suppose.
Q Okay. Just to state again for the record: Central Bank initiated the foreclosure; Central Bank initiated the request for the auction -- for a sale. I want that in there for the record.
MR. WISEMAN: Objection. Is that a question? You can't make statements.
BY MR. WAIN:
Q Would you say that was -- those statements were fair? That Central Bank alone initiated their own foreclosure on their own behalf, and Central Bank alone requested the order of sale?

A Yes.
Q Thank you.
THE WITNESS: Sorry.
MR. WISEMAN: You're fine. If it moves it along, so be it.
BY MR. WAIN:
Q And again, Central Bank did not file for distribution until they got permission from the master commissioner?
MR. WISEMAN: Objection. Form. And asked and answered.
Move on.
BY MR. WAIN:
Q While you were at Central Bank, what was the last direct payment you received from the Wains? Do you remember?
A I do not remember.
Q Is it possibly January 31, 2019?
A I -- I do not remember, but that has all been entered into the record previously.
MR. WAIN: I'll upload another document if my computer will behave.
Okay. So I guess this is Exhibit 7.
(Plaintiffs' Exhibit 7, Agreed Judgment, Case No. 19-CI-00812, was marked and presented for

purposes of identification.)
MR. WAIN: While you're looking at it, I'll be right back.
Are you ready?
(Pause in proceedings.)
MR. WISEMAN: Yeah, we're still on the record; we never went off.
MR. WAIN: Oh, I'm sorry. I thought you were reading the document.
BY MR. WAIN:
Q Could you tell me what that document is?
A That was an offer by the bank to you to enter into an agreed judgment to allow you to resume making your payments and reduce the deficiency of those payments.
Q That was the prerequisite, signing that agreement, before reinstating the loan; is that correct?
A Yes.
Q Have you used that document before with other accounts at Central Bank?
A Yes.
Q When the loan was accelerated on January 31, 2019 -- it's indicated in the letter -- but do you remember what the past-due

amount was?
A No.
Q According to the letter, it was approximately $4,500.
Does that sound right?
A I don't remember.
Q Who is Judge Kimberly Bunnell?
A I'm sorry?
Q Who is Judge Kimberly Bunnell?
A She is a judge that oversaw the foreclosure case in Lexington, Kentucky.
Q Has Central Bank had other cases in front of Judge Bunnell?
A I'm sure we have. I can't recall any particular cases.
Q Have you ever spoken directly with her or her office?
A No.
Q Have you ever seen her outside the court?
A No.
Q Would other people at Central Bank be familiar with Judge Bunnell?
A I don't know.
Q Does or did Central Bank have a campaign depository account with Judge Bunnell?

A I have no idea.
Q You would not know?
A No.
Q Does Central Bank make campaign donations?
A To my knowledge, they don't. But I am not involved in any of that and never was.
Q Who would be involved with campaign donations at Central Bank?
A I don't -- I don't know.
Q Could it be Luther Deaton Jr.?
MR. WISEMAN: Objection. Speculation. Also vague. What is "campaign"?
BY MR. WAIN:
Q A political campaign donation.
A I personally would have no idea.
Q Okay. I'm going to see if I can do this without uploading documents, but we'll see.
In 2019 and in 2023, Central Bank reported to credit agencies that this Wain account was charged off.
What does that mean?
A Charged off is dictated by regulatory compliance that when a loan is so many days past due, and the collateral has been sold, the bank writes off the balance as a -- as a loss on their

financial accounting reports.
Q Again, who reports the charge-off to the credit agencies? I think you said it was the --
A The deposit services department.
Q Okay. Is that who does the credit reporting?
A Yes.
Q Okay. Were you aware that these -- the account was sent to the credit agencies as charged off?
A I would have known that it would be reported as a charge-off. I don't -- didn't have anything to do with the reporting of that personally.
But, yes, any loan that is charged off by the bank is reported to the credit bureaus as a charge-off.
Q So you don't know why there was two charge-offs, one in 2019 and 2023?
MR. WISEMAN: Objection.
BY MR. WAIN:
Q Well, let me ask you: Do you know -- that was a -- do you know why there was two charge-offs reported, one in 2019 and one in 2023?
A No.

Q Were you aware that there was two charge-offs, one in 2019 and 2023?
A Not that I recall.
Q Were you aware of any charge-offs that was reported?
A I was aware of the charge-off after we received -- I -- Mr. Wain, I don't recall.
Q But you would have been notified had it been reported as a charge-off to a credit agency?
A Yes -- no, I would not have been notified if it was reported to a credit agency.
Q So you would not know if it was charged off?
A Yes, I would know if it was charged off. I do not recall the exact charge-offs.
Q So you would know if it was charged off on Central Bank's books, but you would not know if it was charged off on the credit agencies? Is that what you're saying? I don't want to put words in your mouth.
A If it was charged off on Central Bank's books and in our loan accounting system, it would automatically be reported to the bureaus as a charge-off.
Q So after the auction on February 6, 2021,

Central Bank did not feel -- did not believe that the loan to the Wains was either satisfied or extinguished?
A No.
Q At any time while you were there, did Central Bank believe that the Wain loan was satisfied or extinguished?
A No.
Q So when you left, that was the policy of Central Bank?
A There was still money due on the loan.
Q That was based on the -- the watch loan committee?
A No. That was based on fact that the bank had not received what was owed on the loan.
Q Well, who agreed with that fact? Was it the watch loan committee?
A Have we not been through this already?
Q I think actually we have. Okay.
MR. WAIN: You know what, if you don't mind, I'm going to take a ten-minute break and go off the record. If that's okay?
THE WITNESS: Certainly.
MR. WAIN: Okay. Madam Court Reporter, we're going to take a -- let's make that a

15-minute break. It's we'll begin again -- it's 11:00 my time, so it's --
MR. WISEMAN: Okay.
THE WITNESS: 2:00.
MR. WAIN: -- 2:00 your time.
Okay, Madam Court Reporter, thank you.
(A brief recess was taken.)
MR. WAIN: Let's go back on the record.
Can you hear me, Madam Court Reporter?
THE COURT REPORTER: Yes. You sound great.
MR. WAIN: Okay. Back on the record.
BY MR. WAIN:
Q Mr. Hall, who is Frost Brown & Todd?
A That is another law firm here in Lexington.
Q Do they work with -- while you were at Central Bank, did they work at Central Bank -- with Central Bank?
A Yes, they did. We did do business with them, yes.
Q Can you tell me what kind of business?
A They were mostly used for litigation in commercial loan matters.
Q Are some of the Central Bank or Central

Bancshares board members, board members of Frost Brown Todd?
A Yes.
Q Donna Craven said that in a September 23, 2023, letter to us, that the letter was written by Frost Brown & Todd, although she signed it.
Are you aware of that?
A Not that I recall.
Q Do you remember such a letter?
It was a complaint to the Consumer Financial Protection Bureau.
A Yes.
Q Okay. Did you discuss Wain matters with Frost Brown & Todd?
MR. WISEMAN: Objection to the extent this is getting into privileged matters.
BY MR. WAIN:
Q You don't have to tell me what you said. Just did you rely on them?
A Not that I recall.
Q Okay. Did Ms. Donna Craven speak to you about this letter? I could post it as an exhibit if you would like.
A I believe so, yes, sir.
Q Okay. Could you tell me what was

discussed?
A I can't recall. Don't -- do not recall.
Q Did she inform you that the attorney had written the letter although she signed it?
A Yes. I do remember that. I do remember the complaint, and that's about the extent of it.
Q So then Frost Brown Todd were involved with the Wain matters, based on that letter?
A If Frost Brown Todd wrote that letter, then, yes, they were involved.
Q Did you participate in any of the audits of Central Bank?
A I'm sorry. Could you repeat that?
Q While were you employed at Central Bank, were you a part of any audits?
A Any --
Q Internally or externally?
A My department was audited several times, yes. At least, annually.
Q By whom?
A By our internal audit department. We used an external auditor, a private auditing company. And I don't remember the name of that company. I'd know it if I heard it. And we also went through examinations by bank regulatory agencies.

Q Okay. Could you give me the names of any of these internal audit and external audit and governmental agencies' names?
A Internal auditing would have been the auditing department of the bank, which at the time, was Donna Craven and Lisa Turner.
Q Donna Craven was the head of the auditing department?
A I don't know if she was the head of the auditing, but I believe she -- she -- I thought she was part of the auditing department, I'm thinking.
Again, I do not remember the name of our external auditor.
And then there's the bank -- banking state regulatory commission that audits all state-chartered banks.
Q Was that the Kentucky Department of Financial Institutions?
A I don't know the name.
Q Was there any federal audits?
A I don't know if we were ever federally audited or not. I wasn't -- all I was ever told is there's a bank examination or an audit, and to have this information prepared. And they would

supply me a list of the information that they would like to see.
Q Who would tell you this?
Who would provide you this -- this information to prepare?
A Our compliance department or auditing, one of the two.
Q And the names would be?
A Donna and Lisa.
Q Donna Craven and -- I'm sorry, Lisa?
A Lisa Turner.
Q Lisa Turner.
Are you familiar with the accounting firm, Crowe?
A Yes. Crowe Chizek. That's who did our external audit. Yes.
Q Was there any other outside firm who did an external audit?
A Not that I recall.
Q While you were in your position at Central Bank, did you have any contact with any law enforcement agencies?
A Yes.
Q Can you name them?
A Lexington-Fayette County Police

Department.

Q That is the only one?

A That's the only one I recall. There -- there could have been -- and I'd say there were other counties' police departments that I had some contact with.

Q But no state or federal law enforcement agencies?

A Not federal. They would be city, state, or a county.

Q So was there state law enforcement that you were in contact with?

A No -- well, I actually -- I don't recall any state law enforcement.

Q Well, why did you have discussions with law enforcement? What were the discussions about?

A They were, for the most part, concerning repossession orders where we could not -- the debtor was not allowing us to repossess our collateral that was, in large part, vehicles. There were eviction proceedings where we had to have the sheriff's department evict people from properties that the bank owned.

Q Were there any criminal investigations that you're aware of?

A I seem to recall one or two, but I do not remember the details.

Q I'm sure you're aware that Central Bank is a sponsor of U.K. athletics through different parties?

A Yes.

Q Does -- did Central Bank routinely offer tickets and other benefits based on their sponsorships to other people outside the bank?

A That would be beyond my knowledge. I don't know.

Q How about within the bank? Would they give free tickets, whatever -- gifts --

A They never gave any to me, so I don't know what they would have given to anybody else.

Q So you've never heard of them gifting anything based on their sponsorship?

MR. WISEMAN: Objection. Form.

THE WITNESS: No.

BY MR. WAIN:

Q You never heard of -- have you ever witnessed any gifting based on Central Bank's sponsorship of U.K. athletics?

A If I had witnessed it, I would have known about it, so the answer is no.

Q Did Central Bank speak to the police department after the Wains filed a police report about a break-in at 2711 Barbados Lane?

MR. WISEMAN: Objection. He's here in his personal capacity. He can answer if he knows. He is not Central Bank.

BY MR. WAIN:

Q In your position at Central Bank.

MR. WISEMAN: You're asking if he spoke to them, or if Central Bank spoke to them?

MR. WAIN: If he spoke to them.

MR. WISEMAN: Then you can rephrase it, ask it that way.

THE WITNESS: Not that I recall.

BY MR. WAIN:

Q Do you recall a police report filed by the Wains about a break-in at the property at 2711 Barbados Lane, Lexington, Kentucky?

A Yes.

Q Was that discussed at Central Bank?

A Yes.

Q Where was it discussed?

A I don't exactly recall. I think our security department was involved. I would surmise that I did discuss it with our attorneys, and

that's about all I can recall.
Q Who is the head -- who was the head of security?
A I don't remember if it -- at the time, if it was Shane Ensminger or if it was Jeff Jacobs. I would --
Q Was it possibly --
A I would -- I would say more than likely it was Shane Ensminger.
Q Was it possibly discussed with the watch loan committee?
A Possibly. I don't recall any specific conversations.
Q During the foreclosure/order of sale auction on February 6, 2021, there was a federal moratorium in place for government-backed mortgages. Were you aware of that?
MR. WISEMAN: Objection. Calls for a legal conclusion, and facts not in evidence.
The mortgage in question was not a federal-backed mortgage.
MR. WAIN: That wasn't the question I asked, and I wasn't asking you. That wasn't the question I asked.
MR. WISEMAN: I'm objecting.

MR. WAIN: Okay.
BY MR. WAIN:
Q Were you aware at the time of the foreclosure that loans backed by the U.S. government -- there was a federal moratorium issued by President Biden?
A Yes.
Q Was that discussed while at Central Bank?
A Yes.
Q Was there a decision made regarding that federal moratorium?
MR. WISEMAN: Objection.
THE WITNESS: What type of decision would have been made? We would not have foreclosed on a federally backed mortgage. That was -- that was the rule.
BY MR. WAIN:
Q Stoll Keenon Ogden was a collection partner for some Central Bank loans; is that correct?
A They were counsel for collections, yes.
Q But they were also --
A I would not -- I would not call them a partner.
Q Did they perform collection activities on

behalf of Central Bank?
A Yes.
Q Was there any other entity that performed collection activities on behalf of Central Bank?
MR. WISEMAN: Objection. Form.
THE WITNESS: Yes.
BY MR. WAIN:
Q And they were?
A They were Frost Brown Todd, Fowler Bell. There were some others. But I were -- that I was not involved with, in markets outside of Lexington.
Q During, say, the last five years of your employment with Central Bank, how many lawsuits were you involved in?
A That number isn't -- would -- I have no idea.
Q Would it be more than ten?
A Yes.
Q Would it be more than 20 over a five-year period?
A I have -- I have no idea.
Q Is it more than 50?
A I'm not -- I'm not going to guesstimate a number.

Q How would you quantify it?
A The last five years, there were -- I would guess far fewer than the previous five years.
Q Meaning five to ten years out?
A Yes.
Q There were fewer the last five years than in the previous five to ten years?
A I would -- in my mind, that's -- that's what I feel.
Q Do you have an idea of how many lawsuits there were in five to ten years?
A I have no idea. I never kept track of how many lawsuits were filed.
Q Again, I'm just trying to -- in the last five years, it --
A I'm -- I'm -- I'm sorry. Go ahead.
Q In the last five years, has it been more than 50 lawsuits that Central Bank has been involved in?
A I have no idea.
Q But more than ten?
A I would think more than ten.
Q Would you think more than 20?
MR. WISEMAN: Objection. Form.
THE WITNESS: It --

MR. WISEMAN: Are you saying --
BY MR. WAIN:
Q Okay. Let me rephrase. I'll -- I'll -- let me rephrase.
Can you tell me who -- what other lawsuits there were within the five years -- the last five years at Central Bank?
A I don't recall. I mean, it's -- I don't -- I didn't commit these to memory. I -- that's -- I don't even know how to answer the question.
Q Well, there was more than ten over the last five years -- would that be a fair statement? -- of your employment?
A I think it would, but I don't know for a fact.
Q Can you name any of the ten lawsuits?
MR. WISEMAN: Objection. Form. The lawsuits about his --
MR. WAIN: That Central Bank -- that Central Bank was a party of.
THE WITNESS: No, I honestly can't think of one.
BY MR. WAIN:
Q Was Imani Church one of them maybe?

A I don't know if that was in the last five years.
Q How about Knoll in Louisville?
A I don't recall that name.
MR. WISEMAN: I'll object to the relevance of these other actions.
MR. WAIN: You're noted. Thank you.
It's noted for the record. Thank you.
BY MR. WAIN:
Q Approximately -- approximately, during your last five years of employment with Central Bank, how much administrative or personnel time was spent on the Wain issues?
MR. WISEMAN: Objection.
THE WITNESS: I would have no idea how to even approximate that.
BY MR. WAIN:
Q Would it be some or considerable?
A Less than some.
Q Last five years of your employment, can you estimate the legal fees associated with the Wains, in the last five years of your employment?
A I -- I do not recall.
Q Can you make an estimate?
A No.

Q Did I ask you a question -- is it -- was it over a hundred --
A I don't -- I don't recall if it was 2,000 or 200,000. I do not recall.
Q Who would know that at Central Bank?
A I don't know.
Q But you would not be advised of the legal fees?
A Yes. But -- of course, I would. But I don't know how much was spent on the Wains. I may have known that at the time, but I do not recall.
Q Where would that be recorded at Central Bank?
A I don't know if the financial planning department would have -- they would know what we spent in legal fees yearly, monthly, or however they tracked it. But I'm not sure they could split it down to how much was spent on the Wains.
Q After the March 14, 2024, distribution, there was a letter from Mr. Wiseman regarding a debtors' exam.
Who authorized the letter to be sent by Tim Wiseman?
MR. WISEMAN: Objection as to privileged information.

BY MR. WAIN:

Q Who at Central Bank authorized the debtors' exam? I'll leave him out.

A That would have been me.

Q Again, and that would be through Paul Thornsberry or the loan watch committee -- watch loan committee?

