DOUGLAS A. WAIN
ELISA WAIN
P.O. Box 7473
Westlake Village, CA 91359
Telephone: (859) 494-3677
Email: douglaswain@gmail.com
Plaintiffs in Pro Per

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| **In re**<br><br>**Douglas Alan Wain, Elisa Wain,**<br><br>**Debtors,**<br>______________________________<br><br>**Douglas Alan Wain and Elisa Wain**<br><br>**Plaintiffs,**<br>**vs.**<br><br>**Central Bank & Trust Co.**<br><br>**Defendant.** | **Case No. 1:24-bk-11814-MB**<br><br>**Adv. Proc. No. 1:25-ap-01026-MB**<br><br>**Chapter 13**<br><br>**DECLARATION OF DOUGLAS A. WAIN IN SUPPORT OF DEBTORS' SUPPLEMENTAL OBJECTION TO AMENDED PROOF OF CLAIM (DOC. 82); INDEX OF EXHIBITS A–G**<br><br>**Hon. Martin R. Barash**<br><br>**Hearing on Doc. 38:**<br>**September 24, 2026, 2:30 p.m.**<br>**Courtroom 303**<br>**21041 Burbank Blvd.**<br>**Woodland Hills, CA 91367** |

## DECLARATION OF DOUGLAS A. WAIN

I, Douglas A. Wain, declare as follows:

1. I am a Debtor in this case, appearing pro per together with my wife, Elisa Wain. I have personal knowledge of the facts stated below and, if called as a witness, could and would testify

competently to them. I make this Declaration in support of Debtors' Supplemental Objection to Amended Proof of Claim of Central Bank & Trust Co. (Doc. 82), filed concurrently, and to place before the Court true and correct copies of the documents identified below.

2. Attached as Exhibit A is a true and correct copy of the Claims Register for this case, which I printed from the Court's CM/ECF system through my PACER account on September 18, 2026 at 6:57 p.m. Pacific time. As of that printing, the register showed Claim No. 1 of Central Bank & Trust Co., filed December 20, 2024, with no amendment, and Claim No. 2 of Bank of America, N.A., with an amendment (2-2) filed February 28, 2025.

3. Attached as Exhibit B is a true and correct copy of the Entry Granting Summary Judgment and Order of Distribution of Sale Proceeds entered on March 7, 2024 by the Fayette Circuit Court, Division 9, in Central Bank & Trust Co. v. Douglas A. Wain, et al., Case No. 19-CI-00812, bearing the electronic filing stamp of the Fayette Circuit Clerk. I obtained this copy from the Fayette Circuit Court's record in that case.

4. Attached as Exhibit C are true and correct copies of documents from the record of the Fayette Circuit Court in Case No. 19-CI-00812 relating to Central Bank & Trust Co.'s garnishments in March 2021: the Affidavit for Writ of Non-Wage Garnishment sworn by Central Bank's counsel on March 1, 2021 and filed March 3, 2021; the Order of Wage Garnishment directed to my wife's employer, Fayette County Public Schools, issued March 3, 2021, with the Sheriff's Return showing service on March 5, 2021; and the March 5, 2021 letter from Stoll Keenon Ogden PLLC transmitting the Notice of Rights to Assert Exemption to Wage Garnishment. I obtained these copies from the Fayette Circuit Court's record in that case.

5. Attached as Exhibit D, for the Court's convenience, is a copy of the Memorandum of Decision in In re Hawkeye Entertainment, LLC, Case No. 1:23-bk-11501-MB, Doc. 371 (Bankr. C.D. Cal. Dec. 8, 2025), cited in the Supplemental Objection, as filed on this Court's docket.

6. Attached as Exhibit E, for the Court's convenience, is a copy of Pearman v. West Point National Bank, 887 S.W.2d 366 (Ky. Ct. App. 1994), cited in the Supplemental Objection, as it appears in the South Western Reporter.

7. Attached as Exhibit F, for the Court's convenience, is a copy of Harvest Homebuilders LLC v. Commonwealth Bank & Trust Co., 310 S.W.3d 218 (Ky. Ct. App. 2010), cited in the Supplemental Objection, as it appears in the South Western Reporter.

8. Attached as Exhibit G, for the Court's convenience, is a copy of Kentucky Joint Stock Land Bank of Lexington v. Farmers Exchange Bank of Millersburg, 274 Ky. 525, 119 S.W.2d 873 (1938), cited in the Supplemental Objection, as it appears in the South Western Reporter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 20, 2026, at Bradenton, Florida

Douglas A. Wain

Debtor, Pro Per

**INDEX OF EXHIBITS**

**TO DECLARATION OF DOUGLAS A. WAIN (DOC. 82 SUPPLEMENTAL OBJECTION)**

| **Exhibit** | **Description** | **Pages** |
|---|---|---|
| A | Claims Register, Case No. 1:24-bk-11814-MB, printed from CM/ECF September 18, 2026, 6:57 p.m. | 2 |
| B | Entry Granting Summary Judgment and Order of Distribution of Sale Proceeds, Fayette Circuit Court Case No. 19-CI-00812, entered March 7, 2024 | 5 |
| C | Affidavit for Writ of Non-Wage Garnishment (filed March 3, 2021); Order of Wage Garnishment and Sheriff's Return (served March 5, 2021); Stoll Keenon Ogden letter of March 5, 2021 with Notice of Rights | 7 |
| D | In re Hawkeye Entertainment, LLC, Memorandum of Decision, Doc. 371 (Bankr. C.D. Cal. Dec. 8, 2025) | 31 |
| E | Pearman v. West Point Nat'l Bank, 887 S.W.2d 366 (Ky. Ct. App. 1994) (South Western Reporter copy) | 3 |
| F | Harvest Homebuilders LLC v. Commonwealth Bank & Trust Co., 310 S.W.3d 218 (Ky. Ct. App. 2010) (South Western Reporter copy) | 4 |
| G | Kentucky Joint Stock Land Bank v. Farmers Exch. Bank, 274 Ky. 525, 119 S.W.2d 873 (1938) (South Western Reporter copy) | 9 |

# EXHIBIT A

Claims Register — printed September 18, 2026

# Central District of California
# Claims Register

## 1:24-bk-11814-MB Douglas Alan Wain and Elisa Wain

**Judge:** Martin R. Barash
**Office:** San Fernando Valley
**Trustee:** Elizabeth (SV) F Rojas (TR)
**Chapter:** 13
**Last Date to file claims:** 01/08/2025
**Last Date to file (Govt):** 04/28/2025

*Creditor:* (42202564)
Central Bank & Trust Co.
300 W Vine Street
Lexington Kentucky 40507

**Claim No: 1**
*Original Filed Date*: 12/20/2024
*Original Entered Date*: 12/20/2024

*Status:*
*Filed by:* CR
*Entered by:* William E Ireland
*Modified:*

Amount claimed: $357990.91

*History:*

| | | |
|---|---|---|
| Details | 1-1 | 12/20/2024 Claim #1 filed by Central Bank & Trust Co., Amount claimed: $357990.91 (Ireland, William) |
| | 38 | 04/27/2025 Motion RE: Objection to Claim Number 1 by Claimant Central Bank & Trust Co.. Filed by Debtor Douglas Alan Wain , Joint Debtor Elisa Wain [EDB FILING] (JC) |

*Description:* (1-1) Proof of Claim
*Remarks:*

*Creditor:* (42286203)
Bank of America, N.A.
PO Box 673033
Dallas, TX 75267-3033

**Claim No: 2**
*Original Filed Date*: 01/06/2025
*Original Entered Date*: 01/06/2025
*Last Amendment Filed*: 02/28/2025
*Last Amendment Entered*: 02/28/2025

*Status:*
*Filed by:* CR
*Entered by:* Jeffrey Randall
*Modified:*

Amount claimed: $12434.37
Secured claimed: $0.00
Priority claimed: $0.00

*History:*

| | | |
|---|---|---|
| Details | 2-1 | 01/06/2025 Claim #2 filed by Bank of America, N.A., Amount claimed: $12434.37 (Myers, Elliott) |
| Details | 2-2 | 02/28/2025 Amended Claim #2 filed by Bank of America, N.A., Amount claimed: $12434.37 (Randall, Jeffrey) |
| | 35 | 02/28/2025 Motion RE: Objection to Claim Number 2 by Claimant Bank of America. Filed by Debtor Douglas Alan Wain , Joint Debtor Elisa Wain [EDB FILING] (JC) |

*Description:*
*Remarks:*

## Claims Register Summary

**Case Name:** Douglas Alan Wain and Elisa Wain
**Case Number:** 1:24-bk-11814-MB
**Chapter:** 13
**Date Filed:** 10/30/2024
**Total Number Of Claims:** 2

| | |
|---|---|
| **Total Amount Claimed*** | $370425.28 |
| **Total Amount Allowed*** | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | **Claimed** | **Allowed** |
|---|---|---|
| **Secured** | $0.00 | |
| **Priority** | $0.00 | |
| **Administrative** | | |

---

| | | | |
|---|---|---|---|
| **PACER Service Center** | | | |
| **Transaction Receipt** | | | |
| 09/18/2026 15:57:18 | | | |
| **PACER Login:** | douglaswain | **Client Code:** | |
| **Description:** | Claims Register | **Search Criteria:** | 1:24-bk-11814-MB Filed or Entered From: 1/1/1900 Filed or Entered To: 9/18/2026 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

# EXHIBIT B

Fayette Circuit Court Order of Distribution of Sale Proceeds — March 7, 2024

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000001 of 000005

**COMMONWEALTH OF KENTUCKY**
**FAYETTE CIRCUIT COURT**
**DIVISION 9**
**CASE NO. 19-CI-00812**

***Electronically Filed***

**CENTRAL BANK & TRUST CO.** **PLAINTIFF**

**vs**

**DOUGLAS A. WAIN, *et al.*** **DEFENDANTS**

---

**ENTRY GRANTING SUMMARY JUDGMENT AND ORDER OF DISTRIBUTION OF SALE PROCEEDS**

---

This matter came before the Court on August 25, 2023, for a hearing on Substitute Defendant/Cross-Claimant U.S. Bank Trust National Association, Not In Its Individual Capacity But Solely As Owner Trustee For RCF 2 Acquisition Trust's ("U.S. Bank") *Motion For Summary Judgment On Its Cross-Claim* ("Motion for Summary Judgment") filed on July 3, 2023; Plaintiff Central Bank & Trust Co.'s ("Plaintiff") *Motion for Distribution* filed on May 22, 2023; and the parties' respective responses to and replies in support of the Motions. Central Bank, U.S. Bank, and Defendants Douglas A. Wain and Elisa Wain ("Defendants Wain") were represented by their respective counsel. The Court, having heard arguments of counsel, and having reviewed the pleadings, the Motions, the Affidavit of Jean Knowles, and other evidence, finds and orders as follows:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. U.S. Bank is the holder of a promissory note executed by Defendants Wain on March 5, 2008, in the original amount of $417,000.00 (the "Note"). The original, blank-endorsed Note was produced for inspection by U.S. Bank's counsel during the hearing on August 25, 2023.

JS : 000001 of 000005

2. U.S. Bank is the mortgagee of record of a first mortgage that encumbered the real property commonly known as 2711 Barbados Lane, Lexington, Kentucky 40509 (the "Property"), along with all replacements and additions, and that was executed by Defendants Wain to secure the indebtedness evidenced by the Note (the "Mortgage"). The Mortgage was recorded in Book 6319, Page 226, and was assigned to U.S. Bank as evidenced by an Assignment of Mortgage recorded in Book 555, age 599, all in the office of the Clerk of Fayette County, Kentucky. The original Mortgage was produced for inspection by U.S. Bank's counsel during the hearing on August 25, 2023.

3. Defendants Wain are in default under the terms of the Note, as modified, and the terms of the Mortgage, and the sums due thereunder have been accelerated. There is due and owing to U.S. Bank on the Note and Mortgage the principal sum of $324,261.97, plus interest at the rate of 5.8750% per annum from July 1, 2019, as may be subsequently adjusted under the terms of the Note and 2019 Modification, together with a deferred principal balance of $106,431.58, plus late fees that continue to accrue, costs, attorney's fees, and other advances made pursuant to the terms of the Note as modified, Mortgage, and Kentucky law, for which U.S. Bank is entitled to a personal judgment against Defendants Wain.

4. On February 8, 2021, the Property was sold to a third party at a Master Commissioner's Sale pursuant to the *Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale* entered in favor of Plaintiff on January 20, 2021. A portion of the sale proceeds were distributed under an *Order Confirming Report of Sale, For Delivery of Deed and Partial Distribution of Proceeds* entered on March 12, 2021, with the remaining sale proceeds of $605,035.42 being held pending further orders of the Court.

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000002 of 000005
JS : 000002 of 000005

5. There is no genuine issue of material fact, the equities favor U.S. Bank, and U.S. Bank is entitled to judgment on its Cross-Claim against Defendants Wain as a matter of law.

**SUMMARY JUDGMENT AND ORDER OF DISTRIBUTION**

6. IT IS ORDERED that U.S. Bank's Motion for Summary Judgment is GRANTED in its entirety.

7. IT IS FURTHER ORDERED that U.S. Bank is granted a *personal judgment* against Defendants Wain in the principal sum of $324,261.97, plus interest at the rate of 5.8750% per annum from July 1, 2019, as may be subsequently adjusted under the terms of the Note and 2019 Modification, together with a deferred principal balance of $106,431.58, plus late fees that continue to accrue, costs, attorney's fees, and other advances made pursuant to the terms of the Note as modified, Mortgage, and Kentucky law.

8. IT IS FURTHER ORDERED that Central Bank's Motion for Distribution is GRANTED IN PART AND DENIED IN PART. The Motion is granted to the extent that the remainder of the sale proceeds shall be distributed as set forth herein. The Motion is otherwise denied.

9. IT IS FURTHER ORDERED that the Master Commissioner is directed to disburse to U.S. Bank from the sale proceeds the following sums to satisfy its personal judgment against Defendants Wain:

| | |
|---|---|
| Unpaid principal balance: | $324,231.97 |
| Deferred balance: | $106,431.58 |
| Interest through 8/27/23: | $79,145.98 |
| Escrow/Other Advances: | $27,211.84 |
| Corporate Advance Balance: | $644.00 |
| Unpaid Late Charges: | $439.45 |
| Recording Fee: | $46.00 |
| **TOTAL:** | **$538,150.82** |

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000003 of 000005

JS : 000003 of 000005

Entered 19-CI-00812 03/07/2024 Vincent Riggs, Fayette Circuit Clerk

10. IT IS FURTHER ORDERED that after distribution of the sale proceeds to U.S. Bank as set forth herein, the remaining sale proceeds of $66,884.60 shall be distributed to Central Bank on its second mortgage lien as adjudicated in the *Partial Summary Judgment, Judgment on the Pleadings, and Order of Sale*.

11. Pursuant to CR 77.04, the Circuit Court Clerk shall serve notice of this Entry Granting Summary Judgment And Order Of Distribution Of Sale Proceeds.

12. There being no just cause for delay, this is a final and appealable matter.




HON. KIMBERLY BUNNELL
JUDGE, FAYETTE CIRCUIT COURT

Prepared by:

/s/ *Shannon O'Connell Egan*
Shannon O'Connell Egan (87296)
Nathan H. Blaske (90369)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 977-8261
Fax: (513) 977-8141
Email: shannon.egan@dinsmore.com
nathan.blaske@dinsmore.com

Have seen and approved:

/s/ James H. Frazier, III
Hon. James H. Frazier, III
Master Commissioner
Fayette Circuit Court

Have seen:

/s/ *Christopher G. Colson* (w/ em auth. 2/21/24)
Hon. Christopher G. Colson
Hon. Taft McKinstry
FOWLER BELL PLLC
300 W. Vine Street, Suite 600
Lexington, KY 40507
Email: CGColson@fowlerlaw.com
TMcKinstry@fowlerlaw.com
*Counsel for Plaintiff, Central Bank & Trust Co.*

Counsel refused to attest (per email 2/26/24)
Hon. David W. Hemminger
HEMMINGER LAW OFFICE, PSC
331 Townepark Circle, Suite 100-C
Louisville, KY 40243
Email: hemmingerlawoffice@gmail.com
*Counsel for Defendants Douglas and Elisa Wain*

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000004 of 000005
JS : 000004 of 000005
Entered 19-CI-00812 03/07/2024 Vincent Riggs, Fayette Circuit Clerk

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that on ______________, 2024, a true and correct copy of the foregoing was served through first class mail, upon:

Shannon O'Connell Egan, Esq.
Nathan H. Blaske, Esq.
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202

Hon. Christopher G. Colson
Hon. Taft McKinstry
FOWLER BELL PLLC
300 W. Vine Street, Suite 600
Lexington, KY 40507

Hon. David W. Hemminger
HEMMINGER LAW OFFICE, PSC
331 Townepark Circle, Suite 100-C
Louisville, KY 40243

Hon. Gregory D. Pavey
Hon. Timothy R. Wiseman
STOLL KEENON OGDEN, PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507

____________________________________
Clerk, Fayette Circuit Court

574227B8-BE18-45A4-A8C5-15A1B149A4C0 : 000005 of 000005
JS : 000005 of 000005

# EXHIBIT C

Central Bank & Trust Co. Garnishment Papers — March 2021

AOC-150.4
Rev. 5-06
Page 1 of 1
Commonwealth of Kentucky
Court of Justice
www.kycourts.net
CR 69.02

**SHERIFF'S RETURN FOR WAGE GARNISHMENT**

Case No. [illegible]
Court CIRCUIT
County FAYETTE

FILED
ATTEST: VINCENT RIGGS, CLERK
MAR 11 2021
FAYETTE CIRCUIT CLERK
BY [signature] DEPUTY

JUDGMENT DEBTOR:
ELISA WAIN

JUDGMENT CREDITOR: CENTRAL BANK & TRUST CO.

Amount Due: $ 358,412.72 + interest, atty. fees & costs (subject to credit)

Probable Court Costs: $ To be determined

Judgment Date: January 20, 2021

Creditor's Attorney: STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507
Attn: R. Houston, Paralegal
(859) 231-3000

THE GARNISHEE (EMPLOYER) IS:
**FAYETTE COUNTY PUBLIC SCHOOLS**
Payroll Department
1126 Russell Cave Road
Lexington, KY

The Commonwealth of Kentucky
To the Sheriff of

FAYETTE County:

You are commanded to summon the Garnishee named above to answer in this action within twenty days from the service hereof; and you will make due return of this Order.

FAYETTE Circuit Clerk, By: [signature] D.C. 3-3-21
(County) (Date)

**SHERIFF'S RETURN**

The Order of Wage Garnishment was served by delivering to: Michelle Hash F.C.P.S. Payroll

this 5 day of March, 2021.

Served by: E. Sparks [signature]

NOTE TO SHERIFF:

Return original to Clerk (White) and retain copy (Canary).