A They would have been informed of that action.

Q So there was no disapproval?

A No.

Q That letter went out in March, and you retired at the end of April. So what do you remember about the process regarding the debtors' exam?

A I really don't recall anything.

Q Did you -- did you know who was to be present at the debtors' exam?

A I do not recall.

Q What can you recall about the debtors' exam?

A I know that we -- we, the bank, requested through the law firm to conduct a debtors' exam.

Q But you don't know who is going to attend and -- or who was going to be hired for the

debtors' exam?
A I may have known at one point. I do not recall.
Q Is that recorded somewhere at Central Bank?
A Not that I know of. I don't -- I do not know.
MR. WAIN: I just want to state something for the record, for you, Ms. Court Reporter -- I mean madam Court Reporter. I need to enter this into the record: I reserve the right to reopen if documents Central Bank has not yet produced come to light.
That is my statement.
BY MR. WAIN:
Q While you were at Central Bank, was there anyone who knew more about the Wain account than you did?
A I don't know how much other people knew, so I don't know how I could answer that question. I'm not in the minds of other people.
Q So it's possible, then, that other people knew as much as you did about the Wain account?
A I have no idea.
Q You don't know if it's possible?

A I have no idea.
Q Okay. Is there anything you told me today that you want to correct or add?
A No.
Q Have you answered all my questions truthfully and completely?
A Yes.
MR. WAIN: Mr. Wiseman, do you have some questions?
MR. WISEMAN: Can we go off the record for five minutes? I might have some, but might not.
MR. WAIN: Okay. Five minutes. We're going off record.
(A brief recess was taken.)
MR. WISEMAN: All right.
MR. WAIN: Let's go back on the record.
Go ahead.
MR. WISEMAN: Tim Wiseman here.
I have just a few questions, Mr. Hall.

DIRECT EXAMINATION

BY MR. WISEMAN:
Q Would the head of Central Bank's special assets department be the best source of information about accounts like the Wains'?
A Yes.

Q And that person was you when the bank obtained the proceeds of the foreclosure sale of the Wains' house, correct?

A Yes.

Q And there's been discussion about some higher-up people in the bank today like Luther Deaton. He would have no information firsthand about the Wains, correct?

A Correct.

MR. WISEMAN: That's all I have.

MR. WAIN: I think we're done, Madam Court Reporter.

THE COURT REPORTER: Okay.

MR. WISEMAN: Thank you.

MR. WAIN: Thank you.

(The deposition was concluded at 2:35 p.m.)

* * *

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY )
) SS:
COUNTY OF KENTON )

I, April L. Crites, RPR, RMR, CRR, CSR, CCR, and a Notary Public within and for the Commonwealth of Kentucky, duly commissioned and qualified, DO HEREBY CERTIFY:

That the above-named STEVEN DENNIS HALL was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said testimony was reduced to writing by me stenographically in the presence of the witness and thereafter reduced to typewriting, and;

I FURTHER CERTIFY that I am not a relative or attorney of either party, in any manner interested in the event of this action, nor am I, or the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Covington, Kentucky, this 31st of August, 2026.

I, April L. Crites, a Kentucky Notary Public - State at Large - No. KYNP13794, for acts performed in or outside Kentucky for recordation in Kentucky; my commission expires: August 25, 2028.



__________________________________________

April L. Crites, RPR, RMR, CRR, CSR, CCR

* * *

## $

**$357,000 (1)** 25:13
**$357,990.91 (1)** 22:3
**$358,000 (2)** 66:18; 67:22
**$4,500 (1)** 72:4
**$600 (1)** 66:23
**$630,000 (3)** 67:21, 23;69:7
**$630,000.01 (1)** 66:24
**$66,000 (6)** 26:24; 29:12;33:11;34:11; 66:3;68:17
**$66,884.60 (1)** 63:5
**$67,000 (1)** 25:17

## [

**[sic] (4)** 8:25;52:25; 64:8;67:17

## A

**abide (1)** 46:14
**able (2)** 10:4;17:17
**accelerated (1)** 71:23
**According (4)** 26:13, 15,16;72:3
**account (22)** 20:13, 21;23:22;25:6,20; 26:11;31:3;40:13; 41:1,18;46:10,23; 48:15;54:2;59:4,8; 65:4;72:25;73:19; 74:9;93:17,23
**accounting (5)** 28:10; 44:16;74:1;75:22; 81:13
**accounts (26)** 13:18; 14:4,6;24:20,24; 29:17;40:16,20;42:3, 8;44:9;45:8,20;46:14; 47:4,7;49:10;57:5; 58:17;59:14,17,21, 24;60:6;71:21;94:24
**accurate (1)** 53:12
**Act (3)** 51:13;52:14; 53:7
**action (9)** 29:7;30:12; 33:2;41:19;45:17; 48:24;50:8;53:9;92:9
**actions (7)** 30:17; 34:20;44:6;46:20; 49:15,20;90:6
**activities (2)** 86:25; 87:4
**actual (1)** 53:13
**actually (2)** 76:19; 82:13
**add (1)** 94:3
**addition (1)** 69:10
**additional (2)** 14:11; 69:2
**administrative (1)** 90:12
**adversary (2)** 8:16; 10:17
**advice (3)** 54:1;56:19; 60:10
**Advices (1)** 12:15
**advised (4)** 34:5; 49:20;62:25;91:7
**again (20)** 16:3; 31:22;36:21;50:2,6; 56:21;57:8;60:3,5,13; 66:5;67:15;69:5,15; 70:7;74:2;77:1; 80:13;88:14;92:5
**against (6)** 30:17; 33:4;52:15;62:8,9,14
**age (1)** 7:7
**agencies (10)** 53:14, 18,24;73:19;74:3,9; 75:18;79:25;81:22; 82:8
**agencies' (1)** 80:3
**agency (2)** 75:9,11
**agree (3)** 12:19;13:3; 67:23
**agreed (4)** 27:19; 70:24;71:13;76:16
**agreement (5)** 18:12; 26:11;34:11;48:13; 71:17
**agreements (1)** 18:6
**Ah (1)** 43:25
**ahead (12)** 21:1;24:7; 38:18;39:1,9;41:8; 43:12;58:24;61:25; 68:12;88:16;94:17
**al (1)** 6:8
**allow (3)** 50:10,21; 71:13
**allowed (9)** 35:12,18, 20;36:8,9,19,20;39:9; 50:22
**allowing (1)** 82:19
**alluded (1)** 38:9
**Almost (1)** 54:22
**alone (3)** 43:8;69:23, 25
**along (2)** 37:23;70:5
**although (2)** 78:6; 79:4
**always (2)** 44:18,20
**among (1)** 28:19
**amount (13)** 28:15; 31:3;33:16,23;63:4, 22;66:14,17,22,25; 67:4,8;72:1
**amounts (1)** 28:17
**annually (1)** 79:19
**answered (6)** 8:18; 32:1;56:24;58:12; 70:11;94:5
**apparent (1)** 65:25
**apparently (1)** 39:8
**appeal (2)** 34:12,18
**appearance (4)** 6:16, 19;8:16;9:18
**appearing (1)** 8:6
**applied (3)** 13:23; 25:20;33:12
**appropriately (1)** 53:21
**Approximate (5)** 15:17;19:25;29:3; 66:21;90:16
**approximately (21)** 6:3;14:7;15:15;19:2; 23:2;26:24;28:24; 29:2;33:11;34:1,12; 47:17;63:8;66:17; 67:1,22;68:17;69:9; 72:4;90:10,10
**April (6)** 6:10;16:9,11; 22:8;23:21;92:13
**around (2)** 20:4;27:4
**asset (1)** 65:13
**assets (27)** 13:22; 14:19;15:4,7,13;16:6; 18:14,16,16,17,21; 19:1,4;20:14,16; 22:14,15,20,22,23; 23:5,8,9,14;24:9; 26:18;94:23
**assigned (1)** 48:15
**assistance (2)** 62:17, 22
**assistant (1)** 15:23
**Assisting (1)** 14:18
**associated (1)** 90:21
**assume (2)** 9:20; 23:25
**assumed (1)** 45:24
**assuming (1)** 62:1
**athletics (2)** 83:4,23
**attempt (1)** 25:5
**attend (1)** 92:24
**attendance (1)** 19:10
**attended (1)** 41:24
**attorney (4)** 22:18; 30:8;39:22;79:3
**attorney-privileged (1)** 30:16
**attorneys (9)** 29:16, 19;49:3,6;50:20;51:5, 6;57:11;84:25
**auction (10)** 26:25; 50:3;65:19,22;66:5; 68:8,22;69:17;75:25; 85:15
**audible (1)** 30:21
**audit (6)** 79:21;80:2,2, 24;81:16,18
**audited (2)** 79:18; 80:23
**auditing (8)** 28:12; 79:22;80:4,5,7,10,11; 81:6
**auditor (2)** 79:22; 80:14
**audits (4)** 79:11,15; 80:16,21
**August (5)** 6:2;10:22, 24;11:15,17
**authorized (3)** 56:2; 91:22;92:2
**automated (1)** 21:6
**automatic (1)** 53:19
**automatically (1)** 75:23
**automobile (2)** 32:15, 18
**available (2)** 48:25; 49:1
**aware (10)** 55:24; 74:8;75:1,4,6;78:7; 82:25;83:3;85:17; 86:3

## B

**back (8)** 9:24;37:10; 62:5,11;71:3;77:8,12; 94:16
**backed (2)** 86:4,15
**balance (10)** 25:6,8, 19,20;26:10,11; 27:20;64:2;65:6; 73:25
**Bancshares (4)** 41:5, 13;46:2;78:1
**Bancshares' (1)** 41:17
**Bank (172)** 6:7;7:17, 18,20;8:4,9,11,13; 9:20;13:12,14,25; 14:14;15:1,6;16:24; 17:2,9,9,15,18;18:6, 16,17;19:17,21; 20:12,19,20;21:15,21, 24;22:2,5,11;23:18; 24:4;25:7,12,16,21; 26:24;27:11,21,23; 29:8;30:4,11,16; 32:20;33:7,11;35:5, 11;36:14;39:11;40:8; 41:5,13;42:9,11;43:4, 14,20;44:14,23; 45:23;46:2;48:14; 49:1,19;50:9;52:15, 17;53:23;57:4,10,10; 59:3,23;61:16,19,21, 22;62:1,4,5,7,8,8,9,9, 12,15,24;63:4,7,11; 64:22,24,25;65:15, 21;66:1;67:17;68:2,8, 16,16,20,25;69:12,16, 17,23,25;70:7,14; 71:12,21;72:12,21, 24;73:4,8,18,24; 74:16;76:1,6,10,14; 77:18,18,19,25;79:12, 14,25;80:5,15,24; 81:21;82:23;83:3,7,9, 12;84:1,6,8,10,20; 86:8,19;87:1,4,14; 88:18;89:7,20,21; 90:12;91:5,13;92:2, 22;93:5,12,16;95:1,6
**banker (1)** 13:16
**banking (3)** 64:22; 65:11;80:15
**Bankruptcy (4)** 10:16; 22:19;29:4,6
**banks (1)** 80:17
**bank's (12)** 21:3; 22:18;39:22;41:16; 45:6;46:7;51:8; 65:13;75:17,21; 83:22;94:22
**Barbados (2)** 84:3,18
**based (9)** 47:11; 63:24;66:10;76:12, 14;79:8;83:8,17,22
**bases (1)** 7:1
**basically (3)** 28:14; 38:18;39:1
**became (7)** 15:12; 20:17;27:22;45:24; 47:13;48:4;65:14
**Becky (3)** 23:13; 44:20;48:5
**becomes (1)** 65:14
**begin (3)** 17:11;29:3; 77:1
**beginning (4)** 6:17; 13:14;14:15;17:12
**behalf (4)** 55:17; 69:24;87:1,4
**behave (1)** 70:22
**Bell (20)** 57:2,3,7,21, 23;58:1,10,16;59:3,6, 7,11,20,24;60:2,6; 61:14;62:10,22;87:9
**Bell's (2)** 60:10;62:16
**benefit (2)** 14:2;17:20
**benefits (6)** 17:1,3,5, 14,17;83:8
**besides (2)** 53:22; 59:14
**best (5)** 19:16,18; 37:1;55:9;94:23
**better (1)** 17:18
**beyond (1)** 83:10
**Biden (1)** 86:6
**birthday (1)** 16:15
**board (12)** 41:4,12,13, 16,17,24;42:3,7;46:1; 62:19;78:1,1
**books (3)** 65:13; 75:17,22
**branch (2)** 13:17,20

**break (4)** 36:24;37:3;76:21;77:1
**break-in (2)** 84:3,17
**brief (3)** 37:9;77:7;94:14
**briefly (1)** 11:25
**bring (1)** 24:21
**brought (1)** 62:5
**Brown (7)** 77:14;78:2,6,14;79:7,9;87:9
**Bunnell (6)** 60:24;72:7,9,13,22,25
**Bureau (1)** 78:11
**bureaus (4)** 53:11,20;74:16;75:23
**business (2)** 77:20,22

## C

**CA (1)** 37:14
**California (1)** 6:11
**call (5)** 63:25;67:3;68:1,2;86:23
**called (1)** 31:5
**Calling (2)** 31:7;56:22
**calls (5)** 27:13;57:9;58:5,12;85:18
**came (3)** 14:9;20:16;62:4
**campaign (5)** 72:24;73:4,7,12,14
**can (27)** 7:13;27:13,17;32:2,5;34:15;41:8;43:12;56:12;57:19;58:8;64:7;65:12;68:12;73:16;77:9,22;81:24;84:5,12;85:1;89:5,17;90:20,24;92:20;94:10
**capacity (1)** 84:5
**card (5)** 21:4,17,19;22:13,21
**cards (1)** 21:11
**career (2)** 13:11;31:18
**carry (1)** 46:15
**case (12)** 6:6,8;10:16;22:4,19;39:20;51:25;54:24;60:20;65:4;70:25;72:11
**cases (2)** 72:12,15
**cashed (2)** 17:10,24
**cautioned (1)** 7:8
**cent (1)** 67:21
**Central (124)** 6:7;7:17,18,20;8:4,9,11,13;9:20;13:12,14;16:24;17:1,14,15,18;18:6;19:17,21;20:19;21:15,21,24;22:2,11;23:13,17;25:7;26:24;27:11,21;29:8;30:4,11,15;35:5,11;36:14;41:5,5,13,13,16;42:9,10;43:4,14;45:5;46:1,2,7;51:8;52:15,17;53:23;57:4;59:3,23;62:9,12,24;63:4,7,11;65:21;66:1;67:17;68:2,8,15,16,19;69:12,16,16,23,25;70:7,14;71:21;72:12,21,24;73:4,8,18;75:17,21;76:1,6,10;77:18,18,19,25,25;79:12,14;81:20;83:3,7,22;84:1,6,8,10,20;86:8,19;87:1,4,14;88:18;89:7,20,21;90:11;91:5,12;92:2;93:4,12,16;94:22
**Certainly (2)** 44:16;76:23
**certified (2)** 6:10;7:9
**CFO (2)** 28:1,10
**chair (2)** 48:4,10
**chairperson (2)** 45:22,24
**chapter (1)** 22:4
**charge (2)** 14:5;44:24
**charged (10)** 65:2;73:20,22;74:9,15;75:12,14,16,18,21
**charge-off (6)** 74:2,12,17;75:6,9,24
**charge-offs (5)** 74:19,23;75:2,4,15
**chat (1)** 9:23
**checking (1)** 14:3
**chief (1)** 28:11
**Chizek (1)** 81:15
**Church (1)** 89:25
**City (2)** 8:22;82:9
**claim (4)** 22:2,9,12,16
**claims (2)** 6:24,25
**clarified (1)** 12:23
**clarify (1)** 32:10
**clear (1)** 13:5
**clearly (1)** 39:5
**close (1)** 16:14
**Co (1)** 6:7
**collateral (4)** 31:20;32:19;73:24;82:20
**collect (3)** 25:5;30:13;49:1
**collected (1)** 14:24
**collecting (1)** 14:5
**collection (8)** 14:18,20;30:17;33:21;34:7;86:18,25;87:4
**collections (4)** 14:23;15:1,20;86:21
**commercial (2)** 44:19;77:24
**commission (1)** 80:16
**commissioner (12)** 33:8;38:17,24;39:4,8,17;50:9;65:20;69:3,8,11;70:9
**commissioner's (2)** 50:15,24
**commit (2)** 52:21;89:9
**committee (27)** 45:2,3,9,11,22;46:3,7,10,13,20;47:1;48:4,17;49:4,12,18;52:18;53:5,9;56:6;62:20;63:1;76:13,17;85:11;92:6,7
**Commonwealth (1)** 6:12
**communicate (2)** 12:19,22
**communications (1)** 39:21
**company (4)** 63:21,22;79:22,23
**compared (1)** 53:10
**Complaint (4)** 51:25;52:14;78:10;79:6
**complete (1)** 9:7
**completely (3)** 53:12;67:13;94:6
**compliance (6)** 15:2;44:15,17,25;73:23;81:6
**computer (3)** 21:3,16;70:22
**concerning (4)** 12:1;42:7;45:14;82:17
**concerns (1)** 13:18
**concluded (1)** 95:16
**conclusion (4)** 27:13;31:8;64:11;85:19
**conduct (1)** 92:23
**confer (2)** 13:1,6
**confidential (1)** 19:12
**confirmation (2)** 56:12,17
**conflict (3)** 61:18,20;62:7
**consensus (3)** 28:14,19;45:16
**considerable (2)** 68:21;90:18
**considered (1)** 64:8
**consisted (1)** 44:13
**consistence (1)** 45:16
**consulted (1)** 22:9
**consulting (1)** 18:4
**consumer (7)** 14:18,20,23,25;15:20;32:16;78:10
**contact (8)** 51:4;54:9;57:23,24;60:4;81:21;82:6,12
**contacted (2)** 51:4,6
**context (1)** 31:14
**continue (2)** 7:2;34:7
**continued (3)** 17:25;18:2;30:17
**continuing (3)** 16:23;30:13;33:20
**controlled (2)** 17:14,16
**conversations (1)** 85:13
**correctly (1)** 9:17
**counsel (6)** 6:13;20:12;29:10;43:7;57:17;86:21
**counties' (1)** 82:5
**County (3)** 55:24;81:25;82:10
**course (4)** 31:18;44:5;62:25;91:9
**COURT (16)** 6:1,11;7:4;9:4;10:11;51:21;52:14;72:19;76:24;77:6,9,10;93:9,10;95:11,13
**courtesy (1)** 14:1
**Court's (1)** 6:23
**coverage (1)** 14:1
**Craven (6)** 44:18;78:4,21;80:6,7;81:10
**Craven's (1)** 48:6
**created (1)** 13:22
**credit (17)** 21:4,11;51:13;52:13;53:7,11,13,17,23;73:19;74:3,5,9,16;75:9,11,18
**creditors (1)** 63:23
**criminal (1)** 82:24
**Crites (1)** 6:10
**CROSS-EXAMINATION (1)** 7:10
**Crowe (2)** 81:14,15
**customer (4)** 13:18;16:25;18:10;23:19
**customers (2)** 14:2;18:18