Fayette County Constable 3rd District
Edward Sparks Constable
P.O. Box 1532
Lexington, KY 40588

TW

Court of Justice www.courts.ky.gov
KRS 425.501

**AFFIDAVIT FOR WRIT OF NON-WAGE GARNISHMENT**

Court CIRCUIT
County FAYETTE

Name : CENTRAL BANK & TRUST CO. JUDGMENT CREDITOR

FILED
ATTEST, VINCENT RIGGS, CLERK
MAR 03 2021
FAYETTE CIRCUIT CLERK
BY ______ DEPUTY

Name : DOUGLAS A. WAIN, ET AL JUDGMENT DEBTORS

The undersigned Affiant states she is counsel for the Judgment Creditor. Affiant further states:

1. The above-named Judgment Debtor is not now, nor has he been at any time during the pendency of this action in the active military service of the United States of America.
2. The Judgment is dated: **January 20, 2021**
3. The amount due on the judgment (subject to any credits due for any sums currently being processed) is **$358,412.72, plus interest, attorneys' fees and costs (subject to credit for proceeds from the sale of collateral, which have not yet been received)**
4. The following are indebted to said Judgment Debtor:

**FORCHT BANK**

**WHEREFORE:** Judgment Creditor prays for garnishment against Judgment Debtor; that the garnishee(s) named herein be made parties to action, and that the garnishee(s) be required to answer the garnishment(s) issued hereunder; and for its cost.

AFFIANT

Subscribed and sworn before me this 1st day of March 20...

My commi...

STOLL
KEENON
OGDEN
PLLC

300 West Vine Street
Suite 2100
Lexington, KY 40507-1801
(859) 231-3000
www.skofirm.com

RHONDA D. HOUSTON
rhonda.houston@skofirm.com

March 5, 2021

VIA REGULAR MAIL AND
E-MAIL: hemmingerlawoffice@gmail.com

David W. Hemminger, Esq.
HEMMINGER LAW OFFICE, PSC
331 Townepark Circle, Suite 100-C
Louisville, Kentucky 40243

RE: Central Bank & Trust Co. v. Douglas A. Wain, Elisa Wain, et al
Fayette Circuit Court, Civil Action No. 19-CI-00812

Dear Mr. Hemminger:

Enclosed please find the Notice of Rights to Assert Exemption to Wage Garnishment regarding the Order of Wage Garnishment issued against Elisa Wain in the above-referenced matter.

Very truly yours,

STOLL KEENON OGDEN PLLC

Rhonda D. Houston, Paralegal

Enclosure
cc: Ms. Elisa Wain
2711 Barbados Lane
Lexington, Kentucky 40509

100443.163845/8474591.1

AOC-150 Doc Code: GW
Rev. 7-09

Commonwealth of Kentucky
Court of Justice www.courts.ky.gov

KRS 425.501-425.506;
CR 69.02

**NOTICE OF RIGHTS TO ASSERT EXEMPTION TO WAGE GARNISHMENT**

Case No. 19-CI-00812
Court CIRCUIT
County FAYETTE

**TO JUDGMENT DEBTOR:**

ELISA WAIN
2711 Barbados Lane
Lexington, KY 40509
SSN: xxx-xx-1443

**JUDGMENT CREDITOR:** CENTRAL BANK & TRUST CO.

**Amount Due: $** 358,412.72 + interest, attorneys' fees & costs (subject to credit)

**Probable Court Costs: $** To be determined

**Judgment Date:** January 20, 2021

**Creditor's Attorney:**
STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507
Attn: R. Houston, Paralegal
(859) 231-3000

The Judgment Creditor is garnishing a portion of your wages to satisfy a judgment entered against you, which includes the Amount Due shown above, plus interest and costs. You may have a right to recover all or part of the money your employer will withhold, but you must follow the instructions given below.

**The Garnishee (Employer) is:**

**FAYETTE COUNTY PUBLIC SCHOOLS**
**Attention: Payroll**
**1126 Russell Cave Road**
**Lexington, KY 40505**

**IMPORTANT LEGAL NOTICE OF RIGHTS TO ASSERT EXEMPTION**

If you are not the actual Judgment Debtor named above, or if the judgment has been paid, immediately notify the Creditor's Attorney (or the Creditor if no attorney is named above) to avoid garnishment, or request a hearing from the Court (see below).

You are entitled to receive a copy of the first Affidavit and Answer of Garnishee (Employer) to be prepared by your employer in response to the garnishment of your wages. **Read it carefully.** Your employer is required to send you a copy of the form on the back of this notice each time garnished funds have been withheld from your paycheck **if the amount withheld is different from the amount previously withheld from your last paycheck.** If you do not receive a copy, request one from your employer. If refused, request a hearing from the Court (see below). **The percentage of disposable earnings exempted from each garnishment, where the pay period is weekly, is the greater of (A) 75% of disposable earnings or (B) for wages earned after 7/24/09 $217.50 (30 times the federal minimum hourly wage of $7.25).**

If you believe that your employer has completed the form incorrectly and withheld wages which are properly exempt, you must take the following steps: (1) Within thirteen (13) days of the **date on the payroll check from which funds have been withheld as a result of this garnishment,** go to the Circuit Clerk's office which issued this garnishment; (2) complete an Affidavit to Challenge Garnishment; (3) file the original of the Affidavit with the Clerk and keep a copy. The Clerk will set a hearing for you to appear in court to contest the garnishment of your wages. **The Clerk cannot give you legal advice. See a lawyer if you need legal advice.** If you do not appear in court for the hearing, you will lose your right to challenge that particular withholding. At the hearing, the judge will check the withholding made by your employer to determine if a mistake has been made. If a portion of your wages was improperly seized, the judge will order that it be returned to you. Otherwise, the judge will order that the garnishment proceed as planned. If you do not request a hearing within thirteen (13) days of the date on the payroll check, the wages withheld will be later sent to the Judgment Creditor. The Creditor's Attorney or the Clerk (if there is no Creditor's Attorney) will hold the garnished money received from your employer for 15 days from the issuance date on the employer's garnishment check. This is to allow you to assert any exemption.

***SEE REVERSE SIDE OF THIS NOTICE FOR SAMPLE OF ORDER OF WAGE GARNISHMENT***

AOC-150
Rev. 7-09

Commonwealth of Kentucky
Court of Justice www.courts.ky.gov

KRS 425.501-425.506;
CR 69.02

# ORDER OF WAGE GARNISHMENT (CONTINUOUS OR AS DESIGNATED)

Case No.____________

Court____________

County____________

JUDGMENT DEBTOR:

JUDGMENT CREDITOR:

Amount Due: $

Probable Court Costs: $

Judgment Date:

Creditor's Attorney:

TO THE GARNISHEE (EMPLOYER) NAMED BELOW:
You are hereby (1) restrained from paying to the Judgment Debtor, or to anyone for him/her, money, property or other evidence of debt in your possession belonging to him/her or in which he/she has any interest: and (2) **ordered to continuously withhold and safely remit to the creditor's attorney or to the Circuit Clerk (if there is no creditor's attorney) each pay period the non-exempt property of the Judgment Debtor withheld for that pay period until the amount due shown above plus interest and costs are paid in full, (or for only the succeeding pay periods _______).**

SEE REVERSE OF THIS ORDER FOR ADDITIONAL REQUIREMENTS AND INSTRUCTIONS.

______________________Circuit Clerk, by:______________________D.C.______________

Garnishee (Employer):

<u>IMPORTANT NOTICE TO THE ABOVE JUDGMENT DEBTOR:</u> THE JUDGMENT CREDITOR IS GARNISHING A PORTION OF YOUR WAGES TO PAY A JUDGMENT ENTERED AGAINST YOU IN THE ABOVE COURT. YOU MAY HAVE A RIGHT TO RECOVER ALL OR PART OF THE MONEY YOUR EMPLOYER HAS WITHHELD FROM YOUR PAY. CAREFULLY REVIEW THIS FORM AND YOUR NOTICE OF RIGHTS TO ASSERT EXEMPTION TO WAGE GARNISHMENT YOU PREVIOUSLY RECEIVED. CLOSELY EXAMINE YOUR EMPLOYER'S CALCULATIONS REGARDING ANY WITHHOLDING PURSUANT TO THIS GARNISHMENT. IF YOU BELIEVE THAT YOUR EMPLOYER HAS WITHHELD TOO MUCH MONEY FROM YOU, GO TO THE OFFICE OF THE CIRCUIT CLERK WHICH ISSUED THIS GARNISHMENT WITHIN 13 DAYS OF THE DATE ON THE PAYROLL CHECK YOU RECEIVED FROM WHICH MONEY WAS WITHHELD PURSUANT TO THIS GARNISHMENT AND COMPLETE AN "AFFIDAVIT TO CHALLENGE GARNISHMENT".

## GAG AFFIDAVIT AND ANSWER OF GARNISHEE (EMPLOYER)

Comes the undersigned Affiant, who after being duly sworn, states:

A. The social security number and name of the Judgment Debtor ("Employee") is:______________
Name:______________

B. The date on which this Order was originally served was: ______________

C. No funds are due employee because______________ ______________

D. If no funds are withheld due to superior (earlier) garnishments, the number of those garnishments is:____.

E. The pay period of the remittance accompanying this return is from__________to__________.

F. The pay period of this employee is: (choose one)

( ) weekly ( ) bi-weekly ( ) semi-monthly ( ) monthly

1. Gross earnings $__________
2. Less amounts required by law to be withheld:
   Federal Income Tax $__________
   State Income Tax $__________
   Occupational Tax $__________
   Social Security $__________

TOTAL DEDUCTIONS $__________

3. Disposable earnings (Line 1 less Line 2) $__________
4. Exempt earnings:
   (a) 75% of line 3 $__________
   (b) $217.50 if weekly, or $471.25 if semi-monthly, or $942.50 if monthly $__________ — For wages earned after 7/24/09
   (c) **Enter greater of 4(a) and 4(b)** $__________
   (d) Ordered Child Support $__________
5. Non-exempt disposable earnings (Line 3 less Lines 4(c) and (d)) $__________

Remit the amount on Line 5 or the Amount Due shown at the top of this Order plus interest and costs, whichever is less, to the Creditor's Attorney or to the Circuit Clerk (if there is no Creditor's Attorney).

______________________________
Affiant Position/Title

Subscribed and sworn to before me this___day of_______,
_______. My Commission expires:

______________________________Notary Public

It's about kids.
FAYETTE COUNTY PUBLIC SCHOOLS

March 17, 2021

Elisa Wain
2711 Barbados LN
Lexington, KY 40509

Dear Mrs. Wain,

Enclosed is a copy of an order garnishment for $358,412.72 which we received from Stoll Keenon Ogden, PLLC. Please keep enclosed copy for your personal records.

Deduction will begin on the next available pay date.

A phone number has been provided for further information. If the above Garnishment has been released or any type of payment arrangement made, we will require a copy of the release or payment arrangement **in writing** from the Creditor. All documentation can be faxed to the following number: 859-381-4208

If you have any questions, please call the Payroll Office at 859-381-4148

Thank you,

Adrian Thompson
Payroll Specialist

Enclosures

AN EQUAL OPPORTUNITY SCHOOL DISTRICT
Board of Education: Stephanie Spires, Chair • Raymond Daniels, Vice Chair • Daryl Love • Christy Morris • Tyler Murphy
Superintendent Emmanuel Caulk

AOC-150 Doc Code: GAG
Rev. 7-09

Commonwealth of Kentucky
Court of Justice www.courts.ky.gov

KRS 425.501-425.506;
CR 69.02

# ORDER OF WAGE GARNISHMENT (CONTINUOUS OR AS DESIGNATED)

Case No. 19-CI-00812
Court CIRCUIT
County FAYETTE

**JUDGMENT DEBTOR:**
ELISA WAIN
2711 Barbados Lane
Lexington, KY 40509
SSN: xxx-xx-1443

**JUDGMENT CREDITOR:** CENTRAL BANK & TRUST CO.

**Amount Due: $** 358,412.72 + interest, attorneys' fees & costs (subject to credit)

**Probable Court Costs: $** To be determined

**Judgment Date:** January 20, 2021

**Creditor's Attorney:**
STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507
Attn: R. Houston, Paralegal
(859) 231-3000

**TO THE GARNISHEE (EMPLOYER) NAMED BELOW:**
You are hereby (1) restrained from paying to the Judgment Debtor, or to anyone for him/her, money, property or other evidence of debt in your possession belonging to him/her or in which he/she has any interest; and **(2) ordered to continuously withhold and safely remit to the creditor's attorney or to the Circuit Clerk (if there is no creditor's attorney) each pay period the non-exempt property of the Judgment Debtor withheld for that pay period until the amount due shown above plus interest and costs are paid in full, (or for only the succeeding pay periods ______).**

SEE REVERSE OF THIS ORDER FOR ADDITIONAL REQUIREMENTS AND INSTRUCTIONS.

Fayette Circuit Clerk, by: [signature] D.C. 3/3/21 (Date)

**Garnishee (Employer):**

**FAYETTE COUNTY PUBLIC SCHOOLS**
**Attention: Payroll**
**1126 Russell Cave Road**
**Lexington, KY 40505**

**IMPORTANT NOTICE TO THE ABOVE JUDGMENT DEBTOR:** THE JUDGMENT CREDITOR IS GARNISHING A PORTION OF YOUR WAGES TO PAY A JUDGMENT ENTERED AGAINST YOU IN THE ABOVE COURT. YOU MAY HAVE A RIGHT TO RECOVER ALL OR PART OF THE MONEY YOUR EMPLOYER HAS WITHHELD FROM YOUR PAY. CAREFULLY REVIEW THIS FORM AND YOUR NOTICE OF RIGHTS TO ASSERT EXEMPTION TO WAGE GARNISHMENT YOU PREVIOUSLY RECEIVED. CLOSELY EXAMINE YOUR EMPLOYER'S CALCULATIONS REGARDING ANY WITHHOLDING PURSUANT TO THIS GARNISHMENT. IF YOU BELIEVE THAT YOUR EMPLOYER HAS WITHHELD TOO MUCH MONEY FROM YOU, GO TO THE OFFICE OF THE CIRCUIT CLERK WHICH ISSUED THIS GARNISHMENT WITHIN 13 DAYS OF THE DATE ON THE PAYROLL CHECK YOU RECEIVED FROM WHICH MONEY WAS WITHHELD PURSUANT TO THIS GARNISHMENT AND COMPLETE AN "AFFIDAVIT TO CHALLENGE GARNISHMENT".

## AFFIDAVIT AND ANSWER OF GARNISHEE (EMPLOYER)

Comes the undersigned Affiant, who after being duly sworn, states:

A. The social security number and name of the Judgment Debtor ("Employee") is:__________
Name:__________

B. The date on which this Order was originally served was: __________.

C. No funds are due employee because__________.

D. If no funds are withheld due to superior (earlier) garnishments, the number of those garnishments is:____.

E. The pay period of the remittance accompanying this return is from______ to______.

F. The pay period of this employee is: (choose one)
( ) weekly ( ) bi-weekly ( ) semi-monthly ( ) monthly

1. Gross earnings $______
2. Less amounts required by law to be withheld:
   - Federal Income Tax $______
   - State Income Tax $______
   - Occupational Tax $______
   - Social Security $______

TOTAL DEDUCTIONS $______

3. Disposable earnings (Line 1 less Line 2) $______
4. Exempt earnings:
   (a) 75% of line 3 $______
   (b) $217.50 if weekly, or $471.25 if semi-monthly, or $942.50 if monthly $______ (For wages earned after 7/24/09)
   (c) **Enter greater of 4(a) and 4(b)** $______
   (d) Ordered Child Support $______
5. Non-exempt disposable earnings (Line 3 less Lines 4(c) and (d)) $______
   Remit the amount on Line 5 or the Amount Due shown at the top of this Order plus interest and costs, whichever is less, to the Creditor's Attorney or to the Circuit Clerk (if there is no Creditor's Attorney).

__________
Affiant Position/Title

Subscribed and sworn to before me this___day of______, ______. My Commission expires:

__________ Notary Public

# EXHIBIT D

In re Hawkeye Entertainment, LLC, Memorandum of Decision (Bankr. C.D. Cal. Dec. 8, 2025)

# FOR PUBLICATION

FILED & ENTERED

DEC 08 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>HAWKEYE ENTERTAINMENT, LLC,<br><br>Debtor-in-Possession. | Case No.: 1:23-bk-11501-MB<br><br>Chapter 11<br><br>**MEMORANDUM OF DECISION RE: DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Hearing Held:**<br>Date: November 4, 2025<br>Time: 1:30 p.m.<br>Place: Courtroom 303<br>21041 Burbank Blvd.,<br>Woodland Hills, CA 91367 |

Case 1:25-ap-01016-MB Doc 1 Filed 02/03/25 Entered 02/03/25 11:12:07 Desc
Main Document Page 2 of 37

## I. INTRODUCTION

The debtor is lessee of a portion of the historic Pacific Stock Exchange Building in downtown Los Angeles, California. It subleases the premises to a non-debtor affiliate, which operates a popular nightclub and concert venue known as "L.A. Exchange." When the debtor's current landlord (and the prior landlord) acquired the building, it was subject to a long-term lease in favor of the debtor. The landlord and its predecessor, however, have other plans for the building and have sought for many years to declare defaults and terminate the lease. The debtor has resisted these efforts.

The result has been over a decade of litigation, both in state court and in the bankruptcy court. This is the debtor's third chapter 11 case.[1] In the prior cases, the debtor successfully assumed the subject lease under Bankruptcy Code section 365(a).[2] In the first chapter 11 case,[3] the debtor did so pursuant to a settlement with the landlord. In the second chapter 11 case,[4] the debtor did so after extensive litigation and a lengthy evidentiary hearing over the nature and existence of defaults under the lease.

Pursuant to Bankruptcy Code section 365(b), to assume a lease, a debtor in possession must cure existing defaults, compensate for pecuniary loss resulting from those defaults, and provide adequate assurance of future performance with respect to such defaults. Whether and to what extent a lease is in default is the central issue in a motion to assume a lease. In the last bankruptcy case, the landlord had the opportunity to litigate the existence and significance of all defaults then existing under the lease. Notwithstanding its efforts, the Court approved assumption of the lease, which the Ninth Circuit Court of Appeals affirmed.

In connection with its effort to assume the same lease in the present case, the debtor seeks—by way of partial summary judgment—to limit the universe of defaults that may be alleged by the landlord in opposition to that relief. The debtor relies on (i) the collateral attack doctrine, (ii) the doctrine of res judicata (or "claim preclusion"), (iii) the doctrine of collateral estoppel (or "issue preclusion"), and (iv) the application of a consensual release between the parties and/or their predecessors in interest. The

---

[1] Case No. 1:23-bk-11501-MB (the "Third Bankruptcy Case" or "Bk III").