## D

**daily (1)** 13:25
**date (8)** 19:25;20:1;22:6;27:1,4,5;38:21;63:9
**dates (1)** 13:12
**David (1)** 44:18
**day (3)** 9:13;16:9;22:8
**Daylight (1)** 6:3
**days (6)** 47:11;65:1,7,9,12;73:23
**deal (3)** 54:5,6;57:21
**dealt (1)** 59:24
**Deaton (4)** 40:9;41:4;73:10;95:7
**debt (6)** 27:23;33:13,16,24;56:15;65:24
**debtor (3)** 31:19;33:4;82:19
**debtors' (7)** 91:21;92:3,14,18,20,23;93:1
**December (2)** 22:3,7
**decided (1)** 46:21
**decision (26)** 25:22,25;26:1,3,4,6,10;30:2;43:6,8,22;46:13,15,18,18;48:11,12,13;49:10,11,14;53:6,8;57:16;86:10,13
**decision-making (1)** 49:9
**decisions (11)** 40:12;45:8,11,13;46:9,16,22;48:9,16;49:12;62:18
**deficiency (16)** 25:6,8;27:20;30:24;31:6,21;32:21;33:15,19,19;34:7;63:17,25;64:2;65:6;71:15
**define (1)** 31:10
**delegated (1)** 20:18
**delinquency (1)** 46:17
**delinquent (7)** 14:24;20:17;41:25;44:5;47:14;53:20;65:1
**DENNIS (2)** 7:6;8:23
**denying (1)** 60:7
**department (31)** 13:22;14:19;15:2,5,7;18:22;19:5;21:18;22:13;23:10,20;24:9;28:10;44:15,16,21;53:16;74:4;79:18,21;80:5,8,11,18;81:6;82:1,22;84:2,24;91:15;94:23
**departments (2)** 13:12;82:5
**dependent (2)** 47:21,22
**deposit (2)** 53:15;74:4
**deposition (10)** 6:9;8:6;10:16,23;11:16,24;12:1,4;55:3;95:16
**depository (1)** 72:25
**describe (2)** 18:15;68:13
**desk (1)** 13:17
**detailing (1)** 46:5
**details (1)** 83:2
**determined (3)** 27:7,9,18
**devices (3)** 12:12,14,16
**D-E-V-I-C-E-S (1)** 12:16
**dictated (1)** 73:22
**difference (2)** 64:6;68:1

**different (6)** 24:4;48:17,18,24;60:14;83:4
**dig (2)** 37:7;60:12
**diligently (1)** 39:12
**direct (2)** 70:15;94:20
**directly (6)** 24:2;29:16;39:16,19;57:21;72:16
**director (2)** 40:2;44:19
**directors (1)** 41:14
**disapproval (1)** 92:10
**disbursed (1)** 35:1
**discovery (2)** 6:24;7:1
**discuss (4)** 40:16;55:7;78:13;84:25
**discussed (23)** 31:1;33:20,22;34:6;43:21;44:7,9;45:10;47:4,6,7,10,16,18;54:2,24;56:5;63:16;79:1;84:20,22;85:10;86:8
**discussing (2)** 48:24;52:16
**discussion (4)** 55:1,4;60:17;95:5
**discussions (12)** 24:23;31:15;40:18,22;42:2,6;44:4;45:14;47:14;48:23;82:15,16
**dispute (1)** 64:16
**distributed (1)** 39:15
**distribution (37)** 27:10;28:16;29:11;30:3;34:10,19,19,22;35:5,9,17;36:4,11,12,15,23;37:14;38:19,22;39:2,10,12;41:2;42:16,17;43:5,9,15;49:25;50:8,10,16,24;51:15;60:19;70:8;91:19
**District (2)** 51:21;52:14
**division (4)** 15:13;23:5,8,14
**document (23)** 10:3,9;34:13;37:3;38:4,11;42:19,21;50:12;51:12;52:11;53:7;59:10;60:12,23;62:5;63:3;66:15;67:20;70:21;71:9,11,20
**documentation (2)** 30:6,11
**documented (2)** 30:15;45:5
**documenting (1)** 13:18
**documents (5)** 9:22;12:3;30:17;73:17;93:12
**document's (1)** 66:20
**dollars (1)** 69:10
**donation (1)** 73:14
**donations (2)** 73:4,8
**done (5)** 38:10;39:22;53:15;56:8;95:11
**Donna (8)** 44:18;48:6;78:4,21;80:6,7;81:9,10
**Douglas (2)** 6:6,18
**down (1)** 91:18
**Drive (1)** 8:25
**due (15)** 38:12,14;39:5,14;46:16;47:11;50:21;65:7,8,10,12,14,17;73:24;76:11
**duly (1)** 7:8
**during (13)** 13:1,7;15:22;16:18;19:9;29:17;36:24;38:13;41:19;44:4;85:14;87:13;90:10
**duties (2)** 15:2;46:6
**duty (1)** 35:21

## E

**Eastern (3)** 6:3;10:24;11:18
**either (2)** 65:2;76:2
**Elisa (2)** 6:7;55:23
**Ellen (8)** 18:25;19:1,10,16;41:20,21;45:23;48:7
**else (8)** 7:15;29:25;43:3,14,18;48:10;59:23;83:15
**employed (6)** 13:14;19:21;49:19;54:14,17;79:14
**employee (5)** 7:18;8:12;23:10,17;48:14
**employees (4)** 14:11,16,24;44:24
**employment (7)** 16:9;55:23;87:14;89:14;90:11,20,22
**end (2)** 36:2;92:13
**enforcement (5)** 81:22;82:7,11,14,16
**enjoy (1)** 16:19
**Ensminger (2)** 85:5,9
**enter (2)** 71:13;93:10
**entered (2)** 8:15;70:20
**entire (3)** 33:16,23;38:10
**entity (2)** 53:22;87:3
**Entry (1)** 60:18
**equity (1)** 21:3
**escheat (2)** 38:24;50:11
**escheated (2)** 38:16;39:7
**ESOP (1)** 17:13
**established (1)** 17:9
**estimate (2)** 90:21,24
**et (1)** 6:7
**even (5)** 15:10;29:3;34:5;89:10;90:16
**eventually (1)** 62:10
**everybody (1)** 28:3
**everyone (3)** 27:19,25;28:2
**everyone's (1)** 14:3
**evict (1)** 82:22
**eviction (1)** 82:21
**evidence (1)** 85:19
**exact (3)** 25:11;47:9;75:15
**exactly (6)** 16:8;61:10;62:3;63:4;65:7;84:23
**exam (7)** 91:21;92:3,15,18,21,23;93:1
**examination (2)** 80:24;94:20
**examinations (1)** 79:25
**examined (1)** 7:9
**excess (1)** 67:3
**exclusively (1)** 32:15
**executive (1)** 28:8
**executives (1)** 44:14
**exhibit (18)** 10:13,14,15,20,22;11:14,15;37:12,13;51:24;52:3,6;60:15,18,25;70:23,24;78:22
**explains (1)** 50:12
**extent (7)** 27:12;29:14;56:22;57:9;64:10;78:15;79:6
**external (5)** 79:22;80:2,14;81:16,18
**externally (1)** 79:17
**extinguished (2)** 76:3,7

## F

**fact (6)** 28:17;43:24;59:1;76:14,16;89:16
**facts (2)** 67:7;85:19
**Fair (5)** 51:13;52:13;53:6;69:23;89:13
**fall (2)** 16:15;32:17
**fallen (1)** 42:1
**false (2)** 67:13,13
**familiar (3)** 52:11;72:22;81:13
**far (5)** 24:3;34:17;65:8,14;88:3
**farther (1)** 66:2
**Fayette (1)** 55:23
**FCC (1)** 60:24
**February (9)** 38:21;42:17,24;50:4;68:22;69:8,11;75:25;85:15
**federal (6)** 80:21;82:7,9;85:15;86:5,11
**federal-backed (1)** 85:21
**federally (2)** 80:22;86:15
**feel (3)** 66:8;76:1;88:9
**fees (3)** 90:21;91:8,16
**few (2)** 47:21;94:19
**fewer (2)** 88:3,6
**figures (2)** 22:12;25:11
**file (23)** 32:18,21;34:21,25;35:5,8,16;38:18;39:2,10;42:16;43:4,8;50:7,10,15,23;51:20;53:19;60:24;63:24;65:17;70:7
**filed (7)** 22:2;36:14;38:20;66:4;84:2,16;88:13
**files (1)** 13:19
**filing (8)** 36:2,10,22;43:15;49:24;51:13,14,22
**final (9)** 34:10;48:11,12,13,16;49:10,11,12,14
**financial (6)** 28:11;44:15;74:1;78:11;80:19;91:14
**find (1)** 37:3
**fine (3)** 8:19;38:2;70:4
**finished (1)** 62:16
**firm (6)** 19:3;57:3;77:15;81:13,17;92:23
**first (20)** 7:7;9:13;14:8;16:17;23:10;25:15;33:9;34:21,24;35:10,12,13,21;36:14;38:13;42:16;62:2;63:21,21;68:18
**firsthand (1)** 95:7
**five (20)** 12:2;61:6;87:13;88:2,3,4,6,7,11,15,17;89:6,6,13;90:1,11,20,22;94:11,12
**five-year (1)** 87:20
**follows (1)** 7:9
**foreclosed (1)** 86:14
**foreclosure (20)** 25:3;29:4,6,7,18;32:23;33:2;38:14;41:1;44:6;50:3;64:20;65:8,18;66:4;69:16,24;72:11;86:4;95:2
**foreclosure/order (1)** 85:14
**foreclosure-initiated (1)** 65:3
**Form (18)** 20:23;25:23;28:5,25;30:19;35:7;36:6;40:14;41:6;43:10;46:11;68:10,24;70:10;83:18;87:5;88:24;89:18
**former (2)** 7:18;8:12
**forms (1)** 48:24
**found (1)** 62:22
**four (2)** 14:9;52:7
**Fowler (22)** 57:2,3,7,21,23;58:1,10,16;59:3,5,7,11,20,24;60:2,6,9;61:14;62:10,16,22;87:9
**Frazier (1)** 39:20
**free (1)** 83:13
**Friday (3)** 6:2;10:24;11:17
**front (1)** 72:12
**Frost (7)** 77:14;78:1,6,14;79:7,9;87:9
**full (2)** 8:21;31:3
**funds (10)** 27:6;33:12;34:19,20,22,25;38:15;39:12;63:10;69:3

## G

**garnishment (3)** 55:22;56:3,11
**gather (2)** 22:11,13
**gave (2)** 51:2;83:14
**generally (2)** 6:23;7:1
**gets (2)** 63:21,22
**gifting (2)** 83:16,22
**gifts (1)** 83:13
**given (2)** 14:10;83:15
**golf (2)** 54:12,21
**Good (1)** 6:1
**Gotcha (1)** 53:5
**government (1)** 86:5
**governmental (1)** 80:3
**government-backed (1)** 85:16
**granted (2)** 33:3,23
**Granting (1)** 60:18
**Great (3)** 7:12;22:1;77:11
**Greg (13)** 29:21;44:2,17;54:6,8,9,13,14,24;55:4,8,14,18
**group (3)** 44:12;45:1,15
**guess (3)** 36:18;70:23;88:3
**guesstimate (1)** 87:24

## H

**half (2)** 35:4;50:5
**Hall (21)** 6:9,21;7:4,6, 14,18,24;8:10,12,21, 23;9:2,6;10:17,23; 11:16,17;21:1;61:13; 77:14;94:19
**hand (3)** 7:5;24:1; 38:11
**handling (3)** 13:18; 20:21;22:19
**handoff (1)** 24:12
**hard (1)** 18:15
**head (11)** 15:12;19:5; 24:8,8;28:1,9;80:7,9; 85:2,2;94:22
**heading (1)** 8:17
**hear (3)** 31:14,17; 77:9
**heard (8)** 30:23;31:4, 9,11,12;79:24;83:16, 21
**held (2)** 14:6;69:3
**help (1)** 14:11
**herein (1)** 7:7
**hereinafter (1)** 7:8
**hesitant (1)** 55:11
**hi (1)** 6:18
**higher-up (1)** 95:6
**hire (2)** 57:7;58:10
**hired (15)** 13:23;14:8, 11;19:3;23:9,11,13, 14;57:4,5,15;58:16; 59:3,16;92:25
**hiring (2)** 59:5,7
**history (1)** 20:22
**Hold (1)** 66:16
**holding (1)** 69:11
**Honestly (2)** 59:5; 89:22
**house (1)** 95:3
**hundred (4)** 28:22,23; 69:10;91:2

## I

**idea (10)** 73:1,15; 87:17,22;88:10,12, 20;90:15;93:24;94:1
**identification (7)** 10:18;11:1,19;37:16; 52:2;60:22;71:1
**Im (1)** 66:19
**imagine (1)** 23:1
**Imani (1)** 89:25
**implementation (1)** 13:24
**implemented (2)** 38:17;39:7
**implore (2)** 34:21; 65:5
**implored (2)** 50:20,20
**important (1)** 26:7
**imprudent (1)** 66:2
**inaction (4)** 38:12,14; 39:6,14
**include (2)** 18:17; 24:17
**included (1)** 47:14
**includes (1)** 46:23
**indicated (1)** 71:24
**indicating (1)** 12:5
**individual (2)** 44:4; 45:15
**individuals (1)** 44:13
**inform (5)** 43:25; 46:20;55:2;56:9;79:3
**information (16)** 21:15;22:14;30:8; 38:23;56:23;57:9,13, 17;58:13;59:6;80:25; 81:1,5;91:25;94:24; 95:7
**informed (4)** 43:24; 50:9;53:9;92:8
**in-house (1)** 20:12
**initiated (6)** 65:9,21; 67:18;69:16,17,23
**instances (1)** 32:14
**institute (1)** 64:20
**instituted (1)** 56:11
**Institutions (1)** 80:19
**instruct (1)** 57:18
**interest (4)** 25:14; 61:18,20;62:7
**interests (1)** 8:12
**internal (3)** 79:21; 80:2,4
**Internally (1)** 79:17
**into (16)** 14:8,16,22; 19:12,24;20:13,16; 23:9,14;32:17;55:14; 62:4;70:20;71:13; 78:16;93:11
**introducing (2)** 10:10, 12
**investigations (1)** 82:24
**involved (10)** 30:2; 40:11;73:6,7;79:7,10; 84:24;87:11,15;88:19
**Ireland (1)** 12:2
**issue (1)** 38:11
**issued (1)** 86:6
**issues (2)** 55:7;90:13