[2] References herein to the "Bankruptcy Code" refer to title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

[3] Case No. 1:13-bk-16307-MT (the "First Bankruptcy Case" or "Bk I").

[4] Case No. 1:19-bk-12102-MT (the "Second Bankruptcy Case" or "Bk II").

landlord rejects these arguments, contending that *all* past defaults are fair game. Based on this premise, the landlord has launched a barrage of discovery aimed at identifying defaults that either were litigated or could have been litigated in the prior case.

After careful consideration of the applicable legal standards, and the circumstances presented, the Court concludes (i) the collateral attack doctrine, claims preclusion doctrine and issue preclusion doctrine are applicable here and each independently precludes the landlord from asserting and litigating the existence of any default under the lease prior to entry of the assumption order in the prior case; and (ii) the voluntary release granted by the landlord's predecessor is binding on the landlord and precludes the assertion of any default existing under the lease at the time the release was granted. Accordingly, the Court will enter a separate order granting partial summary judgment in favor of the debtor, limiting the scope of the defaults that may be asserted in connection with the lease assumption.

## II. JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over the debtor's motion for partial summary judgment pursuant to 28 U.S.C. § 1334(b), because it arises under Bankruptcy Code section 365 and involves issues unique to this and prior bankruptcy cases. *See* Bk III Dkt. 236 (the "MPSJ"). As such, the MPSJ pertains to statutorily and constitutionally core matters over which this Court has the adjudicative authority to enter final orders. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The Court also finds that venue is proper under 28 U.S.C. § 1409(a) because the MPSJ was filed in the court where the Third Bankruptcy Case is pending.

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Lease and Sublease

In 2009, PAX America Development, LLC ("PAX") was the owner of the historic twelve-story commercial building located at 618 S. Spring Street, Los Angeles, CA 90014, known as the Pacific Stock Exchange Building. The habitable and leasable portions of the building are the first four floors and the basement, specifically the south end of the basement (the "Premises").

On July 17, 2009, PAX entered into a long-term lease of the Premises to Hawkeye Entertainment, LLC (the "Debtor"). Bk III Dkt. 237 at Ex. A (the "Lease"). The Lease is guaranteed by

Adi McAbian and W.E.R.M. Investments, LLC ("WERM"), a non-debtor affiliate. *Id.* at Ex. A, Ex. G thereto. McAbian is the principal of the Debtor. *Id.* at ¶ 1.

On October 1, 2009, the Debtor subleased the Premises to WERM. *Id*. at Ex. B (the "Sublease"). WERM uses the Premises to operate a nightclub and entertainment venue under the name "Exchange LA."

**B. New Vision Acquires the Premises, Disputes Arise**

On December 20, 2010, New Vision Horizon, LLC ("New Vision") acquired the Premises from PAX at a non-judicial foreclosure sale. Michael Chang was the managing member of New Vision. Bk III Dkt. 247-1 at ¶ 4 n.1.

**C. The First Bankruptcy Case**

Between 2009 and 2013, the Debtor withheld nearly $1 million in rents under the Lease, alleging that New Vision failed to make certain improvements required by the Lease. The Debtor filed two lawsuits against New Vision—one in 2011 and one in 2013. On September 20, 2013, New Vision responded with a notice of default for failure to pay the withheld rental amount and five days to cure the deficiency. On September 30, 2013, the Debtor filed a chapter 11 petition, initiating the First Bankruptcy Case, over which the Hon. Maureen Tighe presided.

The Debtor moved to assume the Lease, which New Vision opposed. Bk I Dkt. 40 (the "First Assumption Motion"); Bk I Dkt. 57. Following mediation, in August 2014, the Debtor and New Vision reached a global resolution of their disputes. Bk I Dkt. 226 at Ex. A (the "New Vision Settlement"); Bk I Dkt. 233 ("Stipulation for Assumption of Lease"); Bk I Dkt. 242 (the "2014 Assumption Order"); Bk I Dkt. 257 (the "2014 Settlement Order"). Among other things, the New Vision Settlement voided certain alleged amendments to the Lease, implemented certain other amendments to the Lease[5] and conferred mutual releases on the parties.

The New Vision Settlement states, in relevant part:

> 10. <u>General Releases</u>:
>
> (a) On the Effective Date, except as otherwise provided in this Agreement, and except as to the Parties' rights and obligations under the Lease and the First Amendment, the Parties, on behalf of themselves and each of their predecessors, successors, assigns, officers,

---

[5] Bk III Dkt. 237 at Ex. C ("First Amendment to Lease Agreement," dated August 19, 2014).

directors, members, agents, and all other persons or entities acting on their behalf, hereby fully and forever release each other, and each of their respective predecessors, successors, assigns, officers, directors, members, agents, employees, insurers, representatives and attorneys, from any and all claims, actions or causes of action, damages, demands, costs, expenses, losses, and attorneys' fees, which they have, or could claim to have against each other arising from or related to: (1) all claims alleged in the First or Second State Court Actions; (2) all claims alleged in, or related to the [First] Assumption Motion, including claims related to the Rent Commencement Date and any offsets to rent allegedly owed to [the Debtor] by New Vision; (3) all claims related to the validity and enforceability of the Lease; (4) all claims related to the validity and enforceability of the Sublease; (5) all claims related to any Rent owed from the period July 17, 2009 through October 31, 2014; and (6) all the Claims of New Vision arising under or related to POC No. 2. It is the parties' mutual intent that by this <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS the parties are resolving all disputes between them</u>. Notwithstanding the foregoing, nothing herein is intended to nor shall release claims, if any, that any Party may have against Pax or its principals.

(b) It is the intention of the Parties that the releases provided in this Agreement, will be effective to bar all claims, demands, controversies, causes of action, liabilities, costs, expenses, attorneys' fees, and damages of whatever character, nature and kind, known or unknown, suspected or unsuspected against one another. [New Vision and the Debtor] expressly waive any and all rights and benefits conferred upon them by California Civil Code section 1542, which states:

> A general release does not extend to claims which the creditor does-not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.;

(c) The Parties acknowledge and agree that this Agreement, including without limitation the foregoing waiver of the provisions of California Civil Code section 1542, is intended to effectuate a full and complete release of any and all claims for relief, whether known or unknown, that may be asserted by them against each other; and

(d) The Parties acknowledge that the foregoing waiver of the provisions of California Civil Code section 1542 is separately bargained for and expressly consented to, and that this Agreement shall be given full force and effect in accord with each and all of its terms and provisions, including those terms and provisions relating to known and unknown claims.

[…]

14. <u>Legal Construction</u>.

(a) This Agreement shall be governed in all respects, including validity, interpretation, and effect, by the Bankruptcy Code and the laws of the State of California, without giving effect to the principles of choice of law or conflicts of law thereof[.]

Bk I Dkt. 226-1 at 6-8.

The order approving the parties' stipulation for assumption of the Lease provides, in relevant part:

[T]he Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed, and that any and all monetary and non-monetary defaults alleged by New Vision are deemed cured, satisfied and/or waived ab initio…; … the Debtor is in full and

> complete compliance each and every provision of Bankruptcy Code § 365(b)(1) (A), (B) and (C)[.]

Bk I Dkt. 242 at 4.

On June 20, 2016, Judge Tighe issued an order confirming the Debtor's chapter 11 plan, which order also confirmed the assumption of the Lease. *See* Bk I Dkt. 363 at ¶ 2. On April 28, 2017, the clerk of the Court entered a final decree in, and closed, the First Bankruptcy Case. Bk I Dkt. 392.

**D. Smart Capital Acquires the Premises**

On January 24, 2018, Smart Capital Investment I, LLC, Smart Capital Investments II, LLC, Smart Capital Investments III, LLC, Smart Capital Investments IV, LLC and Smart Capital Investments V, LLC (collectively "Smart Capital") acquired the Premises from New Vision via recordation of a grant deed. Bk III Dkt. 247-1 at ¶ 4 n.1. Chang is the managing member of Smart Capital. *Id.*

**E. The Second Bankruptcy Case**

On August 5, 2019, Smart Capital delivered to the Debtor a letter asserting non-monetary defaults under the Lease. Bk III Dkt. 237 at ¶ 11 and Ex. H. Despite the Debtor's efforts to obtain more specific information on the nature of the alleged defaults, Smart Capital then issued a three-day notice to quit the Premises. *Id.* at ¶ 13. Shortly thereafter, on August 21, 2019, the Debtor filed a second chapter 11 petition initiating the Second Bankruptcy Case, over which Judge Tighe also presided.

In October 2019, the Debtor moved to assume the Lease pursuant to Bankruptcy Code section 365, which Smart Capital opposed. Bk II Dkt. 21 (the "Second Assumption Motion"); Bk II Dkt. 26. From October 2019 to September 2020, i.e., for approximately one year, the parties conducted extensive discovery on issues related to the Second Assumption Motion. *See* Bk II Dkt. 111 (setting August 28, 2020 as deadline to complete discovery); Bk II Dkt. 164 (ordering production of additional information); *In re Hawkeye Ent., LLC*, 625 B.R. 745, 757 (Bankr. C.D. Cal. 2021) (Tighe, J.) (describing discovery efforts as "extensive"). In October 2020, the Court conducted a four-day evidentiary hearing over the nature and extent of alleged defaults under the Lease. Bk II Dkts. 266, 269, 270, 271 (transcripts of evidentiary hearing).

On October 15, 2020, the Court approved the Debtor's assumption of the Lease; in relevant part, Judge Tighe's oral ruling was as follows:

Case 1:23-bk-10502-MB Doc 961 Filed 09/03/25 Entered 09/03/25 11:02:10 Desc Main Document Page 7 of 12

> [Regarding the alleged defaults raised by Smart Capital,] [t]he details of the default just appeared manufactured, and minor, and made-up, sometimes. [Chang] understandably is very upset. He's got an under-market lease, allegedly, [for] an historic building with all sorts of restrictions that he's got to work closely with his tenant.
>
> […]
>
> They're the kind of issues you work out in that kind of building, if they're real issues, but I thought he was using immaterial issues, or manufacturing issues that hadn't been there, as an attempt to characterize them as a default, and the bottom line is, there was no preponderance of evidence on any of these issues to convince me there's a default.

Bk II Dkt. 269 at 110-101.

> The defaults that I found occurred I found were not material, and I didn't find Mr. Chang credible on them, … he was exaggerating them, and he had already certified that everything was fine when he signed the estoppel, that there were no defaults, and then he kept moving the target.
>
> So I didn't find that there were any defaults … that weren't cured, and the curing of the late payment … I don't know that you can characterize that as a default, where the lease itself provides … you pay the late fee, and that was done.

Bk II Dkt. 271 at 55; *see also* Bk II Dkt. 230 (the "2020 Assumption Order") at 3:7-8 ("the Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed.").

Smart Capital appealed the 2020 Assumption Order, which the Ninth Circuit Court of Appeals affirmed. *Smart Cap. Invs. I, LLC v. Hawkeye Ent., LLC (In re Hawkeye Ent., LLC)*, 49 F.4th 1232 (9th Cir. 2022). The Court of Appeals held that the Court had incorrectly limited the curative requirements of section 365(b)(1) to "material" defaults rather than all defaults. *Id.* at 1237. The Court of Appeals concluded, however, that the error was harmless because (i) the Court had determined that all defaults by the Debtor had been cured as of the time of assumption, and (ii) any adequate assurance required by the statute in respect of the Debtor's defaults would not have implicated Smart Capital's substantive rights:

> [T]he record establishes that the bankruptcy court determined that any default was cured as of the time of assumption, and that many of the alleged defaults were either not defaults in the first place or were only minor deviations from the contract terms. Thus, any adequate assurance responsive to the alleged defaults would be little more than simple promises not to deviate from the contract terms again.

*Id*. at 1240–41.

On August 6, 2021, the Court confirmed the Debtor's chapter 11 plan in the Second Bankruptcy Case. Bk II Dkt. 391. The Second Bankruptcy Case has not yet been closed. On January 23, 2024, it was

reassigned to the undersigned judicial officer and redesignated as case no. 1:19-bk-12102-MB. Bk II Dkt. 493.

**F. The CUB Dispute**

One of the ongoing disputes between the Debtor and Smart Capital involved the efforts by WERM, the Debtor's subtenant, to renew the approval by the Los Angeles Department of City Planning (the "Planning Department") for a conditional use of the Premises for the sale of alcoholic beverages (a "CUB"). WERM is required by city ordinance to maintain a CUB to sell alcoholic beverages at the Premises.[6] To operate at the Premises as a nightclub and event venue, the Lease requires that WERM obtain a CUB. Bk III Dkt. 237 at 14 (Lease Section 5.3).

On February 25, 2013, the Planning Department granted approval of WERM's plans to continue on-site sales of a full line of alcoholic beverages. Bk III Dkt. 112 at Ex. A (the "CUB-PA4"); *see* Planning Department case no. ZA-1995-830-CUB-PA4. Condition no. 47 of the CUB-PA4 provided that in order to renew the Planning Department's authorization, WERM was required to submit a renewal application before the CUB-PA4 expired, i.e., before March 12, 2023 (the "CUB-PA5 Application"). *Id*. at 8. After expiry of an administrative appeal period, the CUB-PA4 became final and effective for a term of ten years beginning on March 12, 2013.

WERM operated under the CUB-PA4 for the entirety of its term and, in 2022, began the process to submit the CUB-PA5 Application. Over the course of approximately a year, Smart Capital refused to provide the property owner with an affidavit necessary for WERM to submit the CUB-PA5 Application.[7] Bk III Dkt. 237 at ¶ 16; Bk III Dkt. 247-1 at ¶ 29. So, the Debtor and WERM sought and obtained relief from the Superior Court of California for the County of Los Angeles (the "Superior Court") compelling Chang to sign and notarize the property owner affidavit. Bk III Dkt. 52 at ¶¶ 25-29.[8]

---

[6] *See* L.A.M.C. § 12.24.W.1 (2025), https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-7378.

[7] Where the holder of a CUB is the tenant (or subtenant) of a property, a CUB renewal application requires that the property owner sign a property owner affidavit "to verify the application is being filed with their knowledge." *Application Instructions (CP13-7810)*, Los Angeles Department of City Planning (July 29, 2025), https://planning.lacity.gov/odocument/8d67e245-e104-404a-8d07-efc8da8923dc/CP13-7810_DCP_Application_Filing_Instructions_10.31.23.pdf.

[8] Notably, this Court previously found that Chang's refusal to provide the property owner affidavit demonstrated an intent to obstruct WERM from timely submitting the CUB-PA5 Application. Bk III Dkt. 137 at 11:24-28.

On March 8, 2023, WERM submitted its renewal application (the "CUB-PA5 Application"). *See* Planning Department case no. ZA-19950830-CUB-PA5. On November 22, 2024, the Planning Department issued a determination approving the CUB-PA5 Application, i.e., the Planning Department approved WERM's sale of alcoholic beverages on the Premises. Bk III Dkt. 237 at Ex. I (the "Planning Decision").

Due to the nature of the parties' ongoing disputes, the Planning Department's consideration of the CUB-PA5 Application "engendered a large amount of correspondence and testimony." *Id.* at 16. "Large" is an understatement—the Planning Department's summary of the correspondence it received, and the testimony and arguments it heard, spanned over 18 pages in single-spaced 12-point font. *Id.* at 20-38. In relevant part, Smart Capital and its various representatives asserted that the CUB-PA5 Application could not "be granted because the … CUB-PA4 was granted in error and is invalid due to [McAbian], instead of [Smart Capital], having signed the [CUB-PA4] application and covenant and agreement." *Id*. at 43; *see also id.* at 22-24, 29-31 (summarizing correspondence from various representatives of Smart Capital, each making the same assertion); *id*. at 33-36 (summarizing comments made by Smart Capital at public hearing, making the same assertion).

The Planning Department refused to invalidate the CUB-PA4, which had been in effect for 10 years and expired by its terms:

> [T]he discussion on the validity of the CUB-PA4 … is moot. The [CUB-PA4] was issued on February 25, 2013, having an appeal period that ended on March 12, 2013, with no appeals filed. The opportunity to challenge [the CUB-PA4] and how the [CUB-PA4] covenant was signed prior to its recordation against the [Premises] has long passed. Further, the term of the [CUB-PA4] was limited to 10 years, and that term has ended. [The Debtor] has been operating the [Premises], utilizing the privileges of that grant, for 10 years….

*Id*. at 43.

**G. The Quiet Title Action**

On November 20, 2024, two days before the Planning Decision was issued, Smart Capital filed a complaint to quiet title to the Premises against McAbian in the Superior Court, initiating case no. 24STCV30709 (the "Quiet Title Action"). Bk III Dkt. 282 at Ex. D. In the complaint, Smart Capital alleges that on March 13, 2013, McAbian fraudulently executed a *Master Covenant and Agreement* (the "Master Covenant") as the purported owner of the Premises and caused the Master Covenant to be

recorded against the Premises. Bk III Dkt. 284 at Ex. A. The complaint acknowledges that the Master Covenant recordation was ancillary to the Planning Department's issuance of the CUB-PA4.[9] To date, the Quiet Title Action remains pending. *See* Bk III Dkts. 327, 334.[10]

**H. The Third Bankruptcy Case**

On October 16, 2023, Smart Capital served on the Debtor three different notices under California Civil Procedure Code § 1161(4) purporting to terminate the Lease, declare a forfeiture of the leasehold, and give the Debtor and its subtenant three days to vacate the Premises (the "Three-Day Notices"). *See* Bk III Dkt. 45-7 at Ex. M. The Three-Day Notices allege that the Debtor breached the Lease by committing or permitting to exist a nuisance on the Premises and using the Premises for an illegal or unlawful purpose. The Debtor denies these allegations. On October 18, 2023, rather than wait for Smart Capital to commence an unlawful detainer action in the Superior Court following expiration of the three-day period provided under the Three-Day Notices, the Debtor filed a chapter 11 petition, commencing this Third Bankruptcy Case.

**1. The Motion to Dismiss and RFS Motion**

On December 19, 2023, Smart Capital filed: (1) a motion to dismiss the Third Bankruptcy Case as a bad faith filing under section 1112(b), and (2) a motion for relief from the automatic stay pursuant to section 362(d) to proceed with an unlawful detainer action against the Debtor and to assert counterclaims against the Debtor in the Superior Court. Bk III Dkt. 44 (the "Motion to Dismiss"); Bk III Dkt. 48 (the "RFS Motion"). On February 14 and March 14, 2024, the Court held evidentiary hearings on the Motion to Dismiss and RFS Motion. Bk III Dkts. 107, 133. On March 29, 2024, the Court held a continued hearing in which it announced its decision to deny the Motion to Dismiss and to deny in part the RFS Motion to the extent Smart Capital sought relief to proceed with an unlawful detainer action regarding the Premises. Bk III Dkt. 156. On April 8, 2024, the Court issued a memorandum of decision regarding the Motion to Dismiss and the RFS Motion. Bk III Dkt. 137; *see also* Bk III Dkts. 143, 197.