## J

**Jacobs (1)** 85:5
**January (6)** 13:15; 33:25;66:18,19; 70:18;71:24
**Jeff (1)** 85:5
**job (1)** 15:5
**jobs (1)** 14:17
**Jr (3)** 40:9;41:4;73:10
**Judge (7)** 60:24;72:7, 9,10,13,22,25
**judgment (30)** 25:3; 30:24;31:2,6,19,21; 32:19,22;33:3,4,7,15, 16,20,23,25;34:7; 56:14,18;60:19; 66:14,17,25;67:5,21; 68:8;69:8,12;70:24; 71:13
**junior (1)** 35:11
**jurisdiction (1)** 6:23

## K

**Keenon (16)** 6:20; 29:20;39:23;54:3,15; 56:2,20;57:6;58:1; 61:19,21;62:6,11,13, 23;86:18
**Ken (3)** 21:24,25;22:1
**Ken's (1)** 21:25
**Kentucky (10)** 6:5,12; 7:20;8:4,5,7,23; 72:11;80:18;84:18
**kept (8)** 20:22;21:2; 47:25;48:5,6,7;65:13; 88:12
**Kimberly (2)** 72:7,9
**kind (1)** 77:22
**Kirk (2)** 21:25;22:1
**knew (5)** 43:14,18; 93:17,19,23
**Knoll (1)** 90:3
**knowing (2)** 64:20; 66:11
**knowingly (1)** 66:10
**knowledge (10)** 19:16,19;21:2;23:24; 28:2,4;37:1;55:9; 73:5;83:10
**known (4)** 74:11; 83:24;91:11;93:2
**knows (5)** 29:14; 34:15,16,16;84:5

## L

**Lane (2)** 84:3,18
**laptop (1)** 12:17
**large (1)** 82:20
**last (18)** 16:9;18:21; 21:25;22:8;40:1; 50:13;70:15;87:13; 88:2,6,14,17;89:6,13; 90:1,11,20,22
**late (1)** 16:15
**law (11)** 19:3;26:16; 33:3;57:3;77:15; 81:21;82:7,11,14,16; 92:23
**lawful (1)** 7:7
**lawsuits (7)** 87:14; 88:10,13,18;89:5,17, 19
**lawyer (1)** 9:9
**leadership (1)** 43:20
**least (1)** 79:19
**leave (1)** 92:3
**left (14)** 15:5;19:20, 23;20:4,8;24:5,9; 25:5;27:9;41:21,23; 45:23;59:20;76:9
**legal (13)** 27:13;31:5, 8;49:20;54:1;56:19; 57:16;60:10;64:11; 85:19;90:21;91:7,16
**lending (4)** 28:1,10; 40:2;44:20
**less (2)** 64:13;90:19
**letter (18)** 10:23;11:7, 8,11,16,20;71:25; 72:3;78:5,5,9,22; 79:4,8,9;91:20,22; 92:12
**Lexington (7)** 6:4; 8:23,25;72:11;77:16; 84:18;87:12
**Lexington-Fayette (1)** 81:25
**lien (5)** 35:11;63:21, 24,24;67:8
**liened (1)** 64:8
**lienholder (8)** 50:7; 63:12;64:14,17,19, 21;66:12;68:19
**lienholder's (1)** 35:22
**light (1)** 93:13
**likely (1)** 85:8
**line (1)** 21:3
**Lisa (5)** 80:6;81:9,10, 11,12
**list (1)** 81:1
**litigation (2)** 16:21; 77:23
**little (1)** 55:11
**loaded (1)** 10:21
**loan (46)** 13:19; 20:16;26:14;27:20; 28:2,4,15,18;44:21; 45:2,3,9;46:3,6,17; 47:1,12,13,15;48:15, 16;49:3,12,18;52:17, 21;53:5,20;62:25; 64:25;67:17;71:17, 23;73:23;74:15; 75:22;76:2,6,11,12, 15,17;77:24;85:11; 92:6,7
**loans (15)** 14:25; 18:17;32:15,16,18; 41:25;44:5,24;45:15; 47:10,17,23;65:11; 86:4,19
**lobby (1)** 13:17
**location (1)** 6:4
**long (2)** 23:7;34:23
**longer (6)** 19:21; 26:19;54:14,17; 62:16;65:12
**look (1)** 52:11
**looking (1)** 71:2
**loss (2)** 38:24;73:25
**lost (1)** 51:12
**lot (1)** 47:22
**Louisville (1)** 90:3
**Luther (4)** 40:9;41:4; 73:10;95:6

## M

**Madam (5)** 76:24; 77:6,9;93:10;95:11
**main (1)** 42:12
**mainly (4)** 32:14,17; 40:24,25
**majority (2)** 25:16; 33:10
**making (3)** 6:19; 18:19;71:14
**man (1)** 21:17
**manager (15)** 14:18, 19,20,23;15:4,6,20; 19:1,4;21:17,19; 22:20,21,22,24
**many (10)** 18:20; 28:12;29:2;40:22; 47:17,23;73:23; 87:14;88:10,13
**March (13)** 26:21,23; 27:3;28:16;29:11; 30:3,18;34:9;56:12; 61:2;63:8;91:19; 92:12
**marked (7)** 10:17,25; 11:18;37:15;52:1; 60:21;70:25
**markets (1)** 87:11
**master (15)** 33:8; 38:16,23;39:4,8,13, 16;50:9,14,24;65:20; 69:3,7,11;70:9
**math (1)** 67:2
**matter (3)** 43:4;58:2, 19
**matters (5)** 16:21; 77:24;78:13,16;79:8
**May (18)** 23:1;26:18, 20;35:17;36:3,9,13; 37:15;42:21;43:5,9, 16;49:24;51:23,24; 59:6;91:10;93:2
**maybe (3)** 15:10; 47:20;89:25
**mean (11)** 7:16; 18:14;25:1;31:4; 34:10;63:17,19;

66:19;73:21;89:8;93:10
**Meaning (1)** 88:4
**means (2)** 18:18;20:4
**mediation (2)** 19:9,11
**meet (2)** 11:23;47:2
**meeting (5)** 44:20;47:5,18,24,25
**meetings (5)** 41:24;44:5,8,11,22
**member (1)** 42:3
**members (9)** 41:4,12,17,17;42:7;43:19;46:1;78:1,1
**memory (6)** 34:14;59:7;61:15;62:5;66:21;89:9
**met (2)** 47:15,23
**might (4)** 34:6;48:25;94:11,11
**mind (4)** 32:11;55:14;76:21;88:8
**minds (1)** 93:21
**minimum-dollar (1)** 47:12
**minute (1)** 38:6
**minutes (8)** 12:2;37:7;47:25;48:5,6,7;94:11,12
**misleading (1)** 67:11
**Misstates (2)** 42:18;67:6
**Mm-hmm (1)** 66:23
**money (9)** 26:4,7;27:11;30:4;49:1;50:11;63:7;65:17;76:11
**month (3)** 47:3,6,8
**monthly (1)** 91:16
**months (2)** 14:10;16:17
**moratorium (3)** 85:16;86:5,11
**more (20)** 11:13;38:6;59:6;65:1,6,9,12;66:24;67:23;68:15;85:8;87:18,20,23;88:17,21,22,23;89:12;93:17
**morning (1)** 6:1
**mortgage (8)** 38:13;44:19;62:2;63:21;64:25;85:20,21;86:15
**mortgage-holder (8)** 25:15;33:9;34:21,25;35:10,12,14;36:5
**mortgages (1)** 85:17
**most (2)** 6:23;82:17
**mostly (3)** 54:5,6;77:23
**motion (19)** 34:22,25;35:5,9,17;36:4,12,14,22;37:13;38:22;42:16;43:5,9,15;49:24;50:15,23;51:14
**mouth (2)** 33:18;75:20
**move (2)** 57:19;70:12
**moved (1)** 58:13
**moves (1)** 70:4
**much (8)** 13:19;24:25;65:24;90:12;91:10,18;93:19,23
**Mullins (5)** 22:25;23:13,22;44:20;48:5
**myself (2)** 16:19;43:7

**N**

**name (12)** 6:10;8:22;21:9,25;28:13;45:1;79:23;80:13,20;81:24;89:17;90:4
**names (6)** 21:23;28:3;43:25;80:1,3;81:8
**nature (1)** 44:6
**near (1)** 17:11
**necessarily (1)** 44:3
**need (7)** 10:3;33:14;34:6;50:18,19;58:20;93:10
**needed (6)** 45:17;46:19;50:14;62:16;65:23,23
**new (6)** 13:17,21,25;38:17,23;39:6
**Newrez (4)** 38:12;39:6;50:8;62:3
**Newrez' (1)** 39:14
**next (2)** 14:12,13
**nobody (2)** 34:5;43:14
**non-attorneys (1)** 30:12
**noon (2)** 10:24;11:18
**normal (1)** 24:5
**normally (1)** 45:15
**Notary (1)** 6:12
**Noted (5)** 20:24;41:9;58:21;90:7,8
**Notice (1)** 37:14
**noticed (1)** 8:6
**notified (2)** 75:8,10
**number (5)** 6:8;37:12;47:11;87:16,25
**numbered (1)** 61:8
**numbers (2)** 22:16,18

**O**

**oath (1)** 9:3
**object (4)** 6:25;55:17;57:8;90:5
**objecting (1)** 85:25
**Objection (46)** 19:11;20:23;25:23;27:12;28:5,25;29:13;30:7,19;31:7,25;35:7;36:6;40:14;41:6,9;42:18;43:10;46:11;49:21,23;56:21,25;58:6,11,12,18,21;64:10;67:6;68:10,24;69:19;70:10;73:11;74:20;78:15;83:18;84:4;85:18;86:12;87:5;88:24;89:18;90:14;91:24
**objections (5)** 6:15,22;7:2;46:22;49:15
**obtain (1)** 57:16
**obtained (5)** 25:3;33:7,15;56:14;95:2
**obvious (2)** 65:15;67:25
**occasion (1)** 57:22
**Occasionally (1)** 45:19
**October (1)** 36:13
**off (17)** 37:4,6;65:2;71:7;73:20,22,25;74:10,15;75:13,14,16,18,21;76:22;94:10,13
**offense (1)** 55:18
**offer (2)** 71:12;83:7
**office (1)** 72:17
**officer (4)** 13:19;14:14;26:15;28:11
**Off-the-record (1)** 60:17
**often (2)** 47:1,4
**Ogden (15)** 6:21;29:20;39:23;54:3,15;56:2,20;57:6;58:1;61:19,21;62:6,11,13;86:18
**Once (8)** 27:22;47:3,13;48:4;54:12,21;62:15,22
**once-a-month (1)** 47:5
**one (25)** 10:19;11:13;14:16;17:24,24;28:23;31:8;38:6;46:18;47:18;51:14;52:7;60:15;67:21;74:19,24,24;75:2;81:6;82:2,3;83:1;89:23,25;93:2
**only (8)** 25:4,17;46:18;55:1;65:16;68:16;82:2,3
**Oops (1)** 60:15
**open (3)** 10:3,4;60:25
**opening (4)** 13:17;37:20;51:19,20
**opinion (2)** 26:17;35:24
**opt (1)** 14:4
**order (18)** 34:12;36:10,22;38:19;39:2,10;50:7,10,22;60:19;61:2;65:20,22;66:6,6,11;67:18;69:25
**ordered (1)** 66:7
**orders (1)** 82:18
**original (1)** 33:25
**originally (1)** 21:22
**others (1)** 87:10
**out (10)** 11:3;14:4;17:10,24;46:15;60:12;62:22;88:4;92:3,12
**outside (8)** 15:5;16:19;19:3;53:22;72:19;81:17;83:9;87:11
**outsized (1)** 55:19
**over (13)** 6:23;23:1,22;24:3,10,25;25:1;40:1;68:7;69:12;87:20;89:12;91:2
**overdraft (1)** 14:2
**overdrafts (1)** 14:3
**overdrawn (1)** 14:6
**Overlapping (2)** 18:9;24:18
**overruled (2)** 48:20,21
**oversaw (1)** 72:10
**oversee (2)** 13:24;14:25
**overseeing (1)** 14:23
**oversight (1)** 44:24
**owed (21)** 25:13,16,21;26:2,5,8,12;27:10,21;28:15,18;30:4;31:3;33:12,16;49:2;67:5,8;68:16,19;76:15
**own (2)** 69:24,24
**owned (1)** 82:23

**P**

**Pacific/12:00 (1)** 11:18
**page (4)** 61:5,5,6,9
**pages (2)** 61:6,7
**paid (3)** 14:3;33:10;66:9
**paper (1)** 12:18
**part (5)** 62:23;79:15;80:11;82:17,20
**participate (1)** 79:11
**participating (1)** 8:3
**particular (2)** 20:15;72:15
**parties (1)** 83:5
**partner (2)** 86:19,24
**party (1)** 89:21
**past (7)** 47:11;65:7,8,10,12,14;73:23
**past-due (1)** 71:25
**Paul (16)** 40:2,4,11,17,22;42:1,12,15;43:3,19;44:2,16;49:16;56:9;62:19;92:5
**Pause (1)** 71:5
**Pavey (9)** 29:21;54:6,8,9,14,25;55:5,9,15
**pay (1)** 68:18
**paying (1)** 9:18
**payment (2)** 20:22;70:15
**payments (9)** 18:19;20:16;21:6;65:2,5,16;66:1;71:14,15
**pen (1)** 12:18
**pending (1)** 52:15
**people (16)** 18:20;28:12,20,24;29:2;44:12,14,17;48:17;72:21;82:22;83:9;93:19,21,22;95:6
**per (1)** 20:20
**percent (3)** 28:22,23;66:24
**perform (1)** 86:25
**performed (1)** 87:3
**performing (2)** 18:17,18
**period (1)** 87:21
**permission (6)** 50:15,18,19,25;51:3;70:8
**person (4)** 13:16;24:10;60:1;95:1
**personal (2)** 13:16;84:5
**personally (4)** 42:4,6;73:15;74:14
**personnel (1)** 90:12
**phone (1)** 11:25
**piece (1)** 12:18
**place (2)** 38:6;85:16
**placed (2)** 14:5,22
**plain (1)** 39:4
**plaintiff (1)** 6:19
**Plaintiffs' (7)** 10:15,22;11:15;37:13;51:24;60:18;70:24
**plan (1)** 17:10
**planning (1)** 91:14
**play (4)** 32:17;54:12,21;62:4
**please (10)** 6:13,15;7:5;11:8;16:3;30:14;41:10;44:1;58:9,24
**pm (1)** 95:17
**point (5)** 14:17;32:21;38:16;65:14;93:2
**Police (5)** 81:25;82:5;84:1,2,16
**policies (2)** 45:6;64:22

**policy (3)** 46:5;64:25; 76:9
**political (1)** 73:14
**populate (1)** 22:15
**portion (2)** 61:22; 62:15
**position (20)** 13:15, 21,23;14:6,8,17; 15:19;18:21;19:24; 20:11;21:14;27:15, 16;35:11,25;39:25; 42:10;45:25;81:20; 84:8
**possibilities (1)** 48:25
**possible (3)** 58:4; 93:22,25
**possibly (5)** 32:15; 70:18;85:7,10,12
**post (1)** 78:22
**preliminary (1)** 9:22
**prepare (2)** 11:23; 81:5
**prepared (1)** 80:25
**prerequisite (1)** 71:16
**present (2)** 49:3; 92:18
**presented (7)** 10:18, 25;11:19;37:16;52:1; 60:21;70:25
**presenting (1)** 8:2
**presently (1)** 12:18
**president (4)** 15:23, 25;40:8;86:6
**president/manager (1)** 16:6
**presidents (2)** 28:8,9
**Pretty (2)** 13:19;24:24
**previous (2)** 88:3,7
**previously (2)** 38:10; 70:20
**price (1)** 68:9
**principal (1)** 25:13
**print (1)** 11:2
**prior (4)** 24:6;31:20; 34:19;51:14
**private (1)** 79:22
**Privileged (7)** 30:7; 56:22;57:9,17;58:12; 78:16;91:24
**probably (5)** 14:12,22; 15:3,10,24
**procedure (2)** 20:20; 30:12
**procedures (2)** 24:5,6
**proceeding (3)** 6:15; 8:16;10:17
**proceedings (6)** 25:4; 61:22;62:15,24;71:5; 82:21
**proceeds (14)** 25:17; 33:10;35:6,9;36:15; 37:14;38:15;39:7; 41:2;60:20;68:15,17, 18;95:2
**process (3)** 38:14; 49:9;92:14
**processed (1)** 21:7
**produced (1)** 93:12
**product (2)** 13:25; 30:8
**Professionally (1)** 42:5
**program (3)** 14:2,4,12
**promoted (6)** 14:13, 16;15:6,22,25;19:24
**proof (4)** 22:2,9,12,16
**properties (1)** 82:23
**property (15)** 25:4,14, 18;27:22;33:4,8,9; 39:13;63:12;64:7; 66:8,23;67:4,20; 84:17
**Protection (1)** 78:11
**provide (1)** 81:4
**provider (1)** 21:5
**providing (1)** 40:25
**Public (3)** 6:12;55:24; 58:19
**pull (1)** 36:25
**purposes (7)** 10:18, 25;11:19;37:16;52:1; 60:21;71:1
**pursued (1)** 39:12
**put (3)** 27:8;33:18; 75:19