---

[9] Condition no. 48 of the CUB-PA4 provided that within 60 days of its effective date, a form covenant acknowledging and agreeing to comply with all the terms and conditions of the CUB-PA4 must be recorded against the Premises. Bk III Dkt. 112 at Ex. A.

[10] This Court previously ruled that Smart Capital's prosecution of the Quiet Title Action does not violate the Debtor's automatic stay in the Third Bankruptcy Case. Bk III Dkt. 296.

**2. The Third Assumption Motion**

In the Third Bankruptcy Case, the Debtor filed a "Motion for an Order (1) Authorizing the Assumption of Non-Residential Real Property Lease and Sublease, and (2) Determining the Debtor and Sublessor Not to Be in Breach or Default, thereby Deeming them in Compliance with 11 U.S.C. section 365(b)(1)(A) and Excusing the Debtor from any Additional Compliance with 11 U.S.C section 365(b)(1)(B) and (C); or alternatively, Extending the Time Period within which the Debtor May Assume or Reject Unexpired Non-Residential Leases and Executory Contracts." Bk III Dkt. 52 (the "Third Assumption Motion").[11]

**3. The Adversary Proceeding**

On June 25, 2024, the Debtor filed a complaint against Smart Capital and Chang, commencing adversary proceeding no. 1:24-ap-01031-MB (the "Adversary Proceeding"). Bk III Dkt. 168; Adv. Dkt. 1 (the "Complaint").

**a. The Complaint and First Injunction Motion**

In the Complaint, the Debtor seeks issuance of: (1) a declaratory judgment that Smart Capital's and Chang's alleged interference with the Debtor's and WERM's rights to operate pursuant to the CUB-PA4 constitutes a violation of the automatic stay; and (2) a permanent injunction against Smart Capital and Chang, enjoining them from interfering with the Debtor's and WERM's rights under the CUB-PA4, including its efforts to renew the CUB-PA4 via the CUB-PA5 Application. The Debtor also filed a motion for a preliminary injunction regarding the same. Adv. Dkt. 2 (the "First Injunction Motion").

**b. The Counterclaims and Second Injunction Motion**

On July 22, 2024, Smart Capital filed counterclaims against the Debtor and WERM. Adv. Dkt. 34 (the "Counterclaims"). In the Counterclaims, Smart Capital asserted causes of action for, among others: (1) breach of the Lease; (2) breach of the implied covenant of good faith and fair dealing; and (3) declaratory and injunctive relief regarding the purported alterations the Debtor and WERM caused to be

[11] The Debtor also filed a "Motion for an (1) Order Deeming Debtor in Compliance with 11 U.S.C. section 365(d)(3) and (2) Authorizing the Debtor to Pay All Monetary Obligations Pursuant to the Lease into the Rental Trust Account." Bk III Dkt. 57. The continued hearings on that pending motion have trailed the hearings on the Third Assumption Motion.

made to the Premises. Smart Capital also filed a motion for a preliminary injunction against the Debtor and WERM regarding the same. Adv. Dkt. 44 (the "Second Injunction Motion").

**c. The Third Injunction Motion**

On July 22, 2024, the Debtor filed a motion for a preliminary injunction against Smart Capital and Chang, this time seeking to enjoin them from interfering with the Debtor's attempts to remedy ventilation and air conditioning problems on the Premises. Adv. Dkt. 37 (the "Third Injunction Motion" and, together with the First and Second Injunction Motions, the "Injunction Motions").

* * *

As discussed below, all discovery pertaining to the Injunction Motions is stayed pending adjudication of the MPSJ. *See* Adv. Dkt. 100; Bk III Dkt. 233.

**4. The Discovery Disputes**

On September 4, 2024, the Court entered an order that, among other things, set a deadline of November 27, 2024, for the parties to complete discovery in connection with the Complaint, the Counterclaims, the Third Assumption Motion and the Injunction Motions. Bk III Dkt. 181; Adv. Dkt. 72.

Smart Capital sought discovery from various parties pursuant to Federal Rule of Civil Procedure 26, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014(c)(1). Specifically, Smart Capital sought information related to several categories of alleged defaults by the Debtor under the Lease:

(1) the Debtor's purported violation of Lease section 2.6 by using the common area of the Premises for revenue-generating events without Smart Capital's prior written consent, including: "a photo shoot in September of 2021," a "Christmas event in December of 2023," a "Dungeons and Dragons event in May of 2024," and "boxing, sumo wrestling, [and] bikini contests" on date(s) uncertain. Bk III Dkt. 247-1 at ¶¶ 55.b, 55.e, Ex. 14.

(2) the Debtor's purported violation of Lease section 10.2 by interfering with Smart Capital's right of entry on multiple occasions in 2024. *Id.* at ¶ 55.d, Ex. 15.

(3) the Debtor's purported violation of Lease section 10.3 by failing to maintain tenant utility facilities in good condition and failure to repair or make replacements necessary to keep the Premises in good condition; namely:

a. failing to maintain the interior ceilings, including damage to an "historic mosaic ceiling tile" that purportedly fell on January 20, 2024. *Id.* at ¶¶ 30, 50-51, 58; Bk III Dkt. 247-2 at ¶¶ 20-24, Exs. 12 and 18. Smart Capital also contends this constitutes a violation of Lease section 9.4.

b. failing to perform requisite maintenance to the HVAC system since execution of the Lease in 2009. Bk III Dkt. 247-1 at ¶¶ 52-55.c; Bk III Dkt. 212 (Smart Capital's RFA no. 107: "Admit that during the period of January 1, 2009 to the present, there were times when YOU did not keep the HVAC system at the PREMISES in good condition and repair."). Smart Capital also contends this constitutes a violation of Lease section 5.7.

c. potential damage to the sump pump in the basement since execution of the Lease in 2009. Bk III Dkt. 247-1 at ¶ 55.a.

d. failing to provide adequate lighting on date(s) uncertain. *Id.* at ¶ 55.d.

(4) the Debtor's purported violation of Lease section 10.5 by performing alterations to the Premises without prior notice to Smart Capital and without Smart Capital's prior written consent, including: (a) retaining structural engineers, (b) receiving structural analyses in July 2022 and December 2023, and (c) submitting a building permit application to LADBS in April 2024, all "regarding the installation of temporary rigging components at the Premises." *Id.* at ¶¶ 38-49, 59-64, Exs. 11 and 19.

(5) the Debtor's purported violation of Lease section 11.3 by making changes to the common area of the Premises; namely, the Debtor's alleged covering of Smart Capital's security cameras in the common area during occasions since execution of the Lease in 2009. *Id.* at ¶ 55.f; Bk III Dkt. 212 (Smart Capital's RFA no. 89: "Admit that on at least one occasion

during the period of January 1, 2009 to the present, YOU obstructed [Smart Capital] from controlling the COMMON AREA.").

(6) the Debtor's purported violation of paragraph 6 of the First Amendment to the Lease by using the basement for non-storage purposes without Smart Capital's authorization, specifically using the basement as a WERM employee breakroom. Bk III Dkt. 247-1 at ¶ 55.a; Bk III Dkt. 247-6 at Ex. 17; Adv. Dkt. 94 (Smart Capital's RFA no. 61: "Admit that on at least one occasion during the period of January 1, 2009 to the present, YOU used the basement of the BUILDING for non-storage purposes.").

(7) the Debtor's purported violation of unidentified provision(s) of the Lease by:

a. obtaining the CUB-PA4, which Smart Capital contends was invalid because the Debtor obtained it allegedly by misrepresenting that the Debtor was the owner of the Premises. Bk III Dkt. 247-1 at 5-6 (¶¶ 25-29). Smart Capital's arguments regarding the various CUBs have evolved considerably over time and across different forums. In its current form, Smart Capital argues that the Debtor and WERM have illegally sold alcohol at the Premises pursuant to the CUB-PA5, which purportedly is invalid because the CUB-PA4 Application was obtained by fraud (i.e., McAbian signed the Master Covenant as the purported owner of the Premises). *See id*. at ¶ 56.

b. on date(s) uncertain, walking through areas "outside the Premises for fire/life safety inspections with the Los Angeles Fire Department without Smart Capital's knowledge or consent." *Id.* at ¶ 55.g; Adv. Dkt. 96 at Ex. A (Peterson Deposition Transcript) at pp. 76-77 ("Q: Did you see … any entity … occupying any space other than the [Premises]? … A: … I saw Adi McAbian in other parts of the building, with the Fire Department, because I did a tour.").

*See also* Bk III Dkt. 247 at 12:6-16:7; Bk III Dkt. 34.

In October and November 2024, the Debtor and Smart Capital filed numerous motions regarding discovery disputes in the Third Bankruptcy Case and the Adversary Proceeding (collectively, the "Discovery Disputes"):

(1) the Debtor's motion to quash subpoenas issued by Smart Capital [Adv. Dkt. 75], filed October 3, 2024;

(2) Smart Capital's motions to compel WERM's responses to: requests for production [Adv. Dkt. 93], requests for admission [Adv. Dkt. 94], and interrogatories [Adv. Dkt. 95], each filed November 18, 2024;

(3) Smart Capital's motions to compel the Debtor's responses to: requests for admission [Bk III Dkt. 212], requests for production [Bk III Dkt. 213], and interrogatories [Bk III Dkt. 214], each filed November 18, 2024;

(4) Smart Capital's motion to compel further deposition of Elizabeth Peterson Group, Inc. [Adv. Dkt. 96], filed November 19, 2024;

(5) the Debtor's motion in limine to preclude Smart Capital from offering any evidence regarding alleged defaults or breaches of the Lease occurring prior to the 2020 Assumption Order [Bk III Dkt. 215], filed November 19, 2024;

(6) the Debtor's motion to compel Smart Capital's responses to interrogatories [Bk III Dkt. 217], filed November 19, 2024.

In summary, Smart Capital argues that discovery regarding the Debtor's entire history of defaults under the Lease is essential for this Court to determine whether the Debtor can assume the Lease in this case. The Debtor argues that many of Smart Capital's discovery requests are improper because they are aimed at developing evidence with respect to defaults that preceded entry of the 2014 Settlement Order, 2014 Assumption Order and the 2020 Assumption Order.

**5. The MPSJ**

On November 26, 2024, the Court conducted a status conference regarding the Discovery Disputes and ordered the parties to present their dispute over the effect of the 2014 Assumption Order, the 2014 Settlement Order and the 2020 Assumption Order as a motion for summary judgment. The Court later memorialized its directive in a written order:

> As the Court discussed with counsel, the Discovery Disputes all relate to a more substantial legal dispute between the parties: whether and to what extent orders entered in the prior bankruptcy cases of the Debtor are preclusive—as a matter of issue preclusion and/or claim preclusion—of issues and/or claims raised in the Complaint, the Counterclaims, the Third Assumption Motion and the Injunction Motions. The Court conclude[d] that the most

efficient way to address these disputes is to adjudicate these legal issues first, pursuant to one or more motions for summary judgment under Federal Rule of Civil Procedure 56. *See* Adv. Dkt. 100; Bk III Dkt. 233. After this threshold issue is adjudicated, the Court can address any outstanding discovery issues. Pending that decision, the Court ordered that "no additional motion pertaining to discovery may be filed by the Debtor or Smart Capital" in the Third Bankruptcy Case or Adversary Proceeding. Adv. Dkt. 100 at ¶ 3; Bk III Dkt. 233 at ¶ 3.[12]

On December 16, 2024, the Debtor filed the MPSJ, a declaration of McAbian and a request for judicial notice. Bk III Dkts. 237, 238. On January 6, 2025, Smart Capital filed an opposition to the MPSJ (the "Opposition"), together with declarations of Chang and Zachary Schorr, counsel for Smart Capital. Bk III Dkt. 247. On January 20, 2025, the Debtor filed a reply to the Opposition. Bk III Dkt. 253. After considering the oral arguments of counsel at multiple hearings, this matter is ripe for decision.

## IV. LEGAL STANDARDS

### A. Summary Judgment under Fed. R. Civ. P. 56

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324. In determining whether a genuine issue of material fact exists, "'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To establish a genuine issue, the non–moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of

---

[12] In September 2025, Smart Capital attempted to circumvent this order by filing a motion to examine the Debtor's bank pursuant to Federal Rule of Bankruptcy Procedure 2004, which the Court denied and declined to reconsider. Bk III Dkts. 331, 338, 339, 344.

evidence in support of the [non–moving party]'s position will be insufficient."). Rather, the nonmoving party must provide "evidence of such a caliber that 'a fair–minded jury could return a verdict for the [nonmoving party] on the evidence presented.'" *United States v. Wilson*, 881 F.2d 596, 601 (9th Cir. 1989) (quoting *Anderson*, 477 U.S. at 252).

**B. Assumption of Unexpired Lease Under 11 U.S.C. § 365**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In a chapter 11 case, the debtor in possession may exercise this power. 11 U.S.C. § 1107(a). Section 365(b)(1), however, establishes some of the restrictions on this power:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

Thus, a debtor in possession may assume a lease only if it: (A) cures the default (or provides adequate assurances that it will); (B) provides compensation for any actual pecuniary loss resulting from the default (or provides adequate assurances that it will); and (C) provides adequate assurances of future performance under the lease. 11 U.S.C. § 365(b)(1)(A)–(C). If no default has occurred, section 365(b)(1)'s requirements—cure, compensation, and adequate assurances of future performance—are not triggered. *See Hawkeye Ent., LLC*, 49 F.4th at 1236.

## V. DISCUSSION

The Debtor asserts that Smart Capital, in opposing the pending Third Assumption Motion, is precluded from asserting any defaults that may have existed under the Lease prior to the assumption of that Lease in 2014 and 2020.[13] The Debtor makes four principal arguments. The first three arguments are premised on distinct but related doctrines that preclude a party from litigating a matter based on a prior litigation and/or adjudication by a court: (i) the collateral attack doctrine, (ii) claim preclusion, and (iii) issue preclusion. The fourth argument is premised on a voluntary settlement and release of claims between the parties in 2014.

### A. Collateral Attack Doctrine

The Debtor contends that Smart Capital's assertion of defaults that may have existed prior to entry of the 2020 Assumption Order is barred as an impermissible collateral attack on that order. The Court agrees.

"The legal system and society generally have a significant interest in the finality of court orders and judgments. In turn, this interest requires that federal court orders carry the full force of law unless and until extinguished through appropriate processes." *Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, 642 B.R. 21, 23 (Bankr. D. Mont. 2022) (footnotes omitted). One such process is a direct appeal. *Id.* at 24. Another, less direct challenge, is a motion for relief from an order or judgment under Federal Rule of Civil Procedure 60(b). *Id.*

Otherwise, "collateral attacks on the judgments, orders, decrees or decisions of federal courts are improper." *Mullis v. U.S. Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385, 1393 (9th Cir. 1987) (citing *Brown v. Baden*, 815 F.2d 575, 576-77 (9th Cir. 1987)) (affirming district court's denial of injunctive relief against bankruptcy court as improper collateral attack).

> Unlike a direct appeal, a collateral attack questions the validity of a judgment or order in a separate proceeding that is not intended to obtain relief from the judgment. 18 Moore's Federal Practice, § 131.02[2]. It seeks, through the second suit, to avoid or evade the earlier judgment, or to deny its force and effect. Even where the second action has an independent purpose and contemplates some other relief, it is a collateral attack if, in some fashion, it would overrule a previous judgment.

---

[13] Because the Court concludes below that the 2020 Assumption Order acts as a bar to asserting all defaults preceding its entry, the Court only analyzes the preclusive effect of the 2020 Assumption Order. The preclusion of defaults preceding entry of the 2020 Assumption Order necessarily includes all defaults that would have preceded the earlier 2014 Assumption Order.

*Uecker & Assocs., Inc. v. L.G. Hunt & Assocs., Inc. (In re Am. Basketball League, Inc.)*, 317 B.R. 121, 128 (Bankr. N.D. Cal. 2004). "This collateral attack doctrine prevents courts from effectively overruling or altering final orders via indirect routes and is firmly grounded on the need for finality." *Shoot the Moon, LLC*, 642 B.R. at 24 (citing *Am. Basketball League, Inc.*, 317 B.R. at 128) (footnote omitted). Moreover, this doctrine "applies equally in the bankruptcy context." *Id.* & n.12 (citing authorities).

The decretal language of the 2020 Assumption Order not only approves assumption of the Lease under Bankruptcy Code section 365(a) but also expressly "deems" the Lease "reinstated … as if no default exists or ever existed." Bk I Dkt. 242 at 4; Bk II Dkt. 230 at 4. Smart Capital's present effort to litigate the existence of prior defaults under the Lease is an impermissible collateral attack on the 2020 Assumption Order.

The 2020 Assumption Order was appealed by Smart Capital but ultimately affirmed by the Ninth Circuit Court of Appeals. Although the Court of Appeals found that the Court used the wrong legal standard, it found the error harmless and affirmed the 2020 Assumption Order without alteration to any decretal provision. *Hawkeye Ent., LLC*, 49 F.4th 1232. Furthermore, the time to seek relief under Federal Rule of Civil Procedure 60(b) has long since expired.

Smart Capital argues that it is not bound by the 2020 Assumption Order because, at that time, defaults existed that it was not aware of and therefore did not assert in opposition to the Second Assumption Motion. But the argument is unavailing. The express language of the 2020 Assumption Order "deems" the Lease reinstated "as if" no such defaults "ever existed." In other words, the operative language of the order declares that going forward, any prior default will be treated as if it never existed. Smart Capital's attempt to litigate the existence and nature of prior defaults here is in direct contradiction of that judicial declaration.

That Smart Capital may contend this language was improper or unjustified is unpersuasive. Even an order premised on legal error may not be collaterally attacked. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (bankruptcy court order discharging student loan debt was legal error but nevertheless enforceable against creditor that had notice of error and failed to timely object or appeal). The Debtor gave Smart Capital notice of the provisions proposed to be used in the 2020

Assumption Order, and Smart Capital did not object to such use. *See* Bk II Dkt. 228 (Debtor's notice of lodgment of proposed 2020 Assumption Order); Bankr. C.D. Cal. Local R. 9021-1(b)(3) (providing procedure to file objection to form of lodged order). The Court subsequently issued the 2020 Assumption Order without altering the Debtor's proposed language. *Compare* Bk II Dkt. 228 *with* Bk II Dkt. 230. Smart Capital appealed that order, and the Court of Appeals affirmed it without alteration. The order is now final and binding on Smart Capital.

Accordingly, pursuant to the express terms of the 2020 Assumption Order, Smart Capital is barred from asserting any defaults under the Lease that may have existed at the time the 2020 Assumption Order was entered.