## Q

**quantify (1)** 88:1
**quite (1)** 38:10

## R

**raise (1)** 7:5
**Re (3)** 10:23;11:16; 51:25
**reach (1)** 12:12
**reading (2)** 37:22; 71:9
**ready (3)** 16:16; 37:25;71:4
**really (2)** 46:17;92:16
**reason (3)** 9:6;24:10; 64:13
**reasons (1)** 66:10
**Rebecca (3)** 22:25; 23:22;24:14
**recall (42)** 15:16,23; 20:7;21:10,23;24:23; 27:1;34:20;36:10,17; 48:3,8;52:12;57:25; 58:3;72:14;75:3,7,15; 78:8,20;79:2,2;81:19; 82:3,13;83:1;84:14, 16,23;85:1,12;89:8; 90:4,23;91:3,4,11; 92:16,19,20;93:3
**receive (4)** 17:1,13; 37:18;65:15
**received (25)** 10:5; 11:6,10,20;25:16; 26:8,24;27:6;33:11; 34:11;38:23;55:2; 56:19;63:4,7,9;64:6, 13;66:3;68:16,20; 69:7;70:15;75:7; 76:15
**recess (3)** 37:9;77:7; 94:14
**recognize (1)** 67:7
**recollection (1)** 56:10
**record (24)** 7:3;8:22; 12:21,25;13:7;20:24; 37:4,6,10;58:19,22; 69:15,18;70:20;71:7; 76:22;77:8,12;90:8; 93:9,11;94:10,13,16
**recorded (2)** 91:12; 93:4
**recordkeeping (2)** 21:8,16
**records (5)** 45:6;46:7; 51:8,9;53:9
**recover (1)** 65:23
**reduce (2)** 65:6;71:14
**referred (1)** 14:1
**referring (1)** 17:4
**refresh (3)** 34:14; 59:6;61:15
**regarding (9)** 39:20; 40:12;42:3;49:9; 54:1;55:5;86:10; 91:20;92:14
**regular (2)** 44:5,8
**regulations (2)** 64:23; 65:11
**regulatory (3)** 73:22; 79:25;80:16
**reinstating (1)** 71:17
**reiterate (2)** 6:22;7:2
**relationship (1)** 16:23
**Relevance (2)** 29:13; 90:5
**relied (1)** 60:9
**rely (1)** 78:19
**remainder (1)** 68:20
**remained (2)** 25:6,21
**remaining (2)** 25:19, 20
**remember (44)** 14:21; 15:9;19:22;20:15; 21:4,25;25:11,14; 27:5;30:1;34:17,18, 23,23;35:2;36:22; 38:4,5;40:25;46:4; 47:9;52:16;59:5,7,25; 60:5,8,11;62:3;63:9; 65:7;70:16,17,19; 71:25;72:6;78:9;79:5, 5,23;80:13;83:2;85:4; 92:14
**remembered (1)** 55:25
**removed (1)** 14:15
**reopen (1)** 93:11
**repeat (8)** 9:16;30:14; 32:8;33:17;36:21; 41:10;58:9;79:13
**repeating (1)** 69:6
**rephrase (4)** 26:22; 84:12;89:3,4
**replace (1)** 58:1
**report (7)** 39:25;40:6; 41:3,3;42:13;84:2,16
**reported (12)** 40:4,7; 53:10,20;73:18; 74:12,16,24;75:5,9, 11,23
**REPORTER (12)** 6:1, 11;7:4;10:11;76:24; 77:6,9,10;93:9,10; 95:12,13
**reporting (10)** 41:25; 51:13;52:13;53:7,12, 13,17,23;74:6,13
**reports (2)** 74:1,2
**repossess (1)** 82:19
**repossession (2)** 32:20;82:18
**represent (8)** 6:14; 7:17,17;8:11;61:21; 62:8,9,14
**representation (1)** 44:23
**Representatives (1)** 44:21
**represented (1)** 9:9
**representing (8)** 7:14, 15,20,24;8:3,8,9;9:14
**request (2)** 12:25; 69:17
**requested (4)** 13:20; 66:11;69:25;92:22
**required (1)** 33:3
**requirement (1)** 47:23
**requirements (2)** 47:10,15
**reserve (1)** 93:11
**residence (2)** 8:22,24
**response (1)** 30:21
**responsibilities (2)** 24:11;46:6
**responsibility (5)** 35:8, 10;41:20,25;50:6
**rest (1)** 63:22
**resume (1)** 71:14
**retainer (1)** 18:5
**retire (4)** 16:8,13,14, 16
**retired (13)** 14:21; 16:1;18:24;19:4; 21:23;23:21;54:13, 18,19,25;55:5,15; 92:13
**retirement (5)** 13:13; 16:18,20;17:7;55:8
**review (3)** 11:8;12:3; 44:21
**reviewed (1)** 53:10
**reviewing (1)** 38:1
**right (16)** 7:5,25; 11:12;12:3;22:16; 27:8;33:6;46:24; 52:20;56:20;59:18; 61:3;71:3;72:5; 93:11;94:15
**Rockbridge (1)** 8:25
**role (6)** 14:16,22,25; 16:4;24:12;57:10
**room (2)** 12:7;48:13
**Ross (1)** 44:19
**routinely (1)** 83:7
**rule (3)** 38:17;39:6; 86:16
**rules (1)** 50:21

## S

**sale (24)** 25:18; 26:25;33:8,10,11; 35:9;36:15;38:15; 39:13;56:12,17; 60:19;66:6,8,11; 67:18;68:8,15,17,18; 69:18,25;85:14;95:2
**same (2)** 9:3;66:7
**satisfied (2)** 76:2,7
**saying (4)** 17:18; 52:20;75:19;89:1
**schools (1)** 55:24
**scroll (2)** 37:23;61:17
**second (7)** 63:12; 64:14,17,19,21;66:12, 16
**second-lien (3)** 63:15, 23;64:8
**secretary (2)** 48:1,3
**security (2)** 84:24; 85:3
**seeing (1)** 62:4
**seek (4)** 31:21;33:3, 14;62:21
**seeking (2)** 6:25; 64:11
**seem (1)** 83:1
**seemed (1)** 55:11
**send (2)** 22:14,17
**senior (4)** 28:9;43:19; 50:7;67:8
**sense (1)** 55:19
**sent (4)** 33:7;53:19; 74:9;91:22
**separation (1)** 18:11
**September (1)** 78:4
**services (6)** 21:18,19;

22:13,21;53:15;74:4
**service's (1)** 23:20
**servicing (1)** 21:5
**set (1)** 16:16
**settlement (1)** 34:10
**seven (2)** 19:2,5
**several (6)** 16:17; 44:12;47:24;50:20; 69:10;79:18
**Shane (2)** 85:5,9
**Sharp (8)** 18:25;19:1, 10,17;41:20,21; 45:23;48:7
**sheriff's (1)** 82:22
**Shewmaker (2)** 44:2, 17
**shortfall (7)** 63:15,20, 23,24;64:3,8,9
**shortly (1)** 62:10
**showed (2)** 21:7; 50:13
**signature (2)** 61:9,13
**signed (3)** 22:3;78:6; 79:4
**signing (1)** 71:16
**situation (1)** 40:19
**six (2)** 14:9,24
**SKO (1)** 61:20
**sold (12)** 25:4,14; 27:22;31:20;32:20; 33:5,9;64:7;66:23; 67:4,20;73:24
**solely (1)** 47:22
**somebody (2)** 20:18; 48:10
**someone (4)** 20:19; 38:17;48:20;59:23
**sometimes (1)** 63:23
**somewhere (2)** 45:5; 93:4
**sorry (31)** 7:21;9:23; 12:13,16;20:10; 21:13;24:7;26:16,21, 22;29:7;30:14;31:22; 36:13;38:8;42:20; 43:1,1;49:5;52:4; 61:5,7,25;66:19;69:5; 70:3;71:8;72:8; 79:13;81:10;88:16
**sort (1)** 64:11
**sound (2)** 72:5;77:10
**sounds (1)** 69:14
**source (1)** 94:23
**speak (4)** 39:16; 41:12;78:21;84:1
**speakers (2)** 18:9; 24:18
**speaking (1)** 65:19
**special (25)** 13:22; 14:19;15:4,7,12;16:6; 18:14,16,21;19:1,4; 20:14,16;22:14,15,20, 22,23;23:5,7,9,14; 24:9;26:18;94:22
**specific (1)** 85:12
**specifically (3)** 15:10; 19:22;20:7
**speculation (2)** 58:5; 73:11
**speed (1)** 24:21
**spend (1)** 16:17
**spent (4)** 90:13;91:10, 16,18
**split (1)** 91:18
**spoke (7)** 11:25;12:1; 39:19;41:16;84:9,10, 11
**spoken (1)** 72:16
**sponsor (1)** 83:4
**sponsorship (2)** 83:17,23
**sponsorships (1)** 83:9
**spring (1)** 16:18
**start (2)** 9:11;13:13
**starting (1)** 38:5
**State (13)** 6:11,14,16; 8:21;38:16;50:12; 69:15;80:15;82:7,9, 11,14;93:8
**state-chartered (1)** 80:17
**stated (2)** 56:1;59:1
**statement (3)** 67:14; 89:14;93:14
**statements (2)** 69:20, 22
**states (3)** 39:5,11; 51:21
**stating (1)** 31:8
**status (1)** 41:1
**stayed (1)** 15:1
**Steve (6)** 8:12;10:17, 23;11:3,16,16
**Steven (4)** 6:9,21;7:6; 8:23
**still (18)** 19:17;22:5; 26:2,4,7,10,11,17; 27:10,21;28:15,17; 30:4;38:1;52:14; 54:9;71:6;76:11
**stock (1)** 17:11
**stock/ESOP (1)** 17:10
**Stoll (17)** 6:20;29:20; 39:23;54:3,15;56:2, 20;57:6;58:1;61:19, 19,21;62:6,11,13,23; 86:18
**subject (1)** 63:15
**subpoena (7)** 10:6,15; 12:6;25:12;55:2; 56:1;66:22
**succeeded (1)** 22:23
**suit (1)** 32:19
**Summary (1)** 60:19
**summer (1)** 16:18
**superior (2)** 19:7; 42:13
**supervisor (2)** 14:10; 15:3
**supply (2)** 59:9;81:1
**suppose (1)** 69:14
**sure (11)** 9:17,23; 11:9;13:4;15:1;38:7; 52:12;55:12;72:14; 83:3;91:17
**surmise (1)** 84:24
**surplus (3)** 68:7,14,21
**sworn (1)** 7:8
**system (8)** 21:3,4,6,8, 9,10,16;75:22

## T

**talk (1)** 58:20
**talking (1)** 66:5
**ten (10)** 28:24;37:6; 87:18;88:4,7,11,21, 22;89:12,17
**ten-minute (2)** 37:2; 76:21
**term (2)** 31:5;48:21
**Testify (1)** 10:16
**testimony (2)** 9:7; 12:20
**therefore (1)** 6:24
**thinking (1)** 80:12
**third (1)** 17:20
**Thornsberry (17)** 40:3,4,11,17,23;42:1, 12,15;43:3,19;44:2, 17;49:11,16;56:9; 62:19;92:6
**though (1)** 32:23
**thought (2)** 71:8; 80:10
**thousand (1)** 69:10
**three (1)** 52:7
**threshold (1)** 47:12
**tickets (2)** 83:8,13
**Tim (9)** 6:20;9:10; 11:25;12:9,22;29:23; 54:7;91:23;94:18
**times (5)** 47:21;48:18, 23;50:21;79:18
**title (4)** 14:9,10;16:1,4
**titles (2)** 13:12;28:7
**Today (18)** 6:2;7:15, 15,24;8:3,10;9:3,7,9, 12,13,13,19;10:7; 54:2;55:7;94:2;95:6
**Todd (7)** 77:14;78:2, 6,14;79:7,9;87:9
**together (2)** 28:14; 54:12
**told (5)** 38:18;39:1,3; 80:23;94:2
**took (11)** 20:11,11; 23:1,22;24:3,10,10; 34:23;38:5;40:1;50:8
**topic (1)** 33:19
**topics (1)** 44:9
**track (2)** 51:12;88:12
**tracked (1)** 91:17
**train (1)** 24:15
**transferred (2)** 38:13; 62:2
**tremendously (1)** 47:19
**Trust (1)** 6:7
**truthful (1)** 9:7
**truthfully (1)** 94:6
**try (2)** 9:22;37:3
**trying (5)** 32:10;49:8; 65:5;67:12;88:14
**Turner (3)** 80:6;81:11, 12
**two (14)** 14:11,13; 15:24;17:22;35:4; 37:11;50:4,5;52:7; 74:18,23;75:1;81:7; 83:1
**type (2)** 17:3;86:13

## U

**UK (2)** 83:4,23
**under (2)** 9:3;55:23
**Understood (1)** 15:21
**United (1)** 51:21
**unless (3)** 14:4;56:1,1
**unsecured (3)** 27:23; 32:16,17
**up (5)** 21:7;24:21; 36:2,25;37:7
**updates (1)** 40:25
**upload (4)** 36:18; 51:11;60:14;70:21
**uploaded (2)** 51:18; 60:16
**uploading (1)** 73:17
**uploads (1)** 37:11
**use (3)** 48:21,22; 68:12
**used (4)** 59:13;71:20; 77:23;79:21
**using (3)** 12:17; 29:10;68:13
**usually (1)** 44:13

## V

**vague (2)** 30:19; 73:12
**varied (2)** 18:23; 47:19
**various (1)** 14:17
**vehicles (1)** 82:20
**vice (5)** 15:23,25; 16:6;28:8,9
**voice-identify (1)** 6:13
**vote (1)** 45:18
**votes (1)** 45:20

## W

**W-A (1)** 52:23
**W-A-C-H (1)** 52:25
**Wain (174)** 6:6,7,17, 18,18;7:11,13,19,23; 8:2,8,14,18,20;9:21; 10:1,9,11,13,14,19; 11:5,13,21;12:24; 16:21;19:14,15; 20:13,24,25;23:22; 24:20,24;25:24;26:9; 27:15,24;28:6;29:1, 15,17;30:9,10,22; 31:9,13,15;32:3,7; 33:13;34:16;35:3,15; 36:7;37:2,10,17,21, 24;38:2,3;40:12,15, 19,19;41:7,11,18; 42:3,7,20,23;43:1,2, 11;44:9;45:20;46:9, 12,14,23;47:4,7,13; 49:9;51:22;52:4,6,7, 10;53:2;54:2;55:20, 21,23;56:24;57:1,5, 12,14,20;58:2,7,14, 15,16,21,23;59:2,4,8, 17,21,24;60:6,14; 61:1,4,10,12;64:12; 67:9,12,16;68:11; 69:1,21;70:6,13,21; 71:2,8,10;73:13,19; 74:21;75:7;76:6,20, 24;77:5,8,12,13; 78:13,17;79:8;83:20; 84:7,11,15;85:22; 86:1,2,17;87:7;89:2, 20,24;90:7,9,13,17; 92:1;93:8,15,17,23; 94:8,12,16;95:11,15
**Wains (16)** 26:8; 27:10;28:16;30:4,18; 33:21;55:5;65:25; 70:16;76:2;84:2,17; 90:22;91:10,18;95:8
**Wains' (6)** 47:13; 52:13;59:14;65:4; 94:24;95:3
**Wain's (1)** 6:24
**wait (4)** 50:3,4;52:23; 56:16
**waited (3)** 34:24,24, 24
**walk (1)** 13:11
**watch (23)** 45:2,3,9; 46:2,6,13;47:1;48:16; 49:3,11,16;52:17,21, 24;53:5;56:5;62:20, 25;76:12,17;85:10; 92:6,6
**W-A-T-C-H (2)** 52:22; 53:3

**way (5)** 27:8;52:15; 54:11;65:16;84:13
**Wayne (1)** 40:16
**week (4)** 51:14;54:12, 21,22
**welcome (1)** 7:12
**What's (1)** 7:22
**William (1)** 12:2
**winter (1)** 16:16
**WISEMAN (104)** 6:20, 20;7:13,16,22;8:1,5, 11,15;9:10;10:10,12; 11:2;12:1,9,22,23; 13:1,6;19:11;20:23; 22:4;25:23;27:12,17; 28:5,25;29:13,23; 30:7,19;31:7,25;32:5; 34:13;35:7;36:6; 37:20,22;38:1;40:14; 41:6,9;42:18,21,24; 43:10;46:11;51:20; 52:3,6,9;53:1;54:7; 55:17;56:21,25;57:8, 16;58:5,11,18,25; 60:23;61:3,7,11; 64:10;67:6,11;68:10, 24;69:19;70:4,10; 71:6;73:11;74:20; 77:3;78:15;83:18; 84:4,9,12;85:18,25; 86:12;87:5;88:24; 89:1,18;90:5,14; 91:20,23,24;94:8,10, 15,18,18,21;95:10,14
**Wiseman's (1)** 9:18
**withdrew (2)** 59:21; 62:11
**within (8)** 12:12;14:9, 12,12;15:24;30:11; 83:12;89:6
**without (3)** 14:9; 50:24;73:17
**witness (22)** 6:4;7:7; 11:4,20;27:18;30:21; 31:11;34:17;35:8; 41:10;61:17;68:25; 70:3;76:23;77:4; 83:19;84:14;86:13; 87:6;88:25;89:22; 90:15
**witnessed (2)** 83:22, 24
**word (2)** 68:13,14
**words (3)** 30:23; 33:18;75:19
**work (6)** 14:11;23:11; 29:21;30:8;77:17,18
**worked (3)** 18:21; 29:23;60:1
**working (5)** 23:4; 24:16;29:16;57:6; 60:5
**workings (1)** 13:25
**works (1)** 13:16
**wristwatch (1)** 53:1
**writes (1)** 73:25
**written (3)** 12:6;78:5; 79:4
**wrong (1)** 38:21
**wrote (1)** 79:9