### B. Claim Preclusion

The doctrine of res judicata, more recently referred to as claim preclusion,[14] prohibits relitigation "of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 4121 (2020) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) (citing *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948)).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001)). Under federal law, application of the claim preclusion doctrine requires: (1) an identity of claims; (2) a final judgment on the merits; and (3) the same parties or privity between parties. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). "[T]he proponent of preclusion has both the burden of persuasion and the correlative risk of non-persuasion." *George v. City of Morro*

[14] "Although the Latin terms 'res judicata' and 'collateral estoppel' historically have been used to describe preclusion principles generally, in modern usage these terms have been retitled and their distinct meanings emphasized. 'Res judicata' is now referred to as claim preclusion, and 'collateral estoppel' is referred to as issue preclusion." *Yaikian v. Yaikian (In re Yaikian)*, 508 B.R. 175, 182 (Bankr. S.D. Cal. 2014); *see also Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008) ("These terms have replaced a more confusing lexicon.").

*Bay (In re George)*, 318 B.R. 729, 737 (B.A.P. 9th Cir. 2004) (citing *Educ. Credit Mgmt. Corp. v. Repp (In re Repp)*, 307 B.R. 144, 148 n.3 (B.A.P. 9th Cir. 2004)).

The Debtor argues the doctrine of claim preclusion prohibits Smart Capital from asserting in this case any defaults under the Lease in existence prior to the 2020 Assumption Order—even defaults that it did not assert at the time. The Debtor argues that because Smart Capital had the opportunity to assert such defaults as defenses to (i.e., in opposition to) the Second Assumption Motion, it should be barred from asserting any such defaults now. In contrast, Smart Capital argues that claim preclusion should not apply here and that it should be free to assert any defaults that have ever existed under the Lease, irrespective of its prior litigation of the Second Assumption Motion.

The parties do not dispute that the same parties are involved here that were involved in the prior litigation. The parties disagree, however, on the other two elements: whether there is an identity of claims and a final judgment on the merits. The Court concludes below that the remaining elements are satisfied.

**1. Identity of Claims**

The Ninth Circuit Court of Appeals has adopted a four-factor test for determining whether there is an "identity of claims" for purposes of claim preclusion: "'(1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions.'" *Warfield v. Nance (In re Nance)*, 156 F.4th 961, 966 (9th Cir. 2025) (quoting *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005)).

These factors are meant to be flexible; "identity of causes of action 'cannot be determined precisely by mechanistic application of a simple test.'" *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1202 n.7 (9th Cir. 1982) (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 206 (9th Cir. 1979)). Moreover, the transactional nucleus of facts factor "is the most important." *Id*. at 1202 (citing *Harris v. Jacobs*, 621 F.2d 341, 343 (9th Cir. 1980)).

This case presents the unusual situation in which a chapter 11 debtor is seeking the same relief, under the same statute, with respect to the same unexpired lease, in a subsequent chapter 11 case. The typical claim preclusion problem requires the Court to compare two civil complaints and assess whether there is an identity of claims between causes of action asserted in each complaint. Nevertheless, claim preclusion applies in bankruptcy and "'must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case.'" *Alary Corp. v. Sims (In re Associated Vintage Grp., Inc.)*, 283 B.R. 549, 558–59 (B.A.P. 9th Cir. 2002) (quoting *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3rd Cir. 2000)).

Faithful application of the applicable legal standards demonstrates that there is an "identity of claims" between the prior and current lease assumption litigation.

**a. Transactional Nucleus of Facts**

The Second and Third Assumption Motions share a common transactional nucleus of facts. Under Bankruptcy Code section 365(a), the entitlement of a debtor in possession to assume a lease depends on the debtor's status as lessee, the validity of the lease, and the unexpired status of that lease. Under Bankruptcy Code section 365(b)(1), assumption is conditioned on the existence, nature and extent of defaults under the lease and whether the debtor in possession has taken (or will take) certain curative or compensatory measures with respect to those defaults.

In the Second Bankruptcy Case, Smart Capital opposed the Second Assumption Motion. Smart Capital had approximately one year to conduct discovery and participated in a four-day evidentiary hearing focused on the very issues contemplated by section 365(b)(1). As the lessor opposing the Debtor's assumption of the Lease, Smart Capital had the opportunity to assert and demonstrate all defaults that may have occurred under the Lease during the eleven-year period in which the Debtor was lessee of the Premises, and to demand satisfaction of the curative and compensatory provisions of section 365(b)(1).

In its opposition to the Third Assumption Motion in this case, Smart Capital wants to take discovery and litigate the existence of defaults that may have existed both *before* and *after* entry of the 2020 Assumption Order. Its effort to litigate the existence and significance of such defaults is based on

the very same transactional nucleus of facts at issue in the Second Bankruptcy Case: the conduct of the Debtor and its subtenant with respect to the operation and maintenance of the Premises during the period preceding the 2020 Assumption Order.

Naturally, Smart Capital could not raise in the prior case any conduct that had not yet occurred. Thus, the conduct of the Debtor and its subtenant that may constitute a default *following* entry of the 2020 Assumption Order is not part of the common transactional nucleus of facts and is not subject to claim preclusion.

Pointing to the text of section 365(b)(1), Smart Capital insists that it should be permitted to litigate and oppose assumption here based on *any* defaults that have occurred at any time under the Lease. Bk. III Dkt. at 10-11. In *Hawkeye Entertainment, LLC*, the Court of Appeals noted that the curative provisions of the statute are triggered "[i]f there *has been* a default." 49 F.4th at 1237 (quoting 11 U.S.C. § 365(b)(1)) (emphasis added). The Court of Appeals held that "[u]sing the present-perfect tense in this this way refers to situations where a default has occurred regardless of whether that default has been resolved or is ongoing." *Id.* Thus, Smart Capital argues that it should be able to rely on *any* default in the past to support its opposition to the Third Assumption Motion.

But its argument conveniently ignores the doctrine of claim preclusion. Whatever the scope of section 365(b)(1), claim preclusion intervenes to provide finality and conserve judicial resources on "issues that were or could have been raised" in prior litigation under that statute. *See Federated Dep't Stores, Inc.,* 452 U.S. at 398. In most cases, this would not be an issue because a motion seeking assumption of a lease normally is the first and only time those issues have been litigated. But this is not most cases. Here, Smart Capital had a full and fair opportunity to litigate, in a prior bankruptcy case, all defaults that may have existed at the time—which make up the transactional nucleus of facts.[15]

---

[15] Smart Capital makes a slightly different but related argument that fares no better. Smart Capital contends that it must be able to conduct discovery into and assert defaults that occurred prior to the entry of the 2020 Assumption Order because those alleged defaults—i.e., all defaults since the inception of the Lease—are relevant to the requirement that the Debtor provide "adequate assurance of future performance" under Bankruptcy Code section 365(b)(1)(C). Again, the argument misses the point. Together, the 2020 Assumption Order and the Court of Appeals' decision affirming that order concluded (notwithstanding certain harmless errors) that the requirements of section 365(b)(1) were essentially satisfied. By operation of claim preclusion, Smart Capital is now barred from litigating under section 365(b)(1)(C) the adequate assurance issue with respect to any defaults that preceded entry of that order.

**b. Impairment of Established Rights and Interests**

Before it can approve a debtor's assumption of an unexpired lease, the bankruptcy court must find that the curative requirements of section 365(b)(1) have been satisfied with respect to defaults under the lease. *See Hawkeye Ent., LLC*, 49 F.4th at 1236–37. Otherwise, the statute does not permit assumption. *See id.* Thus, the Court could not have issued the 2020 Assumption Order unless, at that time, it determined that the Debtor had cured any defaults under the Lease.

Permitting Smart Capital to turn back the clock, relitigate the issue, and assert defaults it did not raise at the time would call into question the very premise on which that order was entered, the rights that were granted to the Debtor under the order, and the grounds on which the order was affirmed on appeal. Doing so also would undermine the Court's order confirming the Debtor's chapter 11 plan in the Second Bankruptcy Case, which order expressly relied on the entry of the 2020 Assumption Order as a material component and enabled the Debtor to reorganize its business affairs.

**c. Infringement of the Same Right**

The rights involved in the Second and Third Assumption Motions are identical. In both instances, the Debtor is asserting its right as a debtor in possession to assume the Lease under section 365(a), subject to the requirements of section 365(b)(1). In opposition, Smart Capital is asserting its rights to curative relief under section 365(b)(1). The rights are being asserted in separate bankruptcy cases and at separate moments in time, but the rights themselves are identical.

**d. Substantially Same Evidence**

In the prior case, the universe of relevant evidence covered the Debtor's conduct as a lessee under the Lease since at least 2014 through its assumption in 2020. But for the application of claim preclusion principles, the universe of relevant evidence would cover the same period and extend further into the present. The resulting overlap would be substantial and would encompass evidence that was or could have been presented in the prior case.

**2. Final Judgment on the Merits**

The 2020 Assumption Order is a final judgment on the merits. As noted, Smart Capital appealed the 2020 Assumption Order, which the Ninth Circuit Court of Appeals affirmed in a detailed opinion that

addressed the merits of the order. *See Hawkeye Ent., LLC*, 49 F.4th 1232. Smart Capital nevertheless argues that the 2020 Assumption Order is not a "final judgment on the merits" because the Court of Appeals held that the Court had incorrectly limited the curative requirements of section 365(b)(1) to "material" defaults. *Id.* at 1237.

Smart Capital is wrong. The Court of Appeals ultimately found that the error was harmless because the Court had determined that all defaults by the Debtor had been cured as of the time of assumption and that any adequate assurance required by the Debtor's defaults would not have implicated Smart Capital's substantive rights. *Id.* at 1240-41. Based on that finding, the Court of Appeals affirmed. Nothing in the Court of Appeals' decision alters the finality of the 2020 Assumption Order or alters its nature as a decision on the merits.

**3. The Effect of Claim Preclusion**

For the foregoing reasons, the Court concludes that claim preclusion applies here. Based on the litigation that culminated in the 2020 Assumption Order, Smart Capital is barred from asserting—in opposition to assumption of the Lease in this case—any default thereunder that may have existed prior to entry of the 2020 Assumption Order, regardless of whether it was previously raised. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. at 398 (claim preclusion "precludes the parties or their privies from relitigating issues that were or could have been raised in [the prior] action"). Conversely, any Lease default that has occurred *after* entry of the 2020 Assumption order is not barred.

This result is not surprising. Courts repeatedly have barred the nondebtor party to an unexpired lease or executory contract from asserting in a subsequent action any default that it failed to raise prior to assumption. *See, e.g., Arriva Pharms., Inc. v. Lezdey (In re Arriva Pharms., Inc.)*, 456 B.R. 419, 424–25 (Bankr. N.D. Cal. 2011) (barring assertion of breaches under executory license agreement that were not raised in opposition to assumption of agreement under chapter 11 plan); *NCL Corp. v. Lone Star Bldg. Ctrs. (E.) Inc.*, 144 B.R. 170, 179 (S.D. Fla. 1992) (barring environmental cleanup claims under lease against lessee that were not asserted in opposition to assumption of lease by predecessor chapter 11 debtor); *Georgia Ports Auth. v. Diamond Mfg. Co. (In re Diamond Mfg. Co.)*, 164 B.R. 189, 199 (Bankr.

S.D. Ga. 1994) (barring environmental indemnity claims under lease that were not asserted in opposition to lease assumption).

Smart Capital contends that it should not be precluded from asserting two specific defaults under the Lease because, at the time of the 2020 Assumption Order, Smart Capital was not aware of the underlying facts, could not have been aware of them, and was prevented from becoming aware of them by Debtor's purported concealment of them. *See* Bk III, Dkt. 247 at 30-33.

Smart Capital's first contention is that the Debtor (or its subtenant) made alterations to the Premises in violation of the Lease prior to entry of the 2020 Assumption Order. Smart Capital argues that it was not aware of these alterations because the Debtor did not provide appropriate notice and/or request permission, as required by the Lease. Smart Capital contends it only began to make inquiries into this matter when a ceiling tile at the Premises fell in 2024. Smart Capital suggests that it was unaware of any alterations made in breach of the Lease prior to issuance of the 2020 Assumption Order and therefore could not have raised them as an objection to the Second Assumption Motion.

Smart Capital's second contention is that the Debtor's subtenant has been violating the Lease by serving alcohol without the necessary approval of the City of Los Angeles. Its argument is based on tortured logic, but goes something like this: (i) McAbian, the principal of the Debtor and its subtenant, WERM, secured City permission to serve alcohol under the prior authorization, called CUB-PA4, by making fraudulent representations to the City of Los Angeles, (ii) McAbian improperly recorded the CUB-PA4 document in the records of the Los Angeles County Recorder's Office, (iii) based on the foregoing, the CUB-PA4 was void *ab initio* (even though it was never revoked by the issuing agency and Smart Capital did not seek to revoke it until after it had expired), and (iv) therefore, the Debtor's subtenant has been serving alcohol in violation of the Lease since 2013. Smart Capital contends that it was unaware of the circumstances giving rise to these arguments during the Second Bankruptcy Case.

The Court is not persuaded. First, generally, a party's prior lack of knowledge, or its subsequent discovery of new evidence, is not an exception to the application of claim preclusion. *See Constantini v. Trans World Airlines,* 681 F.2d 1199, 1202-03 (9th Cir. 1982) (holding that exception to claim preclusion not available where precluded party did not allege any efforts in prior suit to discover purportedly

concealed information); *see also Hudson v. Hedge,* 27 F.3d 274, 276 (7th Cir. 1994); *Saud v. Bank of New York*, 929 F.2d 916, 920 (2nd Cir. 1991). Second, it is not clear in the Ninth Circuit whether there is a "fraudulent concealment exception" to claim preclusion. *Constantini,* 681 F.2d at 1202-03 (declining to decide that legal question but nevertheless rejecting appellant's contention that there were adequate allegations to sustain a finding of concealment). Third, even assuming such an exception exists, the Court is not persuaded by any evidence in the summary judgment record that Smart Capital was prevented or otherwise unable to discover in the prior case the facts on which these defaults are now asserted.

As for alleged alterations to the Premises, Smart Capital had ample opportunity during the Second Bankruptcy Case to discover the evidence it belatedly seeks in this case. As noted, in the Second Bankruptcy Case, Smart Capital had nearly a year to conduct formal discovery under the Federal Rules of Civil Procedure. Among other things, those rules provide for both the production of documents and the entering onto land for purposes of inspection. *See* Fed. R. Civ. P. 34; Fed. R. Bankr. P. 7034 (incorporating Fed. R. Civ. P. 34). And even before the Second Assumption Motion was filed, Smart Capital had the right as lessor to inspect and examine the Premises on 24 hours' notice. Bk III Dkt. 237 at 20 (Lease Section 10.2). The evidence in the summary judgment record does not substantiate or even raise a material dispute suggesting that Smart Capital was prevented from exercising these rights prior to the four-day trial on the Second Assumption Motion. The declaration testimony of Chang offered in opposition to the MPSJ does describe his thought process in wanting to explore the issue of alterations to the Premises following the detachment of a ceiling tile in 2024, but it does not support the contention that Smart Capital could not have discovered any alterations that existed at the time of the Second Assumption Motion. *See* Bk III Dkt. 247-1 at 11-12 (¶¶ 56-67).

Likewise, the summary judgment record does not support the contention that Smart Capital could not have conducted discovery in the prior case regarding its theory that CUB-PA4 authorizing alcohol sales was somehow invalid. The CUB-PA4 was issued by the City of Los Angeles in 2013. If Smart Capital had any concerns about the bona fides of the CUB-PA4—or was looking for any possible defaults on which to challenge the Second Assumption Motion, as it appears to be doing—Smart Capital

could have easily conducted discovery into the issuance of that approval. Nothing about the facts it claims to have recently discovered were concealed or otherwise unavailable. Indeed, the Master Covenant recorded against the Premises pursuant the CUB-PA4, which is central to Smart Capital's theory, is literally a public record. *See* Bk III Dkt. 247-6 at 124–35. The Master Covenant was recorded at the Los Angeles County Recorder's Office in 2013. Nothing in the summary judgment record establishes that Smart Capital could not have found this document by way of a routine search of real property records.

Smart Capital had a full and fair opportunity to discover and assert any default that may have existed prior to entry of the 2020 Assumption Order. Claim preclusion bars Smart Capital from doing so now.

**C. Issue Preclusion**

The doctrine of collateral estoppel, now referred to as issue preclusion, "generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012).

"The burden is on the party seeking to rely upon issue preclusion to prove each of the elements have been met." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050–51 (9th Cir. 2008). "This means providing 'a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action.'" *Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 462 (B.A.P. 9th Cir. 2015) (quoting *Kelly v. Okoye (In re Kelly)*, 182 B.R. 255, 258 (B.A.P. 9th Cir. 1995), *aff'd*, 100 F.3d 110 (9th Cir. 1996)).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. at 891 (2008). The requirements for issue preclusion under federal common law are:

(1) there was a full and fair opportunity to litigate the issue in the previous action;
(2) the issue was actually litigated in that action;
(3) the issue was lost as a result of a final judgment in that action; and

(4) the person against whom issue preclusion is asserted in the present action was a party or in privity with a party in the previous action.

*U.S. Internal Revenue Svc. v. Palmer (In re Palmer)*, 207 F.3d 566, 568 (9th Cir. 2000).

The Debtor argues that, in connection with the Section Assumption Motion, the Court determined the nature and extent of the Lease defaults existing at the time. As such, the Debtor argues that Smart Capital is barred by issue preclusion from relitigating those issues.

The 2020 Assumption Order is a federal court judgment, so federal common law on issue preclusion controls. *See Taylor v. Sturgell*, 553 U.S. at 891. Regarding the first element, as a creditor in the Second Bankruptcy Case, Smart Capital had a full and fair opportunity to litigate the existence of defaults prior to the 2020 Assumption Order. The parties conducted "extensive" discovery for nearly a year. *Hawkeye Ent., LLC*, 625 B.R. at 757; Bk II Dkts. 111, 164. As for the second element, Smart Capital actually did litigate the existence of such defaults by opposing the Second Assumption Motion, participating in a four-day trial on it, and unsuccessfully appealing the result of that trial to the Ninth Circuit Court of Appeals. As noted above, the 2020 Assumption Order is a final judgment. Finally, Smart Capital does not contest that it was a party to and participated extensively in the Second Bankruptcy Case.

Accordingly, even if application of the claim preclusion doctrine did not bar Smart Capital from asserting any default under the Lease that may have existed prior to entry of the 2020 Assumption Order, the doctrine of issue preclusion does.

**D. Voluntary Settlement and Release of Claims**

The Debtor argues that the New Vision Settlement, which the Court approved in the 2014 Settlement Order, constitutes a general release between the Debtor and Smart Capital's predecessor regarding any claimed breaches or defaults, both known and unknown, based on actions that occurred prior to entry of the 2014 Settlement Order. Bk III Dkt. 236 at 30-31; Bk III Dkt. 253 at 21-24. Relying on the enumerated list of claims released in Section 10(a) of the New Vision Settlement, Smart Capital contends that the New Vision Settlement constitutes a "limited release," and that Smart Capital's predecessor did not release claims related to the Debtor's alleged "construction on the Premises, use of the Premises for an unlawful purpose, or fraudulently applying for the CUB-PA4." Bk III Dkt. 247 at 31.