## Y

**year (11)** 13:21; 14:13,21;15:8,16,24, 24;17:12;19:22;20:7, 15
**yearly (1)** 91:16
**years (23)** 14:13;19:2, 6;35:4;47:20;50:5,5; 87:13;88:2,3,4,6,7,11, 15,17;89:6,7,13;90:2, 11,20,22

## Z

**Zoom (1)** 10:25

## 0

**03/07/2024 (1)** 60:20

## 1

**1 (3)** 10:14,15;23:1
**1/19/2021 (1)** 69:9
**1:25-ap-01026-MB (1)** 6:8
**11 (2)** 10:22;18:24
**11:00 (1)** 77:2
**11:39 (1)** 6:3
**1183 (1)** 8:25
**12 (2)** 18:24;44:13
**12:00 (1)** 10:24
**120 (4)** 65:1,7,9,12
**12th (1)** 56:12
**13 (1)** 22:4
**14 (5)** 11:15;26:23; 30:18;63:8;91:19
**14th (4)** 27:3;28:16; 29:11;30:3
**15 (4)** 14:22;44:13; 51:23,24
**15-minute (1)** 77:1
**19 (2)** 33:25;66:19
**1998 (1)** 13:15
**19-CI-00812 (3)** 37:15;60:20;70:25

## 2

**2 (2)** 10:20,22
**2,000 (1)** 91:3
**2:00 (2)** 77:4,5
**2:35 (1)** 95:17
**20 (3)** 22:7;87:20; 88:23
**200,000 (1)** 91:4
**2000 (1)** 13:21
**2008 (1)** 14:7
**2009 (1)** 14:15
**2012 (1)** 15:24
**2014 (1)** 14:22
**2019 (12)** 15:3,10,13; 20:2,4;40:1;70:18; 71:24;73:18;74:19, 24;75:2
**2020 (7)** 15:3,10; 20:2,5;23:10,11;40:1
**2021 (6)** 33:25;50:4; 68:22;69:12;75:25; 85:15
**2023 (19)** 35:17;36:3, 9,14;37:15;38:22; 42:17,22;43:5,9,16; 49:24;51:23,24; 73:18;74:19,24;75:2; 78:5
**2024 (16)** 16:10,11; 22:7,8;23:2,21;26:18, 21,23;28:16;30:18; 34:9;41:22;63:8; 66:19;91:19
**2026 (5)** 6:2;10:22, 24;11:15,17
**20-what (1)** 26:20
**21 (6)** 6:2;10:24; 11:17;15:11;41:21; 66:19
**22 (8)** 37:15;38:21; 42:17,21;43:5,9,16; 49:24
**22nd (1)** 38:21
**23 (5)** 35:17;36:3,9, 13;78:4
**24 (1)** 22:3
**2711 (2)** 84:3,17

## 3

**3 (2)** 11:14,15
**30 (5)** 16:9,11;22:8; 23:21;47:21
**300 (1)** 66:15
**31 (2)** 70:18;71:24
**358 (1)** 68:2
**358,000 (3)** 67:5,24; 69:9

## 4

**4 (5)** 37:12,13;60:24; 61:5,6
**40 (1)** 47:20
**401k (4)** 17:7,8,13,25
**40515 (1)** 9:1

## 5

**5 (6)** 52:3,4,6;60:15, 18,25
**5:23-cv-00139-DCR (1)** 51:25
**50 (3)** 47:20;87:23; 88:18

## 6

**6 (7)** 50:4;51:24;52:8; 68:22;69:11;75:25; 85:15
**630 (1)** 68:2
**630,000 (1)** 67:4
**65 (2)** 16:14,16
**66 (1)** 25:17
**66,000 (2)** 26:8;30:3
**6th (1)** 69:8

## 7

**7 (3)** 34:9;70:23,24
**70 (1)** 66:24
**7th (1)** 61:2

## 8

**800-some-thousand (1)** 25:15

## 9

**9:00 (1)** 11:17

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re Douglas Alan Wain and Elisa Wain
Debtor

Case No. 1:24-bk-11814-MB

Chapter 13

*(Complete if issued in an adversary proceeding)*

Douglas Alan Wain and Elisa Wain,
Plaintiff
v.
Central Bank and Trust, Co.
Defendant

Adv. Proc. No. 1:25-ap-01026-MB

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Steve Hall 1183 Rockbridge Road, Lexington, KY 40515
*(Name of person to whom the subpoena is directed)*

☑ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME |
|---|---|
| Remote deposition by videoconference (Zoom). | August 21, 2026 9:00am Pacific Time |

The deposition will be recorded by this method:
Stenographic (by certified court reporter).

☐ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: July 9, 2026

CLERK OF COURT

[signature]
*Signature of Clerk or Deputy Clerk*

OR

N/A
*Attorney's signature*

EXHIBIT
HALL Exhibit 1
exhibitsticker.com

The name, address, email address, and telephone number of the attorney representing *(name of party)* Douglas Alan Wain and Elisa Wain , who issues or requests this subpoena, are:
N/A; Plaintiffs are self-represented.

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: Steve Hall
on *(date)* 7/31/26.

☑ I served the subpoena by delivering a copy to the named person as follows: Hand delivered to steve Hall, 1183 Rockbridge Rd., Lexington, KY 40515 and served $50.00 postal money order on (date) 7/31/2026 ; or

☐ I returned the subpoena unexecuted because: ______

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ ______ .

My fees are $ ______ for travel and $______ for services, for a total of $______ .

I declare under penalty of perjury that this information is true and correct.

Date: 7/31/2026

Dep. [signature] 3302
*Server's signature*

Dep. R. Berberich 3302
*Printed name and title*

224 E. High St., Lexington, KY 40507
*Server's address*

Additional information concerning attempted service, etc.:

955

| ATTORNEY OR PARTY WITHOUT ATTORNEY: DOUGLAS A. & ELISA WAIN<br>P.O. BOX 7473<br>WESTLAKE VILLAGE, CA 91359<br>TELEPHONE NO.: (859) 494-3677<br>EMAIL ADDRESS: douglaswain@gmail.com<br>ATTORNEY FOR: | *FOR COURT USE ONLY* |
|---|---|
| **UNITED STATES BANKRUPTCY COURT COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br>STREET ADDRESS:<br>MAILING ADDRESS:<br>CITY AND ZIP CODE:<br>BRANCH NAME: | |
| PLAINTIFF: DOUGLAS ALAN WAIN & ELISA WAIN<br>DEFENDANT: CENTRAL BANK AND TRUST, CO. | CASE NUMBER:<br>1:24-BK-11814-MB<br>COURT DATE:<br>8/21/2026 9:00 am |
| **PROOF OF SERVICE** | Ref. No. or File No.: |

1. I am over 18 years of age and not a party to this action.

2. Received by LEXINGTON - FAYETTE COUNTY CONSTABLE 3RD on 7/31/2026 at 9:01 am to be served on **STEVE HALL, 1183 ROCKBRIDGE ROAD, LEXINGTON, KY 40515.**

3. **INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **SUBPOENA TO TESTIFY AT A DEPOSITION ON A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING), $ 50 POSTAL MONEY ORDER (55119604831), FEDERAL RULE OF CIVIL PROCEDURE, ATTACHMENT A TO SUBPOENA TO TESTIFY AT A DEPOSITION** with the date and hour of service endorsed thereon by me, to: **STEVE HALL** at the address of: **1183 ROCKBRIDGE ROAD, LEXINGTON, KY 40515**, and informed said person of the contents therein, in compliance with state statutes.

4. Date and Time of service: 7/31/2026 at 11:03 am

5. Description: Age: 66, Sex: M, Race/Skin Color: WHITE, Height: 5 8, Weight: 160, Hair: SALT & PEPPER, Glasses: Y

6. Military Status: Based upon inquiry of party served, Defendant is not in the military service of the United States of America.

7. Marital Status: Based upon inquiry of party served, Defendant is not married.

8. I am

9. My name, address, telephone number, and, if applicable, county of registration and number are:
   Name: DEPUTY R. BERBERICH 3302
   Firm: LEXINGTON - FAYETTE COUNTY CONSTABLE 3RD
   Address: 224 E HIGH ST, SUITE 0, LEXINGTON, KY 40507
   Telephone number: (859) 309-2807
   Registration Number: Process Server
   County: 40515

ANGELA ROBIN MABE MY COMM. EXPIRES 10/17/2029 NOTARY PUBLIC ID # KYNP105910 STATE AT LARGE KENTUCKY

10. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Notary: Angela Robin Mabe
ID# KYNP105910
My Comm. Expires: 10/17/2029

Date: July 31, 2026

DEPUTY R. BERBERICH 3302
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

Deputy R. Berberich 3302
(SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Douglas A. Wain and Elisa Wain
P.O. Box 7473, Westlake Village, CA 91359
(859) 494-3677 | douglaswain@gmail.com
Plaintiffs, Pro Per

August 11, 2026

**VIA U.S. MAIL**

Mr. Steve Hall
1183 Rockbridge Road
Lexington, KY 40515

**Re: Your Deposition — Friday, August 21, 2026, 12:00 noon Eastern Time — by Zoom (no travel required)**
**Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB (Bankr. C.D. Cal.)**

Dear Mr. Hall:

This letter confirms the logistics for your deposition under the subpoena personally served on you on July 31, 2026. The deposition is entirely remote — you may appear from home by computer, tablet, or telephone; no travel is required. It begins at 12:00 noon Eastern Time (9:00 a.m. Pacific) on Friday, August 21, 2026, before a certified court reporter who will host the videoconference and administer the oath.

So that the court reporter can send you the Zoom connection link, please provide an email address — you can email me at douglaswain@gmail.com, or call me at (859) 494-3677. If you prefer not to use email, telephone dial-in access is available, and I will mail you or read you the connection details; just call me. If any technical question comes up on the morning of the deposition, call me and we will get you connected.

If you have a scheduling conflict with this date, please contact me as soon as possible so it can be addressed.

Thank you — we look forward to speaking with you on the 21st.

Respectfully,



Douglas A. Wain
Plaintiff, Pro Se

EXHIBIT
HALL Exhibit 2
exhibitsticker.com

Douglas A. Wain and Elisa Wain
P.O. Box 7473
Westlake Village, CA 91359
(859) 494-3677 | douglaswain@gmail.com

August 14, 2026

**VIA FEDEX 2-DAY DELIVERY**

Mr. Steve Hall
1183 Rockbridge Road
Lexington, KY 40515

**Re: Deposition of Steve Hall — Friday, August 21, 2026, 9:00 a.m. Pacific / 12:00 noon Eastern**

**Wain v. Central Bank & Trust Co., Adv. Proc. No. 1:25-ap-01026-MB (Bankr. C.D. Cal.)**

Dear Mr. Hall:

This letter follows my letter of August 11, 2026 regarding the logistics of your deposition, which will be taken by remote videoconference (Zoom) on Friday, August 21, 2026, beginning at 12:00 noon Eastern time (9:00 a.m. Pacific). You will not need to travel anywhere — you may appear from your home or any location convenient to you.

Below is everything you need to join the session:

**Join by computer, tablet, or smartphone (Zoom link):**
https://us02web.zoom.us/j/83029935310?pwd=ENze6ERlI8SLaTx9jHzLzKQxGiOiER.1&jst=5

**Meeting ID: 830 2993 5310**
**Passcode: 921772**

**Join by telephone (no computer needed):**
Dial +1 (312) 626-6799 or +1 (309) 205-3325, then enter the Meeting ID and Passcode above when prompted. If it is easier, you are welcome to attend by telephone only.

The session will be hosted by April L. Crites, a certified court reporter, who will admit you from the Zoom waiting room, and who will administer the oath and record the testimony. Please plan to join a few minutes before 12:00 noon Eastern so everything can begin on time.

EXHIBIT
Hall Exhibit 3
exhibitsticker.com

If you have any questions at all — about the technology, the schedule, or anything else — please call me at (859) 494-3677 or email douglaswain@gmail.com, and I will be glad to help. If you would like the Zoom invitation sent to you by email, just let me know the address to use.

Thank you again for your time. We appreciate it and will work to use no more of your day than necessary.

Sincerely,

Douglas A. Wain
Plaintiff, Pro Per

**COMMONWEALTH OF KENTUCKY**
**FAYETTE CIRCUIT COURT**
**NINTH DIVISION**
**CIVIL BRANCH**
**CIVIL ACTION NO. 19-CI-00812**

***ELECTRONICALLY FILED***

**CENTRAL BANK & TRUST CO.** **PLAINTIFF**

**v.**

**DOUGLAS A. WAIN;**
**ELISA WAIN; AND**
**NEWREZ, LLC**[1] **DEFENDANTS**

## MOTION FOR DISTRIBUTION OF PROCEEDS; NOTICE

---

Plaintiff, Central Bank & Trust Co. ("Central Bank"), by counsel, moves this Court for entry of an order of distribution to Central Bank from the proceeds currently held by the Master Commissioner from the sale of the real property that is the subject of this action. Such funds have been held by the Master Commissioner since February 8, 2021. Of those funds, $358,412,72[2] should now be released and distributed first to pay Central Bank's Judgment in full. To the financial detriment to Central Bank, the other secured lienholder has failed to pursue any interest in these funds. In support hereof, Central Bank states as follows:

## BACKGROUND

On March 6, 2019, Central Bank initiated this foreclosure action after Douglas Wain and Elisa Wain (the "Wains") defaulted on a home equity line of credit due Central Bank secured by a mortgage on their home (the "Mortgage"). Under the Mortgage, the Wains had granted Central Bank a lien on the real property located at 2711 Barbados Lane, Lexington, Fayette County,

EXHIBIT
HALL Exhibit 4

---

[1] NewRez LLC d/b/a Shellpoint Mortgage Servicing ("NewRez"), assignee of Ditech Financial, LLC, successor by merger to Green Tree Servicing, LLC, has been substituted for Ditech Financial, LLC ("Ditech").



[2] Plus interest from March 6, 2019, costs and its attorneys' fees

Kentucky (the "Property"). On October 29, 2019, Central Bank filed its First Amended Complaint adding Ditech as a party defendant.

After full briefing, and based on the record before it, including the Wains' own admissions, on December 11, 2020, this Court from the bench sustained Central Bank's Motion for Summary Judgement on its claims against the Wains. On January 20, 2021, this Court entered Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale (the "Judgment"). The Judgment in favor of Central Bank awarded $358,412.72, plus interest from March 6, 2019, until paid, plus costs expended and attorneys' fees. The Judgment directed the Master Commissioner to sell the Property on February 8, 2021. The Judgment was final and appealable.

The Property was sold by the Master Commissioner on February 8, 2021.[3] On February 24, 2021, this Court entered its Order Confirming Sale. On March 12, 2021, the Court entered its Order for Delivery of Deed and Partial Distribution of Proceeds to the Master Commissioner for his costs and fees. This Order left the remainder of the proceeds—$605,035.42—with the Master Commissioner.

Following the confirmation of the sale, on March 16, 2021, NewRez was substituted as a defendant in this action in place of Ditech and authorized to file an amended answer and crossclaim (collectively, "Amended Answer"). NewRez entered its appearance based upon an unrecorded assignments of a mortgage granted to Ditech by the Wains on the Property. In its Amended Answer, NewRez alleged it was owned $324,261.97 in principal, plus interest at the rate of 5.875% from July 1, 2019, plus a deferred principal of $106,431.58, plus late fees, costs, and expenses, including attorneys' fees on the mortgage debt owed by the Wains.

---

[3] On February 17, 2021, after the Master Commissioner's sale, the Wains filed a Notice of Appeal of the Judgment. The Wains did not post a supersedeas bond to stay enforcement or execution of the Judgment.

On November 4, 2022, the Court of Appeals rendered its opinion affirming this Court's Judgment. The Wains have moved the Supreme Court of Kentucky to grant discretionary review. That motion remains pending.