Smart Capital offers no legal authorities in support of its narrow interpretation of the New Vision Settlement. *Id.*

The New Vision Settlement states that the Bankruptcy Code and California law governs its interpretation. Bk I Dkt. 226-1 at 8. When interpreting a contract under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641; *see also* Cal. Civ. Proc. Code § 1858 ("where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."). Where general and specific provisions are inconsistent, the specific provision will control, Cal. Civ. Proc. Code § 1859; however, "[p]articular clauses of a contract are subordinate to its general intent." Cal. Civ. Code § 1650. The apparent main purpose of the parties is to be given effect. *See* Cal. Civ. Code §§ 1652, 1653, 1648.

Here, the intent of the parties in the New Vision Settlement is unambiguous per its terms. The parties' mutual intent was to "fully and forever" "resolv[e] all disputes between them" and "to effectuate a full and complete release of any and all claims for relief, whether known or unknown, that may be asserted by them against each other." Bk I Dkt. 226-1 at 6-7 (§§ 10(a), (c)). When giving effect to this main purpose, the result is obvious: Smart Capital is precluded from raising any default under the Lease that may have existed prior to entry of the 2014 Settlement Order.

While the New Vision Settlement does include an enumerated list of claims that the parties contemplate being waived pursuant to the general release, that particular clause is subordinate to the general intent of the New Vision Settlement. *See* Cal. Civ. Code § 1650. Moreover, the language preceding that list is particularly instructive: "the Parties … hereby fully and forever release each other … from any and all claims … which they have, or could claim to have against each other arising from or related to: … (2) all claims alleged in, or related to the [First] Assumption Motion…." Bk I Dkt. 226-1 at 6 (emphasis added). Contrary to Smart Capital's assertions, this broad language means that the parties' waiver does not concern solely the issues that the parties *had* raised in the litigation and contested matters pending between them at the time they executed the New Vision Settlement (e.g., solely the

defaults actually alleged in New Vision's opposition to the First Assumption Motion). Instead, the parties' waiver includes any issues that they *could have* raised.

As noted previously, in opposition to the First Assumption Motion, Smart Capital's predecessor could have raised any default under the Lease that may have existed prior to entry of the 2014 Settlement Order. The New Vision Settlement contemplates waiver of Smart Capital's right to raise all such defaults, regardless of whether those alleged defaults were "known or unknown, suspected or unsuspected." *See id.* at 6-7 (§§ 10(a), (b)).

The New Vision Settlement contains only two exceptions to the parties' general release: (i) "the parties' rights and obligations under the Lease and the First Amendment," and (ii) the "claims, if any, that any Party may have against Pax or its principals." Bk I Dkt. 226-1 at 6 (§ 10(a)). Only the first exception is relevant here. Pursuant to that exception, Smart Capital's predecessor did not waive Smart Capital's rights to assert Lease defaults that allegedly occurred after entry of the 2014 Settlement Order. Accordingly, Smart Capital is barred from asserting any defaults under the Lease that may have existed at the time the 2014 Settlement Order was entered.

## VI. CONCLUSION

As set forth above, the Debtor has met its burden of showing that there is no genuine issue of material fact that Smart Capital is precluded from asserting or seeking discovery on alleged defaults existing under the Lease prior to entry of the 2020 Assumption Order.[16] Smart Capital is not precluded from asserting defaults under the Lease occurring after entry of the 2020 Assumption Order. Accordingly, the Court will enter a separate order granting the MPSJ.

Date: December 8, 2025

Martin R Barash
United States Bankruptcy Judge

[16] This necessarily includes any alleged defaults existing at the time the 2014 Assumption Order and the 2014 Settlement Order were entered.

# EXHIBIT E

Pearman v. West Point National Bank, 887 S.W.2d 366 (Ky. Ct. App. 1994)

is authorized to levy a tax to fund the library under KRS 173.310(4).

[3] Appellants' second argument is that the tax for Bracken County Library District constitutes impermissible double taxation for those who live in Augusta. While the Augusta City Library is indirectly funded through city taxes, we nevertheless do not see that this results in impermissible double taxation. The citizens of Augusta are not being taxed twice for the same service. Rather, they are being taxed for a common service being provided by two different public entities. This is no different than being taxed for a city and county fire department, police department, etc.

For the reasons stated above, the judgment of the Bracken Circuit Court is affirmed.

All concur.

**Harold Dean PEARMAN, Appellant,**

**v.**

**WEST POINT NATIONAL BANK, Appellee.**

**No. 93–CA–1193–MR.**

Court of Appeals of Kentucky.

Nov. 11, 1994.

Foreclosing mortgagee sought deficiency judgment. The Circuit Court, Hardin County, Hugh Roark, J., held for mortgagee, and mortgagor appealed. The Court of Appeals, Miller, J., held that, where mortgagee contracted with third parties to sell mortgaged property during foreclosure action and, in fact, ultimately sold same for amount which would have fully satisfied debt owed by mortgagor, mortgagee could not recover deficiency judgment.

Reversed.

**1. Mortgages ⇐534**

Generally, mortgagee who purchases at his own judicial sale takes title free from any equity by one liable on secured debt, except when qualifying facts and circumstances exist.

**2. Mortgages ⇐559(3)**

Where mortgagee contracted with third parties to sell mortgaged property during foreclosure action and, in fact, ultimately sold same for amount which would have fully satisfied debt owed by mortgagor, mortgagee could not recover deficiency judgment, even though it had purchased property at foreclosure sale for less than amount due; mortgagee's conduct, while mortgagor-mortgagee relationship was yet in full force and effect, breached implied covenant of good faith and fair dealing in mortgage contract.

**3. Mortgages ⇐561.2**

Foreclosure judgment was not res judicata barring subsequent challenge to mortgagee's claim for deficiency judgment.

---

Douglas E. Miller, Radcliff, for appellant.

Edward K. Black, Louisville, for appellee.

Before EMBERTON, JOHNSTONE and MILLER, JJ.

MILLER, Judge:

Harold Dean Pearman brings this appeal from a judgment and order of sale of real property dated March 9, 1993. We reverse.

The facts are clear. On February 25, 1992, West Point National Bank (the bank) brought the instant action against Pearman to enforce a judgment lien on real property. Ky.Rev.Stat. (KRS) 426.720. The lien resulted from a deficiency judgment in a foreclosure proceeding (Civil Action No. 91–CI–305) upon unrelated real property in the Hardin Circuit Court.

In the instant action, Pearman attacks the validity of the deficiency judgment. In this regard, it becomes necessary to examine the circumstances surrounding the foreclosure. In that action, a judgment and order of sale was entered on May 14, 1991. It concerned real property owned by Pearman located on North Wilson Road in Radcliff, Hardin County, Kentucky. The judgment was for $44,271.03, plus accrued interest. The property was appraised at a fair market value of $45,000.00. KRS 426.520. The realty was sold "at the courthouse door" by the master commissioner on July 12, 1991, with the bank being the sole bidder and purchaser at $31,000.00—approximately two-thirds of the appraised value. The obvious purpose in bidding that amount was to avoid the equity of redemption provided in KRS 426.530. The master commissioner's report of sale was filed on the same day (July 12) with the clerk serving notice on July 15, 1991. Ky.R.Civ.P. (CR) 53.06. No exceptions were taken. The order and judgment confirming the sale and directing the master commissioner's deed was entered July 30, 1991. Therein, a deficiency was granted against Pearman in a sum exceeding $16,000.00. KRS 426.005. On the day before the deficiency judgment was entered (July 29), the bank contracted for sale of the property with certain third parties (Steve and Kevan Chung) for the appraisal of $45,000.00,[1] a sum in excess of Pearman's total indebtedness. After receiving the deed from the master commissioner, the bank conveyed the property to the Chungs.[2]

In defense of the present action, Pearman argues that his obligation to the bank was extinguished by the bank's action in purchasing and reselling the property, thus there is no deficiency and the judgment should not be allowed to stand. The circuit court commented that "[t]he bid at 2/3rds value will not pay off the indebtedness leaving a 'deficiency.' However, the Bank now owns the property which it can resell for its true market value (which will be at least the amount they originally loaned on it or more as banks seldom will loan 100% of its value). And that is what happened in this case. Even before the Court had confirmed the sale, the Bank had resold it for its true market value. (An appraised value of $45,000.00). In reality, there was no 'deficiency.'" The circuit court further noted that it has not been faced with a case where "a lending institution has sought to collect a 'deficiency judgment' wherein it was able to resell the property for the amount of the indebtedness." Nevertheless, on March 9, 1993, the circuit court upheld the deficiency judgment and entered the judgment and order of sale from which this appeal is taken.

Pearman contends that the circuit court committed reversible error by recognizing the validity of the deficiency judgment. We agree.

The circuit court relied upon *Kentucky Joint Stock Land Bank v. Farmers Exchange Bank*, 274 Ky. 525, 119 S.W.2d 873, 877 (1938), wherein the status of a mortgagee who purchased the collateral at a foreclosure sale was addressed. The Court stated:

> There might be ***qualifying facts and circumstances*** whereby one who may be liable for the originally secured debt might still have some remaining equity in the mortgaged property, even after sale; but whether so or not, there are certainly no such qualifying facts appearing in this record, even by the remotest intimation. On the contrary, the record presents only the usual case where a court ordered the sale of mortgaged property, and which order was executed by the court's commissioner in the usual and ordinary manner as prescribed by the law. The owner of the debt, secured by the lien ordered to be enforced, became the purchaser at an advanced price of more than fifty per cent above the appraised value of the property. The bidder later received a deed pursuant to the order of the court, and credited the indebtedness by the net amount of its bid. Under all the law that has been cited to us, and under all that we have been able to find—as well as in accordance with logic,

1. Steve and Kevan Chung paid $10,000.00 in cash, and the bank financed the balance.

2. The master commissioner's deed to the bank bore the date of July 30, 1991, and showed a recordation date of August 14, 1991.

justice and common sense—the sold security became exhausted upon its sale, in the circumstances and conditions outlined, and the vendee of the court's commissioner ... obtained an unencumbered title, and which consequence follows whether the purchaser is the holder of the secured debt—and consequently the plaintiff in the proceedings wherein the mortgaged property was sold—or whether he be a stranger to the debt.

... In each case the purchaser—without some agreement or ***conduct on his part creating a different result***—obtains the title to the judicially sold property free from the lien created by the enforced mortgage, notwithstanding the net proceeds of the sale were insufficient to extinguish the mortgage debt. (Emphases added.)

**[1, 2]** We do not perceive, as did the trial court, that this holding is fatal to Pearman's position. We construe *Kentucky Joint Stock* as holding that generally a mortgagee who purchases at his own judicial sale takes title free from any equity by one liable on the secured debt, except when "qualifying facts and circumstances" exist. *Id.* We believe there exists qualifying facts and circumstances in the instant action, such being that the bank contracted with third parties (the Chungs) to sell the mortgaged property ***during the foreclosure action*** and, in fact, ultimately sold same for an amount which would have wholly satisfied the debt owed by Pearman. More succinctly, we view the qualifying and distinguishing feature of this action as being that the bank contracted to sell the mortgaged property while the mortgagor-mortgagee relationship was yet in full force and effect. Such becomes a pivotal and consequential fact owing to the implied covenant of good faith and fair dealing in the mortgage contract.

In *Ranier v. Mount Sterling Nat'l Bank*, Ky., 812 S.W.2d 154, 156 (1991), the Court observed that "[i]n every contract, there is an implied covenant of good faith and fair dealing." We are bound to conclude that the mortgage contract in question contains such a covenant and that neither the loan delinquency nor the foreclosure process impaired its validity. *Cf.* Annot., 55 A.L.R.4th 1026 (1987). We believe the covenant imposed upon the bank the duty to act in a bona fide [3] manner throughout the foreclosure proceedings. It may reasonably be assumed that for an appreciable time before the contract of sale was entered into, the bank was aware of the Chungs' interest in Pearman's property and of their willingness to purchase it for $45,000.00. In any event, its failure to adopt a course that would have liquidated its customer's debt in the entirety and choosing instead to seize an advantageous business opportunity was a breach of its good faith obligation. Under these circumstances, we believe the bank should not be allowed to profit. We conclude that the bank's breach of its duty of good faith and fair dealing resulted in effacement of the deficiency.

[3] The bank contends that Pearman's attack on the deficiency judgment is foreclosed in that an appeal should have been taken from the original foreclosure judgment (Civil Action No. 91–CI–305). CR 73.02. However, this issue was not raised at trial level and, therefore, was not properly preserved for appellate review. *See Regional Jail Auth. v. Tackett,* Ky., 770 S.W.2d 225 (1989). Nevertheless, we do not consider this proceeding a re-adjudication of the original foreclosure action. In this instance, the doctrine of *res judicata* has no application. We view this proceeding as a collateral attack upon the foreclosure judgment which has been "discharged," "satisfied," or for "equitable grounds" should not be allowed to stand. CR 62.02 and 62.03.

For the foregoing reasons, the Judgment and Order of the Hardin Circuit Court is reversed.

All concur.

3. *Black's Law Dictionary* 177 (6th ed. 1990) defines "bona fide" as being "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud.... Truly; actually; without simulation or pretense. Innocently; in the attitude of trust and confidence; without notice of fraud, etc. Real, actual, genuine, and not feigned." (Citations omitted.)

# EXHIBIT F

Harvest Homebuilders LLC v. Commonwealth Bank & Trust Co., 310 S.W.3d 218 (Ky. Ct. App. 2010)

Chief Justice

**HARVEST HOMEBUILDERS LLC and Barbara A. Jeter, Appellants,**

**v.**

**COMMONWEALTH BANK AND TRUST COMPANY, Appellee.**

**No. 2008–CA–001897–MR.**

Court of Appeals of Kentucky.

Jan. 29, 2010.

**Background:** Bank filed action against defaulting property owner for breach of promissory note. The Circuit Court, Oldham County, Karen A. Conrad, J., entered deficiency judgment for bank. Property owner appealed.

**Holding:** The Court of Appeals, Taylor, J., held that bank did not breach implied covenant of good faith and fair dealing, and thus bank was not precluded from pursuing deficiency judgment.

Affirmed.

**1. Mortgages ⚷211, 272, 559(3)**

Bank did not breach implied covenant of good faith and fair dealing, and thus bank was not precluded from pursuing deficiency judgment against property owner which defaulted on promissory note, in connection with any failure by bank to acquiesce to sale of property by owner prior to foreclosure, and any negotiations bank undertook regarding bank's sale of property to potential purchaser, where bank did not enter into contract with potential purchaser, and bank did not consent to sale of property by owner during foreclosure proceedings because owner insisted that such sale be conditioned on bank's release of owner from liability for any resulting deficiency.

**2. Contracts ⚷168**

The implied covenant of good faith and fair dealing imposes on the parties a duty to do everything necessary to carry out the contract.

---

Robert E. Salyer (argued), Frankfort, KY, for appellants.

David J. Kellerman (argued), Louisville, KY, for appellee.

Before COMBS, Chief Judge; TAYLOR, Judge; HENRY,[1] Senior Judge.

*OPINION*

TAYLOR, Judge.

Harvest Homebuilders LLC and Barbara A. Jeter bring this appeal from a September 10, 2008, judgment of the Oldham Circuit Court awarding Commonwealth Bank and Trust Co. (Commonwealth Bank) a deficiency judgment in the amount of $207,334.35. We affirm.

On June 24, 2005, Harvest Homebuilders executed and delivered a promissory note in the amount of $247,500 to obtain a loan from Commonwealth Bank. The loan was used to purchase real property located

1. Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes 21.580.

in Oldham County, Kentucky. To secure repayment of the note indebtedness, Harvest Homebuilders additionally granted a mortgage to Commonwealth Bank against said real property. Barbara Jeter and Charles Jeter, partners in Harvest Homebuilders, also executed personal guarantees to secure repayment of the loan debt to Commonwealth Bank.

In 2007, Harvest Homebuilders defaulted under the terms of the promissory note. Commonwealth Bank then filed an action against Barbara, Charles, and Harvest Homebuilders alleging breach of the promissory note, seeking enforcement of the personal guarantees, and further pursuing foreclosure of the mortgage encumbering the real property that secured the debt.

In an attempt to sell the real property prior to foreclosure, Barbara entered into an option agreement with Sterling Development Group. Therein, Sterling Development was given an option to purchase the mortgaged property for $235,000 and would exercise the option provided Sterling Development could get "R2 zoning and site plan approval." The option agreement contained no expiration date. Sterling Development did not exercise its option to purchase the real property. Barbara then attempted to sell the real property to two other prospective buyers, John Thunderburke and the Hallgarten Group, to no avail.

A judgment and order of sale was entered in December 2007. On February 5, 2008, the real estate was sold by the Commissioner to Commonwealth Bank for $67,000. The purchase price of $67,000 did not satisfy the outstanding judgment. Consequently, Commonwealth Bank filed a motion for deficiency judgment in the amount of $210,253.37 against Barbara and Harvest Homebuilders.[2] In response, Harvest Homebuilders and Barbara (collectively referred to as appellants) filed a motion for relief from judgment. Appellants argued that Commonwealth Bank breached its implied duty of good faith and fair dealing by not acquiescing to the sale of the real property prior to foreclosure and by failing to negotiate with Sterling Development to sell Sterling the real property. By judgment entered September 10, 2008, the circuit court awarded Commonwealth Bank $207,334.35 representing the deficiency owed on the original judgment and $817.50 in attorney's fees. This appeal follows.

Appellants contend that the circuit court erred by awarding Commonwealth Bank a deficiency judgment. Specifically, appellants assert that Commonwealth Bank breached the implied covenant of good faith and fair dealing, thus precluding it from pursuing a deficiency judgment. In support thereof, appellants point to Commonwealth Bank's refusal to consent to the sale of the subject real property to either Thunderburke or to the Hallgarten Group during the foreclosure proceedings. And, appellants point to Commonwealth Bank's apparent negotiations during the foreclosure proceedings to sell the real property to Sterling Development after appellants and Sterling had entered into the option agreement. Appellants argue that these facts clearly demonstrate that Commonwealth Bank breached the implied covenant of good faith and fair dealing. Under the authority of *Pearman v. West Point National Bank*, 887 S.W.2d 366 (Ky.App. 1994), appellants allege that Commonwealth Bank is barred from recovering a deficiency judgment as a result of its

2. It appears that Charles Jeter was never successfully served with summons and copy of the complaint. Commonwealth Bank and Trust Company elected to only pursue claims against Barbara Jeter and Harvest Homebuilders LLC.

breach of the implied covenant of good faith and fair dealing.