In response, on April 15, 2021, the Wains filed an answer to NewRez's crossclaim and filed a crossclaim against NewRez. However, on April 28, 2021, the Wains filed Notice of Withdrawal of their crossclaim against NewRez. On May 27, 2021, the Wains were granted leave to file an Amended Answer asserting affirmative defenses to NewRez's crossclaim.[4]

For 2 years now, almost to the day, NewRez has taken no action on its crossclaim against the Wains. It has allowed this case to remain dormant to the detriment and damage to Central Bank.[5]

On March 17, 2023, Central Bank's counsel received communication from the Office of the Fayette County Master Commissioner (the "Commissioner") regarding the sale proceeds of $605,035.42, held by the Commissioner. The correspondence indicated that due to rule changes governing master commissioners, funds held by the Commissioner for 2 years would escheat to the State. Upon further communication with the Commissioner that the funds are the subject of this pending litigation, the Commissioner has agreed that the funds held by his office in this case are not subject to escheat. However, that communication brings attention to the fact that, for 2 years, NewRez has taken no action to enforce claims that it may have to those funds to the detriment and damage of Central Bank which has Judgment and has been adjudicated to have a lien thereon.

[4] Also, on May 27, 2021, NewRez served discovery requests on the Wains

[5] It now appears that NewRez may have assigned its mortgage to a new assignee. However, no successor assignee, **if any**, has made an appearance in this case.

## ARGUMENT

Central Bank has diligently pursued and advanced this litigation since it initiated this case in 2019. These efforts resulted in the entry of Judgment in favor of Central Bank, and the sale of the Property in February, 2021. However, since the sale of the Property, the inaction of NewRez has interfered with Central Bank receiving the proceeds that it is entitled to from the sale of the Property. This inaction is causing and will continue to cause harm to Central Bank, unless the Court intervenes. To remedy this situation, the Court must apply principles of equity and authorize the distribution of the sale proceeds first to satisfy the Judgment lien of Central Bank.

The Court retains broad powers of equity when legal remedies are inadequate. Such power exists when dilatory acts cause another party's harm. "This is a proper place for application of the well-known rule in equity that as between innocent parties he must suffer who, by his acts or laches, has made a loss possible." *Akers v. Cushman Constr. Co.*, 487 S.W.2d 60, 62 (Ky. 1972). In *Akers*, the court decided that equitable principles required satisfaction of liens that would otherwise be inferior, "as this situation is a creature of the [otherwise senior lienholder's] laches and negligence they must bear this loss." The *Akers* decision provides guidance. This Court may turn to equitable principles to prevent an unjust result suffered by an innocent party that is caused by the laches of another. The well-known rule in equity is "that as between two innocent persons he must suffer who, by his acts or latches, has made a loss possible." *Lincoln Bldg. & Loan Ass'n v Liberty Nat'l Bank & Trust Co.*, 227 S.W.2d 191, 193 (Ky. 1950).

As stated in *Louisville Asphalt Co. v Cobb*, 220 S.W.2d 110, 129 (Ky. 1949), under the doctrine of estoppel, the decision should be against the party "who was in a better position by reasonable diligence or care to have averted the loss which must be borne by one or the other."

Further, NewRez has waived its lien rights and interest in the sale proceeds. Under Kentucky law, a "waiver" is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party, at his option, might have demanded or insisted upon." *Barker v. Stearns Coal & Lumber Co.*, 291 Ky. 184, 163 S.W.2d 466, 470 (Ky. 1942).

NewRez is a represented party. It has taken no action to enforce its mortgage or have same adjudicated by this Court. It has not demanded or insisted upon the release or distribution of funds on its mortgage. It has taken *no action* of any kind for nearly *two years*. NewRez has sat on its rights. Whether it be called latches, waiver or estoppel, its inaction has caused damage to Central Bank. NewRez should now be barred from asserting rights superior to Central Bank.

As a result of NewRez's total and complete inaction for 2 years, Central Bank faces an unjust result beyond its control. The continued delay harms Central Bank. The Court should order a distribution of the sale proceeds first to Central Bank.

**CONCLUSION**

For the foregoing reasons, the Court should order the Master Commissioner to distribute from the sale proceeds first to Central Bank in the amount of $358,412,72 plus interest from March 6, 2019, costs and its attorneys' fees, and grant such other relief to which Central Bank may be entitled under the circumstances.

**NOTICE**

The parties will please take notice that this motion shall be heard before the Fayette Circuit Court on the 26th day of May, 2023, at 8:30 a.m., or as soon thereafter as counsel may be heard.

Respectfully submitted,

**FOWLER BELL PLLC**

*/s/ Christopher G. Colson*
Christopher G. Colson. Esq.
Kentucky Bar ID: 93328
Taft A. McKinstry, Esq.
Kentucky Bar ID: 46610
300 West Vine Street, Suite 600
Lexington, KY 40507-1751
(859) 252-6700
(859) 255-3735 fax
GGColson@FowlerLaw.com
TMcKinstry@Fowlerlaw.com

**ATTORNEYS FOR PLAINTIFF,
CENTRAL BANK & TRUST CO.**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing was served through the Court's e-filing system upon the following, on this the 22nd day of May, 2023:

James H. Frazier, III, Esq.
201 E. Main Street, Suite 770
Lexington, Kentucky 40507
james@faycom.info
**MASTER COMMISSIONER**

David W. Hemminger, Esq.
hemmingerlawoffice@gmail.com
**ATTORNEY FOR DOUGLAS & ELISE WAIN**

Paul M. Nalepka, Esq.
KYE-Notifications@rslegal.com
**ATTORNEY FOR DITECH FINANCIAL, LLC**

Shannon O'Connell Egan, Esq.
Nathan H. Blaske, Esq.
Shannon.Egan@dinsmore.com
Nathan.Blaske@dinsmore.com
**ATTORNEYS FOR NEWREZ LLC**

*/s/ Christopher G. Colson*
**ATTORNEY FOR PLAINTIFF**

4893-0947-2869, v. 1/4300.01158

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000001 of 000005

**COMMONWEALTH OF KENTUCKY**
**FAYETTE CIRCUIT COURT**
**DIVISION 9**
**CASE NO. 19-CI-00812**

***Electronically Filed***

**CENTRAL BANK & TRUST CO.** **PLAINTIFF**

**vs**

**DOUGLAS A. WAIN, *et al.*** **DEFENDANTS**

---

**ENTRY GRANTING SUMMARY JUDGMENT AND ORDER OF DISTRIBUTION OF SALE PROCEEDS**

---

This matter came before the Court on August 25, 2023, for a hearing on Substitute Defendant/Cross-Claimant U.S. Bank Trust National Association, Not In Its Individual Capacity But Solely As Owner Trustee For RCF 2 Acquisition Trust's ("U.S. Bank") *Motion For Summary Judgment On Its Cross-Claim* ("Motion for Summary Judgment") filed on July 3, 2023; Plaintiff Central Bank & Trust Co.'s ("Plaintiff") *Motion for Distribution* filed on May 22, 2023; and the parties' respective responses to and replies in support of the Motions. Central Bank, U.S. Bank, and Defendants Douglas A. Wain and Elisa Wain ("Defendants Wain") were represented by their respective counsel. The Court, having heard arguments of counsel, and having reviewed the pleadings, the Motions, the Affidavit of Jean Knowles, and other evidence, finds and orders as follows:

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

1. U.S. Bank is the holder of a promissory note executed by Defendants Wain on March 5, 2008, in the original amount of $417,000.00 (the "Note"). The original, blank-endorsed Note was produced for inspection by U.S. Bank's counsel during the hearing on August 25, 2023.

JS : 000001 of 000005



EXHIBIT
HALL Exhibit 5
exhibitsticker.com

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000002 of 000005

2. U.S. Bank is the mortgagee of record of a first mortgage that encumbered the real property commonly known as 2711 Barbados Lane, Lexington, Kentucky 40509 (the "Property"), along with all replacements and additions, and that was executed by Defendants Wain to secure the indebtedness evidenced by the Note (the "Mortgage"). The Mortgage was recorded in Book 6319, Page 226, and was assigned to U.S. Bank as evidenced by an Assignment of Mortgage recorded in Book 555, age 599, all in the office of the Clerk of Fayette County, Kentucky. The original Mortgage was produced for inspection by U.S. Bank's counsel during the hearing on August 25, 2023.

3. Defendants Wain are in default under the terms of the Note, as modified, and the terms of the Mortgage, and the sums due thereunder have been accelerated. There is due and owing to U.S. Bank on the Note and Mortgage the principal sum of $324,261.97, plus interest at the rate of 5.8750% per annum from July 1, 2019, as may be subsequently adjusted under the terms of the Note and 2019 Modification, together with a deferred principal balance of $106,431.58, plus late fees that continue to accrue, costs, attorney's fees, and other advances made pursuant to the terms of the Note as modified, Mortgage, and Kentucky law, for which U.S. Bank is entitled to a personal judgment against Defendants Wain.

4. On February 8, 2021, the Property was sold to a third party at a Master Commissioner's Sale pursuant to the *Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale* entered in favor of Plaintiff on January 20, 2021. A portion of the sale proceeds were distributed under an *Order Confirming Report of Sale, For Delivery of Deed and Partial Distribution of Proceeds* entered on March 12, 2021, with the remaining sale proceeds of $605,035.42 being held pending further orders of the Court.

JS : 000002 of 000005

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000003 of 000005

5. There is no genuine issue of material fact, the equities favor U.S. Bank, and U.S. Bank is entitled to judgment on its Cross-Claim against Defendants Wain as a matter of law.

**SUMMARY JUDGMENT AND ORDER OF DISTRIBUTION**

6. IT IS ORDERED that U.S. Bank's Motion for Summary Judgment is GRANTED in its entirety.

7. IT IS FURTHER ORDERED that U.S. Bank is granted a *personal judgment* against Defendants Wain in the principal sum of $324,261.97, plus interest at the rate of 5.8750% per annum from July 1, 2019, as may be subsequently adjusted under the terms of the Note and 2019 Modification, together with a deferred principal balance of $106,431.58, plus late fees that continue to accrue, costs, attorney's fees, and other advances made pursuant to the terms of the Note as modified, Mortgage, and Kentucky law.

8. IT IS FURTHER ORDERED that Central Bank's Motion for Distribution is GRANTED IN PART AND DENIED IN PART. The Motion is granted to the extent that the remainder of the sale proceeds shall be distributed as set forth herein. The Motion is otherwise denied.

9. IT IS FURTHER ORDERED that the Master Commissioner is directed to disburse to U.S. Bank from the sale proceeds the following sums to satisfy its personal judgment against Defendants Wain:

| | |
|---|---|
| Unpaid principal balance: | $324,231.97 |
| Deferred balance: | $106,431.58 |
| Interest through 8/27/23: | $79,145.98 |
| Escrow/Other Advances: | $27,211.84 |
| Corporate Advance Balance: | $644.00 |
| Unpaid Late Charges: | $439.45 |
| Recording Fee: | $46.00 |
| **TOTAL:** | **$538,150.82** |

JS : 000003 of 000005

10. IT IS FURTHER ORDERED that after distribution of the sale proceeds to U.S. Bank as set forth herein, the remaining sale proceeds of $66,884.60 shall be distributed to Central Bank on its second mortgage lien as adjudicated in the *Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale*.

11. Pursuant to CR 77.04, the Circuit Court Clerk shall serve notice of this Entry Granting Summary Judgment And Order Of Distribution Of Sale Proceeds.

12. There being no just cause for delay, this is a final and appealable matter.

/s/ HON. KIMBERLY BUNNELL
electronically signed
3/4/2024 6:58:46 PM ET

HON. KIMBERLY BUNNELL
JUDGE, FAYETTE CIRCUIT COURT

Prepared by:

/s/ *Shannon O'Connell Egan*
Shannon O'Connell Egan (87296)
Nathan H. Blaske (90369)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 977-8261
Fax: (513) 977-8141
Email: shannon.egan@dinsmore.com
nathan.blaske@dinsmore.com

Have seen and approved:

/s/ James H. Frazier, III
Hon. James H. Frazier, III
Master Commissioner
Fayette Circuit Court

Have seen:

/s/ *Christopher G. Colson* (w/ em auth. 2/21/24)
Hon. Christopher G. Colson
Hon. Taft McKinstry
FOWLER BELL PLLC
300 W. Vine Street, Suite 600
Lexington, KY 40507
Email: CGColson@fowlerlaw.com
TMcKinstry@fowlerlaw.com
*Counsel for Plaintiff, Central Bank & Trust Co.*

Counsel refused to attest (per email 2/26/24)
Hon. David W. Hemminger
HEMMINGER LAW OFFICE, PSC
331 Townepark Circle, Suite 100-C
Louisville, KY 40243
Email: hemmingerlawoffice@gmail.com
*Counsel for Defendants Douglas and Elisa Wain*

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000004 of 000005
JS : 000004 of 000005

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000005 of 000005

**CLERK'S CERTIFICATE OF SERVICE**

I hereby certify that on ______________, 2024, a true and correct copy of the foregoing was served through first class mail, upon:

Shannon O'Connell Egan, Esq.
Nathan H. Blaske, Esq.
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202

Hon. David W. Hemminger
HEMMINGER LAW OFFICE, PSC
331 Townepark Circle, Suite 100-C
Louisville, KY 40243

Hon. Christopher G. Colson
Hon. Taft McKinstry
FOWLER BELL PLLC
300 W. Vine Street, Suite 600
Lexington, KY 40507

Hon. Gregory D. Pavey
Hon. Timothy R. Wiseman
STOLL KEENON OGDEN, PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507

_________________________________
Clerk, Fayette Circuit Court

JS : 000005 of 000005

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
(LEXINGTON DIVISION)

DOUGLAS A. WAIN
P.O. Box 7473
Westlake Village, California 91359

PLAINTIFFS

and

ELISA WAIN
P.O. Box 7473
Westlake Village, California 91359

v.

CENTRAL BANK & TRUST CO.
300 W. Vine Street
Lexington, Kentucky 40507

DEFENDANTS

SERVE: FBT LLC Lexington
250 W. Main St., Ste. 2800
Lexington, KY 40507

AND

EQUIFAX INFORMATION SERVICES, LLC
1550 Peachtree Street, N.W.
Atlanta, Georgia 30309

SERVE: CSC-Lawyers Inc. Service Co.
421 W. Main St.
Frankfort, KY 40601
(BY CERTIFIED MAIL)

AND

EXPERIAN INFORMATION SOLUTIONS, INC.
475 Anton Boulevard
Costa Mesa, California 92626

EXHIBIT
HALL Exhibit 6
exhibitsticker.com

SERVE: CT Corporation System
306 W. Main St., Ste. 512
Frankfort, KY 40601
(BY CERTIFIED MAIL)

AND

TRANS UNION, LLC
555 W. Adams Street
Chicago, Illinois 60661

SERVE: The Prentice Hall Corporation System
421 W. Main Street
Frankfort, Kentucky 40601
(BY CERTIFIED MAIL)

** ** ** **

## VERIFIED COMPLAINT

Come the Plaintiffs, Douglas A. Wain and Elisa Wain, and for their Verified Complaint against the Defendants, Central Bank & Trust Co. ("CBT"), Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union") states as follows:

## I. PRELIMINARY STATEMENT

1. This is an action for violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C §1681 et seq. arising out of Defendant, CBT's, impermissible and unlawful access of Plaintiff, Douglas Wain's Equifax credit report, and Defendants', CBT's, Equifax's, Experian's, and Trans Union's reporting of false and derogatory information on Plaintiffs' Equifax, Experian, and Trans Union credit reports.

## II. PARTIES

2. Plaintiff, Douglas A. Wain, is a citizen of the State of California residing in Westlake Village, California 91359.

3. Plaintiff, Elisa Wain, is a citizen of the State of California residing in Westlake Village, California 91359.

4. Plaintiffs are "consumers" as that term is defined by the FCRA 15 U.S.C. §1681a(c).

5. Defendant, CBT, is a Kentucky corporation with its principal place of business at 300 Vine St., Lexington, Kentucky 40507.

6. CBT is a "person" and a "furnisher of information" as those terms are defined by the FCRA.

7. Defendant, Equifax, is a corporation organized under the laws of the State of Georgia and doing business in the Commonwealth of Kentucky, with its principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.

8. Equifax is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as that term is defined by the FCRA, 15 U.S.C. §1681a(o).

9. Equifax is regularly engaged in the business of assembling, evaluating, and dispensing information concerning consumers for the purpose of furnishing "consumer reports," as that term is defined at 15 U.S.C. §1681a(d), to third parties.

10. Defendant, Trans Union, is a limited liability corporation organized under the laws of the State of Illinois and doing business in the Commonwealth of Kentucky, with its principal place of business located at 555 West Adams Street, Chicago, Illinois 60661.

11. Trans Union is a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as that term is defined by the FCRA, 15 U.S.C. §1681a(o).

12. Trans Union is regularly engaged in the business of assembling, evaluating, and

dispensing information concerning consumers for the purpose of furnishing "consumer reports," as that term is defined at 15 U.S.C. §1681a(d), to third parties.