In *Pearman,* the Court of Appeals was faced with materially different facts. *Id.* Therein, West Point National Bank foreclosed upon real property owned by Pearman. The real property was sold at two-thirds of its appraised value ($31,000) to West Point National Bank at the foreclosure sale. A deficiency judgment was entered for $16,000 against Pearman. However, the day before entry of the deficiency judgment, West Point National Bank contracted to sell the real property to a third party for $45,000 and actually sold the property to the third party for said amount. The sale price of $45,000 was in excess of Pearman's total indebtedness owed to the Bank.

Under these "qualifying facts and circumstances," the Court of Appeals held that West Point National Bank breached the implied covenant of good faith and fair dealing, thus resulting "in effacement of the deficiency." *Id.* at 368. Pivotal to the Court's holding was the fact that "the bank contracted with third parties . . . to sell the mortgaged property ***during the foreclosure action*** and, in fact, ultimately sold same for an amount which would have wholly satisfied the debt owed by Pearman." *Id.* at 368.

These facts are clearly distinguishable from the facts in our case. In *Pearman,* the Bank contracted with third parties to sell the real property during the foreclosure action and actually sold the property for an amount in excess of Pearman's total indebtedness. *Id.* By contrast, Commonwealth Bank neither entered into a contract to sell the real property during the foreclosure proceedings nor actually sold the real property to a third party. We, thus, do not view *Pearman* as controlling, and we reject appellants' attempt to broaden the holding of *Pearman* to encompass these facts. *See id.*

**[1, 2]** As to appellants' general argument that Commonwealth Bank breached the covenant of good faith and fair dealing, we do not think the evidence supports same. The implied covenant of good faith and fair dealing simply "impose[s] on the parties . . . a duty to do everything necessary to carry" out the contract. *de Jong v. Leitchfield Deposit Bank,* 254 S.W.3d 817, 823 (Ky.App.2007)(quoting *Farmers Bank and Trust Co. v. Willmott Hardwoods, Inc.,* 171 S.W.3d 4, 11 (Ky.2005)). The record clearly demonstrates that Commonwealth Bank did not enter into a contract with Sterling Development to sell the real property. Any alleged attempt by Commonwealth Bank to do so is simply insufficient alone to constitute a breach of the covenant. Additionally, Commonwealth Bank asserts that it did not consent to selling the subject real property prior to foreclosure because Barbara insisted that the sale be conditioned upon the Bank's releasing Harvest Homebuilders and Barbara from liability for any resulting deficiency. In support thereof, we are cited to Volume I at page 123 of the circuit court record. There is found a written instrument signed by Barbara. It reads, in relevant part, as follows:

> I, Barbara Jeter, owner of Harvest Homebuilders, LLC release Alex Hallgarten to speak with W.S. Reisz, counsel for Barbara Jeter and David Kellerman, attorney for Commonwealth Bank and Trust, concerning the purchase of the property/mortgage of 6.7 acres located in Pewee Valley, KY owned by Harvest Homebuilders, LLC. It is agreed that Alex Hallgarten group may only purchase the property/mortgage if they obtain a written release of liability/full satisfaction of debt for Barbara Jeter, Charles Jeter, and Harvest Homebuild-

ers from Commonwealth Bank and Trust.

Thus, Barbara conditioned the sale of the real property upon "a written release of liability/full satisfaction" of the debt from Commonwealth Bank. As such, the record clearly establishes that Commonwealth Bank did not breach the implied covenant of good faith and fair dealing. We also believe the record sets forth sufficient facts upon which the circuit court could rule on appellants' motion for relief from judgment and that additional discovery was not warranted.

Upon the whole, we cannot say the circuit court erred by rendering a deficiency judgment in favor of Commonwealth Bank.

We view any remaining issues to be without merit.

For the foregoing reasons, the judgment of the Oldham Circuit Court is affirmed.

ALL CONCUR.

**Glenn BROWN, Appellant,**

**v.**

**LOUISVILLE JEFFERSON COUNTY REDEVELOPMENT AUTHORITY, INC. and Louisville/Jefferson County Metro Government, Appellees.**

**No. 2008–CA–001890–MR.**

Court of Appeals of Kentucky.

April 9, 2010.

**Background:** Former employee brought action against redevelopment authority and county and metro government for promissory estoppel, detrimental reliance, and fraud arising from an employment relationship between redevelopment authority and employee. The Circuit Court, Jefferson County, A.C. McKay Chauvin, J., entered summary judgment against employee, and he appealed.

**Holding:** The Court of Appeals, Lambert, J., held that genuine issues of material fact as to whether employee was promised employment for a definite term precluded summary judgment in employees promissory estoppel, detrimental reliance, and fraud action.

Affirmed in part, vacated in part, and remanded.

Keller, J., filed opinion concurring in part, and dissenting in part.

**Judgment ⚷181(21)**

Genuine issues of material fact as the whether former employee was promised employment for a definite term precluded summary judgment in his promissory estoppel, detrimental reliance, and fraud action against development authority and county metro governmental entity, even if employee failed to provide additional reciprocal consideration for such a promise.

---

Garry R. Adams, Louisville, KY, for appellant.

Grover C. Potts, Jr., Louisville, KY, for appellee.

Before ACREE, KELLER, and LAMBERT, Judges.

*OPINION*

LAMBERT, Judge.

Glenn Brown appeals from the entry of a summary judgment order in favor of

# EXHIBIT G

Kentucky Joint Stock Land Bank v. Farmers Exchange Bank, 274 Ky. 525,
119 S.W.2d 873 (1938)

that compensation for the interference with the entrance to the property resulting from the changing of the grade was included in the consideration paid for it. But whether so or not, we construe the present statute requiring the county to bear the cost of acquiring a right of way and damages incurred by reason thereof or as an incident of construction by the State Highway Commission of state roads as not embracing liability for such damages as is claimed in this case, under such conditions as is described. The thought of the Legislature expressed in the phrase "damages incurred" was undoubtedly damages incident to the acquisition of a right of way in the exercise of the power of eminent domain. Rights of action for compensation subsequent to the taking of property, as we have often stated, rest upon the same basis as if the proceeding had preceded the taking. Jefferson county, so far as the petition shows, was not called upon here to furnish a right of way.

We are of opinion, therefore, that the judgment should be, and it is, affirmed.

274 Ky. 525

**KENTUCKY JOINT STOCK LAND BANK OF LEXINGTON v. FARMERS EXCHANGE BANK OF MILLERSBURG et al.**

Court of Appeals of Kentucky.

June 24, 1938.

Rehearing Denied Oct. 14, 1938.

**1. Mortgages ⊜534**

The purchaser at sale of mortgaged property ordered by court in mortgage foreclosure action obtains an unincumbered title whether the purchaser is the mortgagee or a third person, since security becomes exhausted on the sale.

**2. Mortgages ⊜556**

On sale of mortgaged property by order of court in mortgage foreclosure action, all primary obligors for payment of the entire debt remain responsible for deficit where net proceeds of sale are insufficient to extinguish the mortgage debt.

**3. Mortgages ⊜556**

The sum for which mortgaged premises were sold at mortgage foreclosure sale must be taken as conclusive test of value of premises as between parties and amount of deficiency for which decree shall be entered is ascertained accordingly and not by market value at the time.

**4. Mortgages ⊜579**

The appeal of a mortgagee from a judgment dismissing petition seeking personal judgment against mortgagor's vendees who had assumed mortgage debt was not dismissible on ground that, after mortgagee's purchase of property at foreclosure sale, mortgage debt had become extinguished by mortgagee's sale of property for amount in excess of deficiency remaining after foreclosure sale. Civ.Code Prac. § 757.

**5. Corporations ⊜370(3), 374**

A corporation may lawfully exercise all express authority conferred on it by the laws of its creation plus all necessarily implied powers that may be required in the execution of the expressly conferred powers.

**6. Banks and banking ⊜86**

Under statutes existing prior to 1936 amendments relating to power of banks in investment of assets, a bank had the right to exercise reasonable business discretion and judgment in the collection of a note due it and forming a part of its assets. Ky.St. §§ 579, 582.

**7. Banks and banking ⊜86**

Under statutes existing prior to 1936 amendments relating to power of bank to invest assets, a bank was authorized to secure its paper by accepting mortgages on either personalty or realty and to privately purchase mortgaged property or purchase mortgaged property at decretal sale when necessary in order to enforce its lien. Ky. St. §§ 579, 582.

**8. Banks and banking ⊜86**

Under statutes existing prior to 1936 amendments relating to power of bank to invest assets, a bank as the owner of mortgage security in the exercise of good business judgment possessed implied authority and right to do any and all things necessary for the protection of its security and to realize the collection of debts due it to

the fullest possible extent. Ky.St. §§ 579, 582.

**9. Banks and banking ⇐96**

Under statutes existing prior to 1936 amendments relating to power of bank to invest assets, a bank had the implied right to assume payment of prior incumbrances as part of consideration for property on which it owned second mortgage and which it became advantageous for bank to purchase in order to protect its security. Ky.St. §§ 579, 582.

**10. Banks and banking ⇐96**

A bank which has the authority to acquire realty may as part of the transaction assume and agree to pay mortgage thereon.

**11. Banks and banking ⇐96**

In mortgagee's action to recover personal judgment on mortgage notes and to foreclose mortgage against mortgagor and vendees of mortgaged property who had assumed mortgage debt including banks which had owned second mortgages on property and had taken conveyance of property in consideration of release of mortgages and assumption of mortgage indebtedness prior to 1936 amendment of statutes relating to power of banks to invest assets, overruling demurrer of mortgagee to defense of ultra vires interposed by banks was error. Ky. St. §§ 579, 582.

**12. Banks and banking ⇐96**

In mortgagee's action to foreclose first mortgage and for personal judgment against vendees of mortgaged property who had assumed mortgage indebtedness, including two banks which owned second mortgages on property and which had taken conveyance of property in consideration of release of second mortgage and assumption of first mortgage indebtedness, wherein banks interposed plea of ultra vires, sustaining demurrer of banks to mortgagee's reply pleading estoppel to rely on defense of ultra vires was error. Ky.St. §§ 579, 582.

**13. Mortgages ⇐280(4)**

In assuming the payment of the mortgage debt, purchaser of the mortgaged property becomes primarily liable as a principal along with the mortgagor, so that the mortgagee, in the absence of a release, may enforce his claim against either or both and have a personal decree against them.

**14. Mortgages ⇐283(2)**

The failure of the mortgagee to enforce lien following first default of mortgagor by asserting right of precipitation did not release from liability for mortgage indebtedness vendees of property who had taken conveyance in consideration of assumption of mortgage indebtedness, on theory that vendees were sureties, who were released by failure of mortgagee to enforce lien.

**15. Mortgages ⇐559(3)**

In mortgage foreclosure action, wherein mortgagee sought personal judgment against vendees of mortgaged property who had assumed mortgage indebtedness, defense that mortgagee had agreed to accept from last owner of property before it was sold for mortgage debt a conveyance of the property in full satisfaction of debt, was not available to other vendees, since defense was demand for specific performance which was ineffective in absence of proper pleading showing that agreement was of nature and kind which would be specifically enforceable.

**16. Mortgages ⇐559(6)**

In mortgagee's action to foreclose first mortgage and for personal judgment against vendees of mortgaged property who had taken conveyance of property in consideration of assumption of mortgage indebtedness, defense predicated on contention that mortgagee had agreed to accept from owner of property at time of commencement of proceeding a conveyance of mortgaged property in full satisfaction of debt was unavailable to other vendees, where defense was denied in reply which was filed following the overruling of the mortgagees' demurrer to the defense in the answer, and a demurrer to the denial was sustained by the court.

**17. Novation ⇐1**

In mortgage foreclosure action wherein mortgagees sought personal judgment against vendees of mortgaged property who had assumed mortgage indebtedness, demurrer to defense interposed by two of vendees that, in consenting to assumption of debt by last vendee, there was created a novation of debt whereby answering vendees were discharged, was properly sustained.

**18. Banks and banking ⇐96**

In mortgage foreclosure action wherein mortgagees sought personal judgment against banks which had assumed mortgage indebtedness in consideration of conveyance of mortgaged property to them, sustaining demurrer to defenses asserted by banks in answer that failure of banks to re-

port assumption of mortgage indebtedness to state banking commissioner or to make record thereof on their books was contrary to public policy and void, was properly sustained. Ky.St. §§ 579, 582.

**19. Banks and banking ⚷67**

In mortgage foreclosure action, wherein mortgagee sought personal judgment against reorganized bank which had taken over assets of bank which had assumed mortgage indebtedness in consideration of conveyance of mortgaged property, sustaining demurrer to defense that assumption of indebtedness by predecessor of reorganized bank was not shown on its books at time of reorganization, and hence liability of predecessor for mortgage debt had not been assumed by reorganized bank, was not error. Ky.St. §§ 579, 582.

**20. Mortgages ⚷578**

On mortgagee's appeal from dismissal of petition in foreclosure action seeking personal judgment against vendees of mortgaged property by which mortgage debt had been assumed, rulings of trial court sustaining demurrers to defenses asserted in answer of vendees were not before reviewing court where no cross-appeal had been prosecuted by vendees from rulings of trial court.

Appeal from Circuit Court, Nicholas County.

Action to foreclose a mortgage and for personal judgment on the mortgage debt by the Kentucky Joint Stock Land Bank of Lexington, Ky., against the Farmers Exchange Bank of Millersburg, Ky., and the Deposit Bank of Carlisle, Ky., and others. From a judgment dismissing that portion of the petition seeking personal judgment against the named defendants, the plaintiff appeals, and the named defendants file a motion to dismiss the appeal.

Motion to dismiss denied and judgment reversed with directions.

Robert H. Hays, of Lexington, for appellant.

Geo. Batterton, of Paris, and I. B. Ross, of Carlisle, for appellees.

THOMAS, Justice.

On February 12, 1923, A. J. Ritchie and wife of Nicholas county, Kentucky, borrowed from the appellant and plaintiff below, Kentucky Joint Stock Land Bank of Lexington, Kentucky, the sum of $20,000, evidenced by notes of the borrowers extending over a period of years and payable semi-annually in stipulated amounts with interest from date. To secure them the makers gave a mortgage to plaintiff on about 340 acres of land in Nicholas county, Kentucky, which was immediately recorded in the county clerk's office of that county. Shortly thereafter, the mortgagors (Ritchies) borrowed from the appellee and a defendant below, Deposit Bank of Carlisle, the sum of $4,283.75, and also borrowed the further sum of $3,309 from the Farmers Bank of Millersburg, Kentucky, for each of which amounts they executed their notes to the respective lenders and gave them as security therefor a second mortgage on the same tract of land. The borrowers met their installments of principal and interest as they became due to plaintiff, but it does not appear whether they did so as to the two banks which were the owners of a second lien upon the mortgaged property. However, on March 3, 1926, the Ritchies conveyed the land outright to the two banks, holding the second mortgage "In consideration of the parties of the second part (the vendees) assuming to pay and paying the mortgage indebtedness of the first party (the Ritchies) owing to the Kentucky Joint Stock Land Bank of Lexington, Kentucky, evidenced by a mortgage upon the land hereinafter described, and the further consideration of the cancellation of the balance of the mortgage indebtedness due from the first party to the parties of the second part."

Not quite two years thereafter (December 3, 1927) the Farmers Bank of Millersburg, Kentucky, conveyed its one-half undivided interest in the land to one McIntyre and on April 11, 1929, he and his joint owner, the Deposit Bank of Carlisle, conveyed the land to E. A. Campbell, who held the title at the time of the filing of this equity action in the Nicholas circuit court on March 21, 1934, by plaintiff against the Ritchies and all of the subsequent vendees who had assumed the payment of plaintiff's indebtedness, including the two banks. In that action plaintiff sought to recover a personal judgment against the makers of the notes held by it —as well as against all subsequent vendees who had assumed payment of its indebtedness—and to foreclose its lien upon the mortgaged land. None of the defendants resisted the prayer of plaintiff's petition,

except the Deposit Bank of Carlisle and its co-defendant (and co-appellee) Farmers Exchange Bank of Millersburg—the latter being a reorganization of the Farmers Bank of Millersburg, which was one of the intermediate vendees of the mortgage property as well as assumers of the payment of plaintiff's debt—the reorganized bank having taken over all of the assets of its predecessor the Farmers Bank of Millersburg and assumed all of its obligations.

The two appellees in their separate answers interposed—in common—five separate defenses to the recovery of a personal judgment by plaintiff for the balance of its indebtedness against them, and which, with interest, amounted to nearly as much as plaintiff's original debt. Those defenses were: (1) That the assumption of plaintiff's debt by the two banks at the time the land was conveyed to them jointly was an ultra vires act on their part and, therefore, unenforceable against them; (2) that default was made by the Ritchies in the payment of their note maturing March 1, 1933, and plaintiff failed to exercise its right to precipitate the payment of all of the indebtedness due it and neglected to then file its action to collect its debt and enforce its lien against the land and the crop grown by the borrowers on the farm for that year, and that by such failure it released all subsequent vendees who assumed the payment of its debt, since—as it was also contended—such vendee-assumer occupied toward plaintiff only the relationship of surety for the debt secured by its lien; (3) that in consenting to the assumption of its debt by the last vendee, E. A. Campbell, there was created a novation of plaintiff's debt whereby the answering banks were discharged; (4) that appellant had agreed with Campbell, after he became the owner of the land, to accept a conveyance of it from him in full satisfaction of its lien, but that it refused to carry out that agreement and by such refusal it released the answering defendants from all obligation to it; (5) that the two banks who assumed plaintiff's debt after they purchased the land in lien failed to report to the state banking commissioner the obligation they so assumed and failed to make a record of such assumption on their books and which "was contrary to public policy and void". The Farmers Exchange Bank interposed an additional, or (6), defense to the effect that upon the reorganization of the Farmers Bank of Millersburg, its predecessor, the liability of that bank—created by its assumption of plaintiff's debt—was not shown on its books, and that when it agreed to assume all liabilities of its predecessor it intended thereby to assume only the obligations shown on the books of its predecessor, and that the obligation here sought to be imposed upon it—not appearing upon its predecessor's books—was not assumed by it.

Plaintiff filed demurrers to each separate defense and to the answers as a whole. The court sustained plaintiff's demurrers to defenses (3), (5) and (6), but it overruled them as to defenses (1), (2) and (4), with objections and exceptions by plaintiff. Replies to the paragraphs left in the answers, after the court had acted on plaintiff's demurrers thereto, were filed, in which it denied the material facts of the remaining paragraphs in the answers and affirmatively pleaded, in extenso, the facts with reference to the assumption by the appellees of its indebtedness, including a plea of estoppel by them to rely on the ultra vires defense. Demurrers by the answering defendants to plaintiff's reply, or replies, were sustained by the court, and that portion of the petition seeking personal judgment against appellees was dismissed, to reverse which plaintiff prosecutes this appeal.