13. Defendant, Experian, is a corporation organized under the laws of the State of California and doing business in the Commonwealth of Kentucky, with its principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626.

14. Experian is a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" as that term is defined by the FCRA, 15 U.S.C. §1681a(o).

15. Experian is regularly engaged in the business of assembling, evaluating, and dispensing information concerning consumers for the purpose of furnishing "consumer reports," as that term is defined at 15 U.S.C. §1681a(d), to third parties.

## III. JURISDICTION

16. This Court has jurisdiction over this action: (1) pursuant to 28 U.S.C. §1331; (2) pursuant to the FCRA, 15 U.S.C. §1681(p); and (3) because the transactions and occurrences giving rise to this action occurred in Fayette County, Kentucky as a result of the Defendant's doing business in Fayette County, Kentucky.

## IV. FACTUAL BACKGROUND

17. Prior to March 19, 2021, Plaintiffs resided at 2711 Barbados Lane in Lexington, Kentucky. From June 2006 to January 20, 2021, 2711 Barbados Lane was subject to a promissory note and mortgage in favor of CBT.

18. On March 6, 2019, CBT filed a foreclosure action in the Fayette Circuit Court against Plaintiffs seeking, among other things, possession of 2711 Barbados Loan and the balance of Plaintiff's indebtedness to CBT.

19. On January 20, 2021, the Fayette Circuit Court entered an Order granting CBT's

Motion for Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale respecting 2711 Barbados Lane and granted a judgment to CBT in the amount of $358,412.72. Further, the Fayette Circuit Court referred the matter to the Fayette County Master Commissioner for judicial sale of the property.

20. Prior to March 5, 2021, 2711 Barbados Lane was sold at a judicial sale. On March 5, 2021, the Fayette Circuit Court granted CBT's Motion to Confirm Report of Sale, and For Delivery of Deed and Partial Distribution of Proceeds. According to CBT' Motion to Confirm, the Fayette County Master Commissioner held, and, upon information and belief, is currently holding $605,035.42. Thus, as of March 5, 2021, CBT had, and continues to have, access to funds sufficient to satisfy any alleged indebtedness of Plaintiffs to CBT.

21. In October 2022, Plaintiff, Douglas Wain, discovered that CBT, on September 27, 2022, impermissibly and unlawfully accessed his Equifax credit report. In January 2023, Mr. Wain discovered that CBT, in December 2022, again impermissibly and unlawfully accessed his Equifax credit report.

22. In addition, in or around June 2021, Plaintiffs discovered that CBT, despite the availability to CBT of funds sufficient to pay any alleged indebtedness, was reporting an alleged past due balance on Plaintiffs' CBT tradelines on Plaintiffs' Equifax, Trans Union, and Experian credit reports.

23. Immediately upon discovering CBT's false and derogatory reporting, Plaintiffs disputed the reporting in writing to Equifax, Trans Union, and Experian. Upon information and belief, Equifax, Experian, and Trans Union, pursuant to the requirements stated in 15 U.S.C. §1681i(a)(2)(A), notified CBT of the disputes at or within five (5) days of Equifax's, Experian's, and Trans Union's receiving notice of the disputes from Plaintiffs.

24. Plaintiffs received responses to their disputes in April 2023. Trans Union deleted the CBT tradeline on Plaintiff, Douglas Wain's, credit report but verified the false and derogatory tradeline reporting on Mrs. Wain's Trans Union credit report. Equifax and Experian verified the accuracy of the false and derogatory CBT tradelines on Plaintiffs' credit reports.

25. Despite Plaintiffs' lawful request for removal or amendment of the disputed item pursuant to the FCRA, CBT, Equifax, and Experian failed to investigate Plaintiffs' disputes and failed to remove the disputed item from Plaintiffs' credit reports.

26. Upon information and belief, CBT, Equifax and Experian did not evaluate or consider any of Plaintiffs' information, claims, or evidence, and did not make any and/or sufficient attempts to remove the disputed items within a reasonable time following their receipt of Plaintiffs' disputes.

27. The Defendants' actions have damaged Plaintiffs in that Plaintiffs have been denied credit and/or have been forced to pay a high rate of interest for credit due to the Defendants' failure to investigate Plaintiffs' disputes and Defendants' reporting of the CBT tradeline. In addition, Defendants' violations of the FCRA have caused Plaintiffs to suffer embarrassment, humiliation, and emotional distress.

## V. CLAIMS

### Negligent Violation of the FCRA - CBT

28. Plaintiffs hereby adopt and incorporate the allegations contained in paragraphs 1 through 27 as if fully set forth herein.

29. CBT obtained Plaintiff, Douglas Wain's, credit information without his authorization in violation of 15 U.S.C. § 1681b(f) and without a permissible purpose in violation of 15 U.S.C. § 1681b.

30. CBT's failure to investigate Plaintiffs' credit reporting disputes and its initial and continuing false reporting of the CBT tradeline are violations of CBT's duties as a furnisher of credit information pursuant to the FCRA, 15 U.S.C. §1681s-2(b).

31. CBT's violations of the FCRA amount to negligent non-compliance with the FCRA as stated in 15 U.S.C. §1681o for which CBT is liable to Plaintiffs for Plaintiffs' actual damages, for statutory damages, and for Plaintiffs' attorneys' fees.

**Negligent Violation of the Fair Credit Reporting Act – Equifax**

32. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

33. Equifax's failure to investigate Plaintiff's disputes and its failure to delete and/or amend its reporting of the subject tradeline despite knowledge of the falsity of the disputed item are violations of Equifax's duty to ensure maximum possible accuracy of consumer reports under 15 U.S.C. §1681e(b) and Equifax's duties regarding investigation of disputed item under 15 U.S.C. §1681i.

34. Equifax's failure to evaluate or consider any of Plaintiffs' information, claims, or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed items within a reasonable time following Equifax's receipt of Plaintiffs' disputes are violations of Equifax's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

35. Equifax's violations of the FCRA amount to negligent non-compliance with the FCRA as stated in 15 U.S.C. §1681o, for which Equifax is liable to Plaintiff for Plaintiff's actual damages, for statutory damages, and for Plaintiff's attorney's fees.

**Negligent Violation of the Fair Credit Reporting Act – Experian**

36. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

37. Experian's failure to investigate Plaintiffs' disputes and its failure to delete and/or amend its reporting of the subject tradeline despite knowledge of the falsity of the disputed item are violations of Experian's duty to ensure maximum possible accuracy of consumer reports under 15 U.S.C. §1681e(b) and Experian's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

38. Experian's failure to evaluate or consider any of Plaintiffs' information, claims, or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed item within a reasonable time following Experian's receipt of Plaintiffs' disputes are violations of Experian's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

39. Experian's violations of the FCRA amount to negligent non-compliance with the FCRA as stated in 15 U.S.C. §1681o, for which Experian is liable to Plaintiff for Plaintiff's actual damages, for statutory damages, and for Plaintiff's attorney's fees.

**Negligent Violation of the Fair Credit Reporting Act – Trans Union**

40. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

41. Trans Union's failure to investigate Plaintiffs' disputes and its failure to delete and/or amend its reporting of the subject tradeline despite knowledge of the falsity of the disputed item are violations of Trans Union's duty to ensure maximum possible accuracy of consumer reports under 15 U.S.C. §1681e(b) and Trans Union's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

42. Trans Union's failure to evaluate or consider any of Plaintiffs' information, claims, or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed item within a reasonable time following Trans Union's receipt of Plaintiffs' disputes are violations of Experian's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

43. Trans Union's violations of the FCRA amount to negligent non-compliance with the FCRA as stated in 15 U.S.C. §1681o, for which Trans Union is liable to Plaintiff for Plaintiff's actual damages, for statutory damages, and for Plaintiff's attorney's fees.

**Willful Violation of the FCRA - CBT**

44. Plaintiffs hereby adopt and incorporate the allegations contained in paragraphs 1 through 43 as if fully set forth herein.

45. As hereinabove stated, CBT had no permissible purpose to obtain Plaintiffs' credit information given the lack of any ongoing business relationship between Plaintiffs and CBT, and given the availability of funds held by the Fayette County Master Commissioner more than sufficient to satisfy CBT's Judgment. As such, CBT obtained Plaintiffs' credit information without Plaintiffs' authorization in violation of 15 U.S.C. § 1681b(f) and without a permissible purpose in violation of 15 U.S.C. § 1681b.

46. CBT's violations of the FCRA amount to willful non-compliance with the FCRA as stated in 15 U.S.C. § 1681n, for which CBT is liable to Plaintiffs for statutory, compensatory, and punitive damages, and for Plaintiffs' attorney's fees.

47. CBT's failure to investigate Plaintiffs' disputes and its initial and continuing false reporting to Equifax, Experian, and Trans Union of the CBT tradeline, despite CBT's knowledge of the inaccuracy of its reporting, are willful violations of CBT's duties as a furnisher of credit

information pursuant to the FCRA, as stated in 15 U.S.C. §1681s-2(b).

48. Given CBT's knowledge of the inaccuracy of its reporting, CBT's violations of the FCRA amount to willful non-compliance with the FCRA as stated in 15 U.S.C. §1681n for which CBT is liable to Plaintiffs for Plaintiffs' actual damages, for statutory damages, for punitive damages, and for Plaintiffs' attorney's fees.

**Willful Violation of the Fair Credit Reporting Act – Equifax**

49. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

50. Equifax's failure to investigate Plaintiffs' disputes and its failure to delete and/or amend its reporting of the subject tradeline despite Equifax's knowledge of the falsity of the disputed item are willful violations of Equifax's duty to ensure maximum possible accuracy of consumer reports as stated in 15 U.S.C. §1681e(b) and Equifax's duties regarding investigation of disputed item under 15 U.S.C. §1681i.

51. Equifax's failure to investigate Plaintiffs' disputes, its failure to evaluate or consider any of Plaintiffs' information, claims or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed item within a reasonable time following Equifax's receipt of Plaintiffs' disputes are willful violations of Equifax's duties regarding investigation of disputed items as stated in 15 U.S.C. §1681i.

52. Equifax's violations of the FCRA amount to willful non-compliance with the FCRA as stated in 15 U.S.C. §1681n for which Equifax is liable to Plaintiffs for Plaintiffs' actual damages, for statutory damages, for punitive damages, and for Plaintiffs' attorneys' fees.

**Willful Violation of the Fair Credit Reporting Act – Experian**

53. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

54. Experian's failure to investigate Plaintiffs' disputes and its failure to delete and/or amend its reporting of the subject tradeline despite Experian's knowledge of the falsity of the disputed item are willful violations of Experian's duty to ensure maximum possible accuracy of consumer reports as stated in 15 U.S.C. §1681e(b) and Experian's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

55. Experian's failure to investigate Plaintiffs' disputes, its failure to evaluate or consider any of Plaintiffs' information, claims, or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed item within a reasonable time following Experian's receipt of Plaintiffs' disputes are willful violations of Experian's duties regarding investigation of disputed items as stated in 15 U.S.C. §1681i.

56. Experian's violations of the FCRA amount to willful non-compliance with the FCRA as stated in 15 U.S.C. §1681n for which Experian is liable to Plaintiffs for Plaintiffs' actual damages, for statutory damages, for punitive damages, and for Plaintiffs' attorneys' fees.

**Willful Violation of the Fair Credit Reporting Act – Trans Union**

57. Plaintiffs hereby adopt and incorporate the allegations contained in the above pleaded paragraphs as if fully set forth herein.

58. Trans Union's failure to investigate Plaintiffs' disputes and its failure to delete and/or amend its reporting of the subject tradeline despite Trans Union's knowledge of the falsity of the disputed item are willful violations of Trans Union's duty to ensure maximum possible accuracy of consumer reports as stated in 15 U.S.C. §1681e(b) and Trans Union's duties regarding investigation of disputed items under 15 U.S.C. §1681i.

59. Trans Union's failure to investigate Plaintiffs' disputes, its failure to evaluate or consider any of Plaintiffs' information, claims, or evidence, and its failure to make any and/or sufficient attempts to delete and/or amend its reporting of the disputed item within a reasonable time following Trans Union's receipt of Plaintiffs' disputes are willful violations of Trans Union's duties regarding investigation of disputed items as stated in 15 U.S.C. §1681i.

60. Trans Union's violations of the FCRA amount to willful non-compliance with the FCRA as stated in 15 U.S.C. §1681n for which Trans Union is liable to Plaintiffs for Plaintiffs' actual damages, for statutory damages, for punitive damages, and for Plaintiffs' attorneys' fees.

WHEREFORE, Plaintiffs, Douglas A. Wain and Elisa Wain, respectfully demand the following:

A. Trial by jury on all issues so triable;

B. An award of all damages to which Plaintiffs are entitled, including all compensatory, consequential, statutory, actual, and punitive damages;

C. An award of Plaintiffs' costs and attorneys' fees; and

D. Any and all other relief to which Plaintiffs may appear to be entitled.

Respectfully submitted,

*<u>/s/David W. Hemminger</u>*
David W. Hemminger
HEMMINGER LAW OFFICE, P.S.C.
331 Townepark Circle, Ste. 100-C
Louisville, KY 40243
Phone, (502) 443-1060
hemmingerlawoffice@gmail.com
*Counsel for Plaintiff*

**VERIFICATION**

I, Douglas A. Wain, hereby state that I have read the foregoing Verified Complaint and the statements contained therein are true and accurate to the best of my knowledge, information and belief.

Douglas A. Wain

## VERIFICATION

I, Elisa Wain, hereby state that I have read the foregoing Verified Complaint and the statements contained therein are true and accurate to the best of my knowledge, information and belief.

Elisa Wain

Elisa Wain

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
CIVIL BRANCH
NINTH DIVISION

CENTRAL BANK & TRUST CO. PLAINTIFF

V. **AGREED JUDGMENT** NO. 19-CI-00812

DOUGLAS A. WAIN and
ELISE WAIN DEFENDANTS

*** *** *** *** ***

By agreement of the parties, and the Court being sufficiently advised and having considered the same, it is hereby AGREED AND ADJUDGED as follows:

1. The Court has jurisdiction over the subject matter of this case and venue is proper in this Court.

2. The Defendants, Douglas A. Wain and Elise Wain (collectively, the “Wains”), admit all of the allegations of the Complaint filed herein by the Plaintiff, Central Bank & Trust Co. ("Central Bank"), and the Wains do further hereby waive any claims or defenses against Central Bank and waive their individual right to file an Answer herein.

3. By execution of this Judgment, the Wains have entered their appearances in the within action for all purposes.

4. Central Bank is hereby granted Judgment against the Defendants, Douglas A. Wain and Elise Wain, jointly and severally, in the amount of $358,412.72, with interest thereon at the variable rate provided by the subject Gold Equity Line Agreement (currently $52.70 per diem) from March 6, 2019 until paid; its attorneys' fees pursuant to KRS 411.195, and its costs herein expended.

5. This Judgment shall be paid as follows:

EXHIBIT
HALL Exhibit 7
exhibitsticker.com

(a) On or before March 20, 2019, the Wains shall make a payment to Central Bank in the amount of $7,658.00, which represents the past due amounts through March, 2019;

(b) Beginning on or before April 5, 2019 and continuing on or before the 5th day of each month thereafter until the date of maturity, the Wains shall resume their regular monthly payments to Central Bank pursuant to the Agreement; and

(c) On or before the maturity date of June 28, 2021, the Wains shall pay Central Bank the full remaining balance due under the Agreement (including all principal, interest, court costs and attorneys' fees).

6. If the Wains default by reason of failure to make any payments due hereunder, Central Bank may elect to declare, without notice, the entire outstanding balance of this Judgment, including all principal, interest, court costs and attorneys' fees, to be immediately due and payable, and further, that Central Bank may then enforce this Judgment in any manner allowable by law. Upon default of this Judgment, Central Bank shall be allowed such reasonable attorneys' fees as it may incur in the collection of this judgment upon approval of this Court, and such fees shall not exceed the maximum amount allowed by KRS 411.195.

7. This is a final and appealable judgment and there is no just reason for delay in the entry thereof.

DATED this _____ day of ______________, 2019.

______________________________________
JUDGE, FAYETTE CIRCUIT COURT

**AGREED TO AND TENDERED BY:**

STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, Kentucky 40507
Phone: (859) 231-3000

________________________________
DOUGLAS A. WAIN, DEFENDANT

By:_____________________________
GREGORY D. PAVEY
ATTORNEYS FOR PLAINTIFF

________________________________
ELISE WAIN, DEFENDANT

**CLERK'S CERTIFICATE OF SERVICE**

This is to certify that a true copy of the foregoing was mailed this ___ day of ____________, 2019, to:

Gregory D. Pavey, Esq.
STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, Kentucky 40507

Mr. Douglas A. Wain
Ms. Elise Wain
2711 Barbados Lane
Lexington, Kentucky 40508

______________________________
CLERK, FAYETTE CIRCUIT COURT

rdh/ 100443.156618
Doc#7898458.1