Early in the action—and considerably before the judgment appealed from was rendered—personal judgments were taken against all of the defendants who had not filed answers, and an order for the sale of the land was made without exception by anyone. It was executed by the Master Commissioner of the court and the land was appraised at $8,475. At the sale plaintiff became the purchaser for the amount of $13,071.19, an advance over the appraisement of $13.50 per acre. The sale was duly reported, and no exceptions were filed thereto and it was later confirmed—followed by a conveyance to plaintiff by the Master Commissioner. Such was the status of affairs at the time of the rendering of the judgment appealed from. Following its rendition, and after the appeal was prosecuted, plaintiff (appellant) sold the land—having held the title to it for something like two years—to one Lewis M. Crosley for a total consideration in excess over its bid sufficient to extinguish the deficiency judgment that it sought to recover against appellee; but, whether it will ever collect that consideration from its vendee, Crosley, is problematical, since its payment is spread over a long period of years, and

whether his installment promises will be promptly or at all met is uncertain. But, whether they will or will not be met by him, appellees, since this appeal was taken, have filed in this court their pleading—setting up the fact of the sale to him—pursuant to section 757 of our Civil Code of Practice—and entered motion to dismiss the appeal, upon the ground that the profit realized by plaintiff in its sale to Crosley satisfied the unpaid balance of its debt after crediting the net proceeds of its bid thereon, and which wiped out the deficiency that it now seeks to recover from appellees. That motion was passed to the merits of the case and is the first question for determination.

[1-3] The contention made by appellees in their motion to dismiss the appeal is indeed a novel one. It readily will be conceded that if the parties to the appeal had—following the rendition of the judgment appealed from—settled and compromised the controverted matters forming the subject matter of the litigation, then the procedure authorized by the section of the Code referred to would be available to the party litigant entitled to it; but no intimation, much less contention, is here made that any such settlement has ever been agreed to so as to authorize the invoking of the remedy furnished by that section. In support of the motion learned counsel for appellees with much vigor and apparent sincerity argue that the mortgage property constitutes the primary fund for the payment of the debt thereby secured. From that premise they insist that it remains in lien for the debt it secured until the title to it becomes vested in a stranger to the debt, although the security may have been exhausted by a sale under foreclosure, or enforcement proceeding of the lien, resulting in a sale of the property, which sale was confirmed and followed by a deed to the purchaser in all cases when the purchaser was the owner of the original lien secured debt. But the argument is non-convincing—especially so under the unqualified facts of this case. There might be qualifying facts and circumstances whereby one who may be liable for the originally secured debt might still have some remaining equity in the mortgaged property, even after sale; but whether so or not, there are certainly no such qualifying facts appearing in this record, even by the remotest intimation. On the contrary, the record presents only the usual case where a court ordered the sale of mortgaged property, and which order was executed by the court's commissioner in the usual and ordinary manner as prescribed by the law. The owner of the debt, secured by the lien ordered to be enforced, became the purchaser at an advance price of more than fifty per cent above the appraised value of the property. The bidder later received a deed pursuant to the order of the court, and credited the indebtedness by the net amount of its bid. Under all the law that has been cited to us, and under all that we have been able to find—as well as in accordance with logic, justice and common sense—the sold security became exhausted upon its sale, in the circumstances and conditions outlined, and the vendee of the court's commissioner (appellant) obtained an unencumbered title, and which consequence follows whether the purchaser is the holder of the secured debt—and consequently the plaintiff in the proceedings wherein the mortgaged property was sold—or whether he be a stranger to the debt.

It is conceded by counsel for appellees that if a stranger had bought the property under the same circumstances the obligors on the original debt secured by the mortgage on the property would be personally liable for any deficiency amount that the net proceeds of the sale of the mortgaged property failed to pay, and it requires a mind of more discriminating ability than we are able to command to detect any difference between a purchase by the plaintiff in the enforcement proceedings and one made by a stranger to such proceedings. In each case the purchaser—without some agreement or conduct on his part creating a different result—obtains the title to the judicially sold property free from the lien created by the enforced mortgage, notwithstanding the net proceeds of the sale were insufficient to extinguish the mortgage debt. Likewise, in each case all primary obligors for the payment of the entire debt are still responsible for such deficit. See Jones on Mortgages, 8th edition, section 2206, wherein this fundamental statement of the law is found: "The sum for which the mortgaged premises were sold must, so long as the sale stands, be taken, as between the parties to the suit, as a conclusive test of their value; and the amount of the deficiency for which a decree shall be entered is ascertained accordingly and not by taking the market value at the time,

in case this happens to exceed the amount obtained at the sale."

The learned author supports the text by many cases from the highest courts of various states—all of which are in accord therewith, with no dissent therefrom.

[4] Appellees' counsel, however, cite the case of Union Joint Stock Land Bank v. Knox County et al., 20 Tenn.App. 273, 97 S.W.2d 842, an opinion by the Court of Appeals of Tennessee, as holding to the contrary. But the limits, appropriate for an opinion like this, forbid our pointing out the clearly distinguishing facts of that case from those appearing in this one. When so compared that (Tennessee) opinion furnishes no material or controlling support whatever for the unqualified application of the principle contended for. Without consuming further time or space we unhesitatingly conclude that the motion to dismiss the appeal should be and it is overruled, and which brings us to a consideration of defenses (1), (2) and (4) supra, which the trial court sustained and dismissed plaintiff's petition. They will be considered in the order named.

1. At the date when the obligation assuming the payment of plaintiff's debt was entered into by the two state banks, sections 579 and 582 of the 1930 edition of Carroll's Kentucky Statutes were in force. They have since been amended, increasing the powers of state banks in investing their assets and which was done by the legislature at its regular 1934 session, which enlarged expressed powers appear in the same two sections as contained in Baldwin's 1936 Revision of Carroll's Kentucky Statutes. Section 579, before such amendments, authorized domestically incorporated banks "to exercise, subject to law, such powers as may be necessary to carry on the business of banking by discounting and negotiating notes, drafts, bills of exchange, and other evidences of debt, and purchasing bonds, receiving deposits, and allowing interest thereon, buying and selling exchange, coin and bullion, and lending money on personal or real security, as provided in this article". Other express powers are enumerated in that section, but which are not immediately pertinent to the question involved.

Section 582, before being so amended, expressly forbid the employment of the assets of a locally incorporated bank "in any enterprise or business, except as provided in § 579", but it expressly provided that such banks "may acquire title to and hold such real estate as may be necessary for the transaction of its legitimate business, and for a period not longer than ten years such other real estate as shall be conveyed to it in satisfaction of debts previously contracted in the course of its business, or that it may purchase under a judgment in its favor."

[5-9] It is conceded by learned counsel for appellees that a corporation may lawfully exercise all express authority conferred upon it by the laws of its creation, plus all such necessarily implied powers that may be required in the execution of the expressly conferred ones. That proposition is not only conceded by learned counsel, but is universally adopted and approved by all courts and text writers. Necessarily, therefore, a bank undoubtedly has the right to exercise reasonable business discretion and judgment in the collection of a note due it and forming a part of its assets. It may likewise—as is expressly conferred by the statutes supra—invest its cash in any of the properties mentioned therein. It is plainly authorized therein to secure its paper by accepting mortgages on, either personal property or real estate, and it may privately purchase any such mortgaged property, or at decretal sale when it becomes necessary to sell it in order to enforce its lien. Undoubtedly the bank, as the owners of such security—and in the exercise of good business judgment—would possess the implied authority and right to do any and all things necessary for the protection of its security, and to realize the collection of debts due it to the fullest extent possible. Good business judgment frequently dictates, in such circumstances, that the owner of the collateral security should purchase the property in lien for his debt in order to vest him with full and complete management of it, and to agree to pay and assume the demanded consideration in order to occupy the advantageous position of absolute owner and controller of the property. If such demanded consideration—or a part of it—should consist in assuming the payment of a prior and superior encumbrance, it would seem to logically follow that the bank would possess the implied right to assume the payment of such prior encumbrance.

[10] But we are not alone dependent upon our interpretation of the two sections supra of our statutes in order to arrive at a correct conclusion of the legal issue

involved in defense (1) now under consideration. On page 177 of 91 A.L.R. is the beginning of an annotation upon the subject of "Assumption of mortgage or lien by bank or other corporation as ultra vires". On page 182 of that volume is the beginning of subdivision III of that annotation, which subdivision is directed exclusively to "Power to acquire land as including power to assume mortgage thereon". The beginning of the discussion in that subdivision (III) is devoted to what would necessarily appear to be the logical conclusion, as we have hereinbefore intimated, to the effect that (as therein expressed) "In accordance with this natural and reasonable conclusion, the weight of authority is clearly in favor of the view that, where it is within the power of a bank or other corporation to acquire certain real estate, it may, as a part of the transaction, assume and agree to pay a mortgage thereon". The annotator then cites in support of such implied power (being the same herein disputed by appellees) the cases of Woods Investment Co. v. Palmer, 8 Colo.App. 132, 45 P. 237; Mapes v. Scott, 88 Ill. 352; Sherry v. Denn, 8 Blackf., Ind., 542; Nippolt v. Farmers' & M. State Bank, 186 Minn. 325, 243 N.W. 136; Lincoln Joint Stock Land Bank v. Bexten, 125 Neb. 310, 250 N.W. 84; Texas Court in Panhandle Nat. Bank v. Emery, 78 Tex. 498, 15 S.W. 23; Desdemona State Bank & Trust Co. v. Streety, Tex.Civ.App., 250 S.W. 286; National Equitable Soc. v. Alexander, Tex.Civ.App., 220 S.W. 184; Kosse Nat. Bank v. Derden, Tex.Civ.App., 36 S.W.2d 295; Williams v. Merchants' Nat. Bank, D.C., 42 F.2d 243; and Zantzinger v. Gunton, 19 Wall. 32, 22 L.Ed. 96.

It would be most elucidating to take excerpts—not only from the annotation referred to—but also from the cases cited by the annotator. That course, however, would lengthen the opinion beyond due bounds, and we will content ourselves with inserting only a few, beginning with the Colorado case of Woods Investment Co. v. Palmer, wherein it is said (45 P. page 238): "The general power to purchase real estate necessarily includes the power to purchase incumbered real estate, and the power to purchase incumbered real estate as necessarily includes the power to assume the incumbrance."

Attention might also be called to the fact, hereinbefore referred to and admitted by appellees' counsel, that the two state banks possessed express power and authority to have purchased outright the debt sued on by plaintiff, and to have paid therefor cash, or, possibly, its duly executed paper. If they had done so, they would then hold both the first and second liens upon the property, and the question of their superiority would have thereby become merged so far as they were concerned. If that had been done, it is conceded that they could have taken a deed from the mortgagor, conveying to them the absolute title to the mortgaged property, in consideration of the surrender and cancellation of all of the indebtedness secured by the mortgages. Instead of pursuing that course—which it is conceded might have been done under express authority—they pursued the one herein outlined, and which put them in the exact position that would have been occupied had they pursued the indicated course, for which it is admitted they possessed full power and authority.

The annotation referred to follows the opinion of the Florida Supreme Court in the case of Missouri State Life Insurance Company v. Lakeland Star-Telegram Co., reported on page 173 of 91 A.L.R., and in 111 Fla. 416, 149 So. 597, which sustains appellees' ultra vires defense; but two members of the court (consisting of a total membership of five) dissented therefrom, and the learned annotator in courteous terms strenuously criticizes the majority opinion—saying among other things that it "represents the only real authority in favor of the view that a bank having the power to purchase real estate has no power to assume an encumbrance thereon". The arguments put forth in the majority opinion are then taken up and clearly shown to be fallacious and wholly unsupportable. Finally, it is said with reference to the majority opinion of that court that it "is opposed to both the weight of authority and the better line of reasoning. It is irreconcilable with other cases on the subject, and the reasons invoked by the court in support of the decision are neither convincing nor satisfactory."

[11, 12] It results that the court erred in overruling the demurrer of appellant to the ultra vires defense. It also erred, as we conclude, in sustaining the demurrer of appellees to the paragraph of appellant's reply pleading an estoppel to rely on that defense, as is clearly pointed out in the same annotation supra, beginning on page 187 of the volume in which

it appears. Compare also on this point the cases of Liberty Coal Mining Co. v. Frankel Coal Co., 206 Ky. 647, 268 S.W. 280, and Wilson, Banking Commissioner, v. Louisville Trust Company, 242 Ky. 432, 46 S.W.2d 767. But, the question of estoppel becomes immaterial when the defense to which it is pleaded is not available.

[13] 2. Defense (2), which was upheld by the trial court, is bottomed upon the theory that appellees, by assuming to pay appellant's debt in the deed conveying the mortgaged land to them, thereby became only secondarily liable to appellant as mortgagee of the land they purchased, and were thereby clothed with the rights and obligations of sureties only. From that premise, it is strenuously argued that the failure of appellant to proceed to enforce its lien, following the first default, by asserting its right of precipitation, caused it to lose its lien on the crops that was grown on the mortgaged premises during the year 1933, and which, counsel argue, had the effect to release their clients who, as they insist, were appellant's sureties only. If their conclusion as to the suretyship relation of their clients should be admitted (but which is not, as will hereinafter appear), it would then at least be a mooted question as to whether their exoneration from liability would be entire, or only pro tanto to the extent of the lost security of which they complain. But, however that may be, counsel's entire theory is incorrect, since this court with others, as well as leading text writers, declare the rule to be that "in assuming the payment of the debt, the purchaser of the land becomes primarily liable and a principal along with the mortgagor, so that the mortgagee, in the absence of a release, may choose to enforce his claim against either or both and have a personal decree against them". The excerpt is taken from the case of White v. Upton, 255 Ky. 562, 74 S.W.2d 924, 926. Other cases are cited in that opinion to the same effect, and the text of Jones on Mortgages, section 940, page 310, unqualifiedly approves the excerpt from the White opinion as being the correct principle.

The chief case relied on in support of the contention that the relationship of appellees to the appellant as mortgagee of the property they purchased—and in which they agreed to assume mortgagee's debt—was only that of surety instead of principal, is Louisville Joint Stock Land Bank v. Ezell, 263 Ky. 367, 92 S.W.2d 349. That case expressly approves the general rule above stated,—that a vendee-assumer of the payment of a prior encumbrance on the property purchased becomes a principal obligor to the mortgagee as the holder of the security—but facts appeared in that case which we held were sufficient to not only change and alter such primary relationship to that of surety, but likewise sufficient to release Ezell entirely as such created surety. It is unnecessary for us to recite such facts, as the reading of the opinion will disclose them. It is only sufficient to say that they are absent from this record.

[14] But, independently of all of the foregoing, learned counsel for appellees cite us to no case so penalizing the owner of the debt if he should fail to exercise his right of precipitation upon the instant it accrues, and to thereby create the right of any one obligated for the debt to become in any manner released, if such right of precipitation is not promptly exercised. It follows that the court also erred in upholding this defense.

[15, 16] 4. Defense (4), as will be seen, is based upon the contention that appellant, before filing its foreclosure proceeding, agreed to accept from Campbell (the last owner of the land before it was sold under the decretal sale) a conveyance of the mortgaged property to it in full satisfaction of its debt. That defense, however, was denied in an appropriate paragraph of appellant's reply following the overruling of its demurrer to this defense made in appellees' answers, but the court sustained a demurrer to that denial. However, the defense as pleaded in the answer was wholly defective, even if it could be made an available one in any event. In effect, it was and is in its essence a demand for specific performance, and for it to have any effect whatever in any state of case, it should be made to appear by proper pleading that the agreement relied on was of the nature and kind that the court would specifically enforce in an action for that purpose. In the circumstances, the attempt to rely on this defense was wholly ineffectual, even if defendant had not denied it in its reply to which, as we have seen, the court sustained appellees' demurrers.

[17-20] The other defenses to which the court sustained appellant's demurrer

(Nos. 3, 5 and 6) will not be discussed by us further than to say generally that we think the court was correct in so holding. But, if otherwise, then no cross-appeal has been prosecuted by appellees from the rulings of the trial court thereon, and which puts it beyond our authority to consider such rulings, even if some or all of them are meritorious, but which we conclude otherwise.

Wherefore, for the reasons stated, the judgment is reversed with directions to set it aside, and for further proceedings consistent with this opinion.

The whole court sitting.

274 Ky. 547

**DAVIS et al. v. MOTOR CAR FINANCE CO.**

Court of Appeals of Kentucky.

June 3, 1938.

Rehearing Denied Oct. 14, 1938.

**1. Courts ⇐223(6)**

**Where plaintiffs sought to recover $499.78 and defendant recovered $12.95 against plaintiffs, Court of Appeals had jurisdiction of appeal, since jurisdiction is determined by the amount in controversy.**

**2. Contracts ⇐265**

**Where rescission of a contract is sought, the plaintiff must restore the defendant to the position he occupied before the contract was made.**

**3. Contracts ⇐266(1)**

**In suit for rescission of contracts made to finance buying of automobile, repayment of amount paid to automobile dealer for plaintiffs by finance company was necessary before plaintiffs could recover against finance company.**

**4. Reformation of Instruments ⇐45(2)**

**Where no agreement was contained in a written contract with company financing purchase of automobile that finance company was to procure insurance on automobile and evidence did not support an oral agreement to that effect, refusal to reform agreement so as to make it finance company's duty to procure such insurance was not error.**



Appeal from Circuit Court, Jefferson County, Chancery Branch, Second Division.

Suit by Beaulah Davis and husband against Motor Car Finance Company to secure the rescission and cancellation of certain contracts made in the buying of an automobile and to recover sums paid under such contracts. From an adverse judgment, plaintiffs appeal.

Affirmed.

Raymond C. Arny, of Louisville, for appellants.

G. E. Wade and Thomas Mapother, Jr., both of Louisville, for appellee.

DRURY, Commissioner.

Beaulah Davis and her husband, Robert L. Davis, sought by this action in equity to secure the rescission and cancellation of certain contracts made with the defendants, Motor Car Finance Company and Sackett Motors, Inc., and to recover of them $499.78, which they had paid thereon. Their petition was dismissed and the Motor Car Finance Company recovered of the plaintiffs $12.95 and the plaintiffs have appealed.

Jurisdiction.

[1] The jurisdiction of this court is determined by the amount in controversy, and in this case that is the $499.78 which the plaintiffs sought to recover, plus the $12.95 that was recovered against the plaintiffs, or the sum of $512.73, hence this court has jurisdiction of this appeal.

The Facts.

On the 13th of June, 1935, the plaintiffs bought from Sackett Motors, Inc., an automobile for which the price was:

| | |
|---|---|
| List price of Ford #18-1795237 (Car #F-439) | $575.00 |
| Freight and delivery | 26.50 |
| Conditioning and handling | 13.50 |
| Extra tail light and horn | 11.07 |
| Accessories | 31.50 |
| Red wheels | 5.12 |
| White side wall tires | 12.12 |
| Sales tax | 20.40 |
| License | 4.10 |
| Manufacturer's tax | 18.47 |
| Total | $717.78 